UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DANTÉ BARTOLOMEO, *et al.*, <br><br> Defendants. | Civil Action No. 3:22-cv-1373 |

PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS

In May 2022, the Connecticut General Assembly enacted legislation that radically curtails employer speech. Connecticut employers now face state-imposed penalties if they require employees to attend meetings or read written communications about "political issues," defined broadly to include a variety of topics including unionization. Conn. Gen. Stat. § 31-51q(a), (b)(2). Political speech is, of course, "at the heart of the First Amendment's protection." *First Nat'l Bank of Bellotti*, 435 U.S. 765, 776 (1978). And federal labor law has long protected employers' right to talk about unionization with their employees. *See* 29 U.S.C. § 158(c); *see also Chamber of Commerce v. Brown*, 554 U.S. 60, 67–68 (2008). In this suit, a coalition of trade associations—some of which are Connecticut employers and all of which represent Connecticut employer members—ask this Court to vindicate their federal rights and protect them and their members from the State's overreach.

ORAL ARGUMENT REQUESTED

The State Defendants have moved to dismiss, though not because they maintain that the law is constitutional. They argue only that this Court lacks subject-matter jurisdiction. The State Defendants' jurisdictional objections are unavailing. Plaintiffs have standing; the claims are ripe; and Defendants are subject to suit under both 42 U.S.C. § 1983 and *Ex parte Young*, 209 U.S. 123 (1908). This Court should deny the motion to dismiss as to the Commissioner of the Connecticut Department of Labor, Danté Bartolomeo, and the Attorney General of Connecticut, William Tong; grant the motion as to the Department of Labor; and let the parties file cross-motions for summary judgment on the merits. *See* Rule 26(f) Report of Parties' Planning Meeting 8, ECF No. 30.

## I.    BACKGROUND

Until last summer, Connecticut General Statute Section 31-51q was a relatively narrow law that protected employees' free-speech rights in the workplace. *See* Conn. Gen. Stat. § 31-51q (2021); *see also Cotto v. United Techs. Corp.*, 738 A.2d 623, 627 (Conn. 1999). Starting in 2018, the Assembly considered expanding Section 31-51q to add provisions that restrict employers' speech in the workplace. *See* House Bill 5473, *An Act Concerning Captive Audience Meetings* (Conn. 2018). Suspecting that the new provisions might run afoul of federal law, Senator Fasano asked the Attorney General for an opinion on their constitutionality. Attorney General Jepsen issued a formal opinion in which he explained that the proposed restrictions on employer speech would likely be preempted by the National Labor Relations Act ("NLRA"). *See* Conn. A.G. Opinion 2018-02, 2018 WL 2215260 (Apr. 26, 2018) (citing

*San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959); *Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp. Rels. Comm'n*, 427 U.S. 132, 140 (1976)). A year later, Attorney General Tong issued a contrary opinion, though he recognized that his conclusion was not "free from doubt." *See* Conn. A.G. Opinion 2019-03, 2019 WL 2246103 (May 17, 2019). In February 2022, the Assembly again proposed to expand Section 31-51q. *See* Senate Bill 163, Reg. Session (Conn. 2022). This time, it passed and became law. *See* Public Act No. 22-24.

As a result, Section 31-51q is effectively a brand-new statute, more far-reaching than its predecessor. It now makes it unlawful for any Connecticut employer to "subject or threaten to subject any employee to discipline or discharge" based on the employee's "refusal to attend an employer-sponsored meeting" or "listen to speech or view communications" when "the primary purpose" of the meeting or communications is "to communicate the employer's opinion concerning religious or political matters." Conn. Gen. Stat. § 31-51q(b)(2). Forbidden "political matters" are defined broadly to include any "matters relating to elections for political office, political parties, proposals to change legislation, proposals to change regulation and the decision to join or support any political party or political, civic, community, fraternal or labor organization." *Id.* § 31-51(a)(1).

Section 31-51q's prohibitions on employers' speech are enforceable in two ways. First, discharged or disciplined employees can sue for damages. *See id.* § 31-51q(b). Second, and of note for this case, the Commissioner of Labor and the Attorney General can seek penalties from employers who violate the law. *See id.* § 31-69a

(providing that the Commissioner of the Department of Labor can investigate violations of state labor laws, seek penalties or fines from employers who violate them, and charge employers for employees' unemployment benefits related to such violations; and providing that the Attorney General can bring a civil action in the Superior Court to recover penalties that employers owe to the Commissioner for violating state labor laws). In its official analysis of the law, the Assembly specifically noted that the new prohibitions on employers' speech will be enforced by "a $300 civil penalty imposed by the Department of Labor (CGS § 31-69a)." An Act Protecting Employee Freedom of Speech and Conscience, OLR Bill Analysis, at 3 (Conn. Apr. 22, 2022), https://www.cga.ct.gov/2022/BA/PDF/2022SB-00163-R01-BA.PDF.

Since its amendment last summer, Section 31-51q has been chilling the speech rights of Connecticut employers, who fear official enforcement and penalties if they hold meetings or send messages about the broadly-yet-vaguely-defined "political matters." The Plaintiffs in this action are trade associations—Chamber of Commerce of the United States of America ("the U.S. Chamber"), Associated Builders and Contractors ("ABC"), Associated Builders and Contractors of Connecticut ("CTABC"), Coalition for a Democratic Workplace ("CDW"), Connecticut Business & Industry Association ("CBIA"), Connecticut Retail Merchants Association ("CRMA"), National Association of Home Builders ("NAHB"), National Federation of Independent Business ("NFIB"), and National Retail Federation ("NRF")—whose members include Connecticut employers and some of whom are themselves Connecticut employers.

Plaintiffs bring this suit for equitable relief, asserting a cause of action under 42 U.S.C. § 1983 and the equitable cause of action recognized in *Ex parte Young*. They ask this Court to (1) declare that the 2022 amendments to Section 31-51q violate the First Amendment to the U.S. Constitution and are preempted by the NLRA and (2) enjoin the Commissioner of the Connecticut Department of Labor, Danté Bartolomeo, and the Attorney General of Connecticut, William Tong, from enforcing the 2022 amendments against Plaintiffs and their members.

## II.    LEGAL STANDARDS

When reviewing a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the Court must "construe plaintiffs' complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009) (quotation omitted).

*1. Standing*—Plaintiffs have standing if they have (1) an "injury in fact" that is (2) "fairly traceable to the challenged action of the defendant" and (3) "redressable by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up). This is not a heavy burden; "an identifiable trifle" is enough. *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 689 n.14 (1973) (quotation omitted). At the pleading stage of a case, allegations that "affirmatively and plausibly suggest that [a plaintiff] has standing to sue" are satisfactory, *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011) (per curiam), and "general factual allegations of injury resulting from the

defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (quotation omitted). In a case seeking only equitable relief, if even one plaintiff has standing, the entire group can proceed. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006).

*2. Ripeness*—The doctrine of constitutional ripeness "prevents a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008). Ripeness and standing are closely related; "[i]n most cases, that a plaintiff has Article III standing is enough to render its claims constitutionally ripe." *In re Methyl Tertiary Butyl (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013). Because federal law so strongly protects speech, standing and ripeness requirements are "relaxed" for plaintiffs alleging violations of their speech rights; a "real and imminent fear of … chilling" is enough to establish both. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).

*3. Sovereign Immunity*—Though States are "immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity," private parties may "seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 532 (2021). This is known as the *Ex parte Young* exception

to sovereign immunity, named for the case that recognized it. *See Ex parte Young*, 209 U.S. 123 (1908). To determine whether the *Ex parte Young* exception applies to a particular defendant, courts "conduct a 'straightforward inquiry' into whether the complaint (1) 'alleges an ongoing violation of federal law' and (2) 'seeks relief properly characterized as prospective.'" *Silva v. Farrish*, 47 F.4th 78, 84 (2d Cir. 2022) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). When the *Ex parte Young* exception applies, plaintiffs need not wait for state officials to enforce an unconstitutional state law against them; plaintiffs may obtain pre-enforcement declaratory and injunctive relief. *See Friends of the East Hampton Airport, Inc. v. Town of East Hampton*, 841 F.3d 133, 144 (2d Cir. 2016).

## III.   ARGUMENT

Beneath the surface of the State Defendants' arguments on standing, ripeness, and sovereign immunity lies essentially a single contention: that there is no imminent risk that the State Defendants will enforce Section 31-51q against Plaintiffs or their members. *See, e.g.*, MTD 16, 18, 21, 26. This contention stems from a misreading of the complaint and an erroneous understanding of the legal standards that apply to claims seeking pre-enforcement review of unconstitutional state laws. Read in the light most favorable to Plaintiffs, the complaint alleges cognizable injuries, a ripe dispute, and a right to sue the State officials who, undisputedly, have authority to enforce Section 31-51q. Accordingly, this Court should deny the State Defendants' motion to dismiss as to the Commissioner of the Connecticut Department of Labor and the Attorney General of Connecticut.

A.    Plaintiffs have standing to raise their First Amendment and preemption claims under Section 1983 and *Ex parte Young*.

The State Defendants first argue that Plaintiffs fail to identify any cognizable injury and thus lack organizational standing (to vindicate Plaintiffs' own rights) and associational standing (to vindicate members' rights). *See* MTD 10–21. These arguments lack merit. "[A] plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation omitted) (pre-enforcement First Amendment challenge). As explained below, Plaintiffs have sufficiently pleaded a chilling-effect injury, which sustains their organizational and associational standing.

1.    The chill Plaintiffs and their members face is a cognizable injury fairly traceable to the 2022 amendments.

Throughout their motion, the State Defendants make several overlapping arguments with one common theme: Plaintiffs and their members are not injured by the 2022 amendments to Section 31-51q. *Compare* MTD 16, 18 (alleging Plaintiffs' and their members' injuries are not sufficiently imminent), *with id.* at 21 (making a similar argument regarding ripeness), *and id.* at 26 (making a similar argument regarding sovereign immunity). Two fundamental misunderstandings taint the State Defendants' analyses of both organizational and associational standing.

First, the State Defendants argue that an employer's decision not to hold mandatory meetings with its own employees out of fear of liability under Section 31-51q is not a real injury because such a decision is based on an "abstract, subjective fear that [the employer's] rights are chilled." MTD 15 (quoting *Walsh*, 714 F.3d at 689); *see id.* at 16 ("CBIA alleges nothing more than an entirely subjective fear of future enforcement."). But when speech interests are at stake, "a real and imminent fear of such chilling is enough." *Walsh*, 714 F.3d at 689. "When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," "[t]he alleged danger of the statute is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." *Id.* (quoting *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000)). Self-censorship is what Plaintiffs allege here. *See, e.g.*, Compl. ¶¶ 3, 45. It is a sufficient injury in fact—particularly at the pleading stage. *Walsh*, 714 F.3d at 690; *see also Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.))).

Second, the State Defendants argue that employers' self-censorship is not fairly traceable to Section 31-51q because the law prohibits employers only "from firing or disciplining employees for refusing to attend" mandatory meetings and "does not prohibit the meetings … themselves." MTD 16; *see id.* at 19 ("[Section 31-51q] only prohibits discharge, discipline, or threats."); *id.* ("Section 31-51q only prohibits

discipline and the threat of discipline, period full stop."). This argument is pure semantics. In the employment context, a *mandatory* meeting is, by definition, a meeting that an employee cannot skip without facing discipline. Thus, Section 31-51q's proscription of disciplining employees who skip mandatory meetings is, by definition, a proscription of mandatory meetings.

How the statute's proscription of mandatory meetings affects employer speech goes to the merits of Plaintiffs' First Amendment and preemption claims, not to Plaintiffs' standing. For instance, Plaintiffs allege that the NLRA creates a federal right to hold mandatory meetings to talk about unionization—one of Section 31-51q's forbidden topics. Plaintiffs also allege that Section 31-51q discriminates based on content and viewpoint because the statute prohibits mandatory meetings where employers engage in political speech but does not prohibit mandatory meetings where employers engage in other speech. Whatever power Connecticut may have to regulate employer discipline cannot be deployed to discriminate against the content or viewpoint of employer speech. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 384 (1992) ("[T]he government may proscribe libel; but it may not make the further content discrimination of proscribing *only* libel critical of the government.").

### 2. Plaintiffs include Connecticut employers that have organizational standing to vindicate their own injuries.

"Organizations are entitled to sue on their own behalf." *N.Y. Civil Liberties Union v. N.Y. City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). "[T]he organization is just another person—albeit a legal person—seeking to vindicate a right." *Id.* As with

individual standing, the requirements of organizational standing are not onerous. The Second Circuit "ha[s] repeatedly held," for instance, "that only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (quotation omitted); *see also SCRAP*, 412 U.S. at 690 n.14 ("an identifiable trifle" is enough).

The State Defendants initially contend that "Plaintiffs do not appear to even attempt to establish organizational standing." MTD 10; *see id.* at 17 ("Plaintiffs do not assert organizational standing in their Complaint."). That contention is demonstrably false, for two reasons.

First, Plaintiffs explicitly and repeatedly invoke both "*their* federal constitutional and statutory rights, and the federal and constitutional rights *of their members*." Compl. ¶ 1 (emphases added); *see id.* ¶ 6 (asserting the "federal constitutional and statutory rights of Plaintiffs and their members"); *id.* ¶ 37 (alleging violation of rights "of Plaintiffs and their members"). Particularly when "constru[ing] plaintiffs' complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiffs' favor," all Plaintiffs have pleaded sufficient facts to assert organizational standing. *Selevan*, 584 F.3d at 88 (quotation omitted).

Second, the complaint details the organizational injuries of CBIA as an "example" of the harm Section 31-51q is causing to other Plaintiffs and to Plaintiffs' members. Compl. ¶ 20. "For example," Plaintiffs allege that "CBIA has held meetings

with … employees about political issues," which it "required all employees, including those who are not engaged in political advocacy, to attend." *Id.* The purpose of some of CBIA's mandatory employee "meetings and communications was to communicate CBIA's position and opinions on political matters, including elections for political office, proposals to change legislation, proposals to change regulations, and its support of, opposition to, or coalition-building activities with various political, civic, or community organizations." *Id.* Plaintiffs allege that "[d]uring several of these meetings, CBIA communicated its opposition to political positions taken by public-sector labor organizations." *Id.* Defendants' argument that CBIA does not "plausibly allege it has its own employees," MTD 18, is perplexing, given the allegations that CBIA "required all employees" to attend its "meetings … about political issues," Compl. ¶ 20. No reasonable reading of the complaint (and certainly not one that draws reasonable inferences in favor of Plaintiffs, *see Selevan*, 584 F.3d at 88) supports Defendants' conjecture that CBIA somehow required "other entities' employees" to attend its meetings. MTD 18.[1]

The complaint continues to detail the harm posed to CBIA directly. It explains that, since the 2022 amendment of Section 31-51q, CBIA has been deterred from holding similar mandatory meetings with its employees. CBIA has been chilled by

---

[1] The State Defendants suggest that CBIA's meetings with its employees might be exempt under Section 31-51q's exemption for meetings "necessary for such employees to perform their job duties." *See* MTD 18–19. That suggestion ignores CBIA's allegation that "CBIA has required *all employees, including those who are not engaged in political advocacy,* to attend these meetings." Compl. ¶ 21 (emphasis added).

the fear that "it and its member companies must either refrain from future meetings and communications concerning political issues or go forward with meetings and communications while exposing themselves to legal risk." Compl. ¶ 20. Plaintiffs' arguments flatly ignore these allegations.

The State Defendants would have the Court ignore Plaintiffs' invocation of their own rights because, supposedly, "nothing in the Complaint suggests that Plaintiffs are even subject to § 31-51q." MTD 10; *see id.* at 17 ("[T]hey do not allege that they are employers subject to enforcement under § 31-51q."). Again, that contention is demonstrably false. Two Plaintiffs are Connecticut-based organizations that conduct a range of activities in the State. *See* Compl. ¶ 14 (CBIA "is Connecticut's largest business organization" and "represents the interest of its membership … before Connecticut's General Assembly[ and] state executive branch agencies"); *id.* ¶ 15 (CRMA "has been working on its behalf at the State Capitol since 1910"). As discussed above, Plaintiffs clearly allege that CBIA has employees who it has required to attend mandatory meetings in the State. *Id.* ¶ 20. As to CRMA, the only reasonable inference is that this Connecticut-based organization has in-state employees performing in-state activities. And this Court can reasonably infer that other national Plaintiffs have employees operating in the State. Defendants' strained reading of these allegations ignores the principle that, on a motion to dismiss for lack of standing, "we presume that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (quotation omitted).

In any event, even if only CBIA's allegations were sufficiently specific, it would be enough to satisfy Article III's standing requirement because, in a case seeking only equitable relief, all plaintiffs may proceed jointly so long as a single plaintiff has standing. *See Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 109 ("It is well settled that where, as here, multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" (quoting *Rumsfeld*, 547 U.S. at 52 n.2)).

### 3. Plaintiffs have associational standing to vindicate members' injuries.

Because at least one Plaintiff has organizational standing to maintain this suit, the Court can deny the motion to dismiss without even addressing associational standing. In any event, this Court can easily conclude that Plaintiffs have associational standing as well.

### a. Plaintiffs satisfy all three elements of associational standing.

Consistent with Article III of the Constitution, an association has standing "as the representative of its members" if it "allege[s] that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). On top of alleging organizational standing, Plaintiffs allege that they "*also* have associational standing to bring this suit on behalf of their various members." Compl. ¶ 7 (emphasis added). To establish associational standing, Plaintiffs must plead that "(a) at least one of the association's

members would otherwise have standing to sue in its own right—i.e., has constitutional standing; (b) the interests the association seeks to protect are germane to its purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *All. for Open Soc. Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 228 (2d Cir. 2011) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977)). Plaintiffs have sufficiently pleaded the three elements of associational standing.

*1. Injured members*—The State Defendants' enforcement of Section 31-51q is causing Plaintiffs' members the same sort of speech-related injuries as CBIA alleges. "The 2022 Amendments are currently violating the constitutional and statutory rights of Connecticut's employers, including Plaintiffs' members" by "impos[ing] sanctions on employers who disseminate truthful information and express their opinions on matters of public concern—speech that 'is at the heart of the First Amendment's protection.'" Compl. ¶¶ 36, 39 (quoting *Bellotti*, 435 U.S. at 776). As a result, Section 31-51q "chill[s] employers' speech and assembly rights guaranteed by the First and Fourteenth Amendments." *Id.* ¶ 45. That injury is traceable to the State because "[e]mployers who violate Section 31-51q(b)(2) are subject to state action, in addition to any liability to affected employees." *Id.* ¶ 31. The State "can seek penalties from employers that violate Section 31-51q(b)(2)" and "can award unemployment benefits to employees discharged in violation of Section 31-51q(b)(2) and, in turn, charge employers for those benefits." *Id.* ¶¶ 32–33. By declaring that the 2022 amendments are unconstitutional and preempted and by enjoining the State from

enforcing them, *see id.* at p. 15, this Court could redress employers' (including Plaintiffs' and their members') ongoing injuries. *See, e.g., Chamber of Commerce*, 554 U.S. 60 (holding that district court was correct to find California laws preempted by the NLRA because the state laws regulated employer speech within "a zone protected and reserved for market freedom").[2]

*2. The Associations' purposes*—The State Defendants do not dispute that protecting members' constitutional rights is "germane to" Plaintiffs' purposes. *All. for Open Soc. Int'l, Inc.*, 651 F.3d at 228. Six of the nine Plaintiffs are national associations that together represent hundreds of thousands of employers across the country, including in Connecticut. *See* Compl. ¶¶ 10, 11, 13, 16, 17, 18. Three of the nine Plaintiffs are Connecticut-based associations that represent employers in a diverse range of industries across the state. *See id.* ¶¶ 12, 14, 15. As business federations, industry trade associations, and the like, Plaintiffs all engage in efforts to protect their members' rights, including by litigating on behalf of their members. *See id.* ¶¶ 10, 14, 18. There is no reason to conclude Plaintiffs cannot do so here.

---

2       The State Defendants suggest that some allegations of Plaintiffs' members' injury are "conclusory." MTD 14–15. A "conclusory" allegation is one that formulaically restates the legal elements of a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). Here, Plaintiffs' allegations of injury are not conclusory. Section 31-51q applies to *all* employers in Connecticut and limits what they can say in mandatory meetings with employees. Because Section 31-51q is so broad, it is not "conclusory" to allege that Section 31-51q "affects," "harms," and "injures" Plaintiffs and their in-state members. Those are *factual* allegations, not disguised *legal* conclusions. It's telling, moreover, that the only "factual support" the State Defendants claim is missing is the names of the affected members. Below, we explain why that detail is not required, *see* pp. 17–18, *infra*, but for present purposes, it suffices to note that a member's name is not a detail that has any bearing on whether that member has been affected, harmed, or injured by Section 31-51q.

*3. Member participation*—The State Defendants also do not dispute that, given the purely legal nature of Plaintiffs' First Amendment and preemption arguments, and the declaratory and injunctive nature of the relief Plaintiffs seek, neither "the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *All. for Open Soc. Int'l, Inc.*, 651 F.3d at 228.

b.     Plaintiffs need not "name names" of their injured employer members.

The State Defendants attack Plaintiffs' associational standing because the Complaint doesn't identify by name members who have standing to sue in their own right. *See* MTD 12 & 13 n.2. As a practical matter, there is no reason for Plaintiffs to "name names," as it should be obvious that a Plaintiff like the U.S. Chamber—"the world's largest business federation," Compl. ¶ 10—has at least one Connecticut-based employer member. The same goes for CBIA, CTABC, and CRMA, whose members are Connecticut employers. *Id.* ¶¶ 14–15.

In the Second Circuit, associations do not have to name members in their pleadings. As long as an association "allege[s] that one or more of its members has suffered a concrete and particularized injury," it need not "'name names' in a complaint." *Building & Constr. Trades Council of Buffalo v. Downtown Dev., Inc.*, 448 F.3d 138, 145 (2d Cir. 2006). Citing *Summers v. Earth Island Institute*, 555 U.S. 488, 498 (2009), the State Defendants contend that *Downtown Development* is "no longer good law," though they acknowledge that district courts still follow *Downtown Development*. MTD 13 n.2. This Court should not (indeed cannot) second-guess *Downtown Development* because it remains binding until the en banc court of appeals

17

or the Supreme Court overrules it. *See Knife Rts., Inc. v. Vance*, 802 F.3d 377, 387 (2d Cir. 2015). *Summers* did not change the standard for pleading associational standing; *Summers* was not even a motion-to-dismiss case.

This rule makes sense. Requiring Plaintiffs to name names would cause yet another First Amendment injury—the violation of an association's constitutional right to keep its membership anonymous from the government. *AFPF v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (citing *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449 (1958)); *New York v. U.S. Dep't of Com. (Census Case)*, 351 F. Supp. 3d 502, 606 n.48 (S.D.N.Y. 2019) ("[T]o hold that Article III requires an organization to name those of its members who would have standing would be in tension with one of the fundamental purposes of the associational standing doctrine—namely, protecting individuals who might prefer to remain anonymous." (citing *Patterson*, 357 U.S. at 458–60)), *aff'd in relevant part*, 139 S. Ct. 2551, 2565–66 (2019). Given the State Defendants' authority to enforce the State's labor laws against Connecticut employers, *see* Conn. Gen. Stat. § 31-69a, it is not hard to imagine why Plaintiffs would "fear … retaliatory efforts on behalf of the government" based on their "participat[ion] as named plaintiffs in a [pre-enforcement] legal challenge," *Forum for Acad. Rts., Inc. v. Rumsfeld*, 291 F. Supp. 2d 269, 286 (D.N.J. 2003) (holding that an association of law schools could keep its members secret without losing standing), *aff'd in relevant part*, 390 F.3d 219, 228 n.7 (3d Cir. 2004), *aff'd in relevant part*, 547 U.S. at 52 n.2.

Neither Supreme Court nor Second Circuit precedent requires Plaintiffs to out their members at the pleading stage. This Court should not either.

> c.   Plaintiffs can rely on associational standing to raise their *Ex parte Young* cause of action.

The State Defendants also argue that the Court should "dismiss this lawsuit in its entirety" because in the Second Circuit, "associational standing is . . . categorically unavailable for claims brought under § 1983." MTD 11. But that argument is misplaced, because Plaintiffs also plead an independent cause of action under *Ex parte Young*, which Plaintiffs may assert on behalf of their members. The State Defendants' arguments ignore this equitable cause of action.

The Second Circuit has held that an association may not bring claims on behalf of its members under Section 1983. *See League of Women Voters v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984); *see also Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011) (applying *Aguayo v. Richardson*, 473 F.2d 1090, 1099–100 (2d Cir. 1973)). Although Plaintiffs disagree with this precedent, they acknowledge that it is binding on this Court.[3]

In any event, this precedent does not undermine Plaintiffs' associational standing to bring this lawsuit, because Section 1983 is just *one* of the two causes of

---

[3]    Plaintiffs reserve their right to challenge Circuit law later on, if needed, for the Second Circuit's narrow interpretation of Section 1983 stands alone in a lopsided circuit split. *See, e.g.*, *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031–40 (6th Cir. 2022); *Heartland Academy Cmty. Church v. Waddle*, 427 F.3d 525, 532 (8th Cir. 2005); *Am. Fed'n of State, Cnty. & Mun. Emps. Council 79 v. Scott*, 717 F.3d 851, 861 n.1 (11th Cir. 2013); *see also Ret. Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 607 (7th Cir. 1993).

action Plaintiffs plead. The Complaint plainly alleges an equitable cause of action under *Ex parte Young*, which provides an independent basis for this lawsuit. *See* Compl. ¶ 6 ("Plaintiffs bring this cause of action under 42 U.S.C. § 1983 *and Ex parte Young, 209 U.S. 123 (1908)*, to enforce the federal constitutional and statutory rights of Plaintiffs and their members" (emphasis added)); *see also Moore v. Urquhart*, 899 F.3d 1094, 1103 (9th Cir. 2018) (holding that "plaintiffs do not need a statutory cause of action" to obtain declaratory and injunctive relief against state officers because "[t]hey can rely on the judge-made cause of action recognized in *Ex parte Young*").

Indeed, the State Defendants never argue that associations cannot bring an equitable claim under *Ex parte Young* on behalf of their members. They entirely fail to recognize that Plaintiffs have asserted a separate cause of action under *Ex parte Young*. Instead, they treat *Ex parte Young* as if it is about sovereign immunity only— not also an independent cause of action. *See* MTD 3, 24–27. That is clearly wrong: *Ex parte Young* provides a cause of action that is distinct from Section 1983. *See Ex parte Young*, 209 U.S. at 150–51 (recognizing the "right to enjoin a state officer from executing a state law in conflict with the Constitution or a statute of the United States, when such execution will violate the rights of the complainant").

This Court should not be the first to extend the Second Circuit's rule regarding Section 1983 claims to equitable claims under *Ex parte Young*. Plaintiffs do not ask this Court to do so, and there is no basis for stretching precedent to eliminate a cause of action that has long been available to associations. The Second Circuit's cases are grounded in the particular "language" and "history" of Section 1983, *Aguayo*, 473 F.2d

at 1099, which is nothing like the judge-made, equitable cause of action in *Ex parte Young*. These two causes of action have co-existed since the Civil Rights Act of 1871, 17 Stat. 13; *cf. Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) (tracing the equitable cause of action's lineage); John Harrison, *Ex Parte Young*, 60 STAN. L. REV. 989 (2008). Moreover, whereas Section 1983 authorizes damages, *see* 42 U.S.C. § 1983; *see also Carey v. Piphus*, 422 U.S. 490 (1975), the equitable cause of action recognized in *Ex parte Young* allows only declaratory and injunctive relief, which is likely to "inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515. Plaintiffs have associational standing to bring their claims under *Ex parte Young*.

*   *   *   *

Plaintiffs have pleaded both organizational and associational standing to sue the State for violations of the First Amendment and Supremacy Clause. However, if the Court is persuaded by any of the State's challenges to Plaintiff's allegations, the Court should not dismiss the case. The Court should allow Plaintiffs "to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff[s'] standing." *Id.* at 501.

## B.    Plaintiffs' claims are ripe.

A ripe claim presents "a real, substantial controversy, not a mere hypothetical question." *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993) (quotation omitted). When speech rights are at stake, as they are here, "pre-enforcement claims brought under the First Amendment are viewed 'under somewhat

relaxed standing and ripeness rules.'" *Ollie v. Univ. of Conn.*, 364 F. Supp. 3d 143, 150 (D. Conn. 2019) (Dooley, J.) (quoting *Walsh*, 714 F.3d at 689). That's because, "without the possibility of pre-enforcement challenges, plaintiffs contesting statutes or regulations on First Amendment grounds face an unattractive set of options"— either "refraining from activity they believe the First Amendment protects, or risk civil or criminal penalties for violating the challenged law." *Id.* (quoting *Walsh*, 714 F.3d at 689). The law does not force plaintiffs to make that choice: "[A] real and imminent fear of such chilling is enough" to entitle them to pre-enforcement review. *Walsh*, 714 F.3d at 689.

Because "ripeness … is really just about" injury-in-fact, *id.* at 688, most of the time when "a plaintiff has Article III standing," it "is enough to render its claims constitutionally ripe." *In re Methyl Tertiary Butyl (MTBE) Prods. Liab. Litig.*, 725 F.3d at 110. As explained above, Section 31-51q currently limits the speech rights of Plaintiffs and their members. *See* pp. 8–16 , *supra*. The ongoing chilling effect they experience renders this case constitutionally ripe for adjudication.

The State Defendants suggest that the proper time to decide these issues is after they bring an "actual enforcement action." MTD 23 ("The complete lack of factual context from an actual enforcement action makes these claims premature."). But the law does not require plaintiffs to wait for an enforcement action before asserting their federal constitutional and statutory rights—especially when their First Amendment rights are being chilled by the threat of enforcement. As the Second Circuit has explained, the harm of "self-censorship" "can be realized even without an

actual prosecution." *Walsh*, 714 F.3d at 689 (quoting *Vermont Right to Life Comm., Inc.*, 221 F.3d at 382).

Moreover, when speech rights are at stake, "[a] plaintiff bringing a pre-enforcement facial challenge against a statute need not demonstrate to a certainty that it will be prosecuted under the statute to show injury." *Vermont Right to Life Comm.*, 221 F.3d at 382. The plaintiff need only allege "a credible threat" of enforcement. *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). In describing the "credible threat" standard, the Second Circuit has explained that in cases like this one, the burden is on the government—not the plaintiff—to show that the government will *not* enforce the statute:

> Part of what makes the Court's approach in these cases "forgiving" is that it appears willing to presume that the government will enforce the law as long as the relevant statute is "recent and not moribund." Thus, in numerous preenforcement cases where the Supreme Court has found standing on a showing that a statute indisputably proscribed the conduct at issue, it did not place the burden on the plaintiff to show an intent by the government to enforce the law against it. Rather, it presumed such intent in the absence of a disavowal by the government or another reason to conclude that no such intent existed.

*Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013) (citations and footnotes omitted).

*Hedges* makes clear that there should be a presumption that the government intends to enforce Section 31-51q. The provisions of Section 31-51q that Plaintiffs challenge are "recent and not moribund." *Id.* (quotation omitted). The Assembly added the challenged provisions just last summer and, in the analysis accompanying the bill, specifically pointed to Section 31-69a and the State Defendants' power to enforce violations of Section 31-51q as amended. OLR Bill Analysis, *supra*. And

critically, the State Defendants do not "disavow[]" that they *could* or *would* seek penalties from employers who violate Section 31-51q. *Hedges*, 724 F.3d at 197. The burden is thus on the State Defendants—not on Plaintiffs—to show that the State does not intend to enforce the statute. Plaintiffs have alleged a "credible threat" of enforcement.

The State Defendants argue that Plaintiffs' allegations that Section 31-51q will "be enforced against them rest largely on speculation about the discretionary actions of third parties." MTD 21. That's a spurious accusation. This is not a case, for instance, where Connecticut's regulation of third parties indirectly causes harm to Plaintiffs and their members. *See, e.g.*, *Warth*, 422 U.S. at 504–05 (noting that "governmental prohibition or restriction" on absent third parties "may make it substantially more difficult to meet the minimum requirement of Art. III"). Section 31-51q applies directly to Plaintiffs and their members, and Section 31-69a gives the State Defendants enforcement power against "any employer, officer, agent or other person who violates any provision of" Chapter 558 of the state's Labor Code, which encompasses Section 31-51q. Because "the plaintiff is himself an object of the action (or forgone action) at issue … there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62.

The made-for-litigation declaration of Thomas Wydra, *see* MTD 22–24, does not disavow the State's intent to enforce the statute as written, nor does it case doubt on that intent. Although Mr. Wydra states that he works for the Department of Labor,

*see* Wydra Dec. ¶ 1, Mr. Wydra does not purport to speak officially on behalf of the Department of Labor. He merely speaks about what he is personally "aware" and "unaware" of. *Id.* ¶¶ 20–21. While Mr. Wydra admits that the Department "has the legal authority to initiate its own investigations" into violations of Section 31-51q "absent a complaint," he avers that the Department typically "conducts investigations … based on complaints received from the public." *Id.* ¶ 5. (Of note, Section 31-69a says nothing about employee complaints.) On this assertion, the State Defendants theorize that their enforcement of Section 31-51q against Connecticut employers depends on "a chain of historically unprecedented contingencies"—meaning, mostly, that someone would have to notify the State Defendants about a possible violation. MTD 23.

Mr. Wydra's declaration says nothing unusual. Many agencies enforce legal requirements reactively because they lack the resources to identify potential violations proactively. If that reality were enough to make a claim unripe, pre-enforcement challenges to unconstitutional state laws would be nearly impossible to maintain—except by plaintiffs willing to engage in open and flagrant violations of state law. Mr. Wydra acknowledges that the State has authority to bring an action regardless of whether someone brings a complaint, and nothing in his declaration rebuts the presumption that the State will do just that.

Mr. Wydra further asserts that, as far as he is "aware," the Department of Labor has never investigated violations of Section 31-51q. Wydra Dec. ¶¶ 20–21. Even assuming the truth of this statement, past non-enforcement has no bearing on the

State's intent to enforce the recently amended provisions of the statute. From its enactment in 1983 until last summer, Section 31-51q was a different, much narrower law, in that it only protected employees' speech and did not prohibit employers' speech. It would be strange, indeed, for the legislature to amend a statute to include additional prohibitions, with no expectation that they would be enforced.

Even if past were prologue, it would not make this suit unripe, for the presumption of enforceability cannot be overcome so superficially. In *Pacific Capital Bank v. Connecticut*, the Second Circuit held that a plaintiff established standing to challenge a civil penalty "despite the state's argument that it never had enforced the statute against anyone and that 'it [wa]s unknown how the state w[ould] apply that section in any future enforcement action.'" *Hedges*, 724 F.3d at 198 (quoting *Pac. Capital Bank v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008)). Indeed, even when a State clearly expresses that it "has no intention of suing" the plaintiff, there remains a credible threat of enforcement because "there is nothing that prevents the State from changing its mind." *Vermont Right to Life Comm.*, 221 F.3d at 383 (collecting cases).

In asking the Court for permission to "proffer[] evidence beyond the pleadings," MTD 9 (quotation omitted), the State Defendants do not create the sort of open-and-shut case they anticipate. The Wydra Declaration says nothing about *future* enforcement, and the State Defendants have not otherwise abandoned their statutory authority to enforce Section 31-51q against Plaintiffs and their members. To hold that this suit is unripe would defeat the purpose of a pre-enforcement challenge to state

laws limiting speech—to protect parties from having their speech chilled while they wait out the uncertainty of enforcement. Plaintiffs need not wait any longer; their claims are ripe for adjudication now.

Because Plaintiffs and their employer members are already being chilled from exercising their rights under the First Amendment and the NLRA, their injuries are ongoing, and their constitutional claims are ripe for adjudication—regardless of the State Defendants' suggestion that they might not seek penalties.

### C.  Sovereign immunity does not bar Plaintiffs' claims.

States' sovereign immunity shields them from suit unless the state waives its immunity or Congress abrogates it. *See CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.*, 306 F.3d 87, 94–95 (2d Cir. 2002). A state's sovereign immunity also shields the state's officers from being sued in their official capacities. *See Davis v. New York*, 316 F.3d 93, 101–02 (2d Cir. 2002). There is, however, a well-established exception to this rule—the *Ex parte Young* exception—by which private parties may "seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health*, 142 S. Ct. at 532.

The State Defendants argue that, for three reasons, the *Ex parte Young* exception to their immunity does not apply here. *See* MTD 24–27. Although the State Defendants have a point that Plaintiffs' claims *against the Department of Labor* may be barred, *see* MTD 24–25, that argument has no bearing on suits against state officers. The second reason the State Defendants give is incorrect and irrelevant:

Plaintiffs' complaint nowhere asks the Court to "enjoin § 31-51q from being enforced *by all employees in Connecticut.*" MTD 25 (emphasis added). Plaintiffs ask the Court only to declare that the 2022 amendments to Section 31-51q are unconstitutional and preempted and to "[e]njoin[] Defendants from enforcing the 2022 Amendments [to Section 31-51q] against Plaintiffs and their members, and from taking other official actions against Plaintiffs and their members, based upon violations of Section 31-51q(b)(2)." Compl. p. 15. *Contra Whole Woman's Health*, 142 S. Ct. at 531–34 (holding that plaintiffs aggrieved by "private civil actions" brought to enforce an allegedly unconstitutional law could not enjoin state judges and clerks from docketing and hearing those suits).

The State Defendants acknowledge that the *Ex parte Young* exception at least potentially applies to Plaintiffs' claims against Dante Bartolomeo (Commissioner of the Department of Labor) and William Tong (Attorney General), who together enforce Section 31-51q through powers conferred by Section 31-69a. The State Defendants contend, however, that after *Whole Women's Health*, it is harder for plaintiffs to prove that the *Ex parte Young* exception applies to suits against state officers. *See* MTD 25–27. That contention lacks merit.

*Whole Women's Health* underscores that the *Ex parte Young* exception to sovereign immunity applies here. The Supreme Court reaffirmed that "*Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws." 142 S. Ct. at 534. As relevant here, the Court held that the *Ex parte Young* exception permitted the plaintiffs' claim against three "executive licensing official[s]

who may or must take enforcement actions against the petitioners if they violate the terms of Texas's Health and Safety Code." *Id.* at 535; *see id.* at 537 ("[T]his is enough at the motion to dismiss stage to suggest the petitioners will be the target of an enforcement action and thus allow this suit to proceed."). So too here. Plaintiffs have sued state officials "who may . . . take enforcement actions" against them and their members, and thus sovereign immunity does not bar this suit. *Id.* at 535.

The State Defendants suggest that *Whole Women's Health* imposed a new and distinct "credible threat" requirement as a condition of the *Ex Parte Young* exception that is somehow more rigorous than the similar requirement for Article III standing and ripeness. But the "credible threat" requirement is the same across the board. *See id.* at 536–37 (Gorsuch, J.) (invoking "credible threat" language from Justice Thomas's separate opinion); 142 S. Ct. 542 (Thomas, J., concurring in part and dissenting in part) ("[W]hether under Article III or *Ex parte Young*, petitioners must show at least a credible and specific threat of enforcement . . . ." (citing *Susan B. Anthony List*, 573 U.S. at 159)). In the end, the State Defendants are trying to use *Whole Women's Health* to smuggle through the same standing and ripeness objections that, as shown above, have no merit.

Other snippets from *Whole Women's Health* are equally unavailing. The State Defendants rely on the Court's refusal to consider a "series of hypotheticals," MTD 26, but take this quote out of context. The Court discussed these hypotheticals in the context of holding that *Ex parte Young* did not permit plaintiffs' claim against Texas's Attorney General, who had no authority to enforce any part of the allegedly

29

unconstitutional law. 142 S. Ct. at 534. Given this lack of authority, the Court declined to indulge the hypothetical possibility that a Texas Board "might in the future promulgate … a rule and the attorney general might then undertake an enforcement action." *Id.* That scenario stands in stark contrast to this case, where the Connecticut Commissioner of Labor and Attorney General undisputedly have power under Section 31-69a to enforce Section 31-51q *right now*, and their enforcement powers are independent of anything an affected employee may do. They can seek penalties even if an affected employee never lodges a complaint with the Department of Labor, and even if he or she never seeks damages from the employer.

There can be "no doubt" that the *Ex parte Young* exception applies to Plaintiffs' suit against the Commissioner of Labor and Attorney General because Plaintiffs allege "an ongoing violation of federal law" (the First Amendment and the Supremacy Clause) and seek "relief properly characterized as prospective." *Silva*, 47 F.4th at 982, 84 (quoting *Verizon Md.*, 535 U.S. at 645). Because Plaintiffs and their members are "not required to pursue arguably illegal activity or expose [themselves] to criminal liability before bringing suit to challenge a statute alleged to violate federal law," this "claim falls squarely within federal equity jurisdiction as recognized in *Ex parte Young* and its progeny." *Friends of the East Hampton Airport*, 841 F.3d at 144–45 (quotation omitted).

## IV.   CONCLUSION

The Court should deny the motion to dismiss and order briefing on the merits of Plaintiffs' challenges to Connecticut General Statutes Section 31-51q, except as to

claims against the Department of Labor, which is immune from suit. If the Court agrees with any of the State Defendants' challenges to the sufficiency of Plaintiffs' allegations of standing and ripeness, the Court should grant Plaintiffs an opportunity to amend.

Respectfully submitted,

/s *Bryan Killian*

MORGAN LEWIS & BOCKIUS LLP
Bryan Killian
One State St.
Hartford, CT 06103-3178
Telephone: (202) 373-6191
Fax: (860) 240-2701
bryan.killian@morganlewis.com

MORGAN LEWIS & BOCKIUS LLP
Philip A. Miscimarra
David B. Salmons
Amanda L. Salz
1111 Pennsylvania Ave., NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Fax: (202) 739-3001
philip.miscimarra@morganlewis.com
david.salmons@morganlewis.com
amanda.salz@morganlewis.com

*Attorneys for the Chamber of Commerce of the United States of America, Associated Builders and Contractors, Associated Builders and Contractors of Connecticut, Coalition for a Democratic Workplace, Connecticut Business & Industry Association, Connecticut Retail Merchants Association, National Association of Home Builders, National Federation of Independent Business, and National Retail Federation*

U.S. CHAMBER LITIGATION CENTER
DARYL JOSEFFER
STEPHANIE A. MALONEY
1615 H Street, N.W.
Washington, DC 20062-2000
(202) 463-5337
djoseffer@uschamber.com
smaloney@uschamber.com

*Attorneys for the Chamber of Commerce of the United States of America*

LITTLER MENDELSON, P.C.
MAURICE BASKIN
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006-4046

*Attorney for Associated Builders and Contractors and Associated Builders and Contractors of Connecticut*

## CERTIFICATE OF SERVICE

I certify that, on this February 3, 2023, I electronically filed Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss with the Clerk for the United States District Court for the District of Connecticut. I used the Court's CM/ECF system, which serves registered CM/ECF users. All attorneys for Defendants Danté Bartolomeo, William Tong, and the Connecticut Department of Labor are registered CM/ECF users and were served accordingly.

*/s/ Bryan M. Killian*
Bryan M. Killian