```
1                    UNITED STATES DISTRICT COURT
2                      DISTRICT OF CONNECTICUT
     _____
3                                    |
     CHAMBER OF COMMERCE OF THE       | No. 3:22-CV-01373-KAD
4    UNITED STATES OF AMERICA,        |
     ET AL,                           | June 28, 2023
5                        Plaintiffs,|
     v.                               | 9:57 a.m.
6    BARTOLOMEO, ET AL.,              |
                         Defendants.|
7    _____|
                                      Brien McMahon
8                                     Federal Building
                                      915 Lafayette Boulevard
9                                     Bridgeport, CT 06604

10                         ORAL ARGUMENT

11   B E F O R E:

12           THE HONORABLE KARI A. DOOLEY, USDJ

13   A P P E A R A N C E S:
     For the Plaintiffs:
14           BRYAN KILLIAN
             AMANDA LEIGH SALZ
15           Morgan, Lewis & Bockius LLP
             1111 Pennsylvania Avenue NW
16           Washington, DC 20004
             (202)739-3000
17           Email: bryan.killian@morganlewis.com
                    amanda.salz@morganlewis.com
18
     For the Defendants:
19           TIMOTHY J. HOLZMAN
             EMILY ADAMS GAIT
20           Office of the Attorney General
             165 Capitol Avenue
21           Hartford, CT 06106
             (860)808-5210
22           Email: timothy.holzman@ct.gov
             Email: emily.gait@ct.gov
23
     Courtroom Deputy:                 Court Reporter:
24   Kristen Gould                     Cassie Zayas, RPR

25                  Chambers:  (203)579-5522
```

```
 1                 (Call to order, 9:57 a.m.)
 2                 THE COURT:  Good morning, everybody.  We are
 3     convened on the matter of the Chamber of Commerce of the
 4     United States of America v. Bartolomeo, et al.
 5                 Counsel, please identify yourselves for the
 6     record.
 7                 MR. KILLIAN:  Good morning, Your Honor.  For the
 8     plaintiffs, Bryan Killian from Morgan Lewis.
 9                 THE COURT:  Good morning.
10                 SPEAKER:  And also for the plaintiffs, Amanda
11     Salz.
12                 MR. HOLZMAN:  Good morning, Your Honor.
13     Assistant Attorney General Tim Holzman on behalf of the
14     defendants.
15                 MS. GAIT:  And Assistant Attorney General Emily
16     Gait.
17                 THE COURT:  Good morning, everybody.  We are
18     convened for oral argument on the defendants' motion to
19     dismiss.  I thought I would share some preliminary
20     observations sort of consistent with the text order that
21     we issued earlier this week.  The issues that --
22                 THE COURT REPORTER:  Judge, I'm sorry, I don't
23     think the mics are on.
24                 THE COURT:  Thank you.  I'll start over.
25                 I had, earlier this week, sent out a text order
```

```
 1   asking people to sort of focus their preliminary arguments

 2   because I think that there are certain issues that may not

 3   need to be decided depending on the outcome of some of

 4   those threshold issues.  As is not uncommon, the issues

 5   did evolve a little bit over the briefing process.

 6           In the initial motion to dismiss, the defendants

 7   primarily challenged the plaintiffs' effort to assert

 8   associational standing on behalf of their members in

 9   bringing their 1983 claims and sort of argued in the

10   alternative that, we don't think they're asserting

11   organizational standing, but if they are, they haven't

12   done that, either.

13           And the defendants responded that they don't

14   disagree that under Second Circuit precedent they cannot

15   pursue 1983 claims asserting associational standing, but

16   then responded, but of course we're asserting

17   organizational standing.  And then the defendants' reply,

18   you know, challenged the adequacy of the plaintiffs'

19   allegations with respect to organizational standing.

20           I think when I read the complaint, it's clear

21   that the plaintiffs at least intended to bring or to

22   assert both organizational standing for the plaintiffs in

23   their own right as well as associational standing for

24   their members.  Whether they have adequately done that on

25   a plaintiff-by-plaintiff basis is a completely different
```

1    question, but I think that was the clear intent of the

2    plaintiffs' complaint.

3        But if one or more of the plaintiffs have

4    adequately alleged organizational standing, then there may

5    not be any need for me to take up either the issue of

6    whether they've adequately alleged associational standing,

7    nor perhaps the more significant question of whether *Ex*

8    *parte Young* provides an independent basis for federal

9    question jurisdiction.

10        And that is a much more complex and thornier

11    issue, frankly, than I had anticipated it would be, and it

12    wasn't, frankly, particularly well flushed out in the

13    briefing.  So I think -- it may be that I don't need to

14    get there.  If I do need to get there, we will be getting

15    supplemental briefing from the parties on that issue.

16        So in the text order, I focused people's

17    attention on the CBIA because I think in the complaint it

18    is sort of identifiable as the plaintiff that has offered

19    the most by way of allegations in terms of organizational

20    standing.  And if I determine at the end of the day that

21    they have adequately alleged organizational standing, I

22    don't think I have to ask whether they've also alleged

23    associational standing or whether any of the other

24    plaintiffs have adequately alleged organizational standing

25    or associational standing, and then I certainly don't have

1    to reach *Ex parte Young*.

2            And I know there's been some disagreement in

3    other cases about this path.  So let me ask sort of

4    preliminarily if either party disagrees with this premise

5    that the motion to dismiss can turn on -- we have -- I

6    should back up.

7            We have the Eleventh Amendment argument

8    independent and separate -- obviously, that has to be

9    taken up -- but do either of the parties disagree with the

10   premise that if the CBIA has adequately alleged

11   organizational standing, I need not reach at this juncture

12   the organizational or associational standing of the other

13   named plaintiffs?

14           And I will hear from the defense first.  I don't

15   know who's -- Attorney Holzman.

16           MR. HOLZMAN:  Yes, Your Honor.  That is our

17   understanding.  If the Court finds standing as to one

18   plaintiff, it does not need to address standing as to the

19   other plaintiffs.  It wouldn't be wrong to do so if it

20   wanted to -- it could do so -- but my understanding of the

21   Second Circuit law is that it's not required to.

22           THE COURT:  Okay, thank you.

23           Plaintiffs?

24           MR. KILLIAN:  I think we do largely agree with

25   Your Honor's assessment in that if there is organizational

standing, then the standing of the other plaintiffs need

not be addressed at this stage of the case.  The

*Centro v. Town of Oyster Bay* case from the Second Circuit

says that plainly.

But if the Court doesn't find organizational

standing, then the other issues would need to be

addressed.  I just want to make that clear.  It's not that

the entire motion goes one way or another on

organizational standing; it's just that the motion may be

denied if organizational standing exists, but not granted

if there is no organizational standing.

THE COURT:  Agreed.

MR. KILLIAN:  Okay.

THE COURT:  Okay.  So I guess I'll start --

there may or may not be two issues here.  The defense has

argued that the allegations themselves do not assert

rights on behalf of the CBIA itself as opposed to its

members.  So that could be the first issue.  And then, if

I find that they have adequately alleged rights on behalf

of themselves individually, itself individually, then the

question -- the broader question of Article III standing

and injury in fact is implicated.

Is it the defendants' position that the

allegations themselves are inadequate to assert rights --

the CBIA's rights versus the rights of its members?

1          MR. HOLZMAN:  Yes, Your Honor.  So it's our

2   position that the complaint should not be construed as

3   alleging standing on its own behalf based on its supposed

4   inability to hold these meetings and give these

5   communications to its own employees.  It should only be

6   alleged as referring to meetings about its members'

7   employees, which would mean that the statute is just

8   completely inapplicable to it and it has no reason to fear

9   doing any of that, and so it doesn't have any sort of

10  pre-enforcement chilling effect type of standing.

11         But, alternatively, even if it is construed that

12  way, the allegations are still insufficient because it

13  just doesn't meet any of the requirements for

14  pre-enforcement standing.

15         THE COURT:  Okay.  All right.  So ...

16         MR. HOLZMAN:  If that answers the Court's

17  question.

18         THE COURT:  It does.  But the complaint is sort

19  of replete with -- recognizing that I have to construe the

20  complaint in the light most favorable to the nonmoving

21  party, the complaint is sort of replete with statements

22  that the plaintiffs are asserting their rights and the

23  rights of their members, that the Court should vindicate

24  the constitutional rights of the plaintiffs and their

25  members.

1              In paragraph 6 -- I'm sorry.  In paragraph 7,

2      they say, "We also have associational standing," which is

3      sort of a trigger that they have at least attempted to

4      assert direct standing, organizational standing.

5              I agree with you that paragraphs 10 through 18

6      really talk about the work that the plaintiffs do on

7      behalf of their members, and there's really not a lot in

8      those that would give rise to the idea of organizational

9      standing.  But those paragraphs themselves talk about

10     these enormous organizations that have all of these

11     members and provide all of these services, and I think

12     it's a reasonable inference that these organizations have

13     employees to carry out their function and provide all

14     these services to their members.

15             And then when we get to paragraph 20 with the

16     CBIA, they say that the CBIA and at least some of its

17     members conduct these mandatory meetings, discuss

18     political issues, to include union positions and the like,

19     that they're going to be left with the Hobbesian choice of

20     not having these meetings, which are sort of integral to

21     the work that they do, or risk consequences if they have a

22     mandatory meeting and they have an employee who doesn't go

23     and, you know -- what do they do then?  Do they discipline

24     that employee or do they just give up mandatory meetings

25     altogether?

1          So why isn't that enough?  Why should I construe

2    what I think is pretty direct language that the CBIA is

3    communicating with its own employees or being chilled from

4    communicating with its own employees.  Why I should

5    construe that to be something else?

6          MR. HOLZMAN:  Well -- so a few things on that,

7    Your Honor.

8          And we certainly recognize that they do make

9    references to their own rights in the complaint -- I mean,

10   we acknowledge that in our brief -- so that suggests

11   they're attempting to bring an organizational standing

12   claim, but there are multiple ways that you could attempt

13   to do that without alleging a theory that you're chilled

14   by the statute from putting on meetings for your members'

15   employees, such as they could have alleged -- they could

16   have been pursuing a theory that it interfered with their

17   essential functions, which is very difficult to show and I

18   don't think that they have it here, but that's why we

19   address that in their brief.

20         They could have been proceeding on the mistaken

21   belief that being chilled from putting on meetings for

22   your members' employees could give rise to standing, which

23   it just couldn't because, I mean, there's no

24   employer/employee relationship there, so we couldn't

25   enforce the statute in that circumstance, which is why we

1    went through the trouble of putting in Mr. Wydra's

2    declaration that the DOL doesn't believe that to be a

3    violation because the statute just doesn't apply there.

4         So just because they are making allegations

5    doesn't mean that they're proceeding on the theory that

6    they have their own employees.  Whether they have their

7    own employees -- it seems reasonable to assume that they

8    do have employees.  But whether that's their theory, I

9    don't think the complaint is clear about that.  And I

10   recognize that the Court has to construe the complaint

11   favorably to the plaintiff, but I don't think that

12   justifies changing the nature of the claim during the

13   briefing stage.

14        And so, I think that the Court shouldn't

15   interpret the complaint as proceeding on the theory that

16   they're chilled from putting on their own meetings to

17   their own employees.  But even if it does construe it in

18   that way -- and this gets into the central part of our

19   argument, which I can get into.  I don't know if you want

20   to hear from the other side on this --

21        THE COURT:  I do.  We'll break it up.

22        MR. HOLZMAN:  -- but the allegations aren't

23   sufficient.  They don't meet any of the three elements of

24   pre-enforcement standing, even if the complaint is

25   interpreted in the way that they're suggesting.  But I'll

```
1    wait on that until you're ready for that.

2              THE COURT:  That's part 2.  All right.

3              Counsel?

4              MR. KILLIAN:  Sure, Your Honor.  Everything my

5    adversary just said, his sentences all began with "could

6    mean, could mean, could mean."  He's taking inferences and

7    drawing them in his own favor rather than, as Your Honor

8    noted, drawing inferences from the complaint in favor of

9    the nonmoving party.

10             And so, in paragraph 20 in the key sentences,

11   the second and third sentences, when CBIA alleges that it

12   has had meetings that it believes are subject to the law

13   and has required all employees to attend those meetings,

14   it is certainly a reasonable inference -- we think it's

15   just clear, but we think it's certainly a reasonable

16   inference that CBIA is having these meetings with its own

17   employees.  And that's enough to trigger organizational

18   standing to bring this pre-enforcement suit.

19             So we agree that paragraph 20 is clear that CBIA

20   is referring to its own meetings with its own employees,

21   and that is the theory of the case that we intend to

22   pursue as to organizational standing.

23             THE COURT:  All right, thank you.

24             MR. HOLZMAN:  Can I add one more thing to that,

25   Your Honor?
```

1          So paragraph 19, it talks about, you know, the

2    2022 amendment will injure plaintiffs' members in

3    Connecticut.  So it's explicitly about their members; not

4    themselves, but their members.  And then paragraph 20

5    begins with, "for example," so that should be construed to

6    mean an example of what's being referred to in comparing

7    19, which is, you know, talking about their members'

8    employees, not their own.

9          THE COURT:  Okay.  I think that, just as to that

10   latter argument, it is -- I think that is more of sort of

11   the art-of-drafting type discussion.  I think that the

12   "for example" does not -- everything that follows the "for

13   example" is not cabined or limited by the prior assertion

14   as to the injury to plaintiffs' members.

15         And I think I just -- I would have to ignore

16   what are allegations that CBIA, as an employer, meets with

17   its employees, and I -- so I think they're over that

18   hurdle.  The harder question for me, frankly, is the

19   pre-enforcement standing.

20         And, I guess, let me hear from -- Attorney

21   Holzman, let me hear from you on that issue first.

22         MR. HOLZMAN:  Yes, Your Honor.  So with respect

23   to CBIA -- first of all, just as a preliminary point which

24   the Court may not need emphasis on, but the chilling

25   effect standing that they're alleging here is not based

1    directly on 31-51q.  That's the statute that permits

2    employees to bring their own private causes of action, so

3    they wouldn't have standing to enforce that directly under

4    *Whole Woman's Health*.  They don't dispute that, that's

5    just out there.

6          But what the -- what their claim of chilling

7    effect standing is actually based on is a civil

8    enforcement statute that's further removed from the actual

9    statute they're challenging, which is, of course, 31-69a

10   which permits -- doesn't require, but permits -- the

11   Department of Labor to levee a civil penalty of $300 for a

12   violation of statutes in that chapter, including 31-51q.

13   And so, they haven't alleged any of the requirements for

14   pre-enforcement standing, Your Honor.

15         And I did want to point the Court to a decision

16   that the Second Circuit issued just last week in the

17   *Vitagliano v. Westchester*.  It was issued on

18   June 21, 2023.  It doesn't change anything in terms of the

19   law and the facts are completely distinguishable from this

20   case, but it does set forth the requirements for

21   pre-enforcement standing and three elements and it kind of

22   synthesizes the cases in a way that I thought was helpful.

23         And so, they're the same issues that we brief in

24   our filings and it doesn't change the law at all, but --

25   so the way that the Court frames it is three elements.

1     So, first of all, you have to show an intention to engage

2     in a course of conduct affected with a constitutional

3     interest; the intended conduct has to be either proscribed

4     by the act or at least arguably proscribed by it; and the

5     third is there has to be a credible threat of prosecution

6     under the law.  So those are the three requirements.  They

7     haven't met any of those requirements in this case.

8          And so, if you start with the first one -- and

9     all of this hinges on paragraph 20.  That's the only

10    paragraph of the complaint that includes allegations that

11    would have a bearing on this.  So have they alleged an

12    intention to engage in conduct that's affected with a

13    constitutional interest?  So assuming, for purposes of

14    argument, the idea of giving -- having meetings and

15    circulating communications.  We're not challenging that

16    that's affected with a constitutional interest -- that's

17    speech -- but they haven't alleged any concrete

18    allegations to establish an actual intention to engage in

19    that conduct.  All they say is that they want to have

20    meetings and communications.  Well, I mean, they don't say

21    anything about when, they don't say anything concrete

22    about what they've done in the past that would establish

23    some kind of a system or frequency of doing so.

24          So, ultimately, it's just a pretty

25    quintessential example of the kind of "someday"

1    allegations that the Supreme Court in *Lujan* said are

2    insufficient to establish a concrete intention.  You can't

3    just say, I'm going to engage in this conduct at some

4    point in the future, I don't exactly know when.  That's

5    just not enough.  So they haven't met that element.

6          The intended conduct is prescribed by the act or

7    at least arguably prescribed by it.  So, again, if you

8    look at paragraph 20, the only conduct that they claim to

9    be afraid to engage in because of the civil penalty

10    statute is the holding of meetings and the giving of

11    communications about political matters.  31-51q doesn't

12    even arguably cover that conduct, Your Honor.  I mean, it

13    doesn't prohibit the meetings and the communications; it

14    prohibits the firing or disciplining of employees for

15    refusing to show up at those meetings or refusing to

16    listen to the communications.

17          And there's a -- there's a threatening component

18    up there, too, that you could violate the statute, but

19    they don't allege that they want to threaten anybody and

20    that they're deterred from doing so.  So that's not part

21    of the case.

22          THE COURT:  If you tell an employee that this is

23    a mandatory meeting, doesn't that employee at that point

24    know that they don't go at their peril?

25          MR. HOLZMAN:  Not necessarily.  I mean, are you

1    asking whether that's a threat?

2         THE COURT:  I'm asking whether a reasonable

3    employee would feel under some form of threat if he's

4    told, this meeting is mandatory.

5         MR. HOLZMAN:  I think it depends on the

6    circumstances.  No, not necessarily, I wouldn't concede

7    that.  But, again, the Court doesn't need to answer that

8    because that's not the conduct that they claim that

9    they're afraid to engage in.  All they say at the end of

10   paragraph 20 is, we think that if we have meetings and

11   communications, then we may get in trouble for violating

12   the statute.  But that's just not prohibited by the

13   statute.

14        The conduct that is prohibited, there's a clear

15   degree of separation between that conduct and the meetings

16   and communications.  It's not about the meetings and

17   communications; it's about how you treat the employees who

18   refuse to show up at the meetings or listen to the

19   communications.  And they don't allege that.

20        THE COURT:  Well, they allege that they have

21   mandatory meetings.  They allege that they are given this

22   choice between risking liability or not having these

23   meetings that they consider necessary and appropriate.

24        But doesn't this -- you may be right, but

25   doesn't this argument go to the merits of their case,

1    whether and to what extent the statute impacts or

2    implicates First Amendment Rights?  And if the answer to

3    that question is in the affirmative, what's the

4    appropriate remedy?  But I don't think, at the

5    reading-of-the-complaint stage, I get to that point.  That

6    strikes me as a merits argument.

7            MR. HOLZMAN:  Well, no Your Honor, because -- I

8    mean, it certainly is a merits argument.  If the statute

9    only prohibits conduct, then First Amendment isn't the

10   case.  And that's our position in the case.  But that's a

11   merits argument.

12           But it's also a standing argument when you are

13   bringing a case based on this pre-enforcement kind of

14   chilling effect, I'm deterred from engaging in particular

15   conduct, because you have to show that you have a

16   legitimate fear that the conduct that you want to engage

17   in is actually prohibited.  That's a critical part of the

18   standing inquiry and in order to answer that, the Court

19   has to look at, well, what does the statute actually

20   prohibit?  It doesn't prohibit meetings and

21   communications.  It just clearly does not.

22           And in their brief, the plaintiffs kind of gloss

23   over this.  They say, well, it's a question of semantics

24   because a mandatory meeting is one that you, you know,

25   have to show up, otherwise you're going to face

1     discipline.  Whether or not that's true or not is really

2     just besides the point because that just rewrites the

3     statute.  It suggests that once -- the act of having a

4     meeting or communication is a violation of the statute.

5     So under their interpretation, as soon as I have a,

6     quote/unquote, "mandatory meeting" or send a communication

7     that you mandatorily have to look at, I violated the

8     statute.  That's just not true.  You don't violate the

9     statute unless and until you actually discipline or fire

10    somebody for not showing up.  So it's clearly separated

11    from the meetings.

12           THE COURT:  What is the point of having a

13    mandatory meeting if there's absolutely no teeth to making

14    a mandatory meeting?  They really are, as a practical

15    matter, being told, you cannot have these mandatory

16    meetings at which you discuss what it is you wish to

17    discuss, because they have no recourse.  They are

18    prevented from doing anything to make the meeting actually

19    mandatory.

20           MR. HOLZMAN:  No, because -- because, again,

21    that suggests that the meeting itself is illegal under the

22    statute.  And the meeting doesn't become, quote/unquote

23    "mandatory" unless and until you actually take the action.

24    They don't allege that they are deterred in paragraph 20.

25    They don't say, we really want to fire or discipline this

1    person for not showing up, but we're afraid to do so

2    because of the statute.  They just say, we're afraid to

3    have the meetings and communications.  That's all that

4    they allege and that's clearly not prohibited by the

5    statute.

6            And so, with respect to the third element,

7    Your Honor, independent of the first two, you have to show

8    a credible threat of prosecution under the law.  And so,

9    there isn't that here for two different reasons, I think,

10   that we set forth in our briefs, which, first of all,

11   although we are not -- we're certainly not disavowing an

12   intention to enforce this civil enforcement statute in its

13   entirety, but we have indicated through the testimony of

14   Mr. Wydra and his declaration that they don't interpret

15   this statute as applying to just meetings and

16   communications; you would have to actually take some

17   further action.  And so, there is no intention to enforce

18   the statute under those circumstances.

19           But, second, the other component of this element

20   is that that it's entirely speculative whether an actual

21   civil enforcement $300 fine would actually be leveed.  If

22   you look at what would need to happen, first of all, they

23   would have to have a meeting or communication that's

24   covered; you would need somebody to refuse to show up; the

25   employer would have to discipline or fire that person,

1    make that discretionary decision; that employee would need

2    to then file a complaint with the Department of Labor,

3    which, from what we can tell, hasn't ever happened in the

4    current version of the statute or the prior one; the

5    investigation would need to find a violation; and then

6    there would need to be a decision by the DOL, Department

7    of Labor, to levee civil penalties.

8         All of those chain of events would have to occur

9    before there was an actual injury.  So here we have all

10   these different discretionary decisions along the way by

11   third parties that would all have to, you know, fall into

12   place for this to happen.  I mean, that's a pretty big

13   parlay.  And the Supreme Court has said that when the

14   likelihood of an injury is dependent on discretionary

15   decisions of third parties who may act predictably or not,

16   depending on the circumstances, the Court doesn't have

17   standing.  So that's this case.

18        So even if the Court were to get through those

19   first two elements, even if the Court think it's arguable

20   that the statute prohibits having meetings,

21   communications -- which it should not find because it just

22   clearly doesn't -- they still can't show the imminence or

23   a nonspeculative basis that they would need to show to

24   establish that third element that an actual civil

25   enforcement remedy is possibly going to even occur under

1    the facts of the case.

2            THE COURT:  But hasn't the Second Circuit said

3    that credible threat arises from the recency alone of the

4    regulation or statute at issue?  It had to have been

5    amended for some reason, and certainly the enforcement

6    provisions were not exempted from the amendment.  And --

7    you know, I think the Circuit has said credible threat,

8    you get to credible threat pretty easily if you've got

9    recent legislative action, haven't they?

10           MR. HOLZMAN:  No, I don't think so.  So I don't

11   think they've ever said that the recency alone establishes

12   the credible threat component of it.  They did say that we

13   assume, as a general matter, if you show that the statute

14   clearly applies to this circumstance, we assume absent

15   evidence to the contrary that the state will enforce it

16   under those circumstances unless they disavow it.  But we

17   don't even get to that because the statute doesn't clearly

18   apply in these circumstances.  The opposite is true; it

19   clearly does not apply.

20            And we do have evidence in this case -- not that

21   we're disavowing it completely, I mean, we're not saying

22   that -- but that we aren't going to enforce it under the

23   circumstances that are alleged here because they just

24   don't rise to the level of a violation of the statute.

25   They don't say they want to threaten their employees or

1    fire their employees or discipline anybody.  They don't

2    allege that.  So the actual conduct that they have to

3    engage in, they don't say they want to engage in.

4              So for those reasons, Your Honor, we would ask

5    that the claim by CBIA be dismissed.  With respect to the

6    other plaintiffs, in our view, assuming the Court

7    dismisses us on CBIA, the other plaintiffs, the analysis

8    as to them is relatively academic in our view because they

9    just allege far less facts than CBIA, and some don't seem

10   to attempt to allege a credible threat of enforcement or

11   chilling effect or anything like that.

12             So we ask that the lawsuit be dismissed entirely

13   on standing.  There are Eleventh Amendment and ripeness

14   arguments as well, but, in our view, the Court should

15   dismiss it on standing.

16             THE COURT:  I understood your ripeness argument

17   to be part and parcel of the standing argument.

18             MR. HOLZMAN:  I think that's right, Your Honor.

19   I mean, I think there's certainly overlap between ripeness

20   and the first element of standing, which is an imminent

21   concrete injury in fact.

22             THE COURT:  In most circumstances, they are --

23   ripeness is subsumed in the standing analysis.  There is a

24   ripeness doctrine in pre-enforcement actions that speaks

25   to prudential concerns where Article III standing has been

1    established, but there may be policy or other reasons not

2    to exercise that Article III jurisdiction.  I did not read

3    your brief as asserting Prudential concerns under the

4    ripeness doctrine.

5        MR. HOLZMAN:  We haven't briefed that,

6    Your Honor, and we haven't asserted that.  I'm not

7    entirely sure how far we would get with that argument.  My

8    understanding of a recent Supreme Court case is they were

9    not incredibly favorable to that kind of argument.  In any

10   case, we haven't raised it in this case.

11       THE COURT:  Okay.  I just wanted to make sure

12   that you hadn't raised it and --

13       MR. HOLZMAN:  Oh, okay, yeah.  Well, that's an

14   easy answer.

15       THE COURT:  All right, thank you.

16       Attorney Killian.

17       MR. KILLIAN:  Thank you, Your Honor.  I would

18   like to start just a few moments going over 31-51q and how

19   the statute operates.

20       THE COURT:  I'm going to interrupt you for a

21   second.

22       Do you have a citation on *Vitagliano*?

23       MR. HOLZMAN:  No, Your Honor.  It was a

24   June 21, 2023, decision and the docket number is 23-30.

25       THE COURT:  Attorney Chambers, can I ask you to

1    get that for me?

2           Sorry, go ahead.

3           MR. KILLIAN:  Of course, Your Honor.

4           As I said, I would like to start with just a

5    brief explanation of how 31-51q operates, the statute,

6    because it is important in determining CBIA's

7    organizational standing to at least be on the same ground

8    with what the statute allows, what it prohibits.

9           My adversary has talked about what the statute

10    prohibits, but that's not exactly the requirement for

11    Article III standing.  That may be a merits question, but

12    the question for Article III standing is whether the

13    statute injures the client, whether it affects CBIA in

14    some way, whether it's speech or otherwise -- but we do

15    think it's speech.

16           Mr. Holzman talked today -- he argues that

17    31-51q does not regulate speech, but on the plain text of

18    31-51q(b)(2), what the employer speaks at that meeting

19    determines what he is allowed to do afterwards, whether he

20    may discipline in any way.  Mr. Holzman said several times

21    today that the statute does not clearly cover the alleged

22    conduct, but that's also not the standard for Article III

23    standing.  And, as the Second Circuit said in the *Vermont*

24    *Right to Life* case which we cite in our brief at page 383,

25    for standing purposes, it only matters that the

1      interpretation, quote, "be reasonable enough."

2              It has to be a reasonable interpretation of the

3      statute, not a clear proscription under the statute,

4      although we do think the statute clearly affects the

5      CBIA's and other members' First Amendment interests.

6              Your Honor noted that the statute also prohibits

7      threatening meetings, and it is our position that simply

8      calling a mandatory meeting is itself a threat, a threat

9      of discipline for an employee who chooses not to go to

10     that meeting.  And so --

11             THE COURT:  Is that an allegation that can

12     fairly be inferred from the complaint?  Because I don't

13     think it's an allegation that's in the complaint.

14             MR. KILLIAN:  I would say yes, Your Honor.  In

15     paragraph 20, CBIA alleges that it not only has held

16     meetings -- this is the second sentence, but the third

17     sentence:  CBIA has required all of its employees,

18     including those who are not engaged in political advocacy,

19     to attend those meetings.

20             So in the past before 31-51q made it subject to

21     a penalty for requiring employees to come to meetings,

22     CBIA did have those meetings.  And at the end of paragraph

23     20, CBIA alleges that it cannot do this any longer because

24     it now would be faced with penalties for having such

25     meetings going forward.

1          So it has to either change the type of meeting,

2     make the meetings optional, change what it says at the

3     meetings and can keep them mandatory, or run the risk of a

4     penalty.   Sort of a trilemma, but in the Second Circuit's

5     jurisprudence it's treated as a dilemma.   You can go

6     forward with the constitutionally protected conduct or you

7     can change your conduct in some way.

8          And so -- but the key takeaway is that what the

9     employer speaks at the meeting -- the meeting that is

10    threatened by calling it "mandatory" or the meeting that

11    ultimately happens -- what the employer says at that

12    meeting then dictates what the employer can do afterwards,

13    and that is conduct arguably invested with a

14    constitutional interest, which is what the Second Circuit

15    requires for standing.

16          Now, I haven't read the decision that my

17    adversary said the Second Circuit handed down last week,

18    although, as he characterized it, it is roughly consistent

19    with how we understand the Second Circuit law to be here

20    for what Article III requires.

21          In a speech case such as this, the Second

22    Circuit has said that the standard for a ripe injury is

23    relaxed, more relaxed than it would be in other cases.

24    This is *National Organization for Marriage v. Walsh*:

25    Essentially, you need to show self-censorship -- you know,

1    a refraining from engaging in conduct -- and the credible

2    threat of enforcement.

3            Well, we believe paragraph 20 does allege this,

4    at least as to CBIA.  It alleges that CBIA has held

5    meetings on politics and labor issues in the past, it

6    would like to do so in the future, and they would like to

7    announce these required meetings as well.  But if they do,

8    as I read in the final two sentences of paragraph 20, then

9    CBIA runs the risk of enforcement.  That's the

10   self-censorship.

11           Now, this is not a situation where the plaintiff

12   then is simply complaining of a subjective chill where

13   they're -- an individual is refusing to engage in conduct

14   for purely subjective reasons.  And cases where that's

15   come up are Supreme Court cases like *Laird v. Tatum,*

16   *Clapper v. Amnesty International*, where the law that was

17   being challenged was not a law that directly regulated the

18   plaintiff; it was a law that allowed the government to

19   engage in surveillance, for instance.

20           But in *Lujan*, a case my adversary cited, the

21   Supreme Court said that when the plaintiff himself is the,

22   quote, "object of regulation," standing is almost

23   trivially easy to demonstrate.

24           So this is not a situation about someday

25   intentions, environmental cases where the plaintiff is not

1    the object of the regulation and may or may not travel to

2    the national park where the development is taking place;

3    this is a case where the law directly applies to the

4    plaintiffs who are bringing this action.  There's no

5    speculation about someday intention, particularly in light

6    of the allegations in paragraph 20.

7            So now I'll move to the credible threat of

8    enforcement.  In *Hedges v. Obama*, the Second Circuit made

9    very clear that there was a strong presumption in favor

10   that new laws will be enforced, and here that presumption

11   is validated by the legislative analysis that accompanied

12   the enactment of 31-51q, for in that report the General

13   Assembly note that had it expected this law to be enforced

14   by the Attorney General, by the Commissioner of Labor,

15   pursuant to the pre-existing authorities under 31-69a.

16           So all of the history that Mr. Wydra talks about

17   in his declaration, that's irrelevant.  That was before

18   31-51q was radically expanded by the Assembly last year.

19   It's also legally irrelevant because, as the Second

20   Circuit told us in the *Pacific Capital Bank* case which is

21   cited in *Hedges v. Obama* and quoted:  Absence of past

22   enforcement or even speculation or uncertainty about

23   future enforcement are not enough to overcome the strong

24   presumption that a new law will be enforced.

25           As Mr. Holzman candidly said today, they are not

```
1    disavowing enforcement.  The only thing the Second Circuit
2    has ever said that would overcome the presumption is a
3    disavowal.  They're not disavowing it today.  Mr. Wydra
4    lacks the authority to disavow -- he's a mid-level
5    employee.  So, in our view, that presumption of
6    enforcement carries the day on Article III standing.
7              THE COURT:  Thank you.
8              Attorney Holzman, do you wish to respond?
9              MR. HOLZMAN:  Yes, Your Honor.
10             First of all, on the question of whether the
11   conduct applies or does not apply, I agree and I think
12   we've said clearly that the standard is -- it has to
13   either apply or arguably apply.  The interpretation has to
14   be reasonable enough.  So I agree with him on that.
15             But it's not reasonable enough -- it's not
16   arguable that the statute covers meetings and
17   communications.  If you look at paragraph 20, it begins by
18   saying that they had meetings and communications and that
19   they required their employees to attend, talking about the
20   past.  Lujan says very clearly, what you do in the past
21   doesn't matter; you have to allege something concrete
22   about what you're going to do in the future.  And so, what
23   do they allege about what they're going to do in the
24   future?  That's at the end of the paragraph, and all they
25   talk about is meetings and communications.  They don't
```

1    talk about making it mandatory, they certainly don't talk

2    about disciplining or firing anybody or threatening or any

3    of that.  None of that is in the complaint.  The only

4    thing that they say that they want to engage in are

5    meetings and communications.  That's clearly just not

6    covered by the statute.  And so --

7              THE COURT:  If they had put in, in the last

8    sentence, that CBIA believes it must either refrain from

9    future -- if they had put in future "mandatory" meetings

10   and communications in those meetings, would that change

11   your analysis?

12             MR. HOLZMAN:  If they had just used the word

13   "mandatory" in there, you mean?

14             THE COURT:  Yeah.

15             MR. HOLZMAN:  No, because, again, it doesn't

16   prohibit -- when you're saying, we want to have mandatory

17   meetings, the assumption there is that the statute

18   prohibits the mandatory meetings themselves.  Meaning that

19   when I have the meeting, I have already violated the

20   statute.  It doesn't.  There's a degree of separation

21   between the meetings/communications and the subsequent

22   conduct that is actually regulated.  So just having the

23   meeting isn't enough to allege conduct that's actually

24   covered by the statute.

25             And so -- and I wanted to get back to that third

1    element about credibility of enforcement.  And so, my

2    opponent talked about the presumption of enforcement.

3    There is a presumption of enforcement that arises when the

4    statute clearly applies.  So that presumption, it doesn't

5    apply here.  It's not a presumption that applies in all

6    cases, that the government is going to enforce a statute

7    in all cases no matter what.  There's no presumption that

8    you have standing to bring a pre-enforcement challenge.

9    The Supreme Court said very clearly in the *Whole Woman's*

10    *Health* decision, nobody is entitled to bring a

11    pre-enforcement challenge on the basis of any statute.

12           And it could simply be the case, as the Supreme

13    Court went on to explain, that some statutes just don't

14    lend themselves to pre-enforcement review because that's

15    just not how they operate.  And so, that means if you want

16    to challenge the constitutionality of 31-51q, you can do

17    so as a defense to a lawsuit that's brought against you.

18    But there's nothing in this record that establishes a

19    credible threat of enforcement in this case based on some

20    meetings they say they want to have sometime in the future

21    that they may never have -- we don't know exactly how

22    they're going to react to an employee not showing up at

23    the meetings.  It's just pure speculation.

24           So absence of past enforcement, Your Honor, so

25    the Second Circuit has said that when -- and it says this

1    again in the *Vitagliano* case -- that when all the other

2    requirements of standing are met, the absence of past

3    enforcement in and of itself does not negate what

4    otherwise would be a valid claim of standing.  So I agree

5    with that.

6              But here we have a very different situation

7    because all the other requirements of standing are not met

8    in this case.  And we have a declaration in the record

9    about how DOL interprets this statute, and they wouldn't

10   interpret it as covering just meetings and communications.

11   So we have affirmative evidence in the record -- not a

12   full-blown disavowal, but we don't need that under this

13   element.  All that it requires is, is there a credible

14   threat of enforcement for the conduct that they're

15   alleging that they want to engage in?  And we don't have

16   that in this case.

17             And that's all I have, Your Honor, on standing,

18   if the Court has questions.

19             THE COURT:  Thank you.

20             Attorney Killian, the disconnect between the

21   conduct that gives rise to penalties, I think, if I'm

22   hearing correctly -- and Attorney Holzman will tell me if

23   I got it wrong -- is that there is an inadequate

24   connection between the allegations of what you want to do

25   versus what is -- would subject you to liability.  And I

think you addressed that already, but I would ask you to
circle back on that as well.

MR. KILLIAN:  Yes, Your Honor.  As I said when I
was describing 31-51q, what the employer says at the
meeting has an effect on what the employer can do
afterwards.  If the employer convenes employees -- even if
the employer doesn't call it a mandatory meeting, if the
employer convenes employees to that meeting and says, you
shouldn't support this person for governor because I don't
like what he's going to do for my business and you guys
may lose your jobs eventually, then that speech prohibits
the employer afterwards from taking any discipline against
employees who chose not to go to that meeting.  Can't fire
them.  Can't reprimand them.  Can't put a note in their
file.

So the law has an effect on the employer,
operates on the employer at these mandatory meetings.
That's apart from the threatening component.  You know,
just saying, I'm going to have a meeting on whether we're
going to talk about whether this law is good or bad for
our business and I want everybody to come, we think that
that reasonably communities a threat such that it would be
arguably covered by the law for these purposes.

And so, the employer is, based on what is said
at the meeting, limited in whether he or she can make it a

1    mandatory meeting, whether he or she can take any actions

2    on the employees afterwards.

3         And so, paragraph 20 says that CBIA would like

4    to have future meetings about political issues.  Whether

5    mandatory or not, having that meeting limits what CBIA can

6    do afterwards with respect to its employees.  And that's

7    the Article III injury, the restriction over the

8    employer's ability to take disciplinary action.

9         And I'll also pivot just briefly to the

10   preemption argument.  We've been focused a lot today on

11   our briefs and the First Amendment, but our allegation is

12   that the National Labor Relations Act gives employers a

13   right to have these mandatory meetings, a right to speak

14   to employees about labor issues apart from the First

15   Amendment.

16        And so, that preemption argument doesn't even

17   need to rise to the level of a bull-blown First Amendment

18   problem.  If we allege, as we have, that there is a

19   federally protected right for employers who tell their

20   employees what the employer thinks about unionization,

21   this law says, well, if you do that, you can't fire the

22   employees anymore.

23        Does that answer Your Honor's question?

24        THE COURT:  It did, thank you.

25        MR. KILLIAN:  Okay.

1          MR. HOLZMAN:  Can I respond briefly to that,

2     Your Honor?

3          THE COURT:  Sure, sure.

4          MR. HOLZMAN:  So I don't know that that

5     completely answers the question because the idea that what

6     is said at the meeting can impact what they can possibly

7     do later on, all that that means is that if what you say

8     at the meeting, that makes it a meeting about a political

9     or religious matter within the meaning of the statute.

10          But, again -- and this is the last time I'm

11     going to say this -- the statute doesn't prohibit these

12     meetings; it only prohibits what they do later on.  All

13     the stuff about what they can't do later on in response to

14     somebody not showing up, they haven't alleged that they

15     want to do any of that stuff because we're not there yet

16     because --

17          THE COURT:  So if they decide they're going to

18     talk about political matters, then they're making that

19     decision knowing that they are now restricted by the

20     statute as to what they can do after the meeting.  So they

21     have to decide, are we going to talk about political

22     matters or are we not going to talk about political

23     matters, because of those limitations that flow from that

24     decision.  And isn't that exactly the impact on First

25     Amendment rights that gets them in the door?

```
1              MR. HOLZMAN:  No, it isn't, because the statute

2     doesn't prohibit that.  I mean, they can have all the

3     meetings they want.  That's their decision.  If they want

4     to have them, they can have them.  There's nothing that

5     prohibits them from doing that.  The only thing they can't

6     do is react negatively or re -- in a retaliatory way to

7     people who don't want to show up.  That comes later.

8              THE COURT:  Okay.

9              MR. KILLIAN:  If I may respond very briefly to

10    that?

11             THE COURT:  Sure.

12             MR. KILLIAN:  It's not a matter of prohibition;

13    it's a matter of burden.  If the state passed a law that

14    said, you can have these meetings, just pay us $1 to have

15    the meeting, that would flagrantly violate the First

16    Amendment, to require paying the state just to have

17    permission to speak to an employee.

18             This is not directly a monetary case, but it

19    still imposes a burden on the employer, as Your Honor

20    noted, at the time during the meeting, what to talk about

21    before the meeting, because the future actions that the

22    employer may or may not want to take are limited by

23    31-51q.

24             MR. HOLZMAN:  Can I just respond very briefly to

25    that?  And then I have nothing else after that.
```

1          So I think we are getting into the merits a

2     little bit now --

3          THE COURT:  I think you are.

4          MR. HOLZMAN:  -- but I think the question of

5     whether the statute covers the conduct that they're

6     alleging is not -- it's part of the merits, but it's also

7     standing.

8          So imagine if you had a law that said that you

9     can assault somebody for refusing to listen to your

10    political speeches, and you say, I don't want to give

11    political speeches now.  I mean, you wouldn't have

12    standing to challenge that law because you haven't alleged

13    any intention to engage in the later subsequent conduct.

14         I mean, so you could say there, well, look,

15    there's a later regulation of conduct that is triggered

16    depending on what is said in the meeting, whether it's

17    political or not political.  But that has absolutely

18    nothing to do with the decision of whether to have the

19    meeting itself.  It's completely distinct.

20         THE COURT:  Well, it's not whether to have the

21    meeting; it's what you say at the meeting that is impacted

22    by the statute.

23         MR. HOLZMAN:  Well, for standing purposes, it's

24    whether you have a legitimate fear of a statute being

25    enforced against you if you, according to their complaint,

1    have these meetings.  And they don't have that because

2    that's not what the statute prohibits.

3             THE COURT:  Okay.  Are we done?

4             Okay.  Give me five minutes.  I want to take a

5    brief recess.  I also want to look quickly at this case,

6    and I may have more questions.  So we're going to take a

7    brief recess.

8                     (A brief recess was taken.)

9             THE COURT:  Thank you, counsel.  I wanted to

10   read the case from the Second Circuit.  I wanted to

11   collect my thoughts.  I had not heard the Eleventh

12   Amendment argument yet, so why don't we do that now.

13            Attorney Holzman -- or, perhaps?  I don't know.

14            MR. HOLZMAN:  Yes, Your Honor.  So with respect

15   to the Eleventh Amendment, I think the plaintiffs agree,

16   certainly, that the Department of Labor is not a defendant

17   under *Ex parte Young* --

18            THE COURT:  They'll be dismissed.

19            MR. HOLZMAN:  Yes, thank you -- and the Attorney

20   General -- so *Whole Woman's Health* discusses when and how

21   to bring state officials in as defendants under *Ex parte*

22   *Young*.  And what it establishes is that, first of all, you

23   need to have enforcement authority in this area and that

24   it can't be unduly speculative in bringing them in and

25   that they will actually do something to enforce the

1   statute against you.  Just alleging you have a chilling

2   effect of having these statutes on the books is not

3   enough.  Justice Thomas talks about that at length in his

4   concurring dissenting opinion, and Justice Gorsuch on

5   behalf of the Court agrees with all of those principles

6   and finds that they were satisfied under the facts of that

7   particular case.

8          The facts of this particular case are quite

9   different, as established by Mr. Wydra's declaration.  I

10  already laid out all the steps that would all have to take

11  place in terms of fruition, in terms of a $300 civil

12  penalty -- and I won't go through all those again.

13         But it's our position that it's too speculative

14  at this point that the Labor Commissioner will actually

15  bring an enforcement action based on what we have in this

16  complaint, against any of these plaintiffs.  And it's

17  certainly too speculative to believe that the Attorney

18  General will, at even a later stage if the Labor

19  Commissioner decides to submit the case to the Attorney

20  General, will bring an enforcement action against these

21  plaintiffs.

22         So, in our view, they're not proper *Ex parte*

23  *Young* defendants, Your Honor.

24         THE COURT:  Okay, thank you.

25         MR. KILLIAN:  Under *Ex parte Young*, the standard

1    is pretty simple.  It's just two requirements.  One, is

2    there an alleged violation of federal law?  Two, are the

3    plaintiffs seeking prospective relief to enjoin

4    enforcement of that law?

5            That's exactly what we've done here.  We've

6    alleged and we've spent a lot of time already this morning

7    talking about the alleged violation of federal law, and

8    the suit does seek prospective relief, injunctive

9    declaratory relief, to enjoin the enforcement.

10           What Mr. Holzman has been talking about today

11   really is a ripeness argument that he's bringing in

12   through the *Ex parte Young* lens.  It's the same credible

13   argument that we've discussed already at length this

14   morning, just being repackaged in the *Ex parte Young*

15   exception to sovereign immunity.

16           We think *Whole Woman's Health* strongly supports

17   our position in this case in that *Whole Woman's Health*

18   found -- held, I should say -- that the *Ex Parte Young*

19   exception applied or repealed the sovereign immunity of

20   the Texas licensing officials who were the defendants who

21   were charged with enforcement authority over SB 8.

22           The Court held that the Attorney General of

23   Texas was not a proper defendant and had sovereign

24   immunity because the Texas law SB 8 clearly stated that it

25   could not be enforced by the Attorney General.  But we're

1    not in that situation here.  It's the exact opposite,

2    given the enforcement powers under 31-69a.

3            THE COURT:  All right, thank you.

4            While I don't think it's necessarily an obvious

5    outcome, I do think, consistent with the Second Circuit

6    precedent to include the recent *Vitagliano* decision, that

7    the CBIA has adequately alleged organizational standing to

8    include Article III injury in fact.  And I've had an

9    opportunity to sort of put my notes together -- frankly,

10   edited -- after hearing the arguments that I heard this

11   morning, so bear with me.

12           Plaintiffs, a coalition of Connecticut-based and

13   national business and trade organizations, have challenged

14   on behalf of themselves and their members the

15   constitutionality of the recently amended Connecticut

16   General Statutes Section 31-51q, which, as relevant to

17   this case, generally prohibits an employer from

18   disciplining an employee who refuses to attend

19   employer-sponsored meetings or refuses to listen to speech

20   relating to their employer's opinion on political and

21   religious matters.  These meetings are often termed

22   "captive audience meetings."

23           Of significance to these plaintiffs, Connecticut

24   has identified "political matters," to include "the

25   decision to join or support any labor organization."  The

1    statute is enforced in two ways.  First, Section 31-51q(b)

2    provides that an employee who is disciplined can sue for

3    loss of wages or compensation.  Second, Connecticut

4    General Statute Section 31-69a provides that an employer

5    who violates Section 31-51q shall be liable to the

6    Department of Labor for a civil penalty of $300, and

7    further provides that the Attorney General, upon complaint

8    of the Labor Commissioner, shall institute civil actions

9    to recover such penalties.

10          Plaintiffs bring this action pursuant to 1983

11   and *Ex parte Young*, contending that Section 31-51q

12   violates their First and Fourteenth Amendment rights and

13   is preempted by the National Labor Relations Act.

14          Defendants move to dismiss the complaint for

15   lack of subject matter jurisdiction pursuant to Rule

16   12(b)(1), arguing that plaintiffs lack standing to sue,

17   their claims are unripe, and the Eleventh Amendment bars

18   this suit.

19          Plaintiff, as we've already discussed, has

20   acknowledged that the motion to dismiss may be granted as

21   to the Department of Labor.  I would -- those claims are

22   dismissed, and the clerk is respectfully requested to

23   terminate this defendant.  The claims against Commissioner

24   Bartolomeo and Attorney General Tong in their official

25   capacities remain.

1          In this case, because the doctrines of standing

2     and ripeness arise from the same Article III limitation,

3     I'm going to sort of address them together.  And, as we've

4     already discussed, the defendants have not raised the

5     ripeness doctrine as a prudential concern in seeking to

6     dismiss the complaint, but really the confluence of

7     ripeness and injury in confirming Article III standing.

8          The law that I am required to apply as to

9     whether these plaintiffs have standing to sue is well

10     established.  Article III of the Constitution limits the

11     jurisdiction of federal courts to cases and controversies.

12     The doctrine of standing gives meaning to these

13     constitutional limits "by identifying those disputes which

14     are appropriately resolved through the judicial process."

15     *That's Lujan v. Defenders of Wildlife.*

16          To establish Article III standing, a plaintiff

17     must show:  One, an injury in fact; two, a sufficient

18     causal connection between the injury and the conduct

19     complained of; and three, a likelihood that the injury

20     will be redressed by a favorable decision.  And that's

21     *Lujan* again.

22          An organization such as the CBIA may bring a

23     Section 19-83 suit on behalf its members, "so long as it

24     can independently satisfy the requirements of Article III

25     standing."  That's *Nnebe v. Daus*, that's a Second Circuit

1    case.

2           The defendants argue that plaintiffs cannot

3    satisfy the injury-in-fact requirement of standing because

4    the statute does not proscribe the holding of meetings and

5    the content of those meetings, and further that the

6    plaintiffs' claimed injuries are wholly speculative and

7    rely on a series of hypotheticals with respect to a

8    statute that has never been enforced.

9           I'm going to address these issues with

10   particular focus on the CBIA.  An injury sufficient to

11   satisfy Article III must be concrete and particularized,

12   and actual or imminent, not conjectural or hypothetical.

13   "An allegation of future injury may suffice if the

14   threatened injury is certainly impending or there is a

15   substantial risk that the harm will occur."  That's

16   *Susan B. Anthony List*.

17          This case presents a pre-enforcement claim

18   brought under the First Amendment.  The Second Circuit has

19   observed that these claims are viewed under somewhat

20   relaxed standing and ripeness rules.  That's *National*

21   *Organization for Marriage v. Walsh*.

22          When -- and I'm quoting *Walsh* now, "a plaintiff

23   has alleged an intention to engage in a course of conduct

24   arguably affected with a constitutional interest, but

25   proscribed by a statute, and there exists a credible

1    threat of prosecution thereunder, that plaintiff should

2    not be required to await and undergo a criminal

3    prosecution as the sole means of seeking relief."

4          The same standard has been applied in civil

5    cases as well.  Indeed, the injury-in-fact requirements

6    are relaxed in pre-enforcement cases in recognition of the

7    fact that plaintiffs contesting statutes or regulations on

8    First Amendment grounds "face an unattractive set of

9    options if they are barred from bringing a facial

10   challenge," refraining from activity they believe the

11   First Amendment protects, or risk civil or criminal

12   penalties for violating the challenged law.  That's also

13   in *Walsh*.

14         Here, the fact that the statute has never been

15   enforced gives no pause.  The Second Circuit has explained

16   that there is nothing that prevents the state from

17   changing its mind.  It is not forever bound, by estoppel

18   or otherwise, to view the law that it asserts in this

19   litigation.

20         Part of what makes the Court's approach in these

21   cases forgiving is that it appears willing to presume that

22   the government will enforce the law as long as the

23   relevant statute is "recent and not moribund."  That's

24   *Hedges v. Obama*.

25         And the recent amendment to Connecticut General

1    Statute 31-51q to expand and address situations where an

2    employee refuses to attend an employer-sponsored meeting

3    or listen to speech relating to an employer's opinion on

4    political and religious matters makes the negligible

5    enforcement history unpersuasive in assessing whether

6    these plaintiffs have sufficiently alleged the requisite

7    credible threat of enforcement in order to establish an

8    injury in fact.

9         So for these reasons, at the very least, I find

10   the CBIA has adequately asserted organizational standing

11   for the 1983 claims.  Plaintiffs have alleged that CBIA

12   has held meetings with and provided written and other

13   communications to employees about political issues.  CBIA

14   has required all employees, including who are not engaged

15   in political advocacy, to attend these meetings, and

16   during those meetings CBIA communicated its opposition to

17   political positions taken by public-sector labor

18   organizations.

19        Plaintiffs have also alleged that the CBIA

20   believes that Section 31-51q exposes CBIA and its member

21   companies to financial liability, costs, and attorneys'

22   fees based on any meetings or communications concerning

23   political issues that CBIA and its member companies

24   conduct or issue in the future, and, finally, that the

25   CBIA and its member companies must either refrain from

1    future mandatory meetings and communications concerning

2    political issues or go forward with such meetings and

3    communications, thus exposing themselves to legal risk,

4    including liability, costs, and attorneys' fees.

5         As the Supreme Court has recognized, there is

6    harm in being forced to modify one's behavior in order to

7    avoid future adverse consequences.

8         The defendants' argument that the statute

9    regulates conduct, disciplining employees and not speech,

10   as a means of defeating the plaintiffs' standing, as I

11   said, while not obvious, is not persuasive.  Plaintiffs

12   have alleged that Section 31-51q has had a negative impact

13   on what would otherwise be speech protected by the First

14   Amendment.

15        Calling a meeting "mandatory" carries with it an

16   understanding on the employee's part that there may be

17   consequences for failing to attend that meeting and an

18   expectation for the employer that such consequences should

19   be available to it, but that is precisely what the statute

20   proscribes.

21        I note, however, that the defendants may renew

22   this argument at the summary judgment stage.  This

23   argument really goes -- I think everybody agreed to a

24   certain extent -- to the merits of plaintiffs' claims,

25   specifically whether, or the extent to which, the statute

1    implicates or burdens an employer's First Amendment rights

2    and the appropriate remedy should this question be

3    answered in the affirmative.

4    And also, as we've already discussed, because I

5    determine that CBIA has organizational standing, the Court

6    does not need to take up whether CBIA has adequately

7    alleged associational standing or whether any of the other

8    plaintiffs have alleged either associational or

9    organizational standing.  That was the process followed by

10   Judge Arterton in *Ross v. Mellekas*.  It has been approved,

11   I think, by the Second Circuit and even implicitly

12   endorsed by the Supreme Court in the *Rumsfeld* decision.

13   We have -- all of the plaintiffs are seeking

14   identical relief and presenting identical arguments, and

15   so -- and I think I have the parties' agreement that

16   there's really no need to delve into what would be sort of

17   murky waters regarding the adequacy of the other

18   plaintiffs' allegations with respect to standing or

19   whether *Ex parte Young* provides an independent basis for

20   federal question jurisdiction.

21   I also conclude that the Eleventh Amendment

22   sovereign immunity does not bar plaintiffs' claims because

23   their claims do fall within the *Ex parte Young* exception

24   for prospective and injunctive relief within state

25   officers in their official capacity.

1          Although the defendants cite to *Whole Woman's*

2   *Health v. Jackson*, I find that that case actually supports

3   the Court's conclusion.  In *Whole Woman's Health*, the suit

4   was allowed to go forward against the executive officials

5   tasked with enforcing the statute, holding that, and

6   quote, "these particular defendants fall within the scope

7   of *Ex parte Young's* historic exception to state sovereign

8   immunity.

9          Likewise here, Section 31-69a provides that the

10  Attorney General, upon complaint of the Labor

11  Commissioner, can bring civil actions to recover the

12  penalties contemplated by 31-51q.

13         And, as noted by Chief Justice Roberts in his

14  concurrence, plaintiffs may bring this pre-enforcement

15  suit challenging section 31-51q, quote, "because there

16  exist state executive officials who retain authority to

17  enforce it."

18         For all of those reasons, the motion to dismiss

19  is denied.

20         Anything else we can do this morning from the

21  plaintiff's perspective?

22         MR. KILLIAN:  No, thank you, Your Honor.

23         THE COURT:  And for the defense?

24         MR. HOLZMAN:  No, Your Honor.

25         THE COURT:  Thank you.  All right.  Counsel, let

1    me just say, the briefing was very good.  The oral

2    argument was exceptional.  Always makes my job easier to

3    have prepared and capable lawyers, so thank you.

4                    (Concluded at 11:20 a.m.)

5

6

7                         CERTIFICATE

8

9        RE: *UNITED STATES CHAMBER OF COMMERCE, ET AL. v*
                    *BARTOLOMEO, ET AL.*

10

11              Case No. 3:22-cv-01373-KAD

12

13          I, Cassie Zayas, RPR, Official Court Reporter

14    for the United States District Court, District of

15    Connecticut, do hereby certify that the foregoing 50 pages

16    are a true and accurate transcription of my stenographic

17    notes taken in the aforementioned matter to the best of my

18    skill and ability.

19

20                         _ /s/   CASSIE ZAYAS_____

21                         Official Court Reporter
                          United States District Court
22                         915 Lafayette Boulevard
                          Bridgeport, CT 06604

23

24

25