UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DANTÉ BARTOLOMEO, *et al.*,<br><br>Defendants. | Civil Action No. 3:22-cv-1373 |

PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

BACKGROUND ................................................................. 3

    I.    Factual Background ................................................ 3

        A.    Through the NLRA, Congress protected employers' right to speak with employees about unionization.............................. 3

        B.    Connecticut and Congress rejected banning captive-audience meetings. ........................................................ 5

        C.    In 2022, Section 31-51q was amended to limit employer speech on "political matters," including unionization................ 7

        D.    Connecticut employers have stopped communicating about "political matters" during mandatory meetings............... 8

    II.    Procedural Posture ................................................ 10

STANDING ................................................................. 10

    I.    CBIA is experiencing a pre-enforcement injury.................... 11

    II.    CBIA's injury is traceable to Defendants' conduct and redressable.......................................................... 15

ARGUMENT ................................................................. 17

    I.    Section 31-51q violates the First and Fourteenth Amendments. ....... 17

        A.    Section 31-51q regulates speech, not just conduct. .................. 17

        B.    Section 31-51q discriminates based on content and viewpoint. ........................................................ 19

        C.    Section 31-51q fails strict scrutiny. ............................ 22

    II.    The NLRA preempts Section 31-51q. ............................. 27

        A.    *Garmon* preemption applies........................................ 28

        B.    *Machinists* preemption applies. .................................. 31

        C.    Section 31-51q's regulation of anti-union speech cannot be severed from the rest of the Act. ................................ 32

CONCLUSION................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*281 Care Comm. v. Arneson,*
    638 F.3d 621 (8th Cir. 2011) ................................................................. 16

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023) ....................................................................... 17, 25

*Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge,*
    403 U.S. 274 (1971) ............................................................................ 4

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ........................................................................... 14

*Babbitt v. United Farm Workers Nat'l Union,*
    442 U.S. 289 (1979) ........................................................................... 14

*Babcock & Wilcox,*
    77 NLRB 577 (1948) ........................................................................... 5

*Bond v. Floyd,*
    385 U.S. 116 (1966) ........................................................................... 25

*Bonwit Teller, Inc. v. NLRB,*
    197 F.2d 640 (2d Cir. 1952) .................................................................. 5

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ........................................................................... 35

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011) .......................................................................... 23

*Brown v. Kemp,*
    86 F.4th 745 (7th Cir. 2023) ............................................................... 16

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ............................................................................. 24

*Burton v. City of Hartford,*
    127 A.2d 251 (Conn. 1956) .................................................................. 34

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017) ....................................................................... 11, 17, 35

*Chamber of Commerce v. Brown,*
  554 U.S. 60 (2008) ............................................................................................. *passim*

*Clark Bros. Co.,*
  70 NLRB 802 (1947) ............................................................................................... 4

*Cohen v. California,*
  403 U.S. 15 (1971) ................................................................................................. 25

*Cotto v. United Techs. Corp.,*
  738 A.2d 623 (Conn. 1999) .................................................................................... 5

*Detroit Hosp.,*
  249 NLRB 449 (1980) ........................................................................................... 29

*Eclipse Enters. v. Gulotta,*
  134 F.3d 63 (2d Cir. 1997) ................................................................................... 22

*Educ. Ass'n v. McGowan,*
  311 F.3d 501 (2d Cir. 2002) .................................................................... 28, 30, 31

*EEOC v. CBS, Inc.,*
  743 F.2d 969 (2d Cir. 1984) ................................................................................. 34

*FEC v. Cruz,*
  596 U.S. 289 (2022) ....................................................................................... 11, 16

*FEC v. Wis. Right to Life, Inc.,*
  551 U.S. 449 (2007) .............................................................................................. 21

*First Nat'l Bank of Boston v. Bellotti,*
  435 U.S. 765 (1978) .............................................................................. 1, 12, 17, 18

*D.S. ex rel. Ford v. Wilson,*
  60 F.4th 770 (4th Cir. 2023) ................................................................................. 16

*Forsyth County v. Nationalist Movement,*
  505 U.S. 123 (1992) .............................................................................................. 24

*Gen. Elec. Co.,*
  240 NLRB 479 (1979) ........................................................................................... 29

*Glacier Nw., Inc. v. Int'l B'hood of Teamsters Loc. Union No. 174,*
    598 U.S. 771 (2023) ........................................................................................ 3

*Healthcare Ass'n of N.Y. State v. Pataki,*
    471 F.3d 87 (2d Cir. 2006) ......................................................................... 32

*Honeyfund.com v. Governor,*
    94 F.4th 1272 (2024) ..................................................................... 2, 19, 20, 26

*Iancu v. Brunetti,*
    588 U.S. 388 (2019) ...................................................................................... 20

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ...................................................................................... 26

*Knife Rts. v. Vance,*
    802 F.3d 377 (2d Cir. 2015) ................................................................. 11, 15

*Linn v. United Plant Guard Works of Am. Local 114,*
    383 U.S. 53 (1966) .......................................................................................... 5

*Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp. Rels. Comm'n,*
    427 U.S. 132 (1976) .............................................................................*passim*

*McCullen v. Coakley,*
    573 U.S. 464 (2014) ................................................................................ 22, 25

*Members of the City Council v. Taxpayers for Vincent,*
    466 U.S. 789 (194) ........................................................................................ 20

*Mills v. Alabama,*
    384 U.S. 214 (1966) ...................................................................................... 12

*Minn. Voters All. v. Mansky,*
    585 U.S. 1 (2018) .......................................................................................... 21

*Murphy v. Nat'l Coll. Ath. Ass'n,*
    584 U.S. 453 (2018) ...................................................................................... 33

*Nat'l Advertising Co. v. Town of Niagara,*
    942 F.2d 145 (2d Cir. 1991) ....................................................................... 33

*Nat'l Ass'n of Mfrs. v. NLRB,*
    717 F.3d 947 (D.C. Cir. 2013) .............................................................. 24, 32

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
    138 S. Ct. 2361 (2018) ........................................................................... 21, 25

*Nat'l Org. for Marriage, Inc. v. Walsh,*
   714 F.3d 682 (2013) ................................................................................ 14

*NCRNC, LLC v. NLRB,*
   94 F.4th 67 (D.C. Cir. 2024) .................................................................. 32

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ................................................................................ 25

*NLRB v. Gissel Packing Co.,*
   395 U.S. 575 (1969) .................................................................................. 5

*NLRB v. Ins. Agents In'tl Union,*
   361 U.S. 477 (1960) ................................................................................ 21

*NLRB v. Vill. IX,*
   723 F.2d 1360 (7th Cir. 1983) .............................................................. 24

*Picard v. Magliano,*
   42 F.4th 89 (2d Cir. 2022) ..................................................................... 11

*RAV v. City of St. Paul,*
   505 U.S. 377 (1992) ........................................................................... 2, 21

*Reed v. Town of Gilbert,*
   576 U.S. 155 (2015) .......................................................... 2, 19, 20, 22

*San Diego Bldg. Trades Council v. Garmon,*
   359 U.S. 236 (1959) ......................................................................*passim*

*Seals v. Hickey,*
   441 A.2d 604 (Conn. 1982) ................................................................... 33

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
   502 U.S. 105 (1991) ........................................................................... 2, 18

*Snyder v. Phelps,*
   562 U.S. 443 (2011) ................................................................................ 25

*Sorrell v. IMS Health Inc.,*
   564 U.S. 552 (2011) .......................................................... 2, 18, 20, 24

*Southside Fair Hous. Comm. v. City of New York,*
   928 F.2d 1336 (2d Cir. 1991) ............................................................... 15

*Southwire Co. v. NLRB,*
   383 F.2d 235 (5th Cir. 1967) ............................................................... 30

*State v. Bell,*
    931 A.2d 748 (Conn. 2007) ................................................................... 33

*Street v. New York,*
    394 U.S. 592 (1969) ............................................................................. 24

*Thomas v. Collins,*
    323 U.S. 516 (1945) ............................................................................... 1

*Tucson v. City of Seattle,*
    91 F.4th Cir. 1318 (9th Cir. 2024) ...................................................... 16

*Tweed-New Haven Airport Auth. v. Tong,*
    930 F.3d 65 (2d Cir. 2019) ............................................................ 14, 15

*Varley v. First Student, Inc.,*
    158 Conn. App. 482 (2015) .................................................................. 15

*Virginia v. Am. Booksellers Ass'n, Inc.,*
    484 U.S. 383 (1988) ............................................................................. 13

*Virginia v. Black,*
    538 U.S. 343 (2003) ............................................................................. 18

*Vitagliano v. County of Westchester,*
    71 F.4th 130 (2d Cir. 2023) ............................................. 12, 13, 14, 16

*New Haven Comm'n on Equal Opportunities ex rel. Washington v.*
    *Yale University,*
    439 A.2d 404 (Conn. 1981) .................................................................. 34

*Ex parte Young,*
    209 U.S. 123 (1908) ............................................................................. 10

## Federal Statutes

29 U.S.C. § 157 ................................................................................... 28, 30

29 U.S.C. § 158 .................................................................................. *passim*

42 U.S.C. § 1983 ...................................................................................... 10

## State Statutes & Bills

Conn. Gen. Stat. § 31-40p ................................................................... 34

Conn. Gen. Stat. § 31-51q ............................................................ *passim*

Conn. Gen. Stat. § 31-69a ............................................................ 8, 15

Conn. Pub. Act No. 83-578 ................................................................. 5

HB 5473, *An Act Concerning Captive Audience Meetings* (Conn. 2018) ............. 6, 34

SB 64, *An Act Concerning Captive Audience Meetings* (Conn. 2019) ................. 6, 24

SB 440, *An Act Protecting Employee Freedom of Speech and Conscience* (Conn. 2019) ........................................................ 6

SB 163, *An Act Protecting Employee Freedom of Speech and Conscience* (Conn. 2022) ........................................................ 7

## Other Authorities

An Act Protecting Employee Freedom of Speech and Conscience, OLR Bill Analysis, at 3 (Conn. Apr. 22, 2022), https://www.cga.ct.gov/2022/BA/PDF/2022SB-00163-R01-BA.PDF ...................... 8

Conn. A.G. Opinion No. 2018-02, 2018 WL 2215260 (Apr. 26, 2018) ................... 6, 27

Conn. A.G. Opinion 2019-03, 2019 WL 2246103 (May 17, 2019) ............................... 7

*Mandatory*, BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................. 13

Memorandum GC 22-04, *The Right to Refrain from Captive Audience and other Mandatory Meetings* (Apr. 7, 2022) ...................................... 30

U.S. CONST. art. VI, cl. 2 ................................................................................... 3

# INTRODUCTION

This is a straightforward case about rights protected under the First Amendment and the National Labor Relations Act ("NLRA"). In response to union lobbying efforts, the Connecticut General Assembly enacted legislation to prohibit so-called "captive-audience meetings" in the workplace. Connecticut employers now face State-imposed penalties if they require employees to attend meetings where they talk about "political matters," defined broadly to include a variety of topics including unionization. Conn. Gen. Stat. § 31-51q(a)(1), (b)(2) ("Section 31-51q" or "the Act").[1] Section 31-51q is unconstitutional in two respects.

First, the Act violates the First Amendment by regulating and chilling speech about political matters—speech "at the heart of the First Amendment's protection," *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978). And the Act doubles down by regulating and chilling union-related speech, which is just as vital. The right "to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly." *Thomas v. Collins*, 323 U.S. 516, 532 (1945).

Connecticut tries to frame its political-speech restriction as a regulation of employer conduct. At the motion-to-dismiss stage, the Commissioner of the

---

[1]     The Act restricts employers' ability to threaten to discipline or discharge, or actually discipline or discharge, employees for "refusal to (A) attend an employer-sponsored meeting … or (B) listen to speech or view communications." Conn. Gen. Stat. § 31-51q(b)(2). Because CBIA's organizational standing is based on meetings it has held in the past and meetings it will hold after Plaintiffs receive declaratory and injunctive relief, *see infra* STANDING, Plaintiffs refer only to the Act's regulation of meetings throughout this motion.

Connecticut Department of Labor, Danté Bartolomeo, and the Attorney General of Connecticut, William Tong, (collectively, "Defendants") asserted that the Act regulates only conduct, not speech. This Court was "not persua[ded]." Hr'g Tr. 47:8–11 (Dooley, J.), ECF No. 64. And for good reason. The Supreme Court has repeatedly rejected attempts to regulate speech by regulating conduct. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). Just last month, the Eleventh Circuit rejected a nearly identical conduct-not-speech argument when affirming the preliminary injunction of another state's content- and viewpoint-based mandatory meeting regulation. *See Honeyfund.com v. Governor*, 94 F.4th 1272 (2024).

Section 31-51q suffers the same fatal content- and viewpoint-based flaws. "Content-based laws … are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And "[v]iewpoint discrimination is censorship in its purest form," requiring the highest scrutiny "because such regulation often indicates a legislative effort to skew public debate on an issue." *RAV v. City of St. Paul*, 505 U.S. 377, 430 (1992) (Stevens, J., concurring in the judgment) (quotation omitted). Connecticut may argue that the Act protects employees from hearing unwanted political speech and discouragement to unionize. Such government interests fall far short of compelling; they are entirely illegitimate ends. It is impermissible for the State to burden employer speech on political matters and unionization in an effort to tilt the playing field in favor of labor unions. And even

2

if the State had identified a serious problem, the Act is both overinclusive and underinclusive as a solution. Legislation like this cannot survive strict scrutiny.

Second, the Act is preempted by federal labor law under the Supremacy Clause, U.S. CONST. art. VI, cl. 2. "It is a bedrock rule … that federal law preempts state law when the two conflict." *Glacier Nw., Inc. v. Int'l B'hood of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023). As the Supreme Court acknowledged when rejecting state efforts to muzzle employer views on unionization in *Chamber of Commerce v. Brown*, 554 U.S. 60, 67–68 (2008) (quotations omitted), Congress "implement[ed] the First Amendment" and "manifested a congressional intent to encourage free debate on issues dividing labor and management" through its amendments to the NLRA, 29 U.S.C. § 158(c). Because Section 31-51q's restrictions on employers' speech about unionization conflicts with the rights Congress expressly protected in Sections 7 and 8(c) of the NLRA, the Act is invalid under *Garmon* preemption. *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 244 (1959). And because Section 31-51q intrudes on an area that Congress intended to be free from state regulation, the Act is invalid under *Machinists* preemption. *See Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp. Rels. Comm'n*, 427 U.S. 132, 140 (1976).

## BACKGROUND

### I.   Factual Background

#### A.   Through the NLRA, Congress protected employers' right to speak with employees about unionization.

Congress enacted the NLRA as a "comprehensive national labor law" to address the "perceived incapacity of … state legislatures, acting alone, to provide an

informed and coherent basis for stabilizing labor relations conflict." *Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am. v. Lockridge*, 403 U.S. 274, 286 (1971).

Long before the State amended Section 31-51q to restrict mandatory meetings, Congress amended the NLRA to protect them. "As enacted in 1935, the NLRA … did not include any provision that specifically addressed the intersection between employee organizational rights and employer speech rights." *Brown*, 554 U.S. at 66 (2008) (citing Wagner Act, 49 Stat. 449). The National Labor Relations Board ("NLRB") mistook the NLRA's silence as an invitation to mandate "complete employer neutrality," imposing draconian speech restrictions on employers and undermining the "free debate" that Congress sought to promote. *Id.* at 66–68. Despite correction by the Supreme Court, *see id.* at 67 (citing *Thomas*, 323 U.S. at 537–38), the NLRB went on to hold that requiring employees "to listen to speeches relating to their organizational activities" violated the NLRA. *Clark Bros. Co.*, 70 NLRB 802, 805 (1947), *enforced*, 163 F.2d 373 (2d Cir. 1947). It justified this prohibition by a purported need to "protect[] employees" from "the employer's economic power which is inherent in his ability to control their actions during working hours." *Id.*

Congress repudiated the NLRB by adopting Section 8(c) of the NLRA and reaffirming the First Amendment rights of employers. Section 8(c) provides that an employer's "expressi[on] of any views, argument, or opinion … shall not constitute or be evidence of an unfair labor practice" provided "such expression contains no threat

of reprisal or force or promise of benefit." Taft-Hartley Act of 1947, 61 Stat. 136 (29 U.S.C. § 158(c)).

Section 8(c) of the NLRA makes "explicit" Congress's policy judgment that governments should stay out of the "freewheeling" debate over unionization. *Brown*, 554 U.S. at 66–68; *accord Linn v. United Plant Guard Works of Am., Loc. 114*, 383 U.S. 53, 62 (1966) (Section 8(c) "manifests a congressional intent to encourage free debate on issues dividing labor and management"). Consistent with Section 8(c), the NLRB and courts have long realized that employer speech about unions is protected and may not be declared unlawful based on the "'compulsory audience' aspect of the speech[]." *Babcock & Wilcox*, 77 NLRB 577, 578 (1948); *see, e.g., Brown*, 554 U.S. at 67; *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617–18 (1969); *Bonwit Teller, Inc. v. NLRB*, 197 F.2d 640, 646 (2d Cir. 1952).

## B. Connecticut and Congress rejected banning captive-audience meetings.

Against this backdrop, the State of Connecticut implemented its own speech protections—including through the original version of Section 31-51q, which was a relatively narrow law focused on *employee* expression. *See* Conn. Pub. Act No. 83-578 (1983). For decades, the statute ensured that no employees in Connecticut could be disciplined or discharged for exercising their free-speech rights in the workplace, by "extend[ing] the protection of federal and state constitutional rights" to private and public employees alike. *See Cotto v. United Techs. Corp.*, 738 A.2d 623, 627 (Conn. 1999).

Starting in 2018, the Assembly set out to change Section 31-51q by adding provisions that restrict (rather than protect) *employers'* speech. Before enacting the changes at issue in this case, the Assembly proposed three similar bills: HB 5473, SB 64, and SB 440. *See* House Bill 5473, *An Act Concerning Captive Audience Meetings* (Conn. 2018); Senate Bill 64, *An Act Concerning Captive Audience Meetings* (Conn. 2019); Senate Bill 440, *An Act Protecting Employee Freedom of Speech and Conscience* (Conn. 2019). Recognizing the legal issues implicated, Senator Fasano asked then-Attorney General Jepsen for an opinion on whether HB 5473 was preempted. Jepsen issued an opinion stating that the proposed ban on mandatory meetings would likely be preempted by the NLRA under both "*Garmon* preemption" and "*Machinists* preemption." Conn. A.G. Opinion No. 2018-02, 2018 WL 2215260 (Apr. 26, 2018). The next year, when asked for an analysis of SB 64 and SB 440, Attorney General Tong concluded that SB 64 would likely be found unconstitutional based on Attorney General Jepsen's prior analysis but that SB 440 was "substantively different" and could "be fairly defended as outside the scope of NLRA preemption." Conn. A.G. Opinion 2019-03, 2019 WL 2246103 (May 17, 2019). Tong contended that the State's police powers authorize it to shield employees from hearing speech they disagree with—including by enacting legislation to "protect the interest of the unwilling listener[s] who cannot avoid speech" by their employers. *Id.* at *3 (noting his theory was not "free from doubt"). All three bills failed.

C.    In 2022, Section 31-51q was amended to limit employer
speech on "political matters," including unionization.

During the 2022 legislative session, the Assembly proposed SB 163—which took elements from the three failed bills. SB 163 would make it unlawful for any Connecticut employer to "subject[] or threaten[] to subject any employee to discipline or discharge" based on the employee's "refusal to (A) attend an employer-sponsored meeting" or "(B) listen to speech or view communications" when "the primary purpose" of the meeting or communications was "to communicate the employer's opinion concerning … political matters." *An Act Protecting Employee Freedom of Speech and Conscience* (Conn. 2022). Forbidden "political matters" were defined broadly to include any "matters relating to elections for political office, political parties, proposals to change legislation, proposals to change regulation and the decision to join or support any political party or political, civic, community, fraternal or labor organization." *Id.* Many legislators and employers (including CBIA) warned that SB 163 would violate the First Amendment and be preempted by the NLRA. For example, based on the "glaring" inclusion of "labor organizations … in the definition of political matters," Senator Fazio opined that SB 163 "seems to be an attempt to sidestep what is a relatively clear interpretation of the National Labor Relations Act by the Supreme Court [in *Garmon*]." SR 1659–60. The bill nevertheless passed, was signed in May 2022, and went into effect in July 2022. Public Act No. 22-24.

Per preexisting State laws, Section 31-51q's new prohibitions on employers' speech became enforceable in two ways. First, employees can sue for damages. *See* Conn. Gen. Stat. § 31-51q(b). Second, the Commissioner of Labor and the Attorney

General can seek penalties from employers. Section 31-69a authorizes the Commissioner of Labor to investigate violations of state labor laws, seek penalties or fines from employers who violate them, and charge employers for employees' unemployment benefits related to such violations. *Id.* § 31-69a(a). Section 31-69a also authorizes the Attorney General to bring a civil action to recover penalties that the Commissioner assesses. *Id.* § 31-69a(c). In its official analysis of the law, the Assembly specifically noted that the new prohibitions on employers' speech will be enforced under Section 31-69a. An Act Protecting Employee Freedom of Speech and Conscience, OLR Bill Analysis, at 3 (Conn. Apr. 22, 2022), https://www.cga.ct.gov/2022/BA/PDF/2022SB-00163-R01-BA.PDF.

### D. Connecticut employers have stopped communicating about "political matters" during mandatory meetings.

Since its amendment, Section 31-51q has chilled the protected speech rights of Connecticut employers. The threat of State enforcement and penalties looms over employers that hold meetings or send messages about "political matters," broadly yet vaguely defined. Conn. Gen. Stat. § 31-51q(a)(1). As a result, employers are foregoing their right to speak, to their own detriment and the detriment of their employees.

Plaintiff CBIA is one such employer. CBIA is Connecticut's largest business association. *See* Statement of Undisputed Material Facts ("SMF") ¶ 1. It advocates for a better business climate, economic growth, and job opportunities for all residents. *Id.* ¶ 2. To accomplish that mission, CBIA engages in advocacy, lobbying, and communications on behalf of its employer members. *Id.* ¶ 3. Key to fulfilling CBIA's

mission is internal employee engagement. *See id.* ¶ 5. CBIA educates all of its employees—from graphic designers to lobbyists—about its mission. *See id.* ¶¶ 4–6.

CBIA requires all employees to attend weekly all-staff meetings. *Id.* ¶ 7. Before Section 31-51q's amendment, CBIA's mandatory all-staff meetings were the primary means of ensuring that all CBIA employees were aware of CBIA's ongoing advocacy and lobbying efforts. *Id.* ¶ 6. During most meetings, CBIA's President, Christian DiPentima, or its former Vice President of Public Policy, Eric Gjede, would present a "Policy Update" that included CBIA's latest institutional opinions on pending legislation, regulatory matters, candidates for office, and the like. *Id.* ¶ 12.

Since Section 31-51q's enactment, CBIA still holds mandatory all-staff meetings, but it has removed its public-policy updates from the weekly agendas. *Id.* ¶ 13. CBIA now refrains from discussing "political matters" out of concern for penalties. *Id.* ¶ 14. Because its public-policy efforts are central to its mission, CBIA wants to return to its old practice of discussing its advocacy and lobbying with all employees—including those whose roles do not directly involve public policy—at mandatory all-staff meetings. *Id.* ¶ 15. And because it believes its employees should be aware of the risks of unionizing, CBIA wants to hold mandatory meetings to communicate its opposition to labor organizations. *Id.* ¶ 18. During these union-related meetings, CBIA will explain the costs of expanding outdated, costly, and inflexible public-sector union practices to non-unionized private-sector workplaces, as well as the dangers of joining public- or private-sector unions. *Id.* As soon as Plaintiffs receive declaratory and injunctive relief from Defendants' enforcement of

9

Section 31-51q, CBIA will return to holding mandatory meetings in which it discusses these matters, including unionization. *Id.* ¶¶ 17–18. Any CBIA employee who refuses to attend all-staff meetings will be subject to discipline. *Id.* ¶ 19.

## II.    Procedural Posture

On November 1, 2022, Plaintiffs brought this suit for declaratory and injunctive relief, asserting a statutory cause of action under 42 U.S.C. § 1983 and the equitable cause of action recognized in *Ex parte Young*, 209 U.S. 123 (1908). Compl., ECF No. 1. They ask that the Court (1) declare that the Act violates the First and Fourteenth Amendments to the U.S. Constitution; (2) declare that the Act is preempted by the NLRA; and (3) enjoin Defendants from enforcing the Act against Plaintiffs and their members.

On December 27, 2022, Defendants moved to dismiss, asserting that all Plaintiffs lacked standing, that their claims were not ripe, and that the State was immune from suit. ECF No. 36. On June 28, 2023, the Court denied the motion as to the Attorney General and the Commissioner of Labor, holding that this case can proceed as long as one Plaintiff has Article III standing and finding that Plaintiffs adequately alleged CBIA's organizational standing. *See* Hr'g Tr. 41:4–49:19 (Dooley, J.), ECF No. 64.

## STANDING

This Court already held that Plaintiffs' complaint included facts sufficient to allege that CBIA has standing to challenge the 2022 amendments to Section 31-51q. *Id.* CBIA now proves these allegations—establishing its organizational standing to

obtain relief for all Plaintiffs. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (holding multiple plaintiffs can proceed to the merits based on a single plaintiff's standing).

For years, CBIA has promoted its institutional mission by educating all its employees on the organization's advocacy and lobbying efforts. SMF ¶ 6. To ensure all employees heard these updates, CBIA presented them during weekly all-staff meetings, which it requires all employees to attend. *Id.* ¶¶ 6–7. Section 31-51q has had a chilling effect on CBIA's speech and the content of these mandatory meetings. CBIA no longer provides public-policy updates so as to avoid penalties. *Id.* ¶ 14. Because the Act limits the content of CBIA's speech during its mandatory meetings, CBIA (1) is experiencing an injury in fact, that is (2) fairly traceable to Defendants' conduct and (3) likely to be redressed by its requested relief. *FEC v. Cruz*, 596 U.S. 289, 296 (2022) (applying *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Thus, CBIA has standing to challenge the Act on behalf of all Plaintiffs.

## I.   CBIA is experiencing a pre-enforcement injury.

"As the Supreme Court has made clear, a plaintiff has suffered an injury-in-fact and has standing to bring a case when [it] is facing the 'threatened enforcement of a law' that is 'sufficiently imminent.'" *Picard v. Magliano*, 42 F.4th 89, 97 (2d Cir. 2022) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158–59 (2014)). The plaintiff need not "expose [it]self to liability before bringing suit to challenge ... the constitutionality of a law threatened to be enforced." *Knife Rts. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015) (quotation omitted). Instead, a plaintiff can bring a pre-

enforcement suit if it demonstrates "(1) 'an intention to engage in a course of conduct arguably affected with a constitutional interest'; (2) that the intended conduct is 'proscribed by' the challenged law; and (3) that 'there exists a credible threat of prosecution thereunder.'" *Vitagliano v. County of Westchester*, 71 F.4th 130, 136 (2d Cir. 2023) (quoting *Susan B. Anthony List*, 573 U.S. at 159). CBIA satisfies all three prongs.

*First,* CBIA's intended conduct—namely, communicating with its employees about "political matters," including unionization—is core First Amendment activity and thus affected with a constitutional interest. Conn. Gen. Stat. § 31-51q(a)(1), (b)(2).

Before the Act's amendment, CBIA's public-policy updates were a key part of its mandatory all-staff meetings. SMF ¶ 11. During the public-policy updates, CBIA's leaders shared with the entire staff the latest advocacy and lobbying efforts— including its support for or opposition to specific candidates for office and pending legislation and regulations. *Id.* ¶¶ 3–7. After Section 31-51q was amended, CBIA stopped giving public-policy updates during its mandatory all-staff meetings to avoid the threat of State enforcement. *Id.* ¶¶ 13–14. CBIA will resume its public-policy updates at mandatory meetings after the Act is declared unconstitutional and Defendants are enjoined from enforcing it. *Id.* ¶ 17.

CBIA's intention to continue "the free discussion of governmental affairs" meets "practically universal agreement" as protected by the First Amendment. *Bellotti*, 435 U.S. at 776–77 (quotation omitted); *see Mills v. Alabama*, 384 U.S. 214,

218–19 (1966) (observing that the First Amendment protects "discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes"). And the Supreme Court has specifically "recogniz[ed] the First Amendment right of employers to engage in noncoercive speech about unionization." *Brown*, 554 U.S. at 67 (citing *NLRB v. Va. Elec. & Power Co.*, 314 U.S. 469, 477 (1941)).

*Second,* CBIA's intended conduct is proscribed by the Act. For purposes of standing, "a plaintiff's intended conduct need only be *arguably* proscribed by the challenged statute, not necessarily *in fact* proscribed." *Vitagliano*, 71 F.4th at 138 (quotation omitted); *see, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (allowing pre-enforcement review even where it was unclear whether the statute actually applied to the plaintiffs' proposed conduct). That is more than satisfied here, where holding a mandatory meeting for the primary purpose of discussing political matters is expressly proscribed by the Act.

A *mandatory* meeting in the workplace inherently and necessarily "threatens … discipline or discharge" for an employee who fails to attend—exactly what the Act proscribes. Conn. Gen. Stat. § 31-51q(b); *see Mandatory*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Of, relating to, or constituting a command; required; preemptory"). And even if the mandatory nature of the meeting alone did not trigger the Act's enforcement, CBIA's post-meeting reprimands and (if necessary) further escalations are certainly the kind of "discipline" prohibited. The inherent threat of discipline for

missing an all-staff meeting is not idle, as CBIA has reprimanded employees who missed such meetings. SMF ¶ 10.

Third, CBIA faces a credible threat of prosecution. The standard for proving existence of a "credible threat" is not rigorous or demanding, especially where core political speech is implicated. See Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). "Where a statute specifically proscribes conduct, the law of standing does 'not place the burden on the plaintiff to show an intent by the government to enforce the law against it.'" Tweed-New Haven Airport Auth. v. Tong, 930 F.3d 65, 71 (2d Cir. 2019) (quoting Hedges v. Obama, 724 F.3d 170, 197 (2d Cir. 2013)); cf. Ashcroft v. ACLU, 542 U.S. 656, 670 (2004) (warning that "speakers may self-censor rather than risk the perils of trial"). Rather, "in the absence of a disavowal by the government or another reason to conclude that no such intent exist[s]," there is a presumption that the government will enforce a statute that is "recent and not moribund." Vitagliano, 71 F.4th at 138 (quotations omitted). Defendants told Plaintiffs and the Court they will not disavow their ability to enforce the Act. See, e.g., Hr'g Tr. 19:11–13 (T. Holzman), ECF No. 64; Exhibit D at Nos. 10–11 (Defs.' Objs. & Resps. to CBIA's Initial Reqs. for Admis. & Interrogs.). Given the Act's recentness, the Court should presume enforcement.

Because speech interests are at stake, "a real and imminent fear of such chilling is enough" to establish a pre-enforcement injury. Nat'l Org. for Marriage, Inc. v. Walsh, 714 F.3d 682, 689 (2d Cir. 2013). CBIA's injury of "self-censorship[,] a harm that can be realized even without an actual prosecution," is reasonable considering

the Act's regulation of mandatory meetings, Defendants' ability to enforce the Act, and their refusal to disavow enforcement against non-compliant employers. *Id.* (quoting *Vermont Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 382 (2d Cir. 2000)). Accordingly, CBIA need not violate the Act before bringing suit to challenge it. *See Vance*, 802 F.3d at 384. It has a ripe, concrete injury now.

## II.   CBIA's injury is traceable to Defendants' conduct and redressable.

The pre-enforcement injury CBIA currently experiences (chilled speech) is traceable to Defendants' conduct and redressable by this Court. The traceability and redressability prongs "both seek a causal nexus between the plaintiff's injury and the defendant's assertedly unlawful act." *Southside Fair Hous. Comm. v. City of New York*, 928 F.2d 1336, 1341 (2d Cir. 1991) (quotation omitted). Because they "often dovetail," Plaintiffs address them together. *Id.* (quotation omitted).

First, CBIA's injury is traceable to Defendants' conduct. "Where, as here, a plaintiff is threatened by the enforcement of a statute that specifically targets the plaintiff, the [traceability] requirement is met." *Tong*, 930 F.3d at 71. As an "employer" in Connecticut, CBIA is the target of the Act. Conn. Gen. Stat. § 31-51q(b); *see Varley v. First Student, Inc.*, 158 Conn. App. 482, 497–501 (2015). And Defendants are enforcers of the Act. They have authority to investigate violations, seek penalties or fines, charge employers for employees' unemployment benefits related to violations, and bring civil actions to recover penalties; and they have expressly declined to disavow their ability to enforce it against CBIA or other employers in Connecticut. *See* Conn. Gen. Stat. § 31-69a. Thus, CBIA's injury results

from Defendants' "application or threatened application of" Section 31-51q and "remains fairly traceable to such application, even if the injury could be described in some sense as willingly incurred." *Cruz*, 596 U.S. at 297.

Second, CBIA's ongoing injury is redressable by its requested relief—a declaration that the Act is unconstitutional and an injunction prohibiting Defendants from enforcing it. *See, e.g.*, *Vitagliano*, 71 F.4th at 140 (acknowledging that a content-based speech restriction can be addressed by a declaration of unconstitutionality and corresponding injunction); *Tucson v. City of Seattle*, 91 F.4th Cir. 1318, 1325–26 (9th Cir. 2024) (similar); *Carolina Youth Action Project; D.S. ex rel. Ford v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023) (similar); *Brown v. Kemp*, 86 F.4th 745, 770 (7th Cir. 2023) (similar). This is true regardless of the Act's private cause of action. *See Vitagliano*, 71 F.4th at 133, 140 (finding redressability prong satisfied despite statute's private right of action); *281 Care Comm. v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011) ("[A] party satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." (quotation omitted)).

* * *

Because CBIA satisfies each of the three elements of pre-enforcement standing, it has proved its organizational standing to raise Plaintiffs' First Amendment and preemption claims. This entitles CBIA to proceed to the merits on behalf of all Plaintiffs. *See* Hr'g Tr. 4:20-5:1 (Dooley, J.), ECF No. 64; *see also id.* 5:16–21 (T. Holzman) (agreeing that "[i]f the Court finds standing as to one plaintiff, it

does not need to address standing as to the other plaintiffs"); *Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 109 ("It is well settled that where, as here, multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" (quoting *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006))).

# ARGUMENT

## I.   Section 31-51q violates the First and Fourteenth Amendments.

On its face, Section 31-51q prohibits employers from threatening to discipline or discharge employees, or actually disciplining or discharging employees, who fail to attend meetings where the employer talks about political matters. This content- and viewpoint-based restriction on employer speech cannot withstand strict scrutiny. The Court should declare that the Act violates the First and Fourteenth Amendments and enjoin Defendants from enforcing the Act.

### A.   Section 31-51q regulates speech, not just conduct.

The First and Fourteenth Amendments protect the speech rights of employers. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 600 (2023) ("the First Amendment extends to all persons engaged in expressive conduct, including those who seek profit"); *Bellotti*, 435 U.S. at 765 (recognizing that First Amendment protection extends to corporations). Section 31-51q violates those rights. It operates as a content- and viewpoint-based ban on only certain mandatory meetings in which an employer speaks on the prohibited political matters. Put differently, what an employer says during a meeting—the topics addressed and the viewpoints expressed—determines

17

whether the employer may make the meeting mandatory or discipline absent employees. Conn. Gen. Stat. § 31-51q(b)(2)(A).

The statutory history makes clear that Connecticut went to great lengths—drafting four slightly different bills over the course of several years—to masquerade its speech-based restriction as a conduct-based one. *See supra* BACKGROUND § I.B, I.C. But the First Amendment is not so easily evaded. A targeted prohibition or regulation of conduct taken *specifically for disfavored content-based speech purposes* is a regulation of speech itself. Under binding Supreme Court precedent, the State's efforts to "silence unwanted speech by burdening its utterance [rather] than by censoring its content" must fail. *Sorrell*, 564 U.S. at 566. For, by conditioning the regulation of employers' conduct on the content of their speech, the Act "impose[s] a specific, content-based burden on protected expression." *Id.* at 565; *see also Simon & Schuster*, 502 U.S. at 115 (holding statute that imposed financial burden on criminals' speech-derived income is content-based and impermissible under the First Amendment). This content-based burden is made even heavier by the Act's discrimination against employers' political views—speech at the "core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003) (plurality op.); *accord Bellotti*, 435 U.S. at 776.

At the motion-to-dismiss stage, this Court correctly rejected Defendants' argument that the Act merely regulates conduct rather than speech. Hr'g Tr. 47:8–20 (Dooley, J.), ECF No. 64. The Eleventh Circuit recently validated this Court's skepticism when confronted with a substantively similar restriction on mandatory

employee meetings. *See Honeyfund*, 94 F.4th 1272. *Honeyfund* concerned a statute that "bar[red] employers from holding mandatory meetings for their employees if those meetings endorse[d] viewpoints the state finds offensive." *Id.* at 1275 (analyzing Fla. Stat. § 760.10(8)). The Eleventh Circuit saw through the state's "attempt[s] to control speech by recharacterizing it as conduct," held that the statute likely violated the First Amendment, and affirmed the district court's injunction against state enforcement. *Id.* at 1275, 1283. "When the conduct regulated depends on—and cannot be separated from—the ideas communicated, a law is functionally a regulation of speech." *Id.* at 1278.

Section 31-51q operates exactly like the unconstitutional statute in *Honeyfund*. It enumerates a list of topics and prohibits employers from sharing views on those topics during mandatory employee meetings. The conduct regulated depends entirely on the content of the speech. Under both statutes, "[t]he only way to discern which mandatory [meetings] are prohibited is to find out whether the speaker disagrees with [the State]." *Id.* at 1277; *see Reed*, 576 U.S. at 163–64.

Defendants' attempt to "hid[e] speech regulations in conduct rules is not only a dubious constitutional enterprise—it is also a losing constitutional strategy." *Honeyfund*, 94 F.4th at 1278 (quotation omitted). The Act is a speech-based regulation subject to ordinary First Amendment principles.

## B.   Section 31-51q discriminates based on content and viewpoint.

The Act is a content- and viewpoint-based regulation of employers' speech. By banning only mandatory meetings whose primary purpose is to discuss political

19

matters, the Act discriminates based on the content of employer speech. And by proscribing only employers' speech, the Act also discriminates based on viewpoint.

Content-based restrictions of speech are "presumptively unconstitutional." *Reed*, 576 U.S. at 163. A restriction is "content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* Section 31-51q does exactly that. By applying only to speech on political matters, the Act allows mandatory meetings on topics the State favors and disallows mandatory meetings on topics it disfavors. In other words, the Act draws distinctions based on the message an employer conveys. This meets the "commonsense meaning of the phrase 'content based.'" *Id.*

Viewpoint-based speech restrictions are subject to even tighter limits under the First Amendment. Such restrictions are "a more blatant and egregious form of content discrimination," *id.* at 168 (quotation omitted), and are "likely even invalid per se," *Honeyfund*, 94 F.4th at 1278. *See Sorrell*, 564 U.S. at 571 ("In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory."); *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring) ("Viewpoint discrimination is poison to a free society."). The First Amendment "forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others," *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 804 (194), or to "burden the speech of others in order to tilt public debate in a preferred direction," *Sorrell*, 564 U.S. at 578.

A restriction discriminates based on viewpoint if a speaker's viewpoint determines his license to speak. To see whether the Act applies, the State must evaluate the viewpoint expressed in the mandatory meeting. If State disagrees with the employer's view, then the meeting cannot be required. By its terms, the Act targets the perspective of employers on political matters and unionization—it facially prefers certain viewpoints. And by barring employer speech on unionization, the Act silences only one side of the unionization debate, as employers rarely support the unionization of their employees. *Cf. NLRB v. Ins. Agents In'tl Union*, 361 U.S. 477, 488 (1960) (observing that labor and management "proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest"). The Act thus suppresses the amount of speech opposing unionization and empowers the State to tilt the playing field in favor of labor unions. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (holding laws that restrict speech based on viewpoint "run the risk that the State has left unburdened those speakers whose messages are in accord with its own views" (quotation omitted)); *RAV v. City of St. Paul*, 505 U.S. 377, 391 (1992) (holding the government cannot "impose special prohibitions on those speakers who express views on disfavored subjects").

Beyond the Act's content- and viewpoint-based restrictions, the Act is also unconstitutionally vague. Its key operative terms—including "political matters" and "primary purpose"—are sweepingly defined. *See Minn. Voters All. v. Mansky*, 585 U.S. 1, 16 (2018) (holding the "unmoored use of the term 'political'" rendered speech restriction unconstitutionally vague); *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449,

468 (2007) ("An intent-based standard 'blankets with uncertainty whatever may be said,' and 'offers no security for free discussion.'" (quoting *Buckley v. Valeo*, 424 U.S. 1, 43 (1976))). The result is to delegate their meaning to Defendants' subjective judgment and to "force potential speakers to 'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Brown*, 564 U.S. at 807 (Alito, J., concurring in the judgment) (quoting *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)); *see also id.* (observing that the "'government may regulate in the area' of First Amendment freedoms 'only with narrow specificity'" (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963))). The chilling effect is enormous, as employers must predict whether their decisions will satisfy the expectations of the State. The Constitution does not tolerate such imprecision.

## C. Section 31-51q fails strict scrutiny.

Content- and viewpoint-based regulations, like Section 31-51q, must overcome strict scrutiny. *Eclipse Enters. v. Gulotta*, 134 F.3d 63, 66 (2d Cir. 1997). Such regulations survive only if "the Government [can] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quotation omitted). Connecticut cannot meet this "exacting standard." *McCullen v. Coakley*, 573 U.S. 464, 478 (2014).

### 1. Connecticut has no legitimate interest in regulating employers' speech on political matters, including unionization.

To regulate speech based on content or viewpoint, "[t]he State must specifically identify an actual problem in need of solving" and prove that its interest is

"compelling." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) (quotation omitted). This is the highest burden, and "ambiguous proof will not suffice." *Id.* at 800. Two possible interests Defendants might proffer come from the so-called "expert" reports of Kate Bronfenbrenner and Dr. Howard Forman, coupled with the Assembly's comments during the floor debates: (1) protecting employees from employers' discouragement to unionize;[2] and (2) protecting employees from psychological harms related to hearing unwanted political speech more broadly. Neither interest is even legitimate, much less compelling.

First, the State has no permissible interest in protecting employees from their employers' opinions on unionization. This is outright censorship masquerading as employee protection, and it is entirely illegitimate. Whatever interest the State may have in protecting employees, that cannot justify censoring employers to tilt the public debate in the State's preferred direction. The State simply lacks an interest in forcing employers to stay silent on unionization to correspondingly amplify others'

---

[2]      Statements made during the 2022 legislative session reveal the Assembly's focus on union-related mandatory meetings. On the House floor, Representative Fishbein stated that he had reviewed all the testimony on SB 163 and "everything that [he] reviewed had to do with union activity claims that their employer denigrated unions, said you shouldn't unionize, things like that." HR 5332 (Rep. Fishbein). And on the Senate floor, Ranking Member Kissel opened the debate by "talk[ing] about the history of labor relations in this country." SR 1669–70 (Sen. Hwang); *see* SR 1571–1603 (Sen. Kissel). Senators on both sides of the political aisle weighed in on SB 163's anticipated impact on labor. *See, e.g.*, SR 1571–603 (Sen. Kissel) (discussing unionization); SR 1607, 1619 (Sen. Sampson) (same); SR 1653 (Sen. Cabrera) (same); SR 1666 (Sen. Fazio) (same); SR 1685 (Sen. Slap) (same); SR 1718 (Sen. Looney) (same). As the debate was coming to a close, Senator Formica noted that while the debate included "a lot of talk about unions and the right to unionize," it left "grey area" regarding the bill's scope and validity. SR 1686 (Sen. Formica).

messages. *See Sorrell*, 564 U.S. at 578–79; *Buckley*, 424 U.S. at 48–49. Decades of cases have recognized that "uninhibited, robust, and wide-open debate in labor disputes" is the best way to achieve sound labor policy. *Brown*, 554 U.S. at 68 (quotation omitted). Open debate benefits employers, who can "present an alternative view and information that a union would not present." *Nat'l Ass'n of Mfrs. v. NLRB*, 717 F.3d 947, 955 (D.C. Cir. 2013) (quotation omitted), *overruled on other grounds by Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18 (D.C. Cir. 2014) (en banc). And it benefits employees, who have the "right to receive information opposing unionization." *Brown*, 554 U.S. at 68; *see also NLRB v. Vill. IX*, 723 F.2d 1360, 1368 (7th Cir. 1983) (recognizing that forbidding an employer from expressing its views "would not serve the interests of [its] employees, for unionization might in fact hurt rather than help them in the long run"). Defendants do not (and cannot) show otherwise.

Second, the State has no permissible interest in protecting people from hearing speech with which they disagree. "Listeners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992). To the extent the State justifies the Act as mitigating the risks of psychological harms associated with hearing unwanted speech, that does not work. The Supreme Court has repeatedly held that government interests in protecting listeners from offensive speech are not compelling, as "[i]t is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas themselves are offensive to some of their hearers." *Street v. New York*, 394

U.S. 576, 592 (1969); *see e.g.*, *Snyder v. Phelps*, 562 U.S. 443 (2011) (holding unconstitutional a restriction on homophobic slurs); *Cohen v. California*, 403 U.S. 15 (1971) (holding unconstitutional a restriction on expletives). "[I]n public debate we must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Snyder*, 562 U.S. at 458 (quotation omitted).

Connecticut has no legitimate, let alone compelling, interest in creating a per se rule that employer speech on political matters is offensive. And countenancing the government's desire to protect[] people from unwelcome communications" as a compelling state interest would make "the First Amendment … a dead letter."" *McCullen*, 573 U.S. at 510 (Scalia, J.) (quotation omitted). Open channels of communication are essential to ensuring people are able to make informed choices. This is particularly true of speech on matters of public concern.[3] And it is also true regardless of whether the listener *wants* to hear the speech. *303 Creative*, 143 S. Ct. at 2321 ("If liberty means anything at all, it means the right to tell people what they

---

[3] *See, e.g.*, *Bond v. Floyd*, 385 U.S. 116, 136 (1966) ("Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected."); *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) ("[D]ebate on public issues should be uninhibited, robust, and wide-open, and … may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."); *303 Creative*, 143 S. Ct. at 2311 ("By allowing all views to flourish, the framers understood, we may test and improve our own thinking both as individuals and as a Nation."); *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2375 ("The best test of truth is the power of the thought to get itself accepted in the competition of the market[.]" (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting))).

do not want to hear." (quotation omitted)). For, "learning how to tolerate speech … of all kinds is part of learning how to live in a pluralistic society, a trait of character essential to a tolerant citizenry." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 538 (2022) (quotation omitted).

> ### 2. Section 31-51q is not the least restrictive means of achieving any compelling government interest.

Even accepting that the State has a compelling government interest in limiting employers' speech, Defendants cannot show that the Act's "curtailment of free speech [is] actually necessary to the solution." *Brown*, 564 U.S. at 799; *see Honeyfund*, 94 F.4th at 1281 ("[E]ven in the face of compelling interests, 'broad prophylactic rules' are generally disfavored and cannot survive." (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963))). The Act is both overinclusive (regulating too much) and underinclusive (regulating not enough) for its supposed purposes.

The Act sweeps broadly, covering far more than union-related speech or controversial political topics. For example, the Act would prohibit a mandatory all-staff meeting held to endorse a political candidate particularly favorable to CBIA's business-oriented mission, or to discuss pending legislation that could economically harm employers, such as tax laws or zoning ordinances. Neither example relates to unionization or would impose psychological harm on even the most fragile employee.

At the same time, the Act is underinclusive when judged against its asserted justification. For example, the Act declines to restrict mandatory meetings on topics such as ethics, diversity, equity, or current events—categories of speech on which Americans are sure to hold widely divergent views and on which disagreements are

26

likely to seem incredibly important. It is easy to imagine employees responding to such speech by employers in the same way as union-related speech; yet the State is willing to leave these subjects alone. Such "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802. This is not the narrow tailoring required by the First Amendment.

## II. The NLRA preempts Section 31-51q.

As the Supreme Court recognized in *Brown*, Congress codified protections for employers' union-related speech in federal labor law, displacing state regulation of labor relations. 554 U.S. at 68–69. The NLRA broadly preempts any state regulation that "directly" or "indirectly" regulates "noncoercive speech about unionization." *Id.* at 69. Connecticut recognized this too. For that reason, Attorney General Jepsen advised the Assembly in 2018 that a law prohibiting employers from holding mandatory meetings to speak with employees about unionization would likely be preempted by Sections 7 and 8 of the NLRA. Conn. A.G. Opinion No. 2018-02, 2018 WL 2215260. The State attempted to circumvent the preemption problems by rephrasing its proposed statutory text to implicitly, rather than explicitly, ban union-related mandatory meetings. That sleight of hand cannot save the Act from preemption.

The Supreme Court has recognized "two types of pre-emption as necessary to implement federal labor policy." *Brown*, 554 U.S. at 65. *Garmon* preemption forbids states from "regulat[ing] activity that the NLRA protects, prohibits, or arguably

protects or prohibits." *Id.* (quotation omitted). *Machinists* preemption forbids states from "regulat[ing] conduct that Congress intended be unregulated [and] left to be controlled by the free play of economic forces." *Id.* (quotation omitted). By amending Section 31-51q to limit employers' speech about unionization, the State violated both.

### A.    *Garmon* preemption applies.

Under *Garmon*, "states may not regulate behavior covered by § 7 or § 8 of the NLRA or behavior arguably covered by either of those two sections." *Bldg. Trades Emps.' Educ. Ass'n v. McGowan*, 311 F.3d 501, 508 (2d Cir. 2002). "Sections 7 and 8 of the Act regulate 'concerted activities' and 'unfair labor practices,' respectively, seeking to protect the former and stamp out the latter." *Id.* (quoting 29 U.S.C. §§ 157, 158). Because Section 31-51q regulates employer rights protected by Section 8 and employee rights protected by Section 7, it is preempted under *Garmon*.

By amending the NLRA, Congress expressly gave employers the right to engage in speech about unions—including during paid workplace meetings and discussions. Section 8 sets forth several unfair labor practices—including "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7]," and "to dominate or interfere with the formation or administration of any labor organization." 29 U.S.C. § 158(a)(1), (2). At the same time, Section 8 specifies that it is *not* an unfair labor practice—or even "evidence" of unlawful conduct—to "express[] any views, argument, or opinion" provided "such expression contains no threat of reprisal or force or promise of benefit." *Id.* § 158(c). The legislative history of the

NLRA confirms Congress's intent to protect mandatory meetings. *See supra* BACKGROUND § I.

Section 31-51q's proscription of union-related mandatory meetings directly conflicts with Section 8's express carve-out for such meetings. Where the NLRA authorizes employer meetings and communications about union issues (absent threats of reprisal or promises of benefit), 29 U.S.C. § 158(c), Section 31-51q prohibits employers from requiring that employees attend meetings on unionization, Conn. Gen. Stat. § 31-51q(b)(2)(A).[4] As a result, Section 31-51q nullifies employers' federally protected speech rights and invalidates employers' ability to discipline employees who refuse to attend such meetings—discipline that the NLRB has found lawful. *See, e.g.*, *Detroit Hosp.*, 249 NLRB 449, 450 (1980) (employee lawfully disciplined for "refusal to listen and by his leaving the meeting," which constituted "grounds for regarding him as insubordinate, and the reason for his discharge was not protected by the Act"); *Gen. Elec. Co.*, 240 NLRB 479 (1979) (employee lawfully disciplined for

---

[4]    The "threat of discipline or discharge" prohibited by Section 31-51q is completely different from the type of "threat of reprisal" that falls within the exception contained in Section 8(c) of the NLRA. Section 31-51q(b)(2)(A) prohibits any threat of discipline or discharge based on an employee's refusal to attend any employer-sponsored meeting, even one that consists entirely of First Amendment protected speech which "contains" no unlawful threat or unlawful promise. In contrast, the exception in Section 8(c) of the NLRA involves speech that is *not* protected whenever it "contains" an unlawful threat of reprisal related to an employee's union sentiments.

insubordination after "walking away" from foreman and stating he "was not going to listen").[5]

Section 7 of the NLRA enacts protections for employees "to form, join, or assist labor organizations" and, as importantly, "to refrain from any or all of such activities." 29 U.S.C. § 157. Employees are guaranteed the right to make an informed decision—to learn about the pros and cons of unionism and to decide for themselves whether or not to join a union. "It is the employee who is to make the choice and a free flow of information, the good and the bad, informs him as to the choices available." *Southwire Co. v. NLRB*, 383 F.2d 235, 241 (5th Cir. 1967). Not so in Connecticut. Section 31-51q stymies the ability of employees to learn from their employers the costs of unionizing. By regulating what employees will hear about unionization, the Section 31-51q regulates "behavior arguably covered" by Section 7. *McGowan*, 311 F.3d at 508.

*Garmon* preemption "assures a coherent national labor policy." *Id.* State efforts to prohibit or penalize noncoercive employer speech frustrate the NLRA's purpose of

---

[5]     Despite Section 8(c)'s plain text, its statutory history, and the Supreme Court and NLRB's consistent interpretation of the statute as protecting employers' right to hold mandatory meetings, the NLRB General Counsel, Jennifer Abruzzo, has publicly taken the opposite stance. *See* Memorandum GC 22-04, *The Right to Refrain from Captive Audience and other Mandatory Meetings* (Apr. 7, 2022). While Plaintiffs strongly disagree with Ms. Abruzzo's long-rejected interpretation of the NLRA, her view provides an alternative basis for concluding that the Act is preempted under *Garmon*. For, if holding a mandatory meeting were an unfair labor practice under the NLRA, then Section 31-51q's proscription on that same conduct would "purport[] to regulate" an employer action that "constitute[s] an unfair labor practice" under federal labor law. *Garmon*, 359 U.S. at 244.

encouraging such speech in order to enable employees' informed decision-making. Section 31-51q is no exception; it is preempted. To allow otherwise "involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." *Garmon*, 359 U.S. at 244.

### B.   *Machinists* preemption applies.

Under *Machinists* preemption, states cannot restrict or penalize conduct "that Congress meant to leave … unregulated and to be controlled by the free play of economic forces." 427 U.S. at 144; *see also McGowan*, 311 F.3d at 508 ("While *Garmon* preemption focuses on conduct arguably within the scope of § 7 or § 8 of the NLRA, [*Machinists*] preemption protects employers' and unions' use of 'economic weapons' that Congress aimed for them to have freely available."). *Machinists* preemption creates a "zone free from all regulations, whether state or federal." *Brown*, 554 U.S. at 74 (quotation omitted).

The Supreme Court applied *Machinists* preemption over a decade ago to strike down a California statute that regulated noncoercive employer speech about unionization through restrictions on public funds. *Id.* The Court explained that state regulation in this area invades the zone that Congress protected and reserved for market freedom and frustrates the "freewheeling" "debate on issues dividing labor and management" that Congress envisioned. *Id.* at 67–68 (quotations omitted).

Since *Brown*, lower courts have applied its principles beyond the state-funding context. For example, in a case involving an NLRB rule on compelled speech, the D.C. Circuit held that Section 8(c) "embraces" the First Amendment's broad protections

for the dissemination of information. *Nat'l Ass'n of Mfrs*, 717 F.3d at 956; *see also id.* at 955 (acknowledging the Second Circuit's "suggest[ion] that § 8(c) not only protects the right of free speech under the First Amendment, but also 'serves a labor law function of allowing employers to present an alternative view and information that a union would not present'" (quoting *Healthcare Ass'n of N.Y. State v. Pataki*, 471 F.3d 87, 98 (2d Cir. 2006)). Just last month, in a case involving an unfair-labor-practice charge for employers' distribution of literature to employees, the D.C. Circuit reiterated *Brown*'s holding that "Section 8(c) recognizes important First Amendment rights and 'precludes regulation of noncoercive speech about unionization.'" *NCRNC, LLC v. NLRB*, 94 F.4th 67, 74 (D.C. Cir. 2024) (quoting *Brown*, 554 U.S. at 67–68).

Applying *Brown* here, it is clear that Section 31-51q restricts actions "that Congress meant to leave … unregulated and to be controlled by the free play of economic forces." *Machinists*, 427 U.S. at 144. Whereas Section 8(c)'s "legislative history and subsequent interpretation" demonstrate that Congress meant to "*expand* speech rights in the labor context," *Pataki*, 471 F.3d at 97 (emphasis added), Section 31-51q *limits* free debate on labor issues. And by limiting only *employers'* speech to employees about the risks of unionization, the State has put its thumb on the scale in favor of unionization. Under *Machinists*, Section 31-51q is preempted.

## C.   Section 31-51q's regulation of anti-union speech cannot be severed from the rest of the Act.

A holding by this Court that Section 31-51q is preempted by federal labor law sinks the statute entirely. Because Section 31-51q was designed to prohibit employers

from holding mandatory meetings on unionization, the offending portion of the "political matters" definition cannot be severed from the rest of the Act.

After concluding that Section 31-51q's ban on union-related mandatory meetings is preempted, this Court "must determine whether the invalid portions of the statute can be severed from the valid portions so the remainder of the statute can be preserved." *Nat'l Advert. Co. v. Town of Niagara*, 942 F.2d 145, 148 (2d Cir. 1991); *see also Murphy v. Nat'l Coll. Ath. Ass'n*, 584 U.S. 453, 488 (2018) (Thomas, J., concurring) ("[T]he Court's modern cases treat the severability doctrine as a 'remedy' for constitutional violations and ask which provisions of the statute must be 'excised.'" (collecting cases)). Because "[s]everability is a question of state law," *Nat'l Advert.*, 942 F.2d at 148, the Court must apply Connecticut law to the inquiry.

Under Connecticut law, the unionization clause is not severable. Where a portion of a statute is unconstitutional, "the valid part can stand only if it and the invalid part are not so mutually connected and dependent as to indicate a legislative intent that they may be inseparable." *Seals v. Hickey*, 441 A.2d 604, 612 (Conn. 1982). This analysis "involves essentially two considerations: the legislature must have intended separability and the statute itself must be capable of separability." *Id.* In determining whether the legislature would have enacted a statute but for the offending provision, the court can consider legislative history. *See State v. Bell*, 931 A.2d 198, 236 (Conn. 2007) (concluding based on "the overwhelming evidence in the legislative history" that "the legislature would have adopted the statute without" the

unconstitutional provision); *see also EEOC v. CBS, Inc.*, 743 F.2d 969, 971 (2d Cir. 1984) ("For guidance we look to the statute and its relevant legislative history.").

Section 31-51q's statutory and legislative history clearly reveal that the Assembly's intention was to prohibit employers from holding mandatory meetings in which they discuss unionization. Two of the bills preceding SB 163—both entitled "An Act Concerning Captive Audience Meetings"—expressly prohibited such meetings. *See* HB 5473 (Conn. 2018); SB 64 (Conn. 2019). After Attorney General Jepsen and Attorney General Tong both opined that *Garmon* and *Machinists* would likely preempt both bills, the Assembly presented bills with the same effect but different language. *See supra* BACKGROUND § I.B, I.C. But once SB 163 got to the Assembly floor in 2022, the debate was almost exclusively about the bill's effect on unionization. *See id.*

In contrast, there is *no* indication that the Assembly intended Section 31-51q to be severable. The Assembly could have included a severability clause. *See New Haven Comm'n on Equal Opportunities ex rel. Washington v. Yale University*, 439 A.2d 404, 408 (Conn. 1981) (excising an unconstitutional portion of a statute based on the inclusion of a severability clause). *But cf. Burton v. City of Hartford*, 127 A.2d 251, 255–56 (Conn. 1956) (holding an entire ordinance unconstitutional despite the inclusion of a severability clause due to "considerations making evident the inseparability of the statute"). But the Assembly did not. The absence of a severability clause in Section 31-51q is even more glaring given a neighboring provision in the Labor Code does provide for severability. *See* Conn. Gen. Stat. § 31-40p ("If any

34

section, clause or provision of sections 31-40j to 31-40o, inclusive, shall be unconstitutional or be ineffective in whole or in part, to the extent that it is not unconstitutional or ineffective, it shall be valid and effective and no other section, clause or provision shall on account thereof be deemed invalid or ineffective.").

Excising only Section 31-51q's prohibition of speech about unionization would undermine the Assembly's primary purpose for passing the Act. And despite the Assembly's awareness of the potential preemption problems, it left no indication that the ban on unionization-related mandatory meetings should be severed if the provision was preempted. In accord with the Assembly's intent, this Court should treat Section 31-51q as a singular provision and hold the entire Act unconstitutionally preempted by federal labor law.

## CONCLUSION

The Court should enter summary judgment in Plaintiffs' favor, declaring that Section 31-51q violates the First Amendment and is preempted by the NLRA and issuing an injunction against Defendants' enforcement of Section 31-51q. Because all Plaintiffs have diligently sought declaratory and injunctive relief for nearly a year and a half, the Court's injunctive relief should extend to all Plaintiffs. *See, e.g., Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 118 ("conclud[ing] that the district court correctly held that the Ordinance is an unconstitutional restriction of commercial speech in violation of the First Amendment" without limiting relief to plaintiffs that established standing); *Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("conclud[ing] that the District Court correctly held that the powers vested in the

Comptroller General under § 251 violate the command of the Constitution that the Congress play no direct role in the execution of the laws" without limiting relief to plaintiffs that established standing).

Respectfully submitted,

Dated: April 26, 2024                */s/ Bryan Killian*

MORGAN LEWIS & BOCKIUS LLP
Bryan Killian
One State St.
Hartford, CT 06103-3178
Telephone: (202) 373-6191
Fax: (860) 240-2701
bryan.killian@morganlewis.com

MORGAN LEWIS & BOCKIUS LLP
Philip A. Miscimarra
David B. Salmons
Patrick A. Harvey
Amanda L. Salz
1111 Pennsylvania Ave., NW
Washington, DC 20004-2541
Telephone: (202) 739-3000
Fax: (202) 739-3001
philip.miscimarra@morganlewis.com
david.salmons@morganlewis.com
patrick.harvey@morganlewis.com
amanda.salz@morganlewis.com

*Attorneys for the Chamber of Commerce of the United States of America, Associated Builders and Contractors, Associated Builders and Contractors of Connecticut, Coalition for a Democratic Workplace, Connecticut Business and Industry Association, Connecticut Retail Merchants Association, National Association of Home Builders, and National Retail Federation*

U.S. CHAMBER LITIGATION CENTER
Daryl Joseffer
Stephanie A. Maloney
1615 H Street, N.W.
Washington, DC 20062-2000
(202) 463-5337
djoseffer@uschamber.com
smaloney@uschamber.com

*Attorneys for the Chamber of Commerce of the United States of America*

LITTLER MENDELSON, P.C.
Maurice Baskin
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006-4046
(202) 772-2526

LITTLER MENDELSON, P.C.
Craig Dickinson
265 Church Street
Suite 300
New Haven, CT 06510
(203) 413-2977

*Attorney for Associated Builders and Contractors and Associated Builders and Contractors of Connecticut*