**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHAMBER OF COMMERCE OF THE, | : | 3:22-cv-01373 (KAD) |
| UNITED STATES OF AMERICA, ET AL. | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | |
| DANTÉ BARTOLOMEO, ET AL. | : | |
| *Defendants*. | : | MAY 24, 2024 |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

1

# Table of Contents

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 4

I.   The Use of Captive Audience Meetings as a Tool for Political Coercion ......................... 4

II.  Holding Workers Captive for the Employer's Personal Political and Religious
     Opinions is Harmful to Workers ..................................................................................... 5

III. Connecticut Passes the Act in Response to Incidents of Employer Abuse ..................... 6

     A.  Testimony before the General Assembly Judiciary Committee ......................... 6

     B.  Similar to other States, the General Assembly passes the Act to protect
         workers' basic dignity and wellbeing, while preserving employers' rights
         to free speech ................................................................................................... 8

IV.  The State has Little Authority to Enforce the Act, and Will Not Do So Except
     Against Employers who Engage in the Egregious Conduct the Act was
     Designed to Prohibit ..................................................................................................... 10

V.   CBIA's Speech is a Prime Example of What the Act Does Not Prohibit ..................... 11

     A.  CBIA fails to assert a subjective "chill" ......................................................... 11

     B.  DOL's sworn guarantee that it will not enforce the Act against CBIA for
         the activity it describes in its declaration ........................................................ 13

VI.  Procedural History ........................................................................................................ 13

ARGUMENT ..................................................................................................................... 14

I.   CBIA Lacks Standing .................................................................................................. 14

     A.  The Act does not arguably prohibit CBIA from discussing its policy
         positions during its monthly all-staff meetings ............................................... 15

     B.  CBIA's newly-minted assertion that it is chilled from holding a meeting
         about unionization cannot be considered, but it is not arguably prohibited
         by the Act anyway ........................................................................................... 18

     C.  There is no credible threat of enforcement ....................................................... 19

     D.  CBIA separately lacks standing to bring its preemption claim, and to sue
         the Attorney General ....................................................................................... 22

II.  Plaintiffs Must Show that the Act Violates the First Amendment and is Preempted
     in All of Its Applications ............................................................................................. 23

III. The Act Satisfies the First Amendment, and Certainly is Not Unconstitutional in
     All Its Applications ...................................................................................................... 24

     A.  The Act regulates conduct, not speech ............................................................ 24

     B.  Employers have no First Amendment right to hold their workers captive
         for unwanted political and religious speech that is unrelated to their jobs ...... 28

|     | C. | The Act satisfies any level of scrutiny | 32 |
|     |    | 1. Compelling Interest | 33 |
|     |    | 2. Narrow Tailoring | 36 |
|     | D. | The Act is undisputedly constitutional as applied to State employers, which defeats Plaintiffs' facial challenge. | 37 |
|     | E. | The Act is not unconstitutionally vague | 38 |
| IV. | The NLRA Does Not Preempt the Act | | 39 |
| V.  | If the Court Grants Relief, That Relief Should be Narrow | | 48 |
| CONCLUSION | | | 50 |

## Table of Authorities

### Cases

*520 S. Mich. Ave. Assocs. v. Unite Here Local 1*, 760 F.3d 708 (7th Cir. 2014)...........................30

*520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119 (7th Cir. 2008) ................................47

*Adam v. Barr*, 792 Fed. Appx. 20 (2d Cir. 2019) ......................................................... 21

*Aguilar v. Avis Rent A Car Sys., Inc.*, 980 P.2d 846 (Cal. 1999) ................................................. 30

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation*, 45 F.3d 1144 (7th Cir. 1995) ................. 33 n. 23

*Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023) ........................................................... 20, 23

*Associated Or. Indus. v. Avakian*, No. CV 09-1494-MO, 2010 U.S. Dist. LEXIS 44263
(D. Or. May 6, 2010) ................................................................................................... 16

*Ayers v. W. Line Consol. Sch. Dist.*, 555 F.2d 1309 (5th Cir. 1977) ........................................... 30

*Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289 (1979) ........................................... 20

*Barr v. American Assn. of Political Consultants*, 140 S. Ct. 2335 (2020) ................................. 49

*Beatty v. Tong*, 659 F. Supp. 3d 219 (D. Conn. 2023) ................................................................. 23

*Blum v. Holder*, 744 F.3d 790 (1st Cir. 2014) ................................................................. 19, 20, 22

*Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60 (1983) ........................................................... 32

*Brokamp v. James*, 66 F.4th 374 (2d Cir. 2023)....................................................... 21, 24, 32, 33

*Browne v. Dept. of Correction*, Superior Court, Judicial District of New Haven,
Docket No. CV-17-6067843-S (Oct. 10, 2017) ....................................................... 17

*Cacchillo v. Insmed, Inc.*, 638 F.3d 401 (2d Cir. 2011) ..................................................... 15 n.13, 22

*Cayuga Nation v. Tanner*, 824 F.3d 321 (2d Cir. 2016) ............................................................... 21

*Chamber of Commerce of the United States v. Bragdon*, 64 F.3d 497 (1995) ........................... 47

*Chamber of Commerce of the United States v. Brown*, 554 U.S. 60 (2008) ....................... passim

*Chevron Corp. v. Donziger*, 833 F.3d 74 (2d Cir. 2016)........................................................ 18, 19

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................................... 14

*Clementine Co.*, LLC *v. Adams*, 74 F.4th 77 (2d Cir. 2023) ................................... 15 n. 13, 24, 28

*Cmty. Hous. Improvement Program v. City of N.Y.*, 59 F.4th 540 (2d Cir. 2023) ...................... 38

*Cohen v. California*, 403 U.S. 15 (1971) .............................................................................. passim

*Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77
  (2d Cir. 2015) .................................................................. 45, 46, 47, 47 n. 26, 48

*Connecticut Fine Wine & Spirits, LLC v. Harris*, 255 F. Sup. 3d 355 (D. Conn. 2017), *aff'd on
  other grounds*, 932 F.3d 22 (2d. Cir. 2019) .......................................................... 48

*Connelly v. County of Rockland*, 61 F.4th 322 (2d Cir. 2023) .................................................. 17

*Consol. Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530 (1980) ........................33, 33 n. 23, 36

*Cotto v. United Technologies Corp.*, 251 Conn. 1 (1999) .......................................................... 49

*Cruz v. Montanez*, 294 Conn. 357 (2009) ................................................................................... 49

*Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766 (1999) ....................................................... 44

*Doe v. Reed*, 561 U.S. 186 (2010) ............................................................................................... 23

*Does v. Suffolk Cty.*, No. 21-1658, 2022 U.S. App. LEXIS 19094 (2d Cir. July 12, 2022) ........ 21

*Domnister v. Exclusive Ambulette, Inc.*, 607 F.3d 84 (2d Cir. 2010) ......................................... 40

*Erznoznik v. Jacksonville,* 422 U.S. 205 (1975) ....................................................... 29, 33, 33 n. 23

*Expressions Hair Design v. Schneiderman*, 581 U.S. 37 (2017) .................................. 24 n. 19, 28

*FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449 (2007) ........................................................ 39

*Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987) ................................................. 46, 47 n. 26

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U. S. 477 (2010) ..... 49

*Frisby v. Shultz,* U.S. 474 (1988) ................................................................................... 29, 33, 37

*Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410 (1979) ........................... 30, 31 n. 21

*Glacier Northwest, Inc. v. Int'l Brotherhood of Teamsters Loc. Union No. 174*,
  143 S. Ct. 1404 (2023) .................................................................................... 39, 40, 41

*Gormley v. Director*, 632 F.2d 938 (2d Cir. 1980) .......................................................... 26 n. 20

*Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116 (3d Cir. 2020) .............. 26

*Green Party v. Garfield*, 648 F. Supp. 2d 298 (D. Conn. 2009) ................................................. 36

*Greenberg v. Lehocky*, 81 F.4th 376 (3d Cir. 2023) ....................................................... 19, 21, 22

*Healthcare Ass'n of N.Y. State v. Pataki*, 471 F.3d 87 (2d Cir. 2006) ............................... passim

*Hedges v. Obama*, 724 F.3d 170 (2d Cir. 2013) ....................................................... 21, 21 n. 17

*Hill v. Colorado*, 530 U.S. 703 (2000) ................................................................................ passim

*Holder v. Humanitarian L. Proj.*, 561 U.S. 1 (2010) .................................................. 20

*Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) ....................................... 26, 27

*Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources, LLC*, 390 F.3d 206 (3d Cir. 2004) ........................................ 45

*International Longshoremen's Assoc. v. Davis*, 476 U.S. 380 (1986) ......................................... 43

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts,* 852 F.3d 178 (2d Cir. 2017) ........................................ 23

*Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018) ........................................ 34

*Kearns v. Cuomo*, 981 F.3d 200 (2d Cir. 2020) ........................................ 21 n. 17

*Keyes v. School Dist. No. 1*, 119 F.3d 1437 (10th Cir. 1997) ........................................ 20

*Lawson v. Hill*, 368 F.3d 955 (7th Cir. 2004) ................................................ 19

*Lehman v. Shaker Heights*, 418 U.S. 298 (1974) ........................................ 29, 33, 33 n. 23

*Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp. Relations. Comm'n,* 427 U.S. 132 (1976) ........................................ passim

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................ 15 n. 13

*Major League Baseball Props. Inc. v. Salvino, Inc.*, 542 F.3d 290 (2d Cir. 2008) .............. 35, 36

*Marks v. United States*, 430 U.S. 188 (1977) ........................................ 33 n. 23

*Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724 (1985) .................. 46, 47 n. 26

*Minn. Voters All. v. Mansky*, 585 U.S. 1 (2018) ........................................ 38

*Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198 (2d Cir. 2014) ................................ 19

*Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033 (5th Cir. 1982) ..................... 38

*NCRNC, LLC v. NLRB*, 94 F.4th 67 (D.C. Cir. 2024) ................................ 47, 47 n. 27

*New York Tel. Co. v. New York State Dept. of Labor*, 440 U.S. 519, (1979) .............. 46, 47 n. 26

*NLRB v. Gissel*, 395 U.S. 575 (1969) ........................................ 25

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126 (11th Cir. 2022) ........................................ 25, 28

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) ........................................ 25

*Otto v. City of Boca Raton*, 981 F.3 854 (11th Cir. 2020) ........................................ 26

*Payne v. Fairfield Hills Hosp.*, 215 Conn. 675 (1990) ........................................ 48, 49

*Picard v. Magliano,* 42 F.4th 89 (2022) ................................................................. 21

*Project Veritas Action Fund v. Rollins*, 982 F.3d 813 (1st Cir. 2020) ......................... 29

*Pucillo v. Town of Madison*, Superior Court, Judicial District of New Haven, Docket
    No. NNH-CV-216115012-S, 2022 Conn. Super. LEXIS 2122 (Sept. 14, 2022) ................. 17

*Resident Advisory Bd. v. Rizzo*, 503 F. Supp. 383 (E.D. Penn. 1980) ......................... 30

*Rest. Law Ctr. v. City of New York*, 360 F. Supp. 2d 192 (S.D.N.Y. 2019) ................. 23

*Restaurant Law Center v. City of New York*, 90 F.4th 101 (2d Cir. 2024) ....... 46, 47, 47 n. 26, 48

*Robinson v. Jacksonville Shipyards*, 760 F. Supp. 1486 (M.D. Fl. 1991) ................... 30

*Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819 (1995) ............... 38

*Rowan v. United States Post Office Dep't*, 397 U.S. 728 (1970) ............... 29, 31, 32, 33

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006) ..... 24, 24 n. 19

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959) ............................. passim

*Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001) ................................. 25, 30

*Serra v. United States General Services Admin.*, 847 F.2d 1045 (2d Cir. 1988) ........................ 38

*Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*,
    502 U.S. 105, 112 S. Ct. 501 (1991) ................................................................. 27

*Slattery v. Cuomo*, 61 F.4th 278 (2d Cir. 2023) ................................................. 24, 28

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ................................................. 27, 32

*State v. Menillo,* 171 Conn. 141 (1976) ................................................................. 49

*Steffel v. Thompson*, 415 U.S. 452 (1974) ............................................................. 21

*Stewart v. City of N.Y.*, No. 22-2775, 2023 U.S. App. LEXIS 28048
    (2d Cir. Oct. 23, 2023) ................................................................................. 17

*Stop This Insanity v. FEC*, 902 F. Supp. 2d 23 (D.D.C. 2012), *aff'd*, 761 F.3d 10 (2014),
    *cert. denied*, 574 U.S. 1074 (2015) ................................................................. 35

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) ..................................... passim

*Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556 (2d Cir. 2011) ....................... 17

*Thomas v. Bd. of Educ.*, 607 F.2d 1043 (2d Cir. 1979) ............................................. 31

*Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307 (6th Cir 1998) ...................... 34

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ................................................. 22

*Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65 (2d Cir. 2019), *cert. denied*,
140 S. Ct. 2508 (2020) ........................................................................... 21

*United States v. Safford*, 814 F.3d. Appx. 638 (2d Cir. 2020) ..................... 38

*United States v. Salerno*, 481 U.S. 739 (1987) .................................. 23, 24

*United States v. Stevens*, 559 U.S. 460 (2010) ........................................ 23

*Vitagliano v. Cnty. of Westchester, 71 F.4th 130,* .............................. 20, 21

*Wilson v. State Bar of Ga.*, 132 F.3d 1422 (11th Cir. 1998) ..................... 20

*Wollschlaeger v. Governor*, 848 F.3d 1293 (11th Cir. 2017) .................... 26

## Statutes

29 U.S.C. § 158 ............................................................................. passim

Conn. Gen. Stat. § 1-2z ........................................................................ 49

Conn. Gen. Stat. § 1-3 ..................................................................... 48, 49

Conn. Gen. Stat. § 31-51q .............................................................. passim

Conn. Gen. Stat. § 31-57v ..................................................................... 45

Conn. Gen. Stat. § 31-40 ....................................................................... 45

Conn. Gen. Stat. § 31-69a .............................................................. passim

Conn. Public Act No. 22-24 ........................................................... passim

Maine Rev. Stat. § 600-B ........................................................................ 9

Minn. Stat. § 181.531- ............................................................................ 9

New York Lab. Law § 201-d ................................................................... 9

New Jersey Stat. § 34:19-10 ................................................................... 9

Or. Rev. Stat. § 659.785a ....................................................................... 9

Rev. Code Wash. § 49.44 ........................................................................ 9

**Constitutional Provisions**

U.S. Const. amend I  ............................................................................  passim

U.S. Const. article VI............................................................................  39

Conn. Const. article first § 4 ...............................................................  44

**Other**

*Conn. A.G. Opinion 2019-03*, 2019 Conn. AG LEXIS 3 (May 17, 2019) ...................................  25

*Conn. A.G. Opinion No. 2018-02*, 2018 Conn. AG LEXIS 2 (Apr. 16, 2018) ..........................  42

Hertel-Fernandez & Secunda, *Citizens United At Work: A Legislative Fix for Workplace
     Political Intimidation Post-Citizens Unite,* 64 UCLA L. Rev. Disc. 2 (2016)  .............  5 n. 2

Hertel-Fernandez & Secunda*, Citizens United at Work: How the Landmark Decision
     Legalized Political Coercion in the Workplace*, 128 Harv. L. Rev. 669 (2014)  ...........  5 n. 2

T. Emerson, *The Affirmative Side of the First Amendment*, 15 Ga. L. Rev. 795 (1981) .............  34

## INTRODUCTION

"[N]o one has a right to press even 'good' ideas on an unwilling recipient." *Hill v. Colorado*, 530 U.S. 703, 718 (2000).  Businesses are no exception.  They ***employ*** workers, they do not ***own*** them.  Employers have a right to discuss their political and religious opinions with their workers, and to try and persuade them to agree with those opinions.  But employers have no right force workers to listen against their will by threatening their livelihoods and retaliating against them if they refuse.  Holding workers captive to political and religious speech that is unrelated to their jobs is not persuasion but raw coercion, and it is inherently degrading and harmful to workers.  Moreover, it is a deliberate assault on workers' own First Amendment rights to free speech and expression.  In recent years, employers have increasingly employed these tactics to pressure their workers into altering their political or religious behaviors—sometimes in the extreme, to the point of outright harassment.  In response to these rising threats, six other States recently passed laws to protect workers from political and religious coercion in the workplace, and a dozen more have legislation pending.

Connecticut is no different.  In response to reports of egregious conduct by Connecticut employers, the General Assembly passed Public Act No. 22-24 ("the Act") to empower workers to resist such abuse.  The Act gives rank-and-file workers the right to refuse to attend meetings or listen to speech about their employers' political and religious opinions, unless those communications are necessary for their jobs, and allows them to sue their employer for damages if their employer retaliates against them for invoking their right of refusal.  Conn. Gen. Stat. § 31-51q(b)(2).  In passing the Act, Connecticut codified a basic workplace standard that ensures workers receive the respect and dignity they deserve, and took an important step in advancing the State's compelling interest in protecting workers' rights to privacy, autonomy, and free speech in

1

the workplace.  Workers in Connecticut no longer need to check their First Amendment freedoms

at the workplace door.  And if they have the misfortune of working for an employer who thinks

otherwise, the Act now gives them a mechanism to resist attempts to invade those rights.

The ink had barely dried on the Act when nine business associations—many of which had

lobbied heavily against it—piled into court claiming the Act should be struck down in its entirety

because it violates employers' First Amendment rights to free speech and is preempted by the

National Labor Relations Act ("NLRA").  Although their facial claims lack merit, this Court

cannot reach them because none of these Plaintiffs have standing to sue.  The only Plaintiff even

asserting an Article III injury is Connecticut Business and Industry Association ("CBIA").  But

the only "injury" CBIA claims is that the Act has chilled it from providing its employees with

updates about its advocacy efforts during its monthly all-staff meetings, and from holding a

separate meeting to discuss with employees the downsides of unionization.  CBIA cannot claim

that the Act objectively chills its speech because the Act does not even arguably prohibit that

speech (or any speech at all).  Moreover, there is **zero** threat of enforcement.  DOL has now

guaranteed in a sworn declaration that it will not seek a civil penalty against CBIA for its intended

speech.

Regardless, CBIA's free speech and preemption claims are meritless.  The Act does not

implicate the First Amendment, much less violate it.  First, the Act does not limit employers'

speech.  They remain as free as they ever were to speak to their workers about their political or

religious opinions.  The Act only restricts them from retaliating or threatening to retaliate against

employees who refuse to listen.  That is conduct, not speech.  And because the prohibited conduct

is "separately identifiable" from the protected speech, it may be regulated without affecting speech

at all.  *Cohen v. California*, 403 U.S. 15, 18 (1971).  Second, even if the Act were treated as a

restriction on speech, the Act merely prohibits employers from coercing their workers—a captive audience—into listening to unwanted speech they would otherwise be powerless to avoid.  The First Amendment gives employers no right to engage in that conduct.  Third, the Act would satisfy whatever level of scrutiny it is subject to, though it should only be subject to intermediate scrutiny because it is content and viewpoint neutral.

Nor is the Act preempted by the NLRA.  States retain broad police powers to protect their workers from harmful and abusive employer conduct, and the Act reflects Connecticut's long history of protecting workers from harmful employer behavior that intrudes on their basic rights to dignity and autonomy in the workplace.  The Act is not preempted under *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236 (1959) ("*Garmon*"), because nothing in the NLRA even arguably gives employers the right to intimidate and retaliate against workers for asserting their rights to be free from unwanted political and religious speech that is unrelated to their jobs.  Nor is the Act preempted under *Lodge 76, Int'l Ass'n of Machinists v. Wisc. Emp. Relations. Comm'n*, 427 U.S. 132 (1976) ("*Machinists*").  The predatory tactics that the Act prohibits exploit and harm workers, and plainly do not represent economic tools that Congress intended to leave accessible for the collective bargaining process.  Instead, the Act is exactly the sort of basic workplace standards law that is not subject to *Machinists*.

In CBIA's brief in support of their motion for summary judgment ("PB"), it makes no serious attempt to address the conduct the Act actually prohibits.  Instead, it erects a strawman.  CBIA says the Act prohibits "mandatory meetings" about political and religious matters, and then proceeds to argue why such a law would be unconstitutional and preempted.  PB 13.  None of those arguments are relevant because the Act does not prohibit mandatory meetings (or any meetings) about politics or religion.  It prohibits retaliation, and threats of retaliation, against

3

employees who refuse to attend.  Interpreting the Act as proscribing mandatory meetings would fundamentally change what it prohibits and how it operates, and this Court should give no indulgence to CBIA's attempt to rewrite the law.  CBIA's false premise that the Act prohibits mandatory meetings taints virtually every argument it makes in its brief.  When the Act is read according to its plain terms, the Act easily passes muster for the reasons set forth above.

The Court should dismiss this lawsuit for lack of standing.  Failing that, it should deny Plaintiffs' motion for summary judgment and grant Defendants' cross motion for summary judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Use of Captive Audience Meetings as a Tool for Political Coercion

Employers have sought to pressure their workers into changing their political or religious views and behaviors to align with those of the employer.  D.56a1 at ¶¶ 1, 8.  One method for accomplishing this is "captive audience meetings."  *Id.* at ¶ 2.  In such meetings, workers are forced to listen to employer speeches, on work time, typically without the right to respond, and may face harassment, discipline, or discharge for speaking up or refusing to attend.  *Id.*

Employers use captive audience meetings most frequently to combat employees' efforts to unionize.  *Id.* at ¶ 3.  They "are not, however, limited to labor organizing."  *Id.* at ¶¶ 5-10.  In recent years, corporate executives have put increasing resources into mobilizing employees as a resource to further the political interests of the executives and business.  *Id.* at ¶ 6.  According to one study of employee mobilization in the United States, "35 percent of corporate managers who reported mobilizing their workers ranked mobilization as their most effective tool for influencing policy."  *Id.* at ¶ 7.  Political captive audience meetings and threats of retaliation have been used to persuade and coerce workers to vote, attend rallies, and campaign in support of political candidates and

legislation the employer favors but that the workers oppose, and interrogate workers about their political leanings and activities.  *Id.* at ¶ 8.[1]

Employers have "free rein" to engage in this conduct because workers are little able to resist.  *Id.* at ¶ 11.  Most workers are "at will" employees, meaning they can be disciplined fired, or otherwise retaliated against, without just cause.  *Id.*

The coercive effect of captive audience meetings is further intensified through the increased ability of employers to monitor their workers' political speech and activity.  *Id.* at ¶ 12. In one survey of American workers who experienced political mobilization, 35 percent perceived they were under some kind of surveillance, and 39 percent reported that the employer had actually discovered their political actions or beliefs in the past.  *Id.* at ¶ 13.  More than a third of those workers felt political retaliation was likely or had experienced it first hand, while 16 percent said political retaliation had in fact occurred in their work place.  *Id.* at ¶ 14.  As two Federal Election Commissioners stated—in reference to a case in which a large coal company was accused of coercing employees to attend a rally for and contribute to the campaign of a company-favored presidential candidate—"this type of coercion is a real danger to our democracy—it puts citizens' right to express their political beliefs at the mercy of their employers."  *Id.* at ¶ 10.

## II.  Holding Workers Captive for the Employer's Personal Political and Religious Opinions is Harmful to Workers

An individual's employment can be critically important to their mental health.  *Id.* at ¶ 16. Employers "have great influence" over their workers because they control wages and opportunities for growth and advancement.  *Id.* at ¶¶ 18-19.  When employers use that influence to attempt to indoctrinate employees with their political and religious beliefs, "employees suffer."  *Id.* at ¶ 27.

---

[1] *See also* Hertel-Fernandez & Secunda, *Citizens Coerced:  A Legislative Fix for Workplace Political Intimidation Post-Citizens United*, 64 UCLA L. Rev. Disc. 2 (2016); *Citizens United At Work: How the Landmark Decision Legalized Political Coercion in the Workplace*, 128 Harv. L. Rev. 669 (2014).

Employees rely on their employment to meet their basic needs, and may come to fear that they cannot express their honest opinions without risking adverse action against them.  *Id.* at ¶ 24.

Employees may feel uncomfortable listening to their employer's religious or political opinions with which they disagree.  *Id.* at ¶ 28.  But when the employer uses its authority to force them to listen, that brings a "heightened level of distress" and "the environment transforms to one more akin to discrimination, harassment, and at a minimum, a psychologically damaging environment."  *Id.* at ¶¶ 28-29.  People go to work in hopes of achieving self-esteem and the ability to do something that accords with their values, but a "coercive work environment could create just the opposite with an employee feeling frightened and damaged," and could do "grave harm to the mental health" of the community.  *Id.* at ¶¶ 25-26.

## III.  Connecticut Passes the Act in Response to Incidents of Employer Abuse

### A.  Testimony before the General Assembly Judiciary Committee

When the General Assembly took up the legislation that became the Act, workers and organizers from across Connecticut came forward to recount their own experiences.  One organizer warned: "Almost without limits, employers can force workers to attend these captive audience meetings" and can "impose a 'no questions or comments' rule and discipline any worker who speaks up," and "can even fire workers who do not attend or [who] get up and leave."[2]

With no ability to defend themselves, many workers were forced to attend incessant, sometimes daily, meetings in which their bosses pressed their views on them, often for hours on end.[3]  Some were cornered in supply closets or trapped in meetings because the employer had

---

[2] *Jud. Comm. Hear.* at 492 (E. Hawthorne) (emphasis omitted).
[3] *Id.* at 259 (J. Petronella) ("hours-long meetings almost every day"); *id.* at 262 (M. Rodriguez) ("he took me to his office and proceeded to keep me there for about three hours"); *id.* at 455 (Sen. J. Cabrera) ("2-3 captive audience meetings per day"); *id.* at 467 (K. Ciantar) ("vigorous campaign of closed-door captive audience meetings" "across all shifts" "at least twice a week"); *id.* at 472 (M. D'Amico) (meetings "would run for an hour and sometimes more," requiring employees to work off the clock to finish their work without pay); *id.* at 495 K. Hoehne ("daily meetings");

blocked the exits.[4]  One described a colleague with diabetes who was kept in meetings until his blood sugar dropped so low he nearly passed out.[5]  Another said she was "followed" by hired-consultants "for my entire shift every day[.]"[6]  "Many workers leave these captive audience meetings shaken, sometimes crying, worrying that management will retaliate if they refuse to attend future meetings or vote in favor of a union."[7]

Workers variously described these tactics as (among other things) "cruel treatment," "inhumane," "haras[ing] and intimidat[ing]," "threatening," "stress and anxiety inducing," "dehumanizing," and "a form of psychological terror" that "slowly tak[es] away your dignity" over time.[8]  They also described the "chilling effect" these tactics have, "in many cases caus[ing] employees to become fearful of standing up for their rights in the workplace."[9]  One worker recounted that the effects extended even beyond the workplace:  "[C]aptive audience meetings extended to our coworkers personal lives as they targeted individuals and visited them at their homes, and even went to church with them."[10]

Not all of that testimony was about employers holding workers captive for speech about unionization.  Some also raised concerns about being held captive for other political speech, including pending legislation or a political candidate the employer supported.[11]

---

*id.* at 561 (D. Weidlich) ("management harasses and intimidates workers sometimes for hours on end"); *id.* at 564 (R. Weldon) ("[a]ll of my co-workers were sent to these meetings for over a month and a half").

[4] *E.g. Jud. Comm. Hear.* at 204 (Sen. M. Looney) (employers "stood and blocked the door [and employees] could not even leave"); *id.* at 362 (J. Brady) ("two managers corner[ed] me in a 10 foot by 10 foot supply closet" and "took turns berating me").

[5] *Id.* at 255 (C. Hutchinson).

[6] *Id.* at 499 (S. Julian).

[7] *Id.* at 523 (J. Malcarne).

[8] *Id.* at 203 (Sen. M. Looney); *id.* at 253-55 (C. Hutchinson); *id.* at 337 (J. Alibi); *id.* at 362 (J. Brady); *id.* at 499 (S. Julian).

[9] *Id.* at 567 (S. Zimmerman); *see also id.* at 499 (S. Julian) ("[t]he intimidating and chilling effect of being treated in such an inhumane way still lingers in the minds of me and my co-workers").

[10] *Jud. Comm. Hear.* at 255 (C. Hutchinson); *see also id.* at 567 (S. Zimmerman) ("chilling effect" apparent for "many other aspects of employees life inside and outside the workplace").

[11] *See id.* at 494 (E. Hawthorne) (giving examples, including Connecticut insurance company "pressur[ing] its . . . rank and file employees to mobilize against legislative efforts to create a state-level public health insurance option,"

**B.   Similar to other States, the General Assembly passes the Act to protect workers' basic dignity and wellbeing, while preserving employers' rights to free speech**

Persuaded by those testimonials, the General Assembly passed the Act, entitled "An Act Protecting Employee Freedom of Speech and Conscience."  It added subsection (b)(2) to § 31-51q, which prohibits employers from "subject[ing] or threaten[ing] to subject any employee to discipline or discharge on account of" the employee's "refusal" to attend a meeting or listen to speech "the primary purpose of which is to communicate the employer's opinion concerning religious or political matters . . . ."  "Political matters" is defined specifically—and narrowly—to mean "matters relating to elections for political office, political parties, proposals to change legislation, proposals to change regulation and the decision to join or support any political party or political, civic, community, fraternal or labor organization[.]"  Conn. Gen. Stat. § 31-51q(a)(1). "Religious matters" is also separately defined.  *Id.* at (a)(2).

The Act was carefully drafted to ensure ample breathing room for employers to speak to their employees about their political and religious opinions.  As the primary sponsor of the legislation emphasized, the Act "does not in any way, shape or form prohibit any speech by the employer . . . ."  H.R. at 5324 (R. Stafstrom).  An employer violates the Act not by holding meetings or speaking about those subjects, but by subjecting employees to retaliation or threats of retaliation based on their "refusal" to listen.  Conn. Gen. Stat. § 31-51q(b)(2); *see* H.R. at 5301, 5305-06, 5341 (R. Stafstrom).

---

and allegations that coal company "coerced employees . . . into making campaign contributions"); *id.* at 348-49 (D. Livingston) (stating, "don't buy the notion that this is only about the employers fighting unions" because "[t]his is part of a national effort by many large companies to use their power to impose their political views on their workers," and citing example of U-Haul workers being forced to listen to political speech); *id.* at 567 (S. Zimmerman) (noting that "the chilling effect not only is apparent in union drives" and that "[e]mployees have been forced to repress their religious or political views because they have been forced to sit through indoctrination by the employer").

And the Act contains numerous other limitations to ensure it only applies to employers who engage in the type of extreme, coercive behavior that workers described in the legislative testimony.  It only prohibits retaliation and threats of retaliation when employees refuse to attend meetings or listen to speech the "primary purpose" of which is to communicate the employer's opinion about religious or political matters.  Conn. Gen. Stat. § 31-51q(b)(2).  It does not apply when the employer is "communicating to its employees any information that is necessary for such employees to perform their job duties . . . ."  *Id.* at (c)(2).  And by exempting communications that are "limited to the employer's managerial and supervisory employees," the Act is limited to protecting rank-and-file workers—those most susceptible to coercion.  *Id.* at (c)(5).

In passing the Act, Connecticut joined several other States with similar laws prohibiting retaliation against workers who refuse to attend political or religious captive audience meetings. Maine Rev. Stat. § 600-B; N.Y. Lab. Law § 201-d; N.J. Stat. § 34:19-10; Minn. Stat. § 181.531; Rev. Code Wash. § 49.44; Or. Rev. Stat. § 659.785.[12]  Like the policymakers in those States, the Connecticut General Assembly believed the Act was necessary to "level the playing field, to eliminate the harassment, intimidation, the bullying that goes on," and to "give people the respect and dignity that they deserve when they go to work and put in a hard day's work for a paycheck." H.R. at 5347 (R. Porter).  After all, "[n]o one should be subjected to the things that's we've heard [in the Judiciary Committee]."  *Id.*; *see also* H.R. at 5334-35 (R. Hughes) (legislation "is about . . . giving [workers] the dignity that they don't have to be captive, they can go back and do their job without fear of retaliation"); Sen. at 1719 (S. Looney) ("this is simply a [b]ill about fairness and

---

[12]About a dozen other States have similar legislation pending.  *See* <u>Will Illinois be next to tackle the problem of 'captive audience' meetings?: Rights and freedoms of 22.7 million workers now protected in seven states | Economic Policy Institute (epi.org)</u> (last visited May 17, 2024).

equity, recognition of individual dignity for workers to be free from fear, from intimidation, from

harassment, from retaliation").

## IV. The State has Little Authority to Enforce the Act, and Will Not Do So Except Against Employers who Engage in the Egregious Conduct the Act was Designed to Prohibit

The Act itself contains no State enforcement mechanism.  Instead, it gives individual

employees a statutory cause of action for damages if their employer retaliates against them for

refusing to listen to their non-work-related political or religious opinions.  Conn. Gen. Stat. § 31-

51q(b).  DOL could seek a $300 fine against an employer who violates the Act under § 31-69a(a),

but DOL does not investigate employers for workplace standards violations unless it receives a

complaint or facts and circumstances warranting an investigation are otherwise brought to DOL's

attention.  D.56a-1 at ¶ 37.  And as best as DOL can tell, it has never received an employee

complaint about or investigated any employer for a violation of any provision of § 31-51q in 40

years, much less fined an employer for it.  *Id.* at  ¶¶ 40-44.

And even if DOL did receive a complaint from an employee, it would not enforce the Act

unless an employer had engaged in the sort of egregious conduct the Act was designed to prohibit.

*Id.* at ¶¶ 52-70.  Consistent with the letter and spirit of the Act, DOL will not enforce it absent

clear, objective evidence that an employer has attempted to indoctrinate an employee with its

political or religious views that are unrelated to work.  *Id.* at ¶ 63.  That requires a clear showing

that the "primary purpose" of the meeting or communication is to communicate the employer's

opinion about those subjects, that an employee has "refused" to listen, and that the employer has

retaliated or threatened to retaliate against them "on account of" that refusal.  Conn. Gen. Stat. §

31-51q; D.56a1 at ¶¶ 62-68.

Most relevant here, as contemplated by § 31-51q(c)(2), the Act has virtually no application

to entities in the business of advocating for political or religious policy changes.  Those entities

10

must be able to function and control their workplaces.  That entails communicating to their employees about the political and religious policies they are advocating for, and disciplining employees who refuse to receive information that is necessary for the organization's core mission. The Act was not designed to interfere in such conduct, and DOL interprets the Act as having virtually no application to organizations engaged in those activities.  D.56a1 at ¶¶ 55-57.

## V.  CBIA's Speech is a Prime Example of What the Act Does Not Prohibit

### A.  CBIA fails to assert a subjective "chill"

Despite Plaintiffs' litigation-rhetoric that "[t]he threat" of a $300 penalty under § 31-69a "looms over employers," not a single one of Plaintiffs' massive base of employer members has come forward to testify to that.  PB 8; *See Compl.* ¶¶ 10-18 (discussing Plaintiffs' membership). Even CBIA appears to have initially been dismissive of the Act's effects.  Eric Gjede, CBIA's former vice president of public policy and leader of its labor and employment council, wrote an e-mail to CBIA President and CEO Christian DiPentima in March, 2022, about the Act (then before the General Assembly), stating that he "wanted to make sure Chris [DiPentima] had the first crack at [giving a media interview about the Act]" because "[h]e has been better at *feigning disgust* over the issue than I have been."  D.56a2 ¶ 48 (emphasis added).  Nonetheless, CBIA claims that its speech is chilled.

But CBIA's activities are a perfect example of what the Act does *not* prohibit.  CBIA is an advocacy organization that pushes for legislative and regulatory policy changes that help businesses.  P.56a1 at ¶¶ 8-9.  CBIA holds all-staff meeting with its employees.  D.56a2 at ¶ 6. CBIA schedules them in the beginning of each year with a recurring calendar invite.  *Id.* at ¶ 22. At those meetings, CBIA discusses a variety of topics related to the business.  *Id.* at ¶ 23.  Among other things, CBIA informs its employees about the policy positions the company is taking on

particular legislative and regulatory matters.  P.56a1 at ¶ 12.  It does so to ensure the employees are on the same page as to the company mission.  *Id.* at ¶ 5; D.56a2 at ¶ 21.  CBIA believes keeping everyone informed helps them do their jobs better and helps the organization run better.  D.56a2 at ¶ 26.

CBIA understands there is a difference between refusing to attend a meeting and failing to attend a meeting for some other reason. *Id.* at ¶ 36.  CBIA has never disciplined or discharged an employee for ***refusing*** to attend an all-staff meeting—indeed, CBIA knows of no employee who ever has refused to attend.  *Id.* at ¶ 37.  CBIA recalls a few instances over the years of employees ***failing*** to attend, but does not know why and could not find any information about those instances. *Id.* at ¶ 38, 40-42.  Those employees were given verbal warnings—which CBIA characterizes in its filings as "reprimands"—which simply means their managers reminded them they must attend the all-staff meetings in the future.  *Id.* at ¶ 39.  There is no written record of those verbal reminders. *Id.* at ¶¶ 40, 43.  CBIA does not have a discipline policy imposing specific consequences for not attending a meeting, or any written discipline policy at all.  *Id.* at ¶¶ 33.

CBIA still holds its monthly all-staff meeting.  P.56a1 at ¶¶ 7, 13.  CBIA asserts that when the Act became effective, CBIA stopped providing its employees with public policy updates during those staff meetings.  *Id.* at ¶ 13.  Why CBIA believes this mundane conduct would ever be the subject of an enforcement action under § 31-69a is unclear.  Most puzzlingly, CBIA asserts that it is chilled not from subjecting employees to discipline, discharge, or threats of discipline or discharge—the conduct the Act actually prohibits—but from ***telling*** its employees about the policies it is advocating for.  *Id.* at ¶ 14.

In addition to discussing its policy updates at its monthly all-staff meeting, CBIA now asserts—for the first time in its summary judgment filings—that it is also chilled from holding a

12

separate meeting with employees to discuss the downsides of unionization.  *Id.* at ¶ 16.  CBIA seems to have formed this supposed intention to hold this meeting long after filing this lawsuit. CBIA repeatedly testified during discovery throughout this litigation that it was only chilled from discussing its policy positions during its all-staff meetings.  D.56a2 at ¶¶ 45-47.

**B.  DOL's sworn guarantee that it will not enforce the Act against CBIA for the activity it describes in its declaration**

CBIA has a "working relationship" with DOL and frequently seeks advice from DOL on how labor laws apply to Connecticut businesses, and how DOL enforces them.  D.56a1 at ¶¶ 71-77.  Despite that sound practice, CBIA never reached out to DOL to ask whether CBIA's planned activities violate the Act or could subject it to the risk of civil penalty.  *Id.* at ¶ 78.  Instead, CBIA censored itself and then rushed to court asserting it had been injured by the Act.

DOL has now clarified that CBIA's reading of the Act is incorrect for several reasons, and that it faces no risk of a civil penalty for its intended actions.  D.56a1 at ¶¶ 52-70.  Tom Wydra, director of the division within DOL responsible for enforcing wage and workplace standards laws, reviewed CBIA's description of its planned activity and has sworn under oath that DOL will not prosecute CBIA.  *Id.* at ¶¶ 52-55, 60, 66, 68.

## VI.  Procedural History

Just after the Act became effective, nine business associations brought this pre-enforcement challenge claiming that the Act violates the First and Fourteenth Amendments and is preempted by the NLRA.  They sought a declaration that the Act is unconstitutional and preempted, and "prospective injunctive relief enjoining Defendants' enforcement of [the Act] against employers who discharge or discipline employees for refusing" to attend meetings or listen to speech about the employers' political opinions.  *Compl.* ¶ 9.

13

Defendants moved to dismiss the Complaint for, among other things, lack of standing.  ECF No. 36.  Defendants did not believe that any Plaintiff was asserting that its own speech was chilled by the Act, as opposed to that of its members.  *Id.* at 10.  This Court disagreed and denied Defendants' motion, concluding that CBIA had adequately alleged organizational standing— though it noted the question was close even on the pleadings.  Tr. 6/28/23 at 41, 47.  This Court authorized Defendants to "renew" their arguments at the summary judgment stage.  *Id.* at 47.

Since then, the parties have engaged in discovery.  During that process, every Plaintiff agreed they are not asserting associational standing on behalf of their members at this stage of the litigation.  D.56a1 at ¶ 35.  And every Plaintiff except CBIA also conceded they have not been injured as organizations.  *Id.* at ¶ 36.

## ARGUMENT

### I.   CBIA Lacks Standing

To establish Article III standing to bring a pre-enforcement challenge, plaintiffs must demonstrate (1) that their planned conduct is "arguably . . . proscribed by [the] statute" and (2) that it faces "a credible threat of prosecution thereunder."  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014).  A plaintiff's "subjective 'chill'" does not confer standing.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013).  Nor can plaintiffs "manufacture standing by inflicting harm on themselves based on their fears of hypothetical future" government actions that are unlikely ever to occur.  *Id.* at 416.

CBIA fails both requirements and therefore cannot claim that the Act objectively chills its intended activity.  First, CBIA's activities are not even arguably proscribed by the Act.  Second,

far from facing a credible threat of enforcement, CBIA now has a sworn guarantee of *non*-enforcement from DOL.[13]

### A. The Act does not arguably prohibit CBIA from discussing its policy positions during its monthly all-staff meetings

The conduct that the Act prohibits is clear and straightforward. Employers cannot "subject[] or threaten[] to subject any employee to discipline or discharge on account of" the employee's "refusal" to attend a meeting or listen to speech about the employer's political or religious opinions. Conn. Gen. Stat. § 31-51q(b)(2). CBIA does not assert that it is chilled from engaging in any of that conduct. CBIA does not claim that one of its employees refused to attend a meeting about politics and that the Act has deterred CBIA from disciplining, firing, or threatening that employee. Indeed, it is unlikely CBIA will ever have occasion to engage in that conduct because none of its employees have ever refused to attend an all-staff meeting, and there is no reason to believe any of them ever would. Nor does CBIA claim that it is chilled from threatening its employees with discipline or discharge for not attending future meetings. Although CBIA claims that informing employees that staff meetings are mandatory may qualify as a threat (it does not), CBIA admits that it "continues" to inform employees of that. *CBIA Dec.* ¶ 17.

All that CBIA says it is chilled from doing is discussing its policy advocacy efforts during those staff meetings. But the Act does not "arguably" prohibit that speech, or any speech. *Driehaus*, 573 U.S. at 159. The Act prohibits retaliation and threats of retaliation against employees who refuse to listen to speech, not the speech itself.

---

[13] The Court's ruling on Defendants' motion to dismiss is not controlling. CBIA's burden of establishing standing is higher now at summary judgment than it was at the pleading stage. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011); *see Clementine Co., LLC v. Adams*, 74 F.4th 77, 83 n.1 (2d Cir. 2023) (district court improperly "failed to account for the higher burden facing a plaintiff seeking preliminary injunctive relief"). CBIA "can no longer rest" on "general factual allegations of injury," but must "set forth by affidavit or other evidence specific facts" to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). And unlike the general allegations of "chill" in the Complaint, *see Compl.* ¶ 20, CBIA has now identified its intended conduct with specificity. This new information makes clear that CBIA's activities are not arguably proscribed by the Act.

CBIA argues that "holding a mandatory meeting for the primary purpose of discussing political matters is expressly proscribed," and that since its all-staff meetings are mandatory, it can only avoid violating the Act by not discussing politics at those meetings. PB 13. That is plainly not what the Act says. An employer violates the Act not by holding a "mandatory meeting," but by retaliating or threatening to retaliate against employees who refuse to attend. *See Associated Or. Indus. v. Avakian*, No. CV 09-1494-MO, 2010 U.S. Dist. LEXIS 44263, at \*11-12 (D. Or. May 6, 2010) ("an employer holds a mandatory meeting, and then creates an employee's cause of action by disciplining an employee who refuses to attend"). CBIA's "interpretation" of the Act would read those prohibitions out of the law entirely. An employer would violate the Act simply by holding a mandatory meeting about politics, even if it never took (or threatened to take) adverse action against an employee who declined to attend.[14] CBIA cannot claim an objective chill based on a re-written version of the law.

None of the other conduct CBIA describes in its declaration come close to a violation of the Act. First, merely telling employees that staff meetings are "mandatory" is not a threat of discipline for not attending. *CBIA Dec.* ¶¶ 17-18; D.56a1 at ¶ 67.[15]

---

[14]That construction would completely change how the law applies. Take just two examples. Suppose an employer held a mandatory meeting and planned to fire anyone who did not attend, but never had to fire anyone because every employee showed up. That employer would have violated a law prohibiting mandatory meetings because it held the meeting. But it would not have violated the Act because it did not retaliate or threaten to retaliate against anyone for refusing to attend. Or suppose an employer threatens its employees by saying "anyone who doesn't attend next week's meeting about the election is getting fired," but ends up canceling the meeting and never reschedules it. That employer would ***not*** have violated a law prohibiting mandatory meetings because the meeting never took place. But it ***would*** have violated the Act because it threatened its employees with discharge if they refused to attend.

[15]Moreover, CBIA's generalized statements during orientation or in its Telecommuting Policy that staff meetings are mandatory cannot be threats of discipline for not attending a meeting about political matters because those statements are not tied to any particular all-staff meeting, but apply to staff-meetings generally. D.56a1 at ¶¶ 68-69. Not all of CBIA's monthly all-staff meetings included political discussion. D.56a2 at ¶ 24. There is no evidence that employees remember their new-hire orientation or actually read the Telecommuting Policy. *Id.* at ¶ 27. Likewise, the ministerial act of listing an employee in the "required" rather than "optional" field in the Outlook invitation is not a threat of anything. D.56a1 at ¶ 68. CBIA itself also lists employees as "optional," apparently inadvertently. D.56a2 at ¶ 32.

Second, CBIA's "post-meeting reprimands" do not even arguably qualify as "discipline" under the Act. PB 13. Connecticut courts interpret "discipline" to require either an affirmative act of punishment for the purpose of punishing or deterring behavior that the employer wishes to suppress, or an adverse material consequence relative to a right. *E.g. Pucillo v. Town of Madison*, Superior Court, judicial district of New Haven, Docket No. NNH-CV-216115012-S, 2022 Conn. Super. LEXIS 2122, at *8-*10 (Sept. 14, 2022); *Browne v. Dept. of Correction*, Superior Court, judicial district of New Haven, Docket No. CV-17-6067843-S (Oct. 10, 2017) (Ecker, J.). What CBIA neglects to mention is that its "reprimands" merely consist of managers having verbal conversations with the employee to remind them to attend in the future. D.56a2 at ¶ 39. And CBIA has no information about which employees were given warnings or when, or any other information about those instances. *Id.* at ¶¶ 40-43. Telling an employee to "do better next time," without more, is plainly not discipline under any commonsense definition of that term. *C.f. Stewart v. City of N.Y.*, No. 22-2775, 2023 U.S. App. LEXIS 28048, at *3 (2d Cir. Oct. 23, 2023) ("criticism, verbal reprimands, and notices of potential discipline, by themselves, do not qualify as adverse employment actions"); *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 570 (2d Cir. 2011) (same). That CBIA self-servingly characterizes these conversations as "discipline" is irrelevant, for that "would give talismanic significance to a label[.]" *Connelly v. County of Rockland*, 61 F.4th 322, 327 (2d Cir. 2023). CBIA does not even have a discipline policy. D.56a2 at ¶ 33.

Finally, even if CBIA were to discipline or discharge employees for refusing to attend all staff meetings about its advocacy efforts because communications of those matters are "necessary" for CBIA's "employees to perform their job duties" that would not violate the Act. Conn. Gen. Stat. §31-51q(c)(2). CBIA is in the business of policy advocacy, and telling its employees what

17

the company is doing is necessary for their job functions, regardless of whether their functions directly involve political advocacy.  D.56a1 ¶¶ 56-59.

**B. CBIA's newly-minted assertion that it is chilled from holding a meeting about unionization cannot be considered, but it is not arguably prohibited by the Act anyway**

Attempting to establish standing to bring its preemption claim, CBIA now asserts—for the first time—that it is also chilled from holding a separate all-staff meeting in which it will discuss its opposition to unionization.  *CBIA Dec.* ¶¶ 32-36.  That supposed chill cannot support standing because it did not arise until after CBIA commenced this action.  *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (parties must have standing "***when the suit was filed***") (emphasis in original).   Defendants' Interrogatory 22 asked CBIA to "[i]dentify all . . . meetings or communications you have refrained from engaging in, or expect that you will refrain from engaging in, with your employees," as alleged paragraph 20 of the Complaint.  D.56a2 at ¶ 45 (citing Ex. 2).  CBIA responded by stating only that it refrains from discussing its policy positions during monthly all-staff meetings; it never mentioned the supposed meeting about unionization. *Id.*  And when CBIA was asked how the Act chilled its speech during its Rule 30(b)(6) deposition on January 29, 2024, CBIA mentioned discussion of its policy positions during the monthly all-staff meetings—as well as other speech CBIA does not rely on to establish standing in it summary judgment filings—but again never mentioned this meeting about unionization.  *Id.* at ¶ 46 (citing Ex. 3).  After CBIA listed those items, counsel asked CBIA, "is there anything else?"  CBIA responded, "No.  I think that's it."  *Id.*

That prior testimony shows that, at least through the date of CBIA's deposition, CBIA was not chilled from holding a meeting to discuss unionization.  CBIA's assertion in its declaration that it "would like to hold" such a meeting is irrelevant because that merely shows that CBIA

presently intended to hold such a meeting when it filed that declaration on April 24, 2024. *CBIA Dec.* ¶ 33. But CBIA had to show that it was chilled prior to suit, and its testimony throughout this case establishes that it was not. *Chevron Corp.*, 833 F.3d at 121.

Alternatively, if CBIA's Declaration asserted that it has been chilled from holding this meeting since before the suit, it would squarely contradict CBIA's prior testimony, and "[t]he 'sham issue of fact' doctrine prohibits a party from defeating summary judgment simply by submitting an affidavit that contradicts the party's previous sworn testimony." *Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 205 (2d Cir. 2014). Either way, CBIA's new assertion that it is chilled from holding a meeting about unionization cannot be used to support standing.

Regardless, this meeting about unionization does not establish standing because it is not arguably prohibited by the Act. As explained above, the Act plainly does not prohibit employers from holding meetings, whether they are "mandatory" or not. It is not an objective chill.

### C. There is no credible threat of enforcement

CBIA also lacks standing because it faces the opposite of a "credible threat" of State enforcement.[16] *Driehaus*, 573 U.S. at 159. CBIA now has a sworn guarantee that DOL will not pursue a civil penalty against CBIA for the conduct CBIA describes in its declaration, including for discussing its policy positions at its monthly all-staff meetings, for holding a separate meeting to discuss unionization, or for reprimanding or disciplining employees for refusing to attend those meetings. D.56a1 at ¶¶ 52-70. That unequivocal guidance to CBIA from DOL "is compelling contrary evidence that no threat exists." *Greenberg v. Lehocky*, 81 F.4th 376, 386 (3d Cir. 2023); *Blum v. Holder*, 744 F.3d 790, 798 (1st Cir. 2014); *Lawson v. Hill*, 368 F.3d 955, 959 (7th Cir.

---

[16] The threat of CBIA facing a private lawsuit from an employee is irrelevant because CBIA is seeking to enjoin the State from enforcing the Act against it through § 31-69a, and is claiming an objective chill based on the threat of State enforcement. *See* Compl.

2004); *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428-29 (11th Cir. 1998); *Keyes v. School Dist. No. 1*, 119 F.3d 1437, 1445 (10th Cir. 1997). Indeed, when the Supreme Court and the Second Circuit find a credible threat of enforcement, they generally do so specifically because the government had ***not*** disavowed enforcement. *E.g. Driehaus*, 573 U.S. at 165; *Holder v. Humanitarian L. Proj.*, 561 U.S. 1, 16 (2010); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 302 (1979); *Antonyuk v. Chiumento*, 89 F.4th 271, 334 (2d Cir. 2023); *Vitagliano v. Cnty. of Westchester*, 71 F.4th 130, 138 (2d Cir.), *cert. denied*, 144 S. Ct. 486 (2023).

DOL's guarantee of non-enforcement carries particular force here. First, it is not a "just trust us" guarantee, but is rooted in the plain text of the Act and DOL's conclusion that the Act plainly does not prohibit the conduct CBIA describes in its affidavit. D.56a1 at ¶¶ 52-70. Guarantees of non-enforcement based on "the Government's own interpretation of the statute" are entitled to "[p]articular weight[.]" *Blum*, 744 F.3d at 798. Second, CBIA frequently relies on and trusts DOL to provide accurate advice concerning the proper interpretation and application of workplace standards laws, including how DOL enforces those laws. D.56a1 at ¶¶ 71-78. Having now received DOL's position that it would not enforce the Act against it, CBIA cannot claim that it fears a DOL enforcement action. Any continued self-censorship would be objectively unreasonable.

CBIA argues that during argument on the motion to dismiss, Defendants "told Plaintiffs and the Court they ***will not*** disavow their ability to enforce the Act." PB 14 (emphasis in original). That is misleading. Counsel merely said DOL would not disavow enforcement under ***all circumstances***, such as if an employer had actually violated the Act. That is irrelevant. As in any standing inquiry, the question is whether ***CBIA*** faces a credible threat of enforcement for ***its intended conduct***, and DOL has now made clear CBIA will not ever face a civil penalty for that

conduct.  *E.g. Greenberg*, 81 F.4th at 386-87 (no standing where government disavowed enforcement as to plaintiff's intended conduct).  The only reason Defendants did not provide a guarantee of nonenforcement against CBIA's conduct at the pleading stage was because they did not yet know what that conduct was—again emphasizing why this Court's decision on the motion to dismiss does not control here.  *See* footnote 13, *supra*.

Even if DOL's sworn declaration were somehow not enough to conclude that CBIA faces no credible threat of enforcement, the absence of any other indication that it faces a threat of enforcement is.[17]  First, there is no history of enforcement for similar conduct.  D.56a1 at ¶¶ 37-44; *c.f. Driehaus*, 573 U.S. at 164; *Brokamp*, 66 F.4th 374, 388 (2d Cir. 2023); *Picard v. Magliano*, 42 F.4th 89, 100 (2d Cir. 2022).  Second, DOL has never threatened CBIA or any other employer with enforcement.  D.56a1 at ¶¶ 40-44; *c.f. Steffel v. Thompson*, 415 U.S. 452, 459 (1974); *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016).  Third, the Act does not specifically target CBIA or CBIA's intended conduct.  *C.f. Vitagliano*, 71 F.4th at 139 (law targeted plaintiff's precise conduct); *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019) (law applied specifically to plaintiff), *cert. denied*, 140 S. Ct. 2508 (2020).  Indeed, § 31-69a does not even mention the Act, but applies generally to all provisions of Chapter 577—among other laws—hardly reason for CBIA to think it would be the target of any enforcement action.

The absence of all of these factors alone requires dismissal.  *Hedges*, 724 F.3d at 201-202; *Adam v. Barr*, 792 Fed. Appx. 20 at 239 (2d Cir. 2019) (summary order); *Does v. Suffolk Cty.*, No. 21-1658, 2022 U.S. App. LEXIS 19094, at *8 (2d Cir. July 12, 2022) (summary order).  But when

---

[17] CBIA relies on the presumption that the State enforces its laws.  PB 7-8.  That is irrelevant.  DOL has sworn it will not enforce the Act against CBIA's planned activities.  But even without DOL's guarantee of non-enforcement, the presumption would not apply because the Act does not *indisputably* prohibit CBIA's intended speech (as explained, it patently does not prohibit it).  *Kearns v. Cuomo*, 981 F.3d 200, 210 n.5 (2d Cir. 2020); *c.f. Hedges v. Obama*, 724 F.3d 170, 197 (2d Cir. 2013) (presumption applies where "statute indisputably proscribe[s] the conduct at issue").

considered in "combin[ation] with [the State's] disavowal of enforcement," it is clear CBIA lacks standing. *Greenberg*, 81 F.4th at 387; *Blum*, 744 F.3d at 798. That is especially true at the summary judgment stage where "[a] plaintiff's burden to demonstrate standing increases[.]" *Cacchillo*, 638 F.3d at 404.

### D. CBIA separately lacks standing to bring its preemption claim, and to sue the Attorney General

Even if CBIA's decision to refrain from providing policy updates at its all-staff meeting gave CBIA standing to bring its First Amendment challenge, it would still lack standing to bring its preemption claim. "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek[.]" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). To have standing to bring its preemption claim, CBIA had to demonstrate that it was specifically injured by the Act's prohibition on retaliation and threats of retaliation against employees who refuse to listen to CBIA's opinions concerning "the decision to join or support any . . . labor organization." Conn. Gen. Stat. § 31-51q(a)(1). CBIA has not shown it was injured by that portion of the Act. It does not assert that its policy updates during monthly all-staff meetings include its opinions about whether to unionize, and its new allegation that it is chilled from holding a meeting about unionization cannot be considered. In any event, CBIA had no objective reason to refrain from holding that meeting. That speech is clearly not prohibited by the Act, and DOL has sworn that it will not prosecute CBIA for it.

CBIA also lacks standing to sue the Attorney General ("OAG"). Section 31-69a permits, but does not require, DOL to refer unpaid civil penalties to OAG to commence a collections suit. DOL has discretion to decide whether to impose a civil penalty in the first instance and then second to refer a decision imposing a penalty to the OAG if a respondent fails to pay the penalty. D.56a1 at ¶¶ 38-39. So even if CBIA were injured by the threat DOL might impose a civil penalty, which

22

it is not, that injury is not fairly traceable to the subsequent actions the OAG may take to collect that penalty if CBIA failed to pay it.  *Beatty v. Tong*, 659 F. Supp. 3d 219, 231-32 (D. Conn. 2023) (plaintiff was injured by agency lien but not by the OAG which could only enforce lien by bringing collections action).

## II.    Plaintiffs Must Show that the Act Violates the First Amendment and is Preempted in All of Its Applications

The Court should construe Plaintiffs' First Amendment and preemption claims as facial rather than as-applied.  Plaintiffs have never argued that their claims are as-applied, and the relief they seek—including declaratory relief that the Act "[is] unconstitutional" and "preempted"— would "reach beyond the particular circumstances of these plaintiffs."  *Doe v. Reed*, 561 U.S. 186, 194 (2010).  Indeed, Plaintiffs ask the Court to grant them injunctive relief even though all of them, except CBIA, have affirmatively conceded that the Act has not injured them in any way.  ECF No. 84.    Moreover, CBIA brought this suit preenforcement, and the Second Circuit has held that preenforcement claims are necessarily facial rather than as-applied.  *Antonyuk v. Chiumento*, 89 F.4th 271, 313 (2d Cir. 2023); *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third & Fourth Dep'ts*, 852 F.3d 178, 184 (2d Cir. 2017); *Rest. Law Ctr. v. City of New York*, 360 F. Supp. 2d 192, 208 (S.D.N.Y. 2019) (rejecting plaintiffs' argument that preenforcement challenge could be brought as-applied).

Facial challenges are "the most difficult challenges to mount successfully[.]"  *United States v. Salerno*, 481 U.S. 739, 745 (1987).  "[T]he challenger must establish that no set of circumstances exists under which the [law] would be valid."  *Id.*

In free speech cases, the overbreadth doctrine allows plaintiffs to prevail on facial claims by showing that "a substantial number" of the law's applications are unconstitutional.  *United States v. Stevens*, 559 U.S. 460, 472-73 (2010) (internal quotation marks omitted).  But CBIA has

waived any reliance on facial overbreadth.  It expressly argued that it was not alleging an overbreadth claim, and criticized Defendants for believing it had.  ECF Nos. 78 at 15; ECF No. 82 at 5; *see Brokamp*, 66 F.4th at 390 n.15 (accepting plaintiff's "disavow[al] [of] any overbreadth claim" because "the party who brings a suit is master to decide what law he will rely upon") (internal quotation marks omitted).  Thus, as with its preemption claim, CBIA can only prevail on its First Amendment challenge if it satisfied *Salerno's* "no set of circumstances" standard.  It cannot do so.

## III. The Act Satisfies the First Amendment, and Certainly is Not Unconstitutional in All Its Applications

### A. The Act regulates conduct, not speech[18]

The First Amendment does not apply to laws that only regulate conduct.[19]  *Clementine Co., LLC v. Adams*, 74 F.4th 77, 85-86 (2d Cir. 2023).  The Act "regulates conduct, not speech," because it "affects what [employers] must ***do*** [and] not what they may or may not ***say***."  *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 65 (2006) ("*FAIR*") (emphasis in original).  Employers "remain free under the statute to express whatever views they may have" about political or religious matters, in a meeting or any other form of communication.  *Id.*  They can ***say*** whatever they want.  What they cannot ***do*** is retaliate, or threaten to retaliate, against employees for refusing to listen.

As the Second Circuit recently held, proscriptions on retaliation regulate employers' "personnel decisions," not their speech.  *Slattery v. Cuomo*, 61 F.4th 278, 292 (2d Cir. 2023);

---

[18]Plaintiffs suggest that the Court "rejected" this argument at the motion-to-dismiss stage.  PB 18.  That is false.  The Court expressly authorized Defendants to "renew [the] argument at the summary judgment stage[.]"  Tr. 6/28/23 at 47.

[19]Laws prohibiting conduct may still merit intermediate scrutiny if the conduct is "inherently expressive."  *FAIR*, 547 U.S. at 66.  But Plaintiffs have waived an expressive conduct claim because they neither plead that theory in their Complaint nor briefed it in their motion for summary judgment.  *See Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 46 n.2 (2017).

*NLRB v. Gissel*, 395 U.S. 575, 616-17 (1969) (distinguishing between employer "conduct . . . such as discharge," and "speech").  Nor are threats of retaliation "'speech' for First Amendment purposes" because they contain no "expressive idea" but merely "facilitate the threat of discriminatory conduct."  *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1139 (11th Cir. 2022) (*quoting Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001) (Alito, J.)); *see also Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 457 (1978) ("employers' threats of retaliation" may be "regulated without offending the First Amendment").

CBIA acknowledges that the Act only actually restricts conduct, but argues that the legislature's introduction of "slightly different" laws in the past "makes clear" that the State is nefariously  "masquerade[ing] its speech-based restriction as a conduct-based one."  PB 18.  That is wholly unfounded.  The Act is "materially different" from those prior bills, and the State's diligent efforts to craft a narrower law that leaves ample breathing room for employers' ability to express their opinions shows a desire to protect speech, not censor it.  Conn. A.G. Opinion 2019-03, 2019 Conn. AG LEXIS 3, *2 (May 17, 2019).

Nor is there any merit to CBIA's argument that the Act should be ***treated*** like a restriction on speech merely because it prohibits employers from retaliating and threatening to retaliate against employees who refuse to listen to ***their*** speech.  PB 18.  By that logic, a law prohibiting people from physically assaulting someone who refused to listen to their religious speeches or attend their political rallies would restrict speech and not conduct.

The Supreme Court has declined to apply the speech/conduct distinction in circumstances that are distinguishable from this case.  The Supreme Court has invalidated laws when "[t]he only 'conduct' which the state sought to punish is the fact of communication."  *Cohen*, 403 U.S. at 18.  That is not the case here.  The conduct prohibited by the Act is "separately identifiable" from

employers' protected speech, and may therefore be regulated without "repressing" that speech. *Id.*; *Otto v. City of Boca Raton*, 981 F.3 854, 865-66 (11th Cir. 2020); *see also Greater Phila. Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 136 (3d Cir. 2020); *Wollschlaeger v. Governor*, 848 F.3d 1293, 1317 (11th Cir. 2017) (en banc). An employer who holds a meeting to express its opinions about political or religious matters violates the Act only if an employee refuses to attend, and the employer then decides to fire, discipline, or threaten that employee because of that refusal. The prohibited conduct is therefore separated from the protected speech by an intervening event—an employee refusing to attend. The Act merely restricts how employers may respond to that employee's decision not to attend. Regulating that conduct has no impact on employers' ability to speak at all.[20] The "speech component" is "left intact." *Greater Phila. Chamber of Commerce*, 949 F.3d at 136.

Again summoning its interpretation of the Act as prohibiting mandatory meetings, CBIA relies on *Honeyfund.com Inc.*, 2024 U.S. App. LEXIS at 5193. PB 18-19. Unlike the Act, that actually did ban mandatory meetings. It prohibited mandatory workplace trainings in which the employer expressed support for certain prohibited topics. *Id.* at *3-5. The State argued that the law restricted "the conduct of holding the mandatory meeting, not . . . the speech that takes place at that meeting." *Id.* at *11 (emphasis omitted). The court rightly rejected that argument because "the conduct regulated ***depend[ed] on—and [could not] be separated from***—the ideas communicated . . . ." *Id.* *10-11 (emphasis added). The speech alone was the violation. Whether an employer violated the law depended entirely on whether it held a meeting in which it endorsed

---

[20]Even if the Act were interpreted as prohibiting prospective threats ("if you refuse to attend next week's all-staff meeting, you will be fired"), that threat is still separately identifiable from the protected speech. An employer violates the Act the moment it makes that threat, even if it never ultimately holds the meeting. So the violation does not merely rest on conduct that is separable from the speech, it does not even depend on whether any speech actually occurs. *See Gormley v. Director*, 632 F.2d 938 (2d Cir.) (law prohibiting telephone calls with intent to harass "proscribes conduct, whether or not a conversation actually ensues"), *cert. denied*, 449 U.S 1023 (1980).

one of the forbidden viewpoints.  So "the only 'conduct' which the State sought to punish' was 'the fact of communication.'"  *Id.* at *13 (*quoting Cohen*, 403 U.S. at 17-18).  The court repeatedly emphasized, however, that it reached that conclusion only because the prohibited conduct was indistinguishable from the speech.  *See id.* *12 ("[B]ecause the conduct and the speech are *so intertwined*, regulating the former means restricting the latter.  In short, the disfavored 'conduct' *cannot be identified apart from* the disfavored speech.") (emphasis added); *id.* at *15 ("the conduct regulated *depends entirely on speech*") (emphasis added).

This case is just the opposite.  The Act does not prohibit mandatory meetings or the "fact of communication" about political or religious matters.  It only prohibits the separately identifiable conduct of retaliating, or threatening to retaliate, against employees who refuse to attend.  *Honeyfund.com Inc.* is irrelevant to such a law.

CBIA also relies on *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011), and *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991), for the proposition that governments cannot restrict speech by "burdening" its exercise.  PB 18.  Those cases are inapposite.  The law in *Sorrell* outright prohibited speech (the use of pharmacy records for marketing purposes).  564 U.S. at 557.  And in *Simon & Schuster, Inc.*, the law "imposed a financial burden on speakers" by requiring accused or convicted criminals' income from works describing their crimes to be deposited into an escrow account for their victims.  502 U.S. at 115.  The Act does not burden employers' speech, only their ability to take adverse actions against those who refuse to listen.  CBIA cites no authority for the proposition that restricting how employers may treat employees who refuse to listen to speech is a restriction on the speech itself.

CBIA seems to believe that some employers may be less inclined to hold meetings about political or religious matters because one or more employees now may refuse to attend.  None of

these Plaintiffs have ever asserted they ever declined to speak for that reason, and there is no evidence that a single other Connecticut employer has either.  But even if the Act did have that effect, it would not change the outcome.  That impact on speech would be purely incidental to the Act's proscription of conduct, and laws that "regulate non-expressive conduct do not implicate the First Amendment at all even if they incidentally burden speech." *Norwegian Cruise Line Holdings Ltd.*, 50 F.4th at 1135 (internal quotation marks omitted); *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017).  After all, "[e]very civil and criminal remedy imposes some conceivable burden on First Amendment protected activities[.]" *Clementine Co., LLC*, 74 F.4th at 85.

The fact that some employers may subjectively think that expressing their opinions is "less worth it" if they cannot retaliate against anyone who does not listen does not transform the Act into a restriction on speech.  That would permit virtually anyone to turn a conduct restriction into a First Amendment claim based on their own predilections.  But "[t]he Supreme Court has rejected the view that an apparently limitless variety of conduct" may be "labeled" as speech merely because the speaker intends at some point to express an idea.  *Slattery*, 61 F.4th at 291.

## B. Employers have no First Amendment right to hold their workers captive for unwanted political and religious speech that is unrelated to their jobs

Unlike a law that broadly prohibited mandatory meetings regardless of whether employees wanted to attend, the Act is limited to protecting ***unwilling*** listeners because it only prohibits employers from retaliating or threatening to retaliate against workers on account of their "refusal" to attend the meeting or listen to speech.  There is a "significant difference between state restrictions on a speaker's right to address a willing audience and those that protect listeners from unwanted communication." *Hill*, 530 U.S. at 715-16.  "The unwilling listener's interest in avoiding unwanted communications" "is an aspect of the broader 'right to be let alone'"—a

common-law interest the Supreme Court has described as "the right most valued by civilized men." *Id.* at 716-17 (internal quotation marks omitted).  The "right of every person 'to be let alone' must be placed on the scales with the right of others to communicate." *Id.* at 718.

The Act is constitutional, for two reasons.  First, employers have no right to force unwanted speech on employees who have objected to it.  Although the First Amendment protects "the right to attempt to persuade others to change their views," "no one has a right to press even 'good' ideas on an unwilling recipient." *Hill*, 530 U.S. at 717-18.  The Supreme Court has never "minimized the enduring importance of 'the right to be free' from persistent importunity, following and dogging' after an offer to communicate has been declined." *Id.* at 718.  "Nothing in the Constitution compels us to listen to or view any unwanted communication, whatever its merit." *Rowan v. United States Post Office Dep't*, 397 U.S. 728, 738 (1970).  The Act is self-limiting, and only prohibits employers from attempting to force their unwanted speech on employees who attempt to resist by refusing to listen.  That is exactly the kind of "following and dogging" that the First Amendment does not protect.  CBIA's free speech claim fails.

Second, even if the Act did restrict speech (which it does not), it would still be constitutional because it protects a captive audience from unwanted speech they cannot avoid.  The government may restrict speech in order to protect unwilling listeners in two circumstances:  when "the speaker intrudes on the privacy of the home . . . ***or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure***." *Erznoznik v. Jacksonville,* 422 U.S. 205 at 209 (1975) (*citing Lehman v. Shaker Heights*, 418 U.S. 298 (1974)) (emphasis added); *Hill*, 530 U.S. at 718; *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 838 (1st Cir. 2020); *see also Frisby v. Shultz*, 487 U.S. 474, 487 (1988) ("[t]he First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid [it]").

The Act fits neatly within the latter category.  When employers force their employees to listen to speech by threatening to fire or discipline them if they refuse, it is virtually impossible—and certainly "impractical"—for them to avoid the speech.  *Erznoznik*, 422 U.S. at 209.  As a general matter, "[f]ew audiences are more captive than the average worker."  *Robinson v. Jacksonville Shipyards*, 760 F. Supp. 1486, 1535 (M.D. Fl. 1991).  They are extraordinarily dependent on their employers for their wellbeing and that of their families, and cannot be expected to risk their jobs and substantial harm to their livelihoods to avoid unwanted speech.  And by exempting communications that are "limited to the employer's managerial and supervisory employees," the Act is limited to rank-and-file workers—those most susceptible to coercion. Conn. Gen. Stat. § 31-51q(c)(5).

Courts have frequently applied the captive audience doctrine in the workplace, and have recognized that employees are captive based solely on the fact that they "must remain on the jobsite during the workday" and are "powerless to avoid [offensive speech] short of giving up their jobs." *Resident Advisory Bd. v. Rizzo*, 503 F. Supp. 383, 402 (E.D. Penn. 1980); *Robinson*, 760 F. Supp. at 1535; *see also 520 S. Mich. Ave. Assocs. v. Unite Here Local 1*, 760 F.3d 708, 724 (7th Cir. 2014) ("[t]he freedom of an unwilling listener to avert one's eyes or ears is considerably lessened when she is required to be on the job"); *Saxe*, 240 F.3d at 210 (*Alito, J.*) ("speech may be more readily subject to restrictions when a . . . workplace audience is 'captive' and cannot avoid the objectionable speech") (*citing Aguilar v. Avis Rent A Car Sys., Inc.*, 980 P.2d 846, 872 (Cal. 1999) (*Werdegar, J.*, concurring) ("[t]he Constitution does not require plaintiffs to sacrifice their employment to avoid" unwanted speech)); *Ayers v. W. Line Consol. Sch. Dist.*, 555 F.2d 1309, 1319 n.16 (5th Cir. 1977) (the "degree of captivity in the workplace may be much greater" than when in the home), *rev'd sub. nom. by Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410

(1979).[21]  So if the inherent pressure to remain on the job is itself sufficient to render employees a captive audience for unwanted speech, they are surely captive when their employer affirmatively threatens to fire or discipline them if they refuse to listen to that speech.

Two final points bear emphasis.  First, the Act is specifically concerned with protecting captive audiences.  In *Cohen*, the Supreme Court rejected the argument that the defendant's prosecution for wearing an offensive jacket in a public courthouse could be justified as a means of protecting unwilling viewers from seeing it because they easily could have averted their eyes.  403 U.S. at 21.  But the Court emphasized that the result would have been different if there were "evidence that persons powerless to avoid [the speech] did in fact object to it" and the statute had "evinced . . . concern . . . with the special plight of the captive auditor . . . ."  *Id.* at 22; *see Thomas v. Bd. of Educ.*, 607 F.2d 1043, 1056 (2d Cir. 1979) (*Newman, J.*, concurring) (discussing *Cohen*).  The Act is just such a law.  It only applies to workers who object to the speech, and the legislative history shows a special concern with protecting vulnerable workers from being held captive to speech they could not otherwise avoid.

Second, the Act does not restrict employers' speech, but merely requires them to respect workers' decision not to listen.  In *Rowan*, the Court relied on the captive audience doctrine to uphold a statute allowing citizens to stop future mailings to their households that they "in [their] sole discretion believe[] to be erotically arousing or sexually provocative."  397 U.S. at 729-30 (internal quotation marks omitted).  If they opted out, mailers had to respect their decision.  *Id.* The power to make the "discretionary evaluation of the material" was vested in the citizen, not the government, which "avoid[ed] possible constitutional questions[.]"  *Id.* at 737.  The same is true

---

[21] On appeal, the Supreme Court held that the captive audience doctrine did not apply, but not because it disagreed with the Fifth Circuit that workers generally are a captive audience while on the job.  The Court simply ruled that because the recipient of the speech had "opened his office door to petitioner," he was not an "***unwilling*** recipient" of the speech.  *Givhan*, 439 U.S. at 415 (emphasis in original).

here.  Some workers may refuse to participate in an employer's meetings about political or religious matters.  Others may not.  But the one examining the speech and deciding whether it should be avoided is the worker, not the government.  Such "private decisionmaking" "avoid[s] governmental partiality and thus insulate[s] [the law] from First Amendment challenge."  *Sorrell*, 564 U.S. at 573-74 (citing *Rowan*); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 72 (1983).  It is employees who will decide whether employers' speech crosses the line from free exchange of ideas to attempts to coerce and control the free thoughts of employees on issues related to religion or politics.

### C.  The Act satisfies any level of scrutiny

The Act should only be subject to intermediate scrutiny.  Since it prohibits conduct and not speech, the Act is, by definition, content neutral.[22]  A violation "does not turn on the content of what [the employer] says," *Brokamp*, 66 F.4th at 393, but on whether an employer subjected a worker to discipline, discharge, or threats, for an unlawful purpose ("on account of" their "refusal" to attend a meeting or listen to speech about politics or religion).  Although  determining whether an employer engaged in that conduct for an unlawful purpose may entail an examination of the underlying speech, that does not transform the Act into a content-based regulation.  *See id.* at 395 (rejecting argument that "a law is content based whenever it is necessary to examine the content of the speech in order to determine how the law applies").

---

[22] The Act is also viewpoint-neutral because it does not matter what "view" the employer expresses about political or religious matters.  Plaintiffs acknowledge as much, but argue that the Act should be treated as viewpoint-based because employers almost always oppose unionization.  PB at 20-21.  The Supreme Court has long rejected that argument.  *See Hill*, 530 U.S. at 724 ("the contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of a debate is without support") (internal quotation marks omitted).

Nonetheless, the Court need not determine whether the Act is content and viewpoint neutral because it satisfies strict scrutiny.  *See Brokamp*, 66 F.4th at 391 (strict scrutiny requires that law advances compelling governmental interests and is narrowly tailored to achieving those interests).

### 1.  Compelling Interest

The Act furthers several compelling governmental interests.  First, as explained above, it protects a captive audience from being subjected to unwanted speech they would otherwise be powerless to avoid.  That interest "justifie[s]" content-based speech restrictions "as a means of preventing significant intrusions on privacy."  *Erznoznik*, 422 U.S. at 211-12; *see also Consol. Edison Co.*, 447 U.S. at 541-42 (state's interest in protecting captive audience was not compelling only because audience could avoid the objectionable speech); *c.f. Frisby*, 487 U.S. at 488 ("[b]ecause the . . . speech [is] directed primarily at those who are presumptively unwilling to receive it, the State has a substantial and justifiable interest in banning it").  The Supreme Court has multiple times upheld content-based restrictions on speech that were necessary to protect captive audiences.  *Rowan*, 397 U.S. at 729-30 (law prohibiting mailings that residents believed to contain lewd material); *Lehman*, 418 U.S. at 302 (plurality) (affirming ordinance prohibiting political advertisements in city buses in part because "[t]he streetcar audience is a captive audience" in that "it is there as a matter of necessity, not of choice"); *id.* at 307 (*Douglas, J.*, concurring) (agreeing that plaintiff "has no right to force his message upon an audience incapable of declining to receive it").[23]

---

[23]Although *Lehman* has been cited for multiple First Amendment concepts, its captive audience rationale is binding, for two reasons.  First, that rationale was the "narrowest grounds" on which a majority of the justices agreed.  *Marks v. United States*, 430 U.S. 188, 193 (1977).  Indeed, it was "the **only** position to command a majority . . . ."  *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation*, 45 F.3d 1144, 1161 (7th Cir. 1995) (*Flaum, J.*, concurring) (emphasis added); *see Erznoznik*, 422 U.S. at 209 n.5 (noting agreement between plurality and concurrence).  Second, regardless of whether that rationale was the narrowest grounds under *Marks*, the Supreme Court has emphasized in several subsequent cases that *Lehman* is correctly understood as a captive audience case.  *Hill*, 530 U.S. at 718; *Erznoznik*, 422 U.S. at 209 and n.5; *see also Consol. Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 542 (1980) (citing Justice

Second, the act of holding workers captive to unwanted political and religious speech is inherently demeaning, harassing, and can be psychologically harmful to workers.  As Dr. Forman concludes, the Act "is an essential part of ensuring employment is psychologically safe and free from coercive power unrelated to work[.]"  D.56a1 at ¶ 32.  The legislative record bears out the compelling need for the Act.  Workers explained the indignity and harm of incessantly being coerced into listening to their bosses' opinions, how it created a chilling effect in the workplace— sometimes extending to their personal lives—and how they felt powerless to resist it.  *See* FACTUAL AND PROCEDURAL BACKGROUND, Part III.A, supra.  If the Act had been in effect, some of those employees may have felt empowered to get up and leave or push back.

Third, the Act protects workers' own First Amendment rights to free speech and expression by allowing them to resist being pressured into participating in political or religious activities they oppose.  "Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning[.]"  *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2464 (2018).  The government therefore "has a compelling interest in insuring that corporate employees . . . are aware of their right to refrain from contributing to political causes they do not support[.]"  *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 315 (6th Cir 1998).  There is no material difference between being forced to sit and listen to an employer's opinions about political and religious matters, with no ability to get up and leave or speak out, and being pressured into participating in those causes.  *See* T. Emerson, *The Affirmative Side of the First Amendment*, 15 Ga. L. Rev. 795, 833 (1981) ("[c]ompulsory listening is the counterpart of compulsory expression of belief").  Indeed, as Professor Bronfenbrenner documented, coerced listening is often used as a means for pressuring workers to alter their actual behaviors.  D.56a1 at ¶ 8.  The Act evinces special concern

---

Douglas' concurring opinion for proposition that captive audience doctrine applies to "passengers on public transportation" who "may well be unable to escape an unwanted message").

with workers being unduly pressured into action (or inaction) because it defines "political matters" and "religious matters" as including issues that are still ongoing, such as "elections for political office," "proposed" legislative and regulatory changes, and "the decision" of whether "to join or support" political, labor, or religious organizations.  Conn. Gen. Stat. § 31-51q(a).  The potency of these tactics likely results in employees distorting their own free thoughts and expression on political and religious matters, even if unconsciously, just to avoid direct conflict with their employer.

Apart from being pressured into actual participation, holding workers captive will inevitably chill the political and religious speech of workers whose views diverge from the company line.  *See* Part III, supra; D.56a1 ¶¶ 9, 14, 24, 28-29.  That alone "represents an unacceptable risk of infringing those employees' First Amendment rights" that States have a compelling interest in preventing.  *Stop This Insanity v. FEC*, 902 F. Supp. 2d 23, 48 (D.D.C. 2012) (government had compelling interest in restricting corporations from directly soliciting contributions for separately held funds from employees due to inevitable chilling effect that would have on employee's speech), *aff'd*, 761 F.3d 10 (2014), *cert. denied*, 574 U.S. 1074 (2015).  The Act is necessary to preserve workers' free speech rights in the workplace.  D.56a1 at ¶ 15.

CBIA does not grapple with any of this.  It dismisses Dr. Forman and Prof. Bronfenbrenner as "so-called 'expert[s],'" but does not challenge their qualifications or any of their testimony, and offers no evidence to counter their opinions.  PB 23.  That would be difficult, since their conclusions are both unremarkable and entirely consistent with the first-hand accounts provided to the General Assembly about the effects this employer conduct.  In any case, their testimony is all undisputed for purposes of summary judgment.  *See Major League Baseball Props. Inc. v.*

*Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("[a] party opposing summary judgment does not

show the existence of a genuine issue of fact . . . merely by making assertions that are conclusory").

Beyond that, CBIA can only contest the State's compelling interests by mischaracterizing

and distorting them.  It argues that the State has no legitimate interest in "protecting employees

from employers' discouragement to unionize," or in "protecting employees from psychological

harms related to hearing unwanted political speech[.]"  PB 23.  That is all true, but irrelevant.  The

State's interest is not in protecting workers from harmful "secondary effects" of listening to speech

they dislike.  The harm is in the ***act of holding an employee captive*** to that speech by threatening

them with discipline or discharge if they resist.  That is an outward display of coercive power over

the employee, and it is inherently degrading and harmful.  As Dr. Forman explained, workers may

feel "uncomfortable" in hearing political or religious speech they disagree with, but when the

employer forces them to listen with threats, "the environment transforms to one more akin to

discrimination, harassment, and at a minimum, a psychologically damaging environment."  D.56a1

at ¶ 28.  And whatever employers' political and religious opinions may be, the act of force-feeding

them to workers is inevitably coercive and erodes workers' First Amendment rights.  The State

has a compelling interest in ensuring all citizens believe they have an equal right to think freely,

participate in the political process, that their voices matter, and that their opinions are not subsumed

by those of their employer simply because of the economic power their employer wields over

them.  *See Green Party v. Garfield*, 648 F. Supp. 2d 298, 352 (D. Conn. 2009) (State has

compelling interest in improving integrity of our democracy and political system).

### 2.  *Narrow Tailoring*

The Act is narrowly tailored to serving those interests.  At the outset, by only prohibiting

retaliation and threats of retaliation against employees who "refuse" to attend, the Act is limited

to protecting only unwilling listeners from speech they cannot avoid. *See Consol. Edison Co.*, 447 U.S. at 542-43 n.11 (observing that, even if there were a compelling interest in protecting consumers against intrusive bill inserts, "the state could achieve its goal simply by requiring [plaintiff] to stop sending [them] to the homes of ***objecting*** customers") (emphasis added); *Frisby*, 487 U.S. at 485 (asking whether "ordinance is narrowly tailored to protect only unwilling recipients of the communications").

The Act is also limited in several other ways to ensure it only captures harmful and intentionally-coercive employer conduct. First, the Act exempts bonafide work-related conduct because it does not apply if the employer fires, disciplines, or threatens and employee for refusing to listen to speech "that is necessary for [the] employees to perform their job duties[.]" Conn. Gen. Stat. § 31-51q(c)(2). Second, the Act only applies when the "primary purpose" of the meeting or communication is to convey the employer's opinion about political or religious matters—limiting the Act to situations where an employer specifically intends to press its opinions on workers. Conn. Gen. Stat. § 31-51q(b)(2). To that same end, the Act also exempts communications the employer is "required by law to communicate," as well as "casual conversations[.]" *Id.* at (c)(1) and (4). Third, by exempting "requirement[s] limited to the employer's managerial and supervisory employees," the Act is limited to rank-and-file workers—those most susceptible to coercion. *Id.* at (c)(5). The Act also contains exemptions for religious institutions. *Id.* at (d). The Act is thus limited to extreme situations where an employer engages in the sort of coercion that is likely to harm workers and their First Amendment rights. The Act is narrowly tailored.

**D. The Act is undisputedly constitutional as applied to State employers, which defeats Plaintiffs' facial challenge.**

Even if the Court were to accept CBIA's theory that the Act imposes impermissible content or viewpoint restrictions on speech—which it should not—the Act still would not be

unconstitutional in all applications.  The Act applies to "any employer, including the state," and the First Amendment does not prohibit States from enacting content-based restrictions on the speech of other State entities.  "The purpose of the First Amendment is to protect private expression and nothing in the guarantee precludes the government from controlling its own expression or that of its agents." *Serra v. United States General Services Admin.*, 847 F.2d 1045, 1048-49 (2d Cir. 1988) (internal quotation marks omitted).  "Consequently, the Government may . . . restrict its own speech in a manner that would clearly be forbidden were it regulating the speech of a private citizen." *Id.* at 1048; *accord Muir v. Ala. Educ. Television Comm'n*, 688 F.2d 1033, 1038 n.12 (5th Cir. 1982).  Thus, the government may "regulate the content of what is or is not expressed when it is the speaker . . . ." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995).  So even under CBIA's own theories, there are still at least some applications of the Act that would not violate the First Amendment.  That defeats CBIA's facial claim.  *Cmty. Hous. Improvement Program v. City of N.Y.*, 59 F.4th 540, 549 (2d Cir. 2023) (any potential constitutional application of law defeats facial challenge).

### E.  The Act is not unconstitutionally vague

CBIA makes the passing assertion that the Act's definition of "political matters" and use of the phrase "primary purpose" render the Act unconstitutionally vague.  PB 21-22.  They do not. The term "political matters" is not "unmoored," *Minn. Voters All. v. Mansky*, 585 U.S. 1, 16-17 (2018), but is defined narrowly and with extreme specificity.   And the Second Circuit has "reject[ed] [the] claim that the phrase 'primary purpose' is unconstitutionally vague" because "[p]ersons of ordinary intelligence are capable of understanding" what it means, i.e., excluding "incidental or accidental" activities.  *United States v. Safford*, 814 F.3d. Appx. 638, 643 (2d Cir. 2020).  Even if an employer does not use magic words informing staff that the "primary purpose"

of a particular meeting is to discuss politics or religion, a reasonable person can discern when it applies.  Of note, in the core First Amendment area of campaign speech, the Supreme Court has declined to find a campaign finance regulation to be vague simply because it requires interpretation.  *FEC v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469-470 (2007) (upholding campaign finance regulation of political speech that is the "functional equivalent" of "express advocacy" where the standard only applies to speech that "is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.").

## IV.  The NLRA Does Not Preempt the Act

Section 31-51q ensures that Connecticut employees retain their freedom of conscience, free from employer harassment, intimidation, and forced indoctrination.  It prohibits employers from exerting their inherent power to force employees to listen to their views on topics that have nothing to do with their job duties.  Such a minimum protection does not interfere with or intrude upon the province of the NLRA.  Connecticut, under its broad police powers, regularly sets minimum standards to protect workers.  The Act is no exception.  Employers remain free to communicate, inform, debate, and discuss any range of issues.  Only when open debate transforms into forced indoctrination does the Act protect employees from adverse employment actions.  The NLRA has never protected an employer's right to force its employees to listen to political and religious opinions upon threat of discipline or discharge.  Invalidating the entire Act on the basis of NLRA preemption would expand the doctrine beyond recognition.  This Court should decline to do so.

"[F]ederal law preempts state law when the two conflict."  *Glacier Northwest, Inc. v. Int'l Brotherhood of Teamsters Loc. Union No. 174*, 143 S. Ct. 1404, 1411 (2023) ("*Glacier*").  NLRA preemption diverges from typical preemption, however, because the NLRA can preempt state law

"even when the two only arguably conflict," a principle termed *Garmon* preemption.  *Id.* at 1412 (emphasis omitted) (citing *Garmon*, 359 U.S. at 245).  And under *Machinists*, the NLRA can also preempt state law when the state regulates "certain zones of labor activity" that Congress intended to be left unregulated and subject to the "the free play of economic forces."  *Chamber of Commerce of the United States v. Brown*, 554 U.S. 60, 62, 65 (2008) ("*Brown*").  Neither applies.

### A.  The Act is not preempted under *Garmon*

*Garmon* preemption does not apply for two reasons: 1) section 8(c) does not arguably protect the activities that the Act prohibits, namely, forcing employees to listen to unwanted speech through threats and retaliation; and 2) the Act represents a deeply rooted state interest in protecting employees from intimidation and forced indoctrination.  *Garmon* preempts state laws that regulate "activities [that] are protected by § 7 of the [NLRA], or constitute an unfair labor practice under § 8."  *Garmon*, 359 U.S. at 244.  The party "asserting [*Garmon*] pre-emption must advance an interpretation of the NLRA that is not plainly contrary to its language and that has not been authoritatively rejected by the courts or the Board.  The party must then put forth enough evidence to enable the court to find that the Board reasonably could uphold a claim based on such an interpretation."  *Glacier*, 143 S. Ct. at 1411 (citation and internal quotation marks omitted).  Only "identical" controversies warrant invalidating a statute in order to protect the supremacy of federal law and NLRB's "primary jurisdiction" over disputes arising under §§ 7 and 8 of the NLRA.  *See Domnister v. Exclusive Ambulette, Inc.*, 607 F.3d 84, 89 (2d Cir. 2010); *Healthcare Ass'n of N.Y. State v. Pataki*, 471 F.3d 87, 95-96 (2d Cir. 2006) ("*Pataki*").

Even if the party asserting preemption satisfies the *Garmon* requirements, the NLRA does not necessarily strip the State of its regulatory authority.  An exception to *Garmon* preemption exists for situations "where the regulated conduct touches interests so deeply rooted in local feeling

and responsibility that, in the absence of compelling congressional direction, a court cannot conclude that Congress deprived the States of the power to act." *Glacier*, 143 S. Ct. at 1411 n.1 (citations and internal quotation marks omitted).

CBIA premises their *Garmon* preemption argument on § 8(c).[24]  That section provides: "The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice . . . if such expression contains no threat of reprisal or force or promise of benefit."  By its express terms, § 8(c) does not expressly (actually) protect any employer right.  *See Glacier*, 143 S. Ct. at 1410.  Instead, § 8 identifies employer conduct that constitutes unfair labor practices.  *Id.*  Since § 8(c) contains no employer right that is *actually* protected, any *Garmon* preemption claim under § 8(c) depends on an *arguably* protected employer right.

CBIA argues that since the Act prohibits non-coercive employer speech, *Garmon* preemption applies because § 8(c) arguably protects non-coercive employer speech about unionization and labor unions. PB 36.  CBIA is mistaken.  The Act does not prohibit non-coercive employer speech.  In fact, it does not prohibit any employer speech whatsoever.  *See* ARGUMENT, Part III.A.  Nor does the Act prohibit mandatory meetings.  It prohibits employers from retaliating and threatening to retaliate against unwilling employees who refuse to listen to the employer's speech, when the speech has nothing to do with the job.  The NLRA contains no employer protected right, not even an arguably protected right, to engage in retaliation for forcing employees to listen to religious and political opinions unrelated to their jobs.

---

[24] To the extent that CBIA asserts § 7 claims, those can be easily resolved.  PB 38. Section 7 "only confers rights on employees, not on employers." *Pataki*, 471 F.3d at 96.  CBIA "ha[s] no valid claim" that the Act "affects [its] rights under section 7." *Id.*

That distinguishes this case from cases like *Brown* and *Pataki* in which the statutes burdened speech by conditioning state money on speech.  The statutes in those cases expressly prohibited use of state funds to "assist, promote, or deter union organizing" and to "encourage or discourage union organization."  *Brown*, 554 U.S. at 63, *Pataki*, 471 F.3d. at 90.  The Act, however, avoids implicating speech directly by only prohibiting adverse employment actions when an employee refuses to listen to their employer's views on religious and political matters.

The Act's prohibition on adverse employment actions also distinguishes it from prior versions of the Act that Attorney General Jepsen opined may be preempted.  Conn. A.G. Opinion No. 2018-02, 2018 Conn. AG LEXIS 2 (Apr. 16, 2018).  The 2018 bill prohibited employers from requiring employees to attend meetings during which the employer discussed its views on political or religious matters.  *See* HB 5473.  The Act operates completely differently.  It does not prohibiting meetings or any speech at those meetings.  *Garmon* therefore does not apply because the Act does not prohibit any conduct that the NLRA protects.

If this Court disagrees and construes the Act as implicating employer speech about unionization, *Garmon* still does not warrant preemption because the Act does not prohibit the kind of speech arguably protected by § 8(c).  At most, § 8(c) arguably protects *some*, but not all, employer speech about unionization—the protection "is not categorical."  *Pataki*, 471 F.3d at 97.  This Court must, as it did in *Pataki*, analyze whether § 8(c) protects the "same" activity prohibited by the Act.  *Id.* at 99.  If enforcement under the Act does not threatens the NLRB's primary jurisdiction by "interfere[ing] with the substantive provisions of section 8(c)," then the NLRA does not preempt the Act.  *Id.* at 100-01.

Primary jurisdiction is not threatened if "an employer has no acceptable method of invoking, or inducing the Union to invoke, the jurisdiction of the Board."  *Id.* at 100.  The disputes

before the NLRB and state court must be identical to warrant *Garmon* preemption.  *Id.*  It is at this point in the *Garmon* analysis that the factual record becomes most relevant to determine whether an identical claim could be brought before the NLRB and the state court.[25]  If the controversies are not identical, *Garmon* preemption does not apply.

CBIA offers no factual analysis to support *Garmon* preemption.  Instead, CBIA relies on "a conclusory assertion of pre-emption" rather than analyzing the potential federal and state claims and identifying an identical controversy.  *Int'l Longshoremen's Assoc. v. Davis*, 476 U.S. 380, 394-96 (1986) (concluding plaintiff failed to "undertake any examination," failed to point to evidence in the record, and, thus, failed to carry its burden).  On that basis alone, this Court should reject CBIA's *Garmon* preemption argument.

Engaging in the record here further undermines *Garmon* preemption.  As in *Pataki*, "[h]ere, there is no proceeding pending in a state tribunal, and [CBIA] point[s] to no possible dispute arising under [the Act] that would be identical with an NLRA dispute or over which the State would usurp NLRB jurisdiction."  *Id.* at 100.  CBIA wants to hold mandatory meetings with its employees to explain CBIA's "institutional opinions, or policy positions, that inform its lobbying and advocacy stances." P56a1 at ¶¶ 11-13.  The "institutional opinions include [CBIA's] support of or opposition to candidates for office and to proposed legislation and regulations" *Id.* ¶ 12.  If CBIA wants to discuss its mission with its employees, it can.  *Id.* at ¶¶ 2, 5.  An employee discharged for refusing to attend a meeting about their employer's core business, or candidates for

---

[25] In *Pataki*, the Second Circuit remanded the case to the district court for further findings as to whether the funding restriction "is limited to a restriction on the use of State funds or whether it overreaches in an attempt to regulate the employers' speech regardless of whether State funds are at issue." *Id.* at 106.  The record here provides ample evidence that the Act does not overreach to regulate employer speech as evidenced by DOL's interpretation and enforcement guidance. D56a1 at ¶¶ 45-70.

political office, or proposed legislation or regulations, could not bring that claim before the NLRB—it has no bearing on labor relations.  NLRB jurisdiction is not threatened.

CBIA also wants to have a "frank meeting with all CBIA employees, where CBIA leadership will explain to them CBIA's opposition to unionization." *Id.* ¶ 33.  That is the only statement that amounts to anything remotely close to a claim that could implicate the NLRA because it is the only allegation about labor relations.  Although Defendants maintain that this Court should not consider CBIA's new assertions about a unionization meeting made for the first time in a CBIA's motion for summary judgment, those self-serving assertions still would not amount to a dispute that would threaten NLRB jurisdiction.  An employee discharged or disciplined for refusing to attend a meeting during which the employer expresses negative views about unionization does not give rise to an NLRB claim.  Especially when the employer's mission includes expressing negative views about unionization, as is the case here.

CBIA also fails to address the well-established exceptions to *Garmon* preemption for deeply rooted local interests.  Connecticut has such an interest in protecting employees from intimidation for exercising their rights to be free from forced listening and indoctrination, and that interest should be respected and not displaced by the federal labor scheme.  The Connecticut Supreme Court wrote that § "31-51q protects an employee from retaliatory discharge due to that employee's exercise of certain enumerated rights, including, inter alia, the right to freedom of expression as guaranteed by the first amendment to the United States constitution, and article first, § 4, of the Connecticut constitution."  *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 778 (1999) (citation omitted).  Against that backdrop, the General Assembly lawfully passed amendments to § 31-51q, which only serve to level the playing field between employer/employee and to further protect the dignity of Connecticut employees.  Employers wield "great influence"

over their employees. D.56a1 at ¶ 19.   And some have attempted to use that influence to indoctrinate employees with their political and religious views.  *Id.* at ¶¶ 1, 3.  Modern attempts at indoctrination include "mobilizing employees as a resource to further the political interests of the executives and the business, often against the employees' will."  *Id.* at ¶ 6.  At the hands of those tactics, "employees suffer."  *Id.* at ¶ 27.

Connecticut employees understand that suffering.  Many "know what it feels like to be captive" when all they want is "to do [their] job."  H.R. at 5333 (R. Hughes). Connecticut appropriately stepped in.  The Act "level[s] the playing field," protects employee "freedom to just do your job," *id.,* at 5334-5335, and to be free from "a form of harassment," Sen. at 1645 (S. Witkos), and "coercion, intimidation, and retaliation in the workplace."  *Id*. at 1716 (S. Looney).

The Act comes on the heels of a long line of statutes that protect Connecticut employees from unlawful discharge for reasons that contravene public policy. *See, e.g.* Conn. Gen. Stat. §§ 31-57v (prohibiting retaliation for using paid sick leave); 31-40d (prohibiting adverse employment actions against employees complaining about the employer's posting of carcinogenic substances list); 31-40w (prohibiting adverse employment action against employees breastfeeding in the workplace); 31-40z (prohibiting adverse employment actions against employees who disclose or discuss wages).  The Act seeks the same end.  It warrants state regulation "as a promoter of democracy" because it regulates a subject concerning the public order, "intimidation."  *See Garmon*, 359 U.S. 236, 243; *see also Hotel Emp.s & Restaurant Emp.s Union, Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206, 212 n.4 (3d Cir. 2004) (citation omitted).  The State's interests in protecting its citizens' independence and free-thinking is integral to a healthy and vibrant political system and its citizens' willingness to participate and engage with our democracy.

**B.  The Act validly imposes a minimum labor standard that does not interfere with the labor negotiation processes and is not subject to *Machinists* preemption**

*Machinists* preemption "forbids both the [NLRB] and States to regulate conduct that Congress intended be unregulated . . . ." *Brown*, 554 U.S. at 65 (citations and internal quotation marks omitted).  Even though Congress left some conduct unregulated, states possess "broad authority under their police powers to regulate the employment relationship. . . ." *CHCP*, 783 F.3d at 85.  Because of that "traditional power," "pre-emption should not be lightly inferred." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987).

The Second Circuit's recent decision in *Restaurant Law Center v. City of New York*, 90 F.4th 101, (2d Cir. 2024), forecloses Plaintiffs' *Machinists* claim.  There the Second Circuit rejected a *Machinists* challenge to a New York law prohibiting employers from discharging fast food employees except for just cause or a bona fide economic reason.  *Id.* at 108.  It explained that the Supreme Court "has, on three occasions, entertained and rejected *Machinists* preemption challenges to 'state rules of general application that affect' but do not indirectly regulate 'the right to bargain or to self-organize.'" *Id.* at 111 (citation omitted).  Those three challenges concerned a New York law that provides unemployment compensation to striking workers, *New York Tel. Co. v. New York State Dept. of Labor*, 440 U.S. 519, (1979), a Massachusetts law requiring employers to provide mental health benefits, *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724 (1985), and a Maine law that that requires employers to provide severance when a plant closes, *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987).  *Restaurant Law Center*, 90 F.4th at 111-12.

Following that precedent, the Second Circuit has its own line of cases upholding state laws "regulating the *substance*, rather than the *process* of labor negotiations." *Id.* at 112 (emphasis in original).  For example, in 2015, the court upheld New York's Wage Parity Law that fixed minimum wages for home healthcare aides in New York City and surrounding counties. *CHCP*,

783 F.3d at 81-82.   And in the beginning of 2024, the court upheld New York's Wrongful Discharge Law in the face of a *Machinists* preemption challenge.  *Restaurant Law Center,* 90 F.4th at 106.  The court reasoned that when a statute "mandate[s] benefits that affect union and nonunion employees equally, neither encourage[s] nor discourage[s] the collective-bargaining processes, and ha[s] only the most indirect effect on the right of self-organization," *Machinists* does not apply. *Id.* at 113 (internal quotations marks and alterations omitted).  That is because, under those circumstances, the statute sets a "minimum labor standard[] dictating specific terms of employment" and does not "put a thumb on the scale of either labor or management in the bargaining process." *Id.*

The Act easily falls into that line of cases.  It applies to all employees and all employers, irrespective of whether they are unionized or employ unionized workers.  *Id.*  It does not interfere with an "active, ongoing labor dispute in which the [l]aw directly intervenes." *Restaurant Law Center,* 90 F.4th at 115 (*citing Chamber of Commerce v. Bragdon,* 64 F.3d 497 (9th Cir. 1995) *and 520 South Michigan Avenue Assocs., Ltd. v. Shannon*, 549 F.3d 1119 (7th Cir. 2008)).  It does not put a thumb on the scale of labor or management because it permits free debate and discussion.

CBIA does not cite or mention this line of cases directly on point and binding on this Court.[26]  Instead, CBIA relies on *Brown* and *NCRNC, LLC v. NLRB*, 94 F.4th 67, 74 (D.C. Cir. 2024) ("*NCRNC*") for the proposition that § 8(c) protects non-coercive employer speech about unionization.[27]  That is irrelevant.  The Act does not prohibit non-coercive employer speech about unionization (or even coercive speech about unionization).  Even if it did, *Garmon* would be the proper analytical framework, not *Machinists*.

---

[26] *See* PB 3-7 omitting *Fort Halifax Packing Co.*, 482 U.S. 1,  *Metropolitan Life Insurance Co.,* 471 U.S. 724, *New York Tel. Co.*, 440 U.S. 519, *Restaurant Law Center*, 90 F.4th 101, and *CHCP*.

[27] *NCRNC* did not involve preemption. Instead it involved a challenge to a NLRB determination of unfair labor practices by an employer during an organizing campaign. *Id.* at 71.

The Act is also readily distinguishable from *Brown*, in which California imposed state fund use restrictions and, moreover, did not impose those restrictions uniformly.  *Brown*, 554 U.S. at 71.  Rather than applying to "all employer advocacy regarding unionization," it created an exception to the prohibition on noncoercive speech about unionization "for **select** employer advocacy activities that promote[d] unions."  *Id.* (emphasis in original).  Thus, it was not neutral in its application.  In addition, the California statute created compliance burdens for employers that outweighed the state's reliance on the use provision.  *Id.* at 72-73.  Here, on the other hand, the Act exempts enforcement when an employer conveys information necessary for employees to perform their jobs.  That exemption protects even more speech, it does not burden it.

In any event, this Court should follow *Restaurant Law Center*.  *Machinists* preemption does not apply because the Act sets a minimum labor standard that does not interfere with the collective bargaining process.

## V.  If the Court Grants Relief, That Relief Should be Narrow

Defendants maintain that the Act is constitutional in all of its applications.  But if the Court were to find an infirmity, the entire Act should not be struck.   "Severability is a question of state law," *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77, 88 (2d Cir. 2015), and Conn. Gen. Stat. § 1-3 provides:  "If any provision of any act passed by the general assembly or its application to any person or circumstance is held invalid, such invalidity shall not affect other provisions or applications of such act."  The legislature has therefore "codified its preference that the invalidity of certain portions of state statutes should, as a general matter, not infect other portions of that statute."  *Connecticut Fine Wine & Spirits, LLC v. Harris*, 255 F. Supp. 3d 355, 367 (D. Conn. 2017), *aff'd on other grounds*, 932 F.3d 22 (2d. Cir. 2019).

Thus, even if this Court deems a portion of the Act to be unconstitutional this Court should either construe the Act in a manner that avoids any unconstitutional application, or "'sever[] any problematic portion[] while leaving the remainder intact.'"  *Barr v. American Assn. of Political Consultants*, 140 S. Ct. 2335, 2350 (2020) (*quoting Free Enterprise Fund v. Public Company Accounting Oversight Bd*., 561 U. S. 477, 508 (2010)).  CBIA ignores § 1-3 and asks the Court to delve into the Act's legislative history.  But § 1-3 prohibits consideration of the legislative history and instead requires the Court to sever any provisions or applications that are infirm.  Moreover, considering legislative history is only appropriate if a statute's text is ambiguous.  *Cruz v. Montanez*, 294 Conn. 357, 370 (2009); *Payne*, 171 Conn. at  685–686 (determining severability based on the statute's plain text).  Section 31-51q is clear and unambiguous, and shows a clear intent to protect employees' right to refuse to listen to a variety of political speech in the workplace, including but not limited to speech about unionization.  Courts must presume "the legislature meant what it said" with § 31-51q, *Cotto v. United Technologies Corp*., 251 Conn. 1, 16 (1999), and would have kept the remainder of the Act even if any of its applications were unconstitutional.

Finally, even if this Court delves into the Act's legislative history, it cannot be said that the legislature "would not have adopted the remainder of the statute independently of the invalid portion." *State v. Menillo*, 171 Conn. 141, 145 (1976). Section 31-51q is a 40-year-old statute and the 2022 amendments "confirm[ed] the legislature's intent to provide coverage for the exercise of constitutional rights at a private as well as at a public workplace."  *Cotto*, 251 Conn. at 8 (analyzing § 31-51q [rev. 1983]). Contrary to CBIA's claim, the legislature's reasons for adopting the statute to protect freedom of conscience extended beyond anti-union campaigns and included protecting individual dignity in multiple areas of politics and religion—all of which warrant consideration. The Act must be severed if this Court deems any portion or application constitutionally infirm.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss this lawsuit for lack of subject matter jurisdiction.  Alternatively, it should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion for summary judgment.

Respectfully submitted,

DEFENDANTS,
DANTÉ BARTOLOMEO, ET AL,

WILLIAM TONG
ATTORNEY GENERAL

BY:   */s/ Timothy J. Holzman*

Timothy J. Holzman (ct30420)
Emily Adams Gait (ct31186)
Benjamin Abrams (ct29986)
Assistant Attorneys General Office
of the Attorney General 165
Capitol Avenue, 5th Floor Tel.:
(860) 808-5212
Fax:  (860) 808-5347
Timothy.holzman@ct.gov
Emily.gait@ct.gov
Benjamin.abrams@ct.gov