UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>DANTÉ BARTOLOMEO, *et al.*,<br><br>Defendants. | Civil Action No. 3:22-cv-1373 |

PLAINTIFFS' COMBINED OPPOSITION TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY BRIEF
IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ORAL ARGUMENT REQUESTED

TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................... 1

STANDING ..................................................................................................... 2

    I.     CBIA has standing to challenge the Act. ............................................. 2

         A.     CBIA's intended conduct is arguably proscribed by the
              Act. ...................................................................................... 3

         B.     CBIA has standing to raise a preemption challenge................... 6

    II.    There remains a credible threat of enforcement................................... 8

         A.     DOL's purported disavowal falls short. ...................................... 8

         B.     The presumption that the State will enforce its laws
               reinforces CBIA's credible threat................................................ 9

         C.     CBIA's injury is traceable to the Attorney General's
               enforcement ability.................................................................... 10

MERITS ......................................................................................................... 11

    I.     Section 31-51q violates the First and Fourteenth Amendments. ....... 11

         A.     Section 31-51q regulates employers' conduct based on the
               content and viewpoint of their speech. ..................................... 11

         B.     Section 31-51q fails strict scrutiny. ......................................... 13

             1.     The State's stated interests are not compelling. ............ 13

                   a.     There is no compelling government interest
                       in censoring unwanted speech in the
                       workplace............................................................. 15

                   b.     There is no compelling interest in protecting
                       employees from psychological harm. .................... 18

                   c.     There is no compelling government interest
                       in protecting private employees' First
                       Amendment rights. .............................................. 19

             2.     Section 31-51q is not narrowly tailored to satisfying
                 the State's stated interests. ............................................ 20

    II.    Section 31-51q is preempted by federal labor law. ............................ 23

## TABLE OF CONTENTS
(continued)

Page

A.    The Act is preempted under *Garmon*. ...................................... 24

B.    The Act is preempted under *Machinists*.................................. 27

C.    Section 31-51q's unionization clause cannot be severed. .......... 29

CONCLUSION ................................................................................................ 31

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*303 Creative v. Elenis,*
    600 U.S. 570 (2023) ................................................................................... 16

*520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Loc. 1,*
    760 F.3d 708 (7th Cir. 2014) ..................................................................... 17

*Aerel, S.R.L. v. PCC Airfoils, LLC,*
    448 F.3d 899 (6th Cir. 2006) ....................................................................... 7

*Aguilar v. Avis Rent A Car Sys., Inc.,*
    980 P.2d 846 (Cal. 1999) ........................................................................... 18

*Antonyuk v. Chiumento,*
    89 F.4th 271 (2d Cir. 2023) ...................................................... 6, 9, 10, 21

*Babcock & Wilcox,*
    77 NLRB 577 (1948) .................................................................................. 24

*Beal v. Stern,*
    184 F.3d 117 (2d Cir. 1999) ...................................................................... 22

*Bombalicki v. Pastore,*
    2000 WL 726839 (Conn. Super. Ct. May 10, 2000) .................................. 5

*Browne v. State Dep't of Corr.,*
    2017 WL 5243854 (Conn. Super. Ct. Oct. 10, 2017) ........................... 4, 5

*Bruni v. City of Pittsburgh,*
    141 S. Ct. 578 (2021) ................................................................................. 16

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ....................................................................................... 20

*Cantwell v. Connecticut,*
    310 U.S. 296 (1940) ................................................................................... 16

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
    868 F.3d 104 (2d Cir. 2017) ........................................................................ 2

*Chamber of Commerce v. Brown,*
    554 U.S. 60 (2008) ............................................................................. passim

*Charron v. Town of Griswold,*
2009 WL 5511272 (Conn. Super. Ct. Dec. 14, 2009) ................................................ 5

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
596 U.S. 61 (2022) ..................................................................................... 15

*City of Lakewood v. Plain Dealer Publ'g Co.,*
486 U.S. 750 (1988) ................................................................................... 22

*Clementine Co. v. Adams,*
74 F.4th 77 (2d Cir. 2023) ........................................................................ 13

*Concerned Home Care Providers, Inc. v. Cuomo,*
783 F.3d 77 (2d Cir. 2015) ........................................................................ 29

*Conn. Fine Wine & Spirits, LLC v. Harris,*
255 F. Supp. 3d 355 (D. Conn. 2017) ........................................................ 30

*Delta Air Lines, Inc. v. Kramarsky,*
650 F.2d 1287 (2d Cir. 1981) .................................................................... 26

*Doe v. City of Albuquerque,*
667 F.3d 1111 (10th Cir. 2012) ................................................................. 22

*EEOC v. CBS, Inc.,*
743 F.2d 969 (2d Cir. 1984) ...................................................................... 30

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975) ................................................................................... 17

*Expressions Hair Design v. Schneiderman,*
581 U.S. 37 (2017) ..................................................................................... 13

*Farrell v. Burke,*
449 F.3d 470 (2d Cir. 2006) ...................................................................... 22

*FEC v. Cruz,*
596 U.S. 289 (2022) ................................................................................... 11

*First Nat'l Bank of Boston v. Bellotti,*
435 U.S. 765 (1978) ................................................................................... 21

*Forsyth County v. Nationalist Movement,*
505 U.S. 123 (1992) ................................................................................... 22

*Fort Halifax Packing Co. v. Coyne,*
482 U.S. 1 (1987) ...................................................................................... 29

*Frisby v. Schultz,*
  487 U.S. 474 (1988) ...................................................................................... 17

*Glacier Nw., Inc. v. Int'l B'hood of Teamsters Loc. Union No. 174,*
  598 U.S. 771 (2023) ...................................................................................... 26

*Green Party of Connecticut v. Garfield,*
  648 F. Supp. 2d 298 (D. Conn. 2009) ....................................................... 18

*Healthcare Ass'n of N.Y. State, Inc. v. Pataki,*
  471 F.3d 87 (2d Cir. 2006) .......................................................................... 25

*Hill v. Colorado,*
  530 U.S. 703 (2000) .............................................................................. 15, 16

*Honeyfund.com Inc. v. Governor,*
  94 F.4th 1272 (11th Cir. 2024) ...................................... 4, 11, 16, 19

*Hotel Emps. Rest. Emps. Union v. Sage Hosp. Res., LLC,*
  390 F.3d 206 (3d Cir. 2004) ........................................................................ 26

*In re Goodman,*
  873 F.2d 598 (2d Cir. 1989) ........................................................................ 25

*Int'l Longshoremen's Ass'n v. Davis,*
  476 U.S. 380 (1986) ...................................................................................... 25

*Kahn v. Conn. Dep't of Mental Health & Addiction Servs.,*
  2011 WL 3278534 (Conn. Super. Ct. July 7, 2011) ................................. 4

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ...................................................................................... 16

*Lodge 76, Int'l Ass'n of Machinists v. Wis. Emp. Rels. Comm'n,*
  427 U.S. 132 (1976) ..............................................................................passim

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ........................................................................................ 6

*Marvel Characters, Inc. v. Kirby,*
  726 F.3d 119 (2d Cir. 2013) ........................................................................ 14

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ...................................................................................... 16

*Metro. Life Ins. Co. v. Massachusetts,*
  471 U.S. 724 (1985) ...................................................................................... 29

*N.Y. Tel. Co. v. N.Y. State Dep't of Labor,*
  440 U.S. 519 (1979) ................................................................................................... 29

*Nastri v. Dykes,*
  2024 WL 1338778 (2d Cir. Mar. 29, 2024)..................................................... 8, 10

*NLRB v. Gissel Packing Co.,*
  395 U.S. 575 (1969) ............................................................................................ 24, 28

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.,*
  50 F.4th 1126 (11th Cir. 2022)................................................................................ 13

*Payne v. Fairfield Hills Hosp.,*
  215 Conn. 675, 578 A.2d 1025 (1990) ................................................................. 30

*Picard v. Magliano,*
  42 F.4th 89 (2d Cir. 2022) .................................................................. 6, 9, 21, 22

*Project Veritas Action Fund v. Rollins,*
  982 F.3d 813 (1st Cir. 2020)................................................................................... 17

*Pucillo v. Town of Madison,*
  2022 WL 6392904 (Conn. Super. Ct. Sept. 14, 2022)............................................ 5

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015) ..................................................................................passim

*Resident Advisory Bd. v. Rizzo,*
  503 F. Supp. 383 (E.D. Pa. 1980)........................................................................ 17

*Rest. Law Ctr. v. City of New York,*
  90 F.4th 101 (2d Cir. 2024) ............................................................................ 28, 29

*Robinson v. Jacksonville Shipyards, Inc.,*
  760 F. Supp. 1486 (M.D. Fla. 1991) .................................................................... 18

*Rowan v. U.S. Post Office Dep't,*
  397 U.S. 728 (1970) ................................................................................................. 17

*Saxe v. State Coll. Area Sch. Dist.,*
  240 F.3d 200 (3d Cir. 2001).................................................................................... 17

*Seals v. Hickey,*
  441 A.2d 604 (Conn. 1982) .................................................................................... 30

*Shaw v. Hunt,*
  517 U.S. 899 (1996) ................................................................................................. 19

*Silva v. Farrish,*
  47 F.4th 78 (2d Cir. 2022) ........................................................................ 10

*State v. Bell,*
  931 A.2d 198 (Conn. 2007) ...................................................................... 30

*Stewart v. City of New York,*
  2023 WL 6970127 (2d Cir. Oct. 23, 2023) ............................................... 5

*Sybalski v. Indep. Grp. Home Living Program, Inc.,*
  546 F.3d 255 (2d Cir. 2008) .................................................................... 19

*Tepperwien v. Entergy Nuclear Ops., Inc.,*
  663 F.3d 556 (2d Cir. 2011) ..................................................................... 5

*United States v. Int'l B'hood of Teamsters,*
  941 F.2d 1292 (2d Cir. 1991) .................................................................. 19

*United States v. Salerno,*
  481 U.S. 739 (1987) ........................................................................... 22, 23

*United States v. Virginia,*
  518 U.S. 515 (1996) ................................................................................ 14

*ValveTech, Inc. v. Aerojet Rocketdyne, Inc.,*
  2023 WL 7210349 (W.D.N.Y. Nov. 2, 2023) ........................................... 14

*Virginia v. Am. Booksellers Ass'n,*
  484 U.S. 383 (1988) ................................................................................ 22

*Vitagliano v. County of Westchester,*
  71 F.4th 130 (2d Cir. 2023) ................................................................... 3, 9

*Wollschlaeger v. Governor,*
  848 F.3d 1293 (11th Cir. 2017) ................................................................ 1

*Zimmerman v. Bd. of Educ. of Town of Branford,*
  597 F. Supp. 72 (D. Conn. 1984) ............................................................ 30

## STATUTES & REGULATIONS

29 U.S.C. § 158 ..................................................................................... 4, 24

42 U.S.C. § 2000e-2(a) .............................................................................. 4

Conn. Gen. Stat. §§ 31-51q .................................................................................passim

Fla. Stat. § 760.10 ..................................................................................................... 11


## RULES

Fed. R. Evid. 402 ....................................................................................................... 14

Fed. R. Evid. 702 ....................................................................................................... 14


## OTHER AUTHORITIES

Colloquium, *Prof. Michael McConnell's Response*, 28 PEPP. L. REV. 747, 748
    (2001) ................................................................................................................. 15

Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1298
    & n.174 (2007) ................................................................................................... 15

## INTRODUCTION

This case turns on two straightforward legal questions: First, does Connecticut General Statutes Section 31-51q ("Section 31-51q" or "the Act") apply to an employer who holds mandatory meetings on political matters? Second, by applying *only* if employers discuss political matters, does Section 31-51q discriminate based on the content and viewpoint of employers' speech? The answer to both questions is "yes."

Rather than confront these questions, Defendants resort to distortion and distraction. But they cannot escape the simple truth that Section 31-51q is a content- and viewpoint-based restriction on speech that prohibits employers from discussing with their employees matters the State defines as "political." Beyond political and religious opinions, no other content is regulated. Beyond employers, no other viewpoint is regulated. In other words, the prohibition and penalties of Section 31-51q turn entirely on the content and viewpoint of the speech.

Defendants mangle their interpretation of the statute in two ways. First, Defendants falsely claim that Section 31-51q regulates only "conduct, not speech." Defs.' Mem. of Law in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Cross-Mot. for Summ. J. at 2, ECF No. 100-1 ("Defs.' Br."). But the fact that the Act controls speech by recharacterizing it as conduct does not save the statute from First Amendment scrutiny. Defendants' say-so cannot transform "speech" into "conduct" that it can more freely regulate. "[K]eep[] in mind that no law abridging freedom of speech is ever promoted as a law abridging freedom of speech." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1308 (11th Cir. 2017) (quotation omitted).

Second, Defendants falsely claim that Section 31-51q merely "prohibits retaliation, and threats of retaliation, against employees who refuse to attend," not "mandatory meetings." Dfs.' Br. 3–4. But a mandatory meeting inherently threatens discipline for those who fail to attend. An employer who holds a mandatory meeting *requires* attendance; it is definitional to the word "mandatory." *See* Hr'g Tr. 47:8–20 (Dooley, J.), ECF No. 64 (rejecting, at the motion-to-dismiss stage, Defendants' argument that the Act does not regulate mandatory meetings).

These two key principles resolve this case. And Defendants' misunderstanding of these key principles infects nearly all their arguments.

## STANDING

I.    CBIA has standing to challenge the Act.

At the motion-to-dismiss stage, this Court found that Plaintiffs had pleaded sufficient facts to assert CBIA's standing. Hr'g Tr. 46:9–47:14 (Dooley, J.), ECF No. 64. Plaintiffs have now supported those allegations through the declaration of CBIA President Christian DiPentima, showing that the Act regulates CBIA and chills its speech. Defendants attempt to inflate CBIA's standing burden and disavow their enforcement authority. Both attempts fail.[1]

---

[1]    Plaintiffs move for summary judgment collectively, relying on the organizational standing of CBIA. *See Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017). The Court has countenanced this well-trod approach, reasoning that "because I determine that CBIA has organizational standing, the Court does not need to take up whether CBIA has adequately alleged associational standing or whether any of the other plaintiffs have alleged either associational or organizational standing." Hr'g Tr. 48:4–9 (Dooley, J.), ECF No. 64. As such, Defendants' construct a strawman in arguing that "not a single one of Plaintiffs' massive base of employer members has come forward" with injuries. Defs.' Br. 11. No

A.    CBIA's intended conduct is arguably proscribed by the Act.

Plaintiffs have submitted enough evidence to show that CBIA's intended conduct—holding mandatory employee meetings to share its institutional opinions on political matters, including unionization—is arguably proscribed by the Act. *See* Pls.' Local Rule 56(a)(1) Statement of Undisputed Material Facts ("SMF"), ECF No. 97-2; Declaration of Christian DiPentima ("DiPentima Decl.) ¶¶ 14–36, ECF No. 97-3. Nothing more is required. *See Vitagliano v. County of Westchester*, 71 F.4th 130, 138 (2d Cir. 2023) ("a plaintiff's intended conduct need only be *arguably* proscribed by the challenged statute, not necessarily *in fact* proscribed" (quotation omitted)). Defendants' contrary assertion is based on misreading the Act's proscriptions.

First, Defendants reprise their conduct-not-speech argument and frame the Act as "prohibit[ing] retaliation and threats of retaliation against employees who refuse to listen to speech, not the speech itself." Defs.' Br. 15; *see* Mot. to Dismiss 1, ECF No. 36-1. But such arguments miss that the Act depends entirely on the content and viewpoint that employers express during their meetings. If CBIA *does* speak about political matters, its conduct *is* regulated; and if CBIA does *not* speak about political matters, its conduct is *not* regulated. Because "[t]he only way to discern which mandatory [meetings] are prohibited is to find out whether the speaker disagrees with [Connecticut]," the Act is not just a regulation on conduct but also "a classic—and disallowed—

such evidence is required at this point in the litigation. *See* Order, ECF No. 84 ("discovery as to the non-CBIA plaintiffs' associational standing may be permitted at a later time").

regulation of speech." *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1277 (11th Cir. 2024).

Second, Defendants dispute that an employer violates the Act by holding mandatory meetings and question that CBIA's post-meeting reprimands qualify as discipline. *See* Defs.' Br. 12 (citing SMF ¶¶ 36–43), 16. But by prohibiting CBIA from disciplining and threatening to discipline its employees for failure to attend meetings about political matters, the Act regulates CBIA's ability to continue holding mandatory meetings about political matters. By calling a meeting "mandatory," an employer inherently threatens discipline against an employee who fails to attend that meeting. And if an employee refused to attend, the only way to effectuate the meeting's mandatory nature would be to discipline the employee for such defiance.[2]

Although "there is no Connecticut appellate decision providing any direct guidance about what exactly constitutes 'discipline' as that word is used in § 31-51q," many lower courts provide guidance. *Browne v. State Dep't of Corr.*, 2017 WL 5243854, at *2 (Conn. Super. Ct. Oct. 10, 2017) (collecting cases). Some have included reprimands. *See, e.g., Kahn v. Conn. Dep't of Mental Health & Addiction Servs.*, 2011

---

[2] Defendants argue that the Act prohibits only extreme forms of discipline, like cornering employees in supply closets, trapping them without food or medicine, or stalking their homes and churches to intimidate them. *See* Defs.' Br. 6–7. But the Act's proscription of "discipline" and "threat[s] [of] discipline" encompasses much more than the abusive employer behavior Defendants reference. Indeed, there would be no need to pass a state statute prohibiting these acts, which are already illegal under federal law. *See, e.g.,* 29 U.S.C. § 158(a) (prohibiting unfair labor practices by employers); 42 U.S.C. § 2000e-2(a) (prohibiting unlawful employment practices by employers). As amended, Section 31-51q discriminatorily regulates even CBIA's "mundane conduct," Defs.' Br. 12, of holding mandatory meetings with attendance required by threat of discipline.

WL 3278534, at *7 (Conn. Super. Ct. July 7, 2011); *Charron v. Town of Griswold*, 2009 WL 5511272, at *11 (Conn. Super. Ct. Dec. 14, 2009). And one defined "discipline" as any "affirmative act of deprivation that diminishes the status or happiness of the recipient rather than a failure to enhance that status or happiness." *Bombalicki v. Pastore*, 2000 WL 726839, at *3 (Conn. Super. Ct. May 10, 2000); *see also Brown*, 2017 WL 5243854, at *3 (crediting *Bombalicki*'s definition of "discipline"); *Pucillo v. Town of Madison*, 2022 WL 6392904, at *3 (Conn. Super. Ct. Sept. 14, 2022) (same).

Defendants ignore these cases and instead conflate "discipline" under Section 31-51q with "adverse employment actions" under Title VII. Defs.' Br. 17 (citing *Stewart v. City of New York*, 2023 WL 6970127 (2d Cir. Oct. 23, 2023); *Tepperwien v. Entergy Nuclear Ops., Inc.*, 663 F.3d 556 (2d Cir. 2011)). But there is no indication that the Act follows Title VII, and state court precedent suggests that it requires far less.

Lastly, Defendants invoke the Act's exception for "necessary" communications and argue that "CBIA is in the business of policy advocacy" so its "communications of those matters are 'necessary' for CBIA's 'employees to perform their job duties.'" Defs.' Br. 17 (Conn. Gen. Stat. § 31-51q(c)(2)). Who knew "necessary" to be so broadly defined? Indeed, such an exception would seem to swallow the rule. Regardless, CBIA has identified employees, like its graphic designer, who do not need political information to perform their jobs. *See* SMF ¶¶ 4–5. And Defendants offer no evidence to the contrary.

5

Defendants may "argue[] for [their] own interpretation of the statute that would not cover [CBIA's] intended conduct," but Plaintiffs need only show that their interpretation of the Act is "not outside the realm of the 'arguable'" to establish standing. *Picard v. Magliano*, 42 F.4th 89, 99–100 (2d Cir. 2022); *see Antonyuk v. Chiumento*, 89 F.4th 271, 336 (2d Cir. 2023) ("In making that [standing] determination, we do not defer to the government's interpretation of the statute, or to its representations regarding the likelihood of a particular prosecution." (citation omitted)). CBIA has done so here.

B.    CBIA has standing to raise a preemption challenge.

Defendants claim that CBIA "asserts—for the first time" that its speech on unionization is chilled, Defs.' Br. 18, but ignore that from the outset of this case, CBIA has asserted its standing to challenge the Act as conflicting with federal labor law. *See* Compl. ¶ 20, ECF No. 1. Relying on CBIA's standing, Plaintiffs' complaint challenged the Act's regulation of speech on "political matters," including "the decision to join or support any … labor organization." Compl. ¶ 39, ECF No. 1 (quoting Conn. Gen. Stat. § 31-51q(a)(1)); *accord id.* ¶¶ 41–43. Now, the President of CBIA has supported those allegations by declaring that CBIA would like to hold a mandatory meeting to discuss the risks of unionization, but is chilled from doing so by the Act. SMF ¶¶ 16, 18 (citing DiPentima Decl. ¶¶ 32–35). This is precisely how the pleading-to-proof summary judgment burden works. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Defendants make much of CBIA's discovery responses and deposition, yet neither contradict its President's sworn testimony. In response to Defendants' broad request in Interrogatory 22, CBIA objected to the request as speculative and construed it as "seeking a high-level summary of the types of meetings" "concerning political issues that CBIA believes it must refrain from holding." CBIA Objs. &. Resps. to Defs.' Initial Interrogs. 22, ECF No. 100-8. Such a response mirrors the Act itself, which applies to "political matters," broadly yet vaguely defined.

As for Mr. DiPentima's deposition, Defendants' counsel never specifically asked about unionization-related meetings, despite Plaintiffs' clear preemption challenge. Nor did Mr. DiPentima concede away CBIA's preemption challenge in responding to Defendants' counsel's unspecific, open-ended questions. *Cf. Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 907 (6th Cir. 2006) ("the deponent is under no obligation to volunteer information not fairly sought by the questioner"). Rather, Mr. DiPentima agreed that CBIA sought to discuss its "policy positions" at its mandatory all-staff meetings.[3] In context, the term "policy positions" is reasonably understood to mean both external advocacy (like CBIA's lobbying efforts) and internal advocacy (like its opposition to unionization)—particularly given CBIA has consistently asserted standing to raise both First Amendment and preemption claims.

---

[3] Defendants' counsel asked: "What CBIA is not able to talk to staff about are its policy positions; right?" Depo Tr. 162:2–4 (B. Abrams), ECF No. 100-9. Mr. DiPentima responded: "Among other things, yes." *Id.* 162:5 (C. DiPentima). After the two went back and forth regarding specific policy positions, Defendants' counsel asked: "And is there anything else?" *Id.* 162:19 (B. Abrams). Mr. DiPentima replied: "No. I think that's it." *Id.* 162:20 (C. DiPentima).

CBIA has standing to litigate Plaintiffs' preemption claim.

## II.   There remains a credible threat of enforcement.

CBIA continues to face a credible threat of prosecution. The standard for "credible threat of prosecution is a quite forgiving requirement that sets up only a low threshold for a plaintiff to surmount." *Nastri v. Dykes*, 2024 WL 1338778, at *2 (2d Cir. Mar. 29, 2024) (quotation omitted). Defendants attempt to avoid the Court's scrutiny and undercut CBIA's standing by submitting a "sworn guarantee that DOL will not pursue a civil penalty against CBIA for the conduct CBIA describes in its declaration." Defs.' Br. 19; *see* Decl. of Thomas Wydra, ECF No. 100-6 ("Wydra Decl."). Such a declaration is cold comfort. Defendants' guarantee does not remedy CBIA's injuries, so the Court should disregard the declaration and proceed to the merits.

### A.   DOL's purported disavowal falls short.

Mr. Wydra's declaration on behalf of DOL is not a true disavowal of enforcement, as he mostly disclaims authority to enforce the Act against CBIA. His declaration rests on the same statutory misreading that underlies most of Defendants' arguments.[4] Defendants admit this: "DOL's guarantee of non-enforcement … is rooted in

---

[4]   Mr. Wydra gives "multiple reasons" for his conclusion that the Act does not regulate CBIA, including: (1) "the Act does not prohibit employers from requiring attendance at meetings or circulating speech or communications the primary purpose of which is to communicate the employer's opinions concerning political or religious matters," Wydra Decl. ¶ 29; (2) "CBIA's discussion of its policy positions are exempt from the Act," *id.* ¶ 30; (3) "CBIA has not 'subject[ed] or threaten[ed] to subject an employee to discipline or discharge on account of' their refusal to attend an all-staff meeting," *id.* ¶ 36; and (4) "[m]erely characterizing a meeting as 'mandatory' or 'required,' or directing employees to attend, does not amount to a threat of discipline within the meaning of the Act," *id.* ¶ 37.

the plain text of the Act and DOL's conclusion that the Act plainly does not prohibit the conduct CBIA describes in its affidavit." Defs.' Br. 20. Defendants cannot disavow enforcement based on a (convenient) misunderstanding of the statute. *See Picard*, 42 F.4th at 98. Should DOL really read the Act as such, it might have issued an interpretive regulation that narrows this broad prophylactic rule. *See* Ct. Admin. Proc. Act § 4-168. It did not.

The Second Circuit has rejected such "strategic concessions" of nonenforcement. *See Picard*, 42 F.4th at 97–100. A State can argue that "it has no intention of suing plaintiff for its activities. While that may be so, there is nothing that prevents the State from changing its mind. It is not forever bound, by estoppel or otherwise, to the view of the law that it asserts in this litigation." *Antonyuk*, 89 F.4th at 337 (quotation omitted). Defendants acknowledge as much here, by conceding that the investigation and enforcement decisions of the current DOL Commissioner, Defendant Dante Bartolomeo, will not bind future Commissioners. *See* Defs.' Objs. & Resps. to CBIA's Initial Reqs. for Admis. & Interrogs. Nos. 14–15, ECF No. 97-7; *see also Picard*, 42 F.4th at 99. In short, Defendants have no way to guarantee that "CBIA will not ever face a civil penalty" for its intended conduct. Defs.' Br. 20.

> ### B.    The presumption that the State will enforce its laws reinforces CBIA's credible threat.

The presumption that the State will enforce a "recent" law further establishes a credible threat of enforcement against CBIA, *Vitagliano*, 71 F.4th at 138 (quotation

omitted)—just as it has in other cases where the government has made similar non-enforcement arguments. *See, e.g., id.* at 138–39; *Antonyuk*, 89 F.4th at 334–35; *Silva v. Farrish*, 47 F.4th 78, 88 (2d Cir. 2022).

Defendants would prefer the Court consider other factors: Defendants' history of enforcement, threats against employers, and targeting of CBIA's conduct. *See* Defs.' Br. 20–21. None overcome the presumption of enforceability or the low threshold for establishing pre-enforcement standing. But in any event, Defendants' arguments on all three points are unpersuasive. First, when an old statute is newly amended, there is no reason to consider the State's history of enforcement. *See Nastri*, 2024 WL 1338778, at *3. Second, the fact that DOL has never threatened CBIA with enforcement makes sense given CBIA has been chilled from speaking in a way that would violate the law. And third, Section 31-69a's broad enforcement mechanism only makes it more likely that Defendants will follow its routine procedure of enforcing Chapter 577. None of these factors "requires dismissal." *Contra* Defs.' Br. 21.

C.    CBIA's injury is traceable to the Attorney General's enforcement ability.

Finally, Defendants argue that CBIA lacks standing to sue the Attorney General because "Section 31-69a permits, but does not require, DOL to refer unpaid civil penalties to OAG to commence a collections suit." Defs.' Br. 22. As a matter of standing, this argument is self-defeating. Defendants admit, as they must, that Section 31-69a provides a mechanism for the Attorney General to enforce Section 31-51q against CBIA. Defendants' belief that it is unlikely that DOL will ask the Attorney General to do so runs into the same "presumption of enforcement" problems just discussed. If

10

anything, this is a matter of remedy—whether the Court *should* enjoin the Attorney General, or whether enjoining DOL alone will prevent the threat of enforcement. Because there is no question that Section 31-69a provides the Attorney General an avenue to enforce Section 31-51q, Plaintiffs have shown that CBIA's injury is "fairly traceable" to the Attorney General's conduct. *FEC v. Cruz*, 596 U.S. 289, 296 (2022).

## MERITS

I.   Section 31-51q violates the First and Fourteenth Amendments.

A.   Section 31-51q regulates employers' conduct based on the content and viewpoint of their speech.

A statute that prohibits employers from holding mandatory meetings on topics disfavored by the State violates the First Amendment. *Honeyfund*, 94 F.4th at 1278–79. With such a statute, "the conduct regulated depends on—and cannot be separated from—the ideas communicated." *Id.* at 1278. Like the unconstitutional statute in *Honeyfund*—which Defendants concede is "rightly" characterized as a regulation of speech, Defs.' Br. 26—Section 31-51q regulates employers' conduct based on the content and viewpoint of their speech. *See* Pls.' Mem. of Law in Supp. of Mot. for Summ. J. at 17–22, ECF No. 97-1 ("Pls.' Br."). Other than the topics prohibited, they are functionally identical. *Compare* Conn. Gen. Stat. § 31-51q(b)(2)(B) (prohibiting employers from "subjecting or threatening to subject any employee to discipline or discharge on account of … such employees' refusal to … listen to speech or view communications" on "political matters"), *with* Fla. Stat. § 760.10(8)(a) (prohibiting employers

11

from "[s]ubjecting any individual, as a condition of employment," to "training, instruction, or any other required activity that espouses, promotes, advances, inculcates, or compels" certain beliefs).

Defendants dispute this comparison and insist that Section 31-51q is not such a law—that it only "regulates conduct, not speech," Defs.' Br. 24 (quotation omitted), and "does not prohibit mandatory meetings or the 'fact of communication' about political or religious matters," Defs.' Br. 27. Defendants' mischaracterization of the Act pervades their entire defense of the law. By prohibiting discipline and threats of discipline, the Act prohibits employers from holding mandatory meetings—put differently, meetings where attendance is required via *ex ante* threats of discipline and/or *ex post* implementation of discipline. Without explanation, Defendants appear to think that employers can hold mandatory meetings absent "their ability to take adverse action against those who refuse" to attend. Defs.' Br. 27.

When an employer instructs an employee to attend a meeting, participate in a training, or complete an assignment, the employer sets a requirement of employment. Implicit in every employer's instruction is a threat that, if the employee fails to comply, he may be subject to discipline. Should an employee fail to comply, his employer must be able to impose that discipline. Otherwise, the employer could not effectuate the "mandatory" or "required" nature of any instruction. This is a basic principle of the workplace.

When conditioning an employer's ability to threaten discipline and impose discipline on the content and viewpoint of the employers' speech, a state law does not just

12

"incidentally burden speech." Defs.' Br. 28 (quoting *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen.*, 50 F.4th 1126, 1135 (11th Cir. 2022)). It regulates conduct *based on* speech. Defendants' cited cases do not undermine the fact that such a statute regulates speech. *See Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47–48 (2017) (rejecting New York's assertion that its statute was "nothing more than a mine-run price regulation" because "[i]n regulating the communication of prices rather than prices themselves, [the statute] regulates speech"); *Clementine Co. v. Adams*, 74 F.4th 77, 85–86 (2d Cir. 2023) (holding a law requiring businesses to check COVID-19 vaccination status did not regulate speech); *Norwegian Cruise Line Holdings*, 50 F.4th at 1136–37 (holding a law preventing businesses from requiring COVID-19 vaccination status did not regulate speech).

## B.    Section 31-51q fails strict scrutiny.

Because Section 31-51q is a content- and viewpoint-based regulation on employers' speech rights, it is subject to strict scrutiny. Defendants have not proven that the Act "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (quotation omitted).

### 1.    The State's stated interests are not compelling.

Defendants claim three interests behind the amendments to Section 31-51q: (1) protecting employees from hearing unwanted speech in the workplace; (2) preventing employees from experiencing psychological harm at work; and (3) preventing employers from violating employees' First Amendment rights. Defs.' Br. 33–36. De-

13

fendants submit two reports opining on these interests based on their supposed pa-rade of horribles regarding employer conduct. *See* Decl. of Kate Bronfenbrenner, ECF No. 100-4; Decl. of Howard L. Forman, MD, ECF No. 100-5. Even taking their testimony at face value, they do not establish that the State has legitimate, let alone compelling, interests in restricting employers' speech.[5]

---

[5]    Plaintiffs object to many of the facts submitted by Prof. Bronfenbrenner and Dr. Forman under Local Rule 56(c)(2), as they cannot be presented in a form that would be admissible in evidence under Federal Rules of Evidence 702 or 703. *See generally* Pls.' Local Rule 56(a)(2) Statement in Opp. to Summ. J., ECF No. 101-1. To the extent Defendants' experts offer any opinions relevant to the case, they merely opine that they think the Act is a good idea. *See* Decl. of Kate Bronfenbrenner ¶ 30 ("Connecticut General Statute §31-51q[] would be an important step in restoring the right of Connecticut workers to exercise their freedoms of speech, choice, and conscience in the workplace."); Decl. of Howard Forman ¶ 26 ("Weighing the theories, experiments and working with people, I have concluded that Conn. Gen. Stat. §31-51q is an essential part of ensuring employment is psychologically safe and free from coercive power unrelated to work."). Their subjective opinions about the merits of the law are irrelevant to whether the State had a compelling interest in restricting employers' speech when it passed the Act. *United States v. Virginia*, 518 U.S. 515, 533 (1996) (government must advance a compelling interest that is "genuine, not hypothesized or invented *post hoc* in response to litigation") They are thus inadmissible. *See* Fed. R. Evid. 402.

Apart from that, Defendants' expert reports are "conduit[s] for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (quotation omitted). Such testimony is routinely excluded as inadmissible as well. *See, e.g., id.* (affirming exclusion of expert historians offering hearsay by freelance artists "concerning Marvel's general practices towards its artists" because they did not "bring their expertise to bear" on those statements); *ValveTech, Inc. v. Aerojet Rocketdyne, Inc.*, 2023 WL 7210349, at *6 (W.D.N.Y. Nov. 2, 2023) (excluding expert's testimony regarding hearsay claim of damages and then only performing simple arithmetic). Thus, Defendants' expert reports can neither support Defendants' motion for summary judgment nor defeat Plaintiffs' motion for summary judgment.

> ### a. There is no compelling government interest in censoring unwanted speech in the workplace.

Defendants claim that discriminatory regulation of employers' speech on political matters is constitutional because Section 31-51q "is limited to protecting *unwilling* listeners." Defs.' Br. 28. And Defendants assert that the State has a compelling government interest in "protect[ing] a captive audience from being subject to unwanted speech they would otherwise be powerless to avoid." Defs.' Br. 33. The older precedents Defendants cite are all distinguishable, as recent precedents confirm.

Defendants rely most on *Hill v. Colorado*, 530 U.S. 703 (2000), which they characterize as holding that "employers have no right to force unwanted speech on employees who have objected to it." Defs.' Br. 28–29; *see id.* at 1 ("[N]o one has a right to press even 'good' ideas on an unwilling recipient." (quoting *Hill*). That Defendants rely so heavily on *Hill* reveals the flaws of their argument: *Hill* is a well-known outlier, and the Supreme Court has not extended *Hill*'s dubious reasoning beyond its facts—laws regulating sidewalk counseling outside abortion clinics.[6] But even accepting *Hill*, the case does not support the State's *content-based* discrimination against

---

[6]    *See Hill*, 530 U.S. at 742 (Scalia, J., dissenting) (recognizing that *Hill* stands "in stark contradiction of the constitutional principles we apply in all other contexts" outside abortion); *id.* at 765 (Kennedy, J., dissenting) (recognizing that *Hill* "contradicts more than a half century of well-established First Amendment principles"). *Hill* remains one of the Court's most widely criticized First Amendment decisions. *See City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 92, 103 (2022) (Thomas, J., joined by Gorsuch & Barrett, JJ., dissenting); Colloquium, *Prof. Michael McConnell's Response*, 28 PEPP. L. REV. 747, 748 (2001); Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. REV. 1267, 1298 & n.174 (2007). The main reason for the ongoing judicial and scholarly critique is the "glaring tension" between *Hill* and more recent Supreme Court precedent on content- and viewpoint-based discrimina-

employers' political speech. *See Honeyfund*, 94 F.4th at 1280 ("Florida cannot pluck one line out of context—from [*Hill,* ]a case about a content-neutral restriction, no less—and use it as a wholesale endorsement of content- and viewpoint-based restrictions.").

The snippet that Defendants extract from *Hill* about "unwilling listeners" does not carry their case either. That statement did not license states to enact discriminatory laws that limit or prohibit political speech in the name of protecting listeners. Many post-*Hill* opinions, which Defendants ignore, prove that shielding listeners from speech they personally dislike is *not* a compelling governmental interest. *See* Pls.' Br. 25–26 (quoting *303 Creative v. Elenis*, 600 U.S. 570, 602 (2023) ("If liberty means anything at all, it means the right to tell people what they do not want to hear." (quotation omitted))); *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 538 (2022) ("[L]earning how to tolerate speech … of all kinds is part of learning how to live in a pluralistic society, a trait of character essential to a tolerant citizenry.")). Likewise, many pre-*Hill* cases hold the same thing. *See, e.g., Cantwell v. Connecticut*, 310 U.S. 296 (1940) (overturning anti-solicitation and breach-of-peace convictions of Jehovah's Witnesses punished for playing anti-Catholic records in a Catholic neighborhood in New Haven).

---

tion on speech. *Bruni v. City of Pittsburgh*, 141 S. Ct. 578 (2021) (Thomas, J., respecting the denial of certiorari) (citing *Reed*, 576 U.S. 155, and *McCullen v. Coakley*, 573 U.S. 464 (2014)).

16

Nor has the Supreme Court held that states can discriminate against political speech whenever the audience is arguably "captive." *See* Defs.' Br. 29–30. While recognizing "the privacy rights of those who may be unwilling viewers," the Supreme Court has held that "[t]he plain, if at times disquieting, truth is that in our pluralistic society, constantly proliferating new and ingenious forms of expression, 'we are inescapably captive audiences [f]or many purposes.'" *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 208, 210 (1975) (quoting *Rowan v. United States Post Office Dep't*, 397 U.S. 728, 736 (1970)). Two opinions Defendants cite are readily distinguishable, as they discuss captivity within one's own home—not in the workplace. *See Frisby v. Schultz*, 487 U.S. 474, 484–85 (1988); *Rowan*, 397 U.S. at 736. One discusses captivity only generally and ultimately holds that content-based discrimination could not "be justified as a means of preventing significant intrusions on privacy." *Erznoznik*, 422 U.S. at 212. And another recognizes a theoretical and limited right to be free from undesirable speech but rejects that privacy interest in favor of protecting free-speech rights. *See Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 838–39 (1st Cir. 2020).

Defendants' assorted, nonbinding decisions addressing workplaces fare no better. Most involve external speakers intruding into the workplace. *See 520 S. Mich. Ave. Assocs., Ltd. v. Unite Here Loc. 1*, 760 F.3d 708, 723–24 (7th Cir. 2014); *Resident Advisory Bd. v. Rizzo*, 503 F. Supp. 383, 384–85, 401–03 (E.D. Pa. 1980). Others involve the government's ability to pass workplace non-discrimination and hostile-work-environment laws. *See Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 210 (3d

17

Cir. 2001); *Aguilar v. Avis Rent A Car Sys., Inc.*, 980 P.2d 846, 863, 872 (Cal. 1999) (Werdegar, J., concurring); *Robinson v. Jacksonville Shipyards, Inc.*, 760 F. Supp. 1486, 1535 (M.D. Fla. 1991). None involves a statute like Section 31-51q that broadly regulates employer speech on "political matters" with which employees may disagree.

> ### b. There is no compelling interest in protecting employees from psychological harm.

Defendants next claim a compelling interest in protecting employees from the "inherently demeaning, harassing, and … psychologically harmful" experience of being held "captive to unwanted political … speech." Defs.' Br. 34.

Given that federal law *protects* an employer's right to share his views on unionization, *see infra* MERITS § II, it is hard to imagine how a state could have a compelling interest in protecting employees from "being forced to sit and listen to an employer's opinions about political … matters," Defs.' Br. 34. Defendants have not borne their burden of establishing this interest exists or is compelling. *See Reed*, 576 U.S. at 171. Their one-paragraph captive-audience analysis does not cite a single case recognizing a state interest tethered to listeners' psychological harms.[7] And Dr. Forman's *post hoc*, academic discussion of Maslow's Hierarchy and the "Psychology of

---

[7]    Paragraphs later, Defendants cite *Green Party of Connecticut v. Garfield*, 648 F. Supp. 2d 298, 352 (D. Conn. 2009), for the proposition that the State has a "compelling interest in improving integrity of our democracy and political system." Defs.' Br. 36. But in *Garfield*, the State asserted much more particularized interests that are entirely unrelated to any interest in protecting employees from captive-audience meetings. *See* 648 F. Supp. 2d at 351 (asserting the State aimed "to eliminate actual and perceived corruption, to free candidates and elected officials from the burden of political fundraising, to encourage a significant level of candidate participation in the public financing program, to protect the public fisc, and to avoid providing incentives for the creation of splintered parties and unrestrained factionalism").

Persuasion" likewise does not establish a *legally* compelling interest. *See Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the legislature's actual purpose for the discriminatory classification[.]" (quotation omitted)). Connecticut "has no compelling interest in creating a per se rule that some speech, regardless of its context or the effect it has on the listener, is offensive and discriminatory" and therefore more likely to cause psychological harm when discussed during a mandatory meeting. *Honeyfund*, 94 F.4th at 1281.

> c.   There is no compelling government interest in protecting private employees' First Amendment rights.

Lastly, Defendants assert that the State has a compelling interest in "protect[ing] workers' own First Amendment rights to free speech and expression." Defs.' Br. 34; *see id.* at 35 ("The Act is necessary to preserve workers' free speech rights in the workplace."). That assertion defies basic constitutional law: purely private employers *cannot* violate employees' constitutional rights because private action is not state action. *See United States v. Int'l B'hood of Teamsters*, 941 F.2d 1292, 1295–96 (2d Cir. 1991) ("To qualify as state action, the conduct in question must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible, and the party charged with the conduct must be a person who may fairly be said to be a state actor." (quotations omitted)); *Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257–58 (2d Cir. 2008) (holding there was no state action where a private employer's

19

acts were not "attributable to the state"). Furthermore, the proffered interest is legally insufficient. "[T]he concept that government may restrict the speech of some elements of our society [*e.g.*, employers] in order to enhance the relative voice of others [*e.g.*, employees] is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976).

### 2.    Section 31-51q is not narrowly tailored to satisfying the State's stated interests.

Even if Defendants proved a compelling interest in protecting unwilling listeners from unwanted speech in the workplace, preventing psychological harm to workers, or protecting private-sector employees' First Amendment rights, they have not shown that the amendments to Section 31-51q were narrowly tailored to those interests. *See Reed*, 576 U.S. at 171.

Defendants contend the Act is narrowly tailored because it is "limited to protecting only unwilling listeners from speech they cannot avoid" and includes several exceptions to liability. Defs.' Br. 36–37. But Defendants miss the elephant in the room: the Act's discrimination against employers' political speech. Section 31-51q targets specific content (political matters) and specific speakers (employers) for disparate treatment. Other speakers addressing other content during a mandatory workplace meeting may be as offensive to listeners as an employer's political opinions might sometimes be to his or her employees. Defendants offer no explanation for why the State has chosen to provide listeners a state-sanctioned opt out *only* when their employer is discussing politics and unionization. Nor do they offer an explanation for why the State has chosen to regulate communications on *all* political matters—as

20

opposed to just the offensive ones. There are none. Section 31-51q is therefore "hope-lessly underinclusive" and overinclusive. *Reed*, 576 U.S. at 171; *see* Pls.' Br. 26–27.

Defendants have not carried their burden to show that Section 31-51q's discriminatory regulation on employers' political speech is the least restrictive means of achieving any compelling interests. The Act is unconstitutional.

\* \* \*

By establishing that Section 31-51q is a content- and viewpoint-based regulation of speech that is not narrowly tailored to achieving a compelling government interest, Plaintiffs have proven that the Act is unconstitutional on its face *and* as applied to CBIA. On its face, the Act's flaws are evident and pervasive. The Act blatantly disfavors speech on "political matters"—speech "at the heart of the First Amendment's protection." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978). And it applies to all employers in Connecticut—including CBIA (and many of Plaintiffs' members).[8] So it does not matter whether the Court construes Plaintiffs' challenge as facial or as applied; the Act is unconstitutional. *See, e.g.*, *Antonyuk*, 89 F.4th at 313–14, 383 (addressing pre-enforcement facial and as-applied challenges); *Picard*, 42 F.4th at 95, 101–07 (same). After all, "where a statute fails the relevant constitutional test," the law "can[not] be constitutionally applied to anyone—and thus there is 'no

---

[8]     Defendants are wrong to suggest that Plaintiffs have forfeited an as-applied challenge by "never argu[ing] that their claims are as-applied." Defs.' Br. 23. Plaintiffs' complaint explicitly identifies CBIA as an employer "affected by the amendment to Section 31-51q." Compl. ¶ 20, ECF No. 1. For the same reasons that Plaintiffs' allegations and evidence support CBIA's standing, they establish that the Act is unconstitutional as applied to CBIA.

set of circumstances' in which the statute would be valid." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012).

Defendants' only response is that the State has somehow insulated itself from any facial challenges merely by including itself as a regulated employer. *See* Defs.' Br. 23–24, 37–38 (citing, *inter alia*, *United States v. Salerno*, 481 U.S. 739, 745 (1987)). This argument is legally and logically untenable.

In some circumstances, facial challenges may be more difficult than as-applied challenges, but "they are more readily accepted in the First Amendment context." *Picard*, 42 F.4th at 101 (citing *Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392–93 (1988)). That's because "the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court," *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129 (1992), and it is difficult to "effectively detect[], review[], and correct[] content-based censorship 'as applied' without standards by which to measure the licensor's action," *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1988). *Salerno*'s "no set of circumstances" test does not place a heavier burden on litigants raising such challenges. In fact, the Court recognizes that its test does not rigidly apply in the First Amendment context.[9] *Salerno*, 481 U.S. at 745; *see also Doe*, 667

---

[9]     There is nothing to Defendants' observation that Plaintiffs have not raised a First Amendment overbreadth claim. Defs.' Br. 23–24. First Amendment overbreadth claims are brought by parties whose constitutional rights are *not* violated yet who seek relief on behalf of others whose constitutional right *are* violated. *See Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006) ("A party alleging overbreadth claims that although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them.").

22

F.3d at 1124 ("The idea that the Supreme Court applies the 'no set of circumstances' test to every facial challenge is simply a fiction, readily dispelled by a plethora of Supreme Court authority.") (collecting Supreme Court cases). Defendants' flawed interpretation and overreliance on *Salerno* is a recipe for disaster. Every state could include itself in a law's list of regulated entities and immediately insulate the law from facial challenges because states, unlike private citizens, lack constitutional rights. This cannot be.

Whether the Court construes Plaintiffs' pre-enforcement challenge as facial or as applied (it is both), there is no question that the Act's discriminatory regulation of employers' speech violates the First Amendment. For that reason, the Court should declare the Act unconstitutional and enjoin Defendants from enforcing it.

## II.    Section 31-51q is preempted by federal labor law.

In response to Plaintiffs' claim that Section 31-51q is preempted by the National Labor Relations Act ("NRLA"), Defendants make similar errors. They assert that "[t]he NLRA has never protected an employer's right to force its employees to listen to political … opinions upon threat of discipline or discharge." Defs.' Br. 39. They contend that the State may exercise its "broad police powers" to set "minimum standards to protect workers." Defs.' Br. 39. And they deny placing a thumb on the scale of unions. Defs.' Br. 47. None of Defendants' arguments can save the Act, which is invalid under both *Garmon* and *Machinists* preemption.[10]

---

[10]    Section 31-51q is preempted both on its face and as applied to CBIA. Just as the distinction between pre-enforcement facial and as-applied challenges need not impact the Court's holding that the Act violates the First Amendment, *see supra*

23

A.    The Act is preempted under *Garmon*.

A state statute is unconstitutional under *Garmon* preemption when it "regu-late[s] activity that the NLRA protects, prohibits, or arguably protects or prohibits." *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008) (applying *San Diego Building Trades Council v. Garmon*, 395 U.S. 236 (1959)). Section 31-51q regulates activity that Section 8(c) of the NLRA protects, and Defendants err in arguing otherwise.

First, Defendants claim Section 8(c) of the NLRA "does not arguably protect the activities that the Act prohibits." Defs.' Br. 40.[11] On its face, Section 8(c) states that it is not an unfair labor practice to hold a mandatory meeting with employees—the exact activity Section 31-51q facially prohibits. *See* 29 U.S.C. § 158(c) ("The ex-pressing of any views, argument, or opinion, or the dissemination thereof … shall not constitute or be evidence of an unfair labor practice … if such expression contains no threat of reprisal or promise of benefit."). Both the Supreme Court and the National Labor Relations Board ("NLRB") have interpreted Section 8(c) to "expressly pre-clude[] regulation of speech about unionization 'so long as the communications do not contain a "threat of reprisal or force or promise of benefit."'" *Brown*, 554 U.S. at 68 (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969)); *accord Babcock & Wilcox*, 77 NLRB 577, 578 (1948) (recognizing that "the language of Section 8 (c) of

---

MERITS § I, it need not impact the Court's holding that the Act is preempted under *Garmon* or *Machinists*.

[11]    Defendants claim the Act "operates completely differently" than Connecticut's failed captive-audience bills. Defs.' Br. 41. Not so. Although the State dropped the "captive audience" language in SB 163, the amended version of the Act and the prior failed bills operate identically—and unconstitutionally. *See* Pls.' Br. 27.

24

the amended Act, and its legislative history," prohibit finding employer speech unlawful based on its "'compulsory audience' aspect").

Based on Section 8(c)'s text and binding precedent, mandatory meetings are not just arguably, but in fact, protected by the NLRA. As a result, Section 31-51q's prohibition conflicts with the federal government's "primary jurisdiction" over such meetings. *In re Goodman*, 873 F.2d 598, 602 (2d Cir. 1989). And even if "there [were] no threat to the NLRB's primary jurisdiction," the Act would be preempted because "there is a real danger that state rules will conflict with federal ones." *Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 96 (2d Cir. 2006).

Second, Defendants are wrong to assert that Plaintiffs were required to "offer … factual analysis," and that the Court must "[e]ngag[e] in the record," to resolve the *Garmon* preemption issue. Defs.' Br. 43. The case Defendants cite for this proposition, *International Longshoremen's Association v. Davis*, 476 U.S. 380, 394–96 (1986), required a factual analysis only because it was unclear whether the plaintiff was an employee (covered by Section 7 of the NLRA) or a supervisor (not covered by Section 7 of the NLRA). But even if a factual analysis were required, the record supports Plaintiffs. CBIA's sworn testimony reinforces that its NLRA-protected speech is being stifled by Section 31-51q. Defendants acknowledge that CBIA "wants to have a 'frank meeting with all CBIA employees, where CBIA leadership will explain to them CBIA's opposition to unionization.'" Defs.' Br. 44 (SMF ¶ 33). That is exactly the right Congress gave employers in Section 8(c). *See Brown*, 554 U.S. at 67.

25

Third, Defendants invoke an exception to *Garmon* preemption that applies to regulations that "touch[] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, a court cannot conclude that Congress deprived the States of the power to act." *Glacier Nw., Inc. v. Int'l B'hood of Teamsters Loc. Union No. 174*, 598 U.S. 771, 777 n.1 (2023) (quotation omitted). Although they fault Plaintiffs for not addressing this exception, Defs.' Br. 44, Defendants do not cite a single case applying it. Instead, they cite footnotes from the Supreme Court's recent opinion in *Glacier Northwest*, 598 U.S. at 777 n.1, and the Third Circuit's opinion in *Hotel Employees Restaurant Employees Union v. Sage Hospitality Resources, LLC*, 390 F.3d 206, 212 n.4 (3d Cir. 2004). Neither court applied the exception, nor should this Court.

Just as the State's purported interest in "protecting employees from intimidation for exercising their rights to be free from forced listening and indoctrination" was not compelling for purposes of strict scrutiny, *see supra* MERITS § I.B.1, it is not "so deeply rooted in local feeling and responsibility" that Defendants may use it as an excuse for overriding federal labor law, *Delta Air Lines, Inc. v. Kramarsky*, 650 F.2d 1287, 1302 (2d Cir. 1981), *aff'd in part and vacated in part on other grounds by Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983). This narrow "local interest exception [is] predicated on state[s'] power over such traditionally local matters as public safety and order and the use of streets and highways"—not power to police employers' protected speech on political matters. *Id.* (quotation omitted).

B.    The Act is preempted under *Machinists*.

Section 31-51q also fails under *Machinists* preemption because the Act "regulates conduct that Congress intended to be left unregulated [and] left to be controlled by the free play of economic forces." *Brown*, 554 U.S. at 65 (applying *Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission*, 427 U.S. 132 (1976)). Ignoring *Brown*'s recognition that Section 8(c) of the NLRA "manifested a congressional intent to encourage free debate on issues dividing labor and management" and directed states "to leave noncoercive speech unregulated," *id.* at 67–68, Defendants focus on *Machinists* challenges that have nothing to do with unionization-related speech, *see* Defs.' Br. 46–48. These cases do not undermine *Brown*'s applicability.

Returning to their core misinterpretations of the Act, Defendants argue *Brown* is "irrelevant" because "[t]he Act does not prohibit non-coercive employer speech about unionization (or even coercive speech about unionization)." Defs.' Br. 47. Beyond that, Defendants have only two arguments for why *Brown* does not resolve the preemption issue.

First, Defendants argue that if the Act does prohibit employers' unionization-related speech then "*Garmon* would be the proper analytic framework, not *Machinists*." Defs.' Br. 47. While *Garmon* is *a* proper analytic framework for determining that the Act is preempted, it is not the only one. Indeed, the Supreme Court in *Brown* concluded that it did not need to address *Garmon* preemption because, under *Machinists*,

27

the speech restriction at issue "regulate[d] within a zone protected and reserved for market freedom." 554 U.S. at 66 (quotation omitted). The same is true here.

Second, Defendants argue "the Act is readily distinguishable from *Brown*" as a factual matter. Defs.' Br. 48. To the contrary, the Act is materially similar to the California statute in *Brown*. Like California's AB 1889, Connecticut's Section 31-51q is not "neutral in its application," Defs.' Br. 48, but "imposes a targeted negative restriction on employer speech about unionization," *Brown*, 554 U.S. at 71. And like AB 1889, Section 31-51q imposes heavy "compliance burdens" in the form of self-censorship. *Id.*; *see also id.* at 73 ("AB 1889's enforcement mechanisms put considerable pressure on an employer either to forgo his 'free speech right to communicate his views to his employees,' or else to refuse the receipt of any state funds." (quoting *Gissel Packing*, 395 U.S. at 617)). Contrary to Defendants' assertion that the Act's exemption for "necessary" communications "protects even more speech" rather than burdening it, Defs.' Br. 48, the exemption protects nothing. Instead, it carves out "necessary" speech as neutral, and grants the State broad discretion to pick and choose which communications fall under its vague exemption. *See* Conn. Gen. Stat. § 31-51q(c). This carve out cannot save the Act from *Machinists* preemption.

Nothing in Defendants' preferred case, *Restaurant Law Center v. City of New York*, 90 F.4th 101 (2d Cir. 2024), undermines *Brown*'s applicability. The Second Circuit did not alter the standard for assessing *Machinists* preemption, nor did the case have any bearing on cases preempted by Section 8(c). The NLRA governs the gambit of employer-employee relations—from joining a labor union to engaging in collective

28

bargaining. Whereas Section 8(c) of the NLRA (like Section 31-51q) regulates employer-employees communications regarding whether to join a labor union, *see Brown*, 554 U.S. at 65, 71–72, Defendants' cited cases address statutes relating to the collective-bargaining process that occurs once employees have unionized, *see Rest. Law Ctr.*, 90 F.4th 101; *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987); *Metro Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985); *N.Y. Tel. Co. v. N.Y. State Dep't of Labor*, 440 U.S. 519 (1979); *Concerned Home Care Providers, Inc. v. Cuomo*, 783 F.3d 77 (2d Cir. 2015). Only in the context of collective-bargaining regulations does *Restaurant Law Center*'s inquiry whether a state statute regulates the "substance, rather than process of labor organizations" make any sense. 90 F.4th at 112 (emphases omitted).

Where, as here, the Court must instead assess whether a state statute is preempted by Section 8(c)'s protections of employers' speech rights on unionization, *Brown* is the governing authority. Applying *Brown*, Section 31-51q is invalid under *Machinists* preemption.

### C.    Section 31-51q's unionization clause cannot be severed.

Finally, when the Court concludes that Section 31-51q is preempted by the NLRA, it should strike the entire Act. Alternatively, and at a minimum, the Court should strike the definition of "political matters," Conn. Gen. Stat. § 31-51q(a)(1), and the regulation of speech about "political matters," *id.* § 31-51q(b)(2)(B). The Court should not, as Defendants suggest, merely strike the reference to "labor organizations." Conn. Gen. Stat. § 31-51q(a)(1). Doing so would violate the Assembly's entire purpose

29

for amending Section 31-51q: preventing employers from holding mandatory meetings to discuss their opposition to unionization with employees.

Defendants rely on Connecticut General Statutes Section 1-3, which provides a general "presumption of severability" when only part of a Connecticut statute is held unconstitutional. *Zimmerman v. Bd. of Educ. of Town of Branford*, 597 F. Supp. 72, 78 n.6 (D. Conn. 1984). However, they ignore that Plaintiffs can—as they have here— "overcome the presumption of severability" by "show[ing] that the portion declared invalid is 'so mutually connected and dependent on the remainder of the statute as to indicate an intent that they should stand or fall together' and that the interdependence is such that the legislature would not have adopted the statute without the invalid portion." *Conn. Fine Wine & Spirits, LLC v. Harris*, 255 F. Supp. 3d 355, 367 (D. Conn. 2017), *aff'd Conn. Fine Wine & Spirits, LLC v. Seagull*, 932 F.3d 22 (2d Cir. 2019) (quoting *Payne v. Fairfield Hills Hosp.*, 578 A.2d 1025, 1030 (1990)).

To determine whether the unconstitutional portion is "mutually connected and dependent" on the rest of the Act, the Court can consider legislative history. *Seals v. Hickey*, 441 A.2d 604, 612 (Conn. 1982); *see State v. Bell*, 931 A.2d 198, 236 (Conn. 2007); *EEOC v. CBS, Inc.*, 743 F.2d 969, 971 (2d Cir. 1984).[12] The legislative history could not be clearer that the Assembly's purpose for prohibiting mandatory meetings

---

[12]    Defendants argue that "considering legislative history is only appropriate if a statute's text is ambiguous." Defs.' Br. 49. But Defendants are not invoking legislative history to interpret the text of Section 31-51q; they are using it to determine whether the Assembly would have passed the Act if not for the offending provision on union-related speech.

30

about "political matters" was to stifle employers' speech anti-union speech. *See* Pls.'

Br. BACKGROUND §§ I.B, I.C. Defendants have not shown otherwise.

The Court should declare the entire Act unconstitutional and enjoin Defendants

from enforcing it against Plaintiffs and their members. However, at a minimum, if

the Court concludes that only the Act's regulation of employers' unionization-related

speech is preempted by federal labor law, it should strike the definition of "political

matters" and every use of that term within the Act.[13]

## CONCLUSION

The Court should grant Plaintiffs' motion for summary judgment and deny De-

fendants' cross-motion for summary judgment.


Respectfully submitted,

Dated: July 21, 2024          */s/ Bryan Killian*

                             MORGAN LEWIS & BOCKIUS LLP
                             Bryan Killian
                             One State St.
                             Hartford, CT 06103-3178
                             Telephone: (202) 373-6191
                             Fax: (860) 240-2701
                             bryan.killian@morganlewis.com

                             MORGAN LEWIS & BOCKIUS LLP
                             Philip A. Miscimarra
                             David B. Salmons
                             Patrick A. Harvey
                             Amanda L. Salz
                             1111 Pennsylvania Ave., NW

---

[13]    If the Court concludes that the Act violates the First Amendment, these are the only options—as the State's regulation of speech about any "political matters" could not pass muster.

31

Washington, DC 20004-2541
Telephone: (202) 739-3000
Fax: (202) 739-3001
philip.miscimarra@morganlewis.com
david.salmons@morganlewis.com
patrick.harvey@morganlewis.com
amanda.salz@morganlewis.com

*Attorneys for the Chamber of Commerce of the United States of America, Associated Builders and Contractors, Associated Builders and Contractors of Connecticut, Coalition for a Democratic Workplace, Connecticut Business and Industry Association, Connecticut Retail Merchants Association, National Association of Home Builders, and National Retail Federation*

U.S. CHAMBER LITIGATION CENTER
Daryl Joseffer
Stephanie A. Maloney
1615 H Street, N.W.
Washington, DC 20062-2000
(202) 463-5337
djoseffer@uschamber.com
smaloney@uschamber.com

*Attorneys for the Chamber of Commerce of the United States of America*

LITTLER MENDELSON, P.C.
Maurice Baskin
815 Connecticut Avenue, NW
Suite 400
Washington, DC 20006-4046
(202) 772-2526

LITTLER MENDELSON, P.C.
Craig Dickinson
265 Church Street
Suite 300
New Haven, CT 06510
(203) 413-2977

32

*Attorney for Associated Builders and Contractors and Associated Builders and Contractors of Connecticut*