```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
_____
CHAMBER OF COMMERCE OF THE      )
UNITED STATES OF AMERICA, ET AL.) No: 3:22-cv-01373-KAD
              Plaintiffs,       )
       v.                       ) November 18, 2024
DANTE BARTOLOMEO, ET AL.,       )
                Defendants.     ) 10:01 a.m.
_____ )
                                  Brien McMahon Federal Building
                                  915 Lafayette Boulevard
                                  Bridgeport, CT 06604


                       MOTION HEARING

B E F O R E:
          THE HONORABLE KARI A. DOOLEY, U.S.D.J.

A P P E A R A N C E S:
For the Plaintiffs:
     BRYAN KILLIAN, ESQ.
     PATRICK HARVEY, ESQ.
     Morgan, Lewis & Bockius, LLP
     1111 Pennsylvania Avenue, NW
     Washington, D.C. 20004
     202-739-3000
     Email: bryan.killian@morganlewis.com
            patrick.harvey@morganlewis.com


For the Defendants:
     TIMOTHY J. HOLZMAN, AAG
     EMILY ADAMS GAIT, AAG
     BENJAMIN A. ABRAMS, AAG
     State of Connecticut
     Office of the Attorney General
     165 Capitol Avenue
     Hartford, CT 06106
     860-808-5020
     Email: timothy.holzman@ct.gov
            emily.gait@ct.gov
            benjamin.abrams@ct.gov


Also present:
     ANDREW SPEARS, ESQ., Law Clerk


Courtroom Deputy:                   Official Court Reporter:
Kristen Gould, Esq.                 Tracy L. Gow, RPR
```

(Call to Order, 10:01 a.m.)

THE COURT:  All right.  Good morning, everybody.

MR. KILLIAN:  Good morning.

MR. HOLZMAN:  THE COURT:  We are here on the matter of *Chamber of Commerce United States of America, et al., v. Dante Bartolomeo* -- that probably would have substituted by now.

Counsel, please identify yourselves for the record.

MR. KILLIAN:  Good morning, Judge Dooley.  Bryan Killian, from Morgan Lewis & Bockius, for the plaintiffs, and with me is my colleague, Patrick Harvey.

THE COURT:  All right.  Good morning.

MR. HOLZMAN:  Good morning, Your Honor.  Assistant Attorney General Tim Holzman, on behalf of the defendants, and with me are my colleagues Assistant Attorneys General Emily Gait and Ben Abrams.

THE COURT:  All right.  Good morning.

MR. HOLZMAN:  Good morning.

THE COURT:  All right.  We are here for oral argument on the cross motions for summary judgment.  There are a lot of issues sort of layered into the motions.  It is not my practice, as you may know, to limit anything that anybody may wish to say.  I will have questions, and I'll share some observations.  As we go in, I will interrupt you at all will, as is my practice, as well.

I think that it is -- the parties brief past each other a little bit on what may be the most significant or core issue at play here.  Obviously, the plaintiffs are of the view that the statute, while regulating conduct, is conduct that is designed to and, in fact, does restrict speech; and the defense obviously is of the view that this is conduct in the purest sense of the word, and, therefore, it doesn't even implicate the First Amendment.

I think that's the most nuanced issue that I have to decide.  It goes to both standing and it goes to the merits of the underlying case.  And I think it's probably the biggest hurdle that the plaintiff faces in the case, because it does implicate both standing and the merits of the case.

I should just say, that if I ask a question about strict scrutiny, it's not an indication that I've decided standing in favor of the defense.  If I ask questions about standing, it's not an indication that I've decided that issue, either.  In fact, I haven't decided any of the issues. They're all well briefed, and I anticipate that they will be well argued.

And I guess I'll leave it there, and I'll interrupt you with my concerns and observations as you go.

I don't know whether -- we have cross motions here. Ordinarily, I know who goes first.  Have you-all had a discussion about how you'd like to present your positions?

MR. KILLIAN:  We've not, Judge Dooley.  I'm happy to go first.

MR. HOLZMAN:  That's fine with us.  I mean, I suppose they do bear the burden of proof on standing and the merits, so we're okay with that.

THE COURT:  They do, indeed.

Okay.  Then the floor is yours, sir.

MR. KILLIAN:  Good morning again, Your Honor.  Bryan Killian.

THE COURT:  Good morning.

MR. KILLIAN:  May it please the Court.  After the 2022 amendments to Connecticut General Statute 31-51q, Connecticut employers face a $300 penalty if they require employees to attend meetings where the employer addresses political matters.  And the statute, 31-51q, defines these political matters to include a range of core First Amendment-protected speech topics, including elections, laws, and unionization.

In our perspective, 31-51q is unconstitutional for two reasons that I want to sketch out very briefly, and then I want to address our standing, and then I'll get into the merits a little bit more, if that's all right with Your Honor.

The first reason is that we believe that 35-51q is a content-based regulation of speech that violates the First

Amendment.  Because whether an employee can instruct his -- excuse me -- an employer -- whether an employer can instruct his or her employees to attend a meeting, whether the employer can discipline the employees after the meeting, if they did not attend, depends entirely on the subject matters and the viewpoints that the employer expresses in that meeting.

So, for example --

THE COURT:  If I agree with you that the speech at issue, that it's content-based speech, there is no question -- we'll leave aside for a moment the question of whether the statute regulates that speech, but it certainly is content-based speech.  I'm not sure it's viewpoint -- it's not viewpoint neutral, and maybe you're going to get there.

MR. KILLIAN:  Yeah.  I think, as the Supreme Court said in the *Rosenberger* v. Board and Rectors of the University of Virginia case, a viewpoint discrimination is just a particularly egregious form of content discrimination.

I'm happy to talk about it very briefly right now, but, ultimately, we do think that this is primarily a content discrimination matter, not a viewpoint discrimination matter.

It's viewpoint, in our perspective, because that's what the Assembly was driving at.  The legislative history could not be clearer that those who supported the law and drafted the law were targeting the viewpoint of employers who

were opposed to unionization.

The law they ultimately wrote targets certain topics and as expressed by only certain individuals -- the employers.

And, so, I think maybe an example can illustrate this.  Whether an employer can discipline an employee, whether an employer can fire an employee if they've missed -- well, let me put it this way.  If an employer talks at a meeting about new database software, if the employer talks at a meeting about their favorite New Haven pizza place, they can make it a mandatory meeting; the employer can fire the employee afterwards if they skip; they can threaten the employee in advance.

But if the employer at that meeting wants to talk about politics -- who the employer supports in the gubernatorial election -- or wants to say what the employer thinks is going to happen in the workplace if the workforce unionizes, then the employer loses that right to discipline.

And, so, that's why we think the law is a content-based discrimination regulation of speech.  The conduct surrounding discipline -- what the employer is allowed to do *vis-a-vis* the employee in that economic relationship -- depends on the speech that is given, or that the employer intends to give, at one of these meetings.  And that's what we think renders it unconstitutional on the First

Amendment.

So, that's the first argument. I'm going to address it a little bit more in-depth in a few moments. I just wanted to sketch it out now. The other argument is that 31-51q is preempted because it regulates employer speech on unionization.

Under the doctrine of *Garmon* preemption, states are not allowed to regulate any conduct -- and the key thing is "conduct" -- that is either affirmatively allowed under federal law -- that's protected under federal law -- or that's prohibited under federal law.

THE COURT: Doesn't preemption require there to be some conflict? I mean, you can't -- the states can't do something that the NLRA -- is in conflict with the NLRA.

And since -- and *Amazon* essentially says that this statute is now completely aligned with the NLRA. I mean, they're different language --

MR. KILLIAN: Yeah.

THE COURT: -- in the Act and the NLRA, but the *Amazon* holding seems to be that there's no reading of this statute that's going to be inconsistent with the NLRA under *Amazon's* reading.

MR. KILLIAN: Yeah, the *Garmon* preemption is more than a mere conflict preemption. *Garmon* preemption is a recognition that particular matters in the labor relations

between employer and employees are to be regulated only by the federal government.

And, so, it's a type of field preemption. That there are specific matters that are arguably protected or arguably prohibited, or actually protected and actually prohibited, where Congress has made the judgment "That's for the Board to regulate" -- the National Labor Relations Board.

States are not allowed to add penalties on top of that. They're not allowed to reach contrary determinations, because the sphere of labor relations as to those matters are exclusively federal.

And so, our view, the *Amazon.com* decision from last week -- number one, it affirms what we've been saying all along about the state of the law before the decision -- that this type of mandatory meeting was, in fact, affirmatively protected by the National Labor Relations Act until last Wednesday -- but now, according to the Board, it's affirmatively prohibited by the Act.

But either way, *Garmon* -- the formulation of *Garmon* is anything that is prohibited or protected by the Act is preempted for the states.

So, that's why I think it's greater than just a conflict preemption.

THE COURT: Okay.

MR. KILLIAN: Now, the state's primary response

before getting to the merits is to say that the Court doesn't have jurisdiction to adjudicate this case.  Specifically, the state contends that the plaintiffs have not proven their standing -- Article III standing.

The Second Circuit sets a very low bar for Article III standing in a First Amendment case.  I think the *Vitagliano* case, by the Second Circuit, puts the standard as something like the following:

As long as the plaintiff has an intention to engage in conduct -- in a course of conduct, that is arguably proscribed by the law, then that plaintiff may bring a pre-enforcement challenge.

We've carried that burden here, with evidence from the CBIA, the Connecticut Business & Industry Association. The declarations and the deposition testimony of CBIA's president clarify that CBIA wants to hold meetings on the political matters that 31-51q covers.  CBIA wants all of its employees to attend these meetings, even employees who, within CBIA, don't need that information in order to perform their jobs.  And CBIA wants to make these meetings mandatory, and it specifically wants to be able to discipline employees who skip.

Those are the three things that the Act prohibits in conjunction.  So --

THE COURT:  Do they -- is it specifically what they

want to do?  Or is it -- have to be a little more concrete than that -- what they intend to do?

MR. KILLIAN:  It's what they intend to do.  And CBIA does intend to do that.  I was using the two as synonymous. I didn't mean to imply distinction between intent and want.

They intend to do this, and the declaration from Mr. DiPentima states that they will do this if Your Honor grants the relief that the Court -- that we've asked the Court to provide.

THE COURT:  So, this is where the case takes a rather -- "ironic" is probably not the right word -- twist. Because the defense has pointed out that the discovery has disclosed that nobody ever misses these meetings, nobody ever refuses to go to these meetings, nobody has ever been disciplined for not going or refusing to go or walking out of these meetings, and -- rendering the basis for CBIA's standing really sort of hypothetical.

And we also have this situation where, because of the nature of CBIA's business model --

MR. KILLIAN:  Uh-huh.

THE COURT:  -- they sort of live in the world of politics -- they are advocates.  They are lobbyists.  I'm sure they spend a fair amount of time at the LOB or meeting with state agencies to talk about --

MR. KILLIAN:  Sure.

11

THE COURT:  So, the state has come back and said: You guys are exempt.  You guys, this statute will not apply to you, you're completely exempt.

And the oddity of having the agency, or the plaintiffs' lawyer, then take the position -- I mean, they're basically getting everything they want from the state -- "You're good to go under this statute" -- and now they're taking the position that, No, we're not good to go.

MR. KILLIAN:  Yeah, I understand Your Honor's -- your observation.

THE COURT:  It's a little bit of a head-scratcher, frankly.

MR. KILLIAN:  Well, I'll start with the first point. The State is wrong that no one has ever been disciplined before.  CBIA has had reprimanding conversations with employees who've missed these meetings.  We've produced evidence -- and this is in the declaration of Mr. DiPentima and in his deposition, pages 58 and 59 -- that CBIA uses a form of progressive discipline.

And, so, when an employee does something wrong, the first time is a conversation.  And it turns out that that works with a lot of employees, so we've never had to fire someone -- CBIA has never had to fire someone for missing these meetings.

But the type of discipline that 31-51q covers

includes reprimands of the sort that has been done in the past.

But that doesn't speak entirely to the future, because our standing in a pre-enforcement challenge isn't based on what we've done in the past.  That's informative, but it's really about what that intention is to take place in the future.

And 35-51q makes it illegal -- or it subjects someone to a fine, put it that way -- if they threaten their employees, if they make a meeting mandatory in the future.

And, so, the fact that CBIA employees have complied with its prior requests for mandatory meetings doesn't really undermine their standing.  They want to continue to make the meetings mandatory, and it's that mandatory nature of the meeting that 31-51q now renders impermissible when the topic of the meeting is politics or unionization.

Now, as to the second observation, Your Honor, about Mr. Wydra's declaration, submitted in response to our summary judgment brief, saying that he would not seek to enforce the law against CBIA.  I think there are several flaws with that.  And why it -- and as we talk to those flaws, I think it reveals why CBIA views that as a cold comfort and not the sort of relief that Your Honor can provide, the sort of permanent and lasting relief.

One of those is that he has not disavowed

enforcement of the entire law.  They've said in their response -- excuse me -- yeah, their answers to our requests for admission, and his original declaration submitted with the Motion to Dismiss that the state filed last year, that the state fully intends to enforce this law.

And, so, this isn't like some of the cases the Second Circuit has dealt with, where a law that had been on the books for a very, very long time and never had actually been enforced, the state comes in and says:  We're not going to apply -- this one's more a bund; don't worry about it.

Here, we have a brand-new law that the Assembly specifically charged the Department of Labor and the Attorney General with enforcing it -- and that power exists in 31-69a -- and the state has not disavowed all enforcement.

What they've done is they've come forward with a targeted disclaimer of enforcement.  Sort of an attempt to pick-off the lead plaintiff in the action that has -- that we've brought.  And that sort of "disclaimer," I'm going to call it, does not overcome the presumption in the Second Circuit that brand-new laws are going to be enforced.  And there's a couple reasons why.

Number one is these disclaimers do not provide the plaintiff, as I said a few moments ago, with the long-term protection that an injunction or a declaration from an Article III court can provide.  And with Mr. Wydra's

departure from the Department of Labor just last week, you know, it's not even clear that it provides short-term protection any longer.

And what the Second Circuit recognized, in the *Picard* case, is that these sort of informal statements aren't binding on future Adminstrations.  A new person can come into the office and change his mind about the prior Administration's enforcement priorities.

But I think the more fundamental problem -- although the temporary nature of it is a pretty big problem -- the more fundamental problem is that disclaimers like Mr. Wydra's are not effective when they are contrary to statutory text.

The Second Circuit, in the *Antonyuk* case, said that "For Article III purposes, courts," quote, "'do not defer to the Government's interpretation of the statute or its representations regarding the likelihood of a particular prosecution.'"

And on several occasions the Second Circuit has refused to acknowledge one of these one-off disclaimers because it was clearly contrary to the statutory text.

The defendants agree with that.  On page 6 of their reply brief, they take the precedents that we have cited and say, Yeah, but in those cases the state's interpretation really was contrary to the statutory text.  And then they pivot to say, but in our case their interpretation, they

claim, is not contrary to the statutory texts.

Well, we respectfully disagree.  We think the defendants' disavowal is based on a blatant misinterpretation, because, as Your Honor previewed at the outset of this argument, their position is this doesn't have anything to do with speech.

THE COURT:  So, your're going to -- I assume you're about to segue into why the exception in the statute doesn't cover CBIA.

MR. KILLIAN:  Yes.

THE COURT:  Even though, if the exception did cover CBIA, that would be good for CBIA.

MR. KILLIAN:  The reason the exception doesn't cover CBIA is that the president of CBIA testified that his graphic designers do not need to know this information in order to carry out their job.  He said that under oath, and that's his position.

The State speculates that as an organization, a policy -- an organization engaged in policy, that maybe all the employees could benefit in some way from knowing the policy positions.

But CBIA has a range of employees.  They have lobbyists who are absolutely engaged in that policy-making exercise, but they have a lot of other employees who are not, and they do not need to know that information to perform

their jobs.  And, so, we think that is ultimately a question of fact, Judge Dooley.

THE COURT:  So, you don't think that because CBIA has employees who do not sort of work in that world, the statute would be unconstitutional -- the exception might cover some of their employees, but wouldn't cover all of their employees being required to go to mandatory meetings?

MR. KILLIAN:  Yeah.  May I read, Your Honor, the exception in (c)(2) of the statute?

"Nothing in this section shall prohibit an employer or its agent, representative or designee from communicating to its employees any information that is necessary for such employees to perform their job duties."

CBIA provides this information to all of its employees, even those for whom it is not necessary to perform their job duties.  And so, ultimately, we believe that --

THE COURT:  So, the graphic designers don't know what the CBIA is out lobbying for or against, or taking positions, publicly or behind closed doors, at the LOB?

MR. KILLROY:  It's not that they don't know it. It's that it's not necessary for them to do their job.

CBIA wants them to know it.  CBIA would like all of its employees to be on board with its mission.  But there are certain responsibilities, jobs within the organization, that are so disconnected from the policy-making of the lobbyists

who work for CBIA, that they don't need it to perform their job duties.

And that's a question of fact that, at summary judgment, is unrebutted.

THE COURT: Okay.

MR. KILLIAN: Okay. And I'll point out that that's at pages -- excuse me -- paragraphs 10 through 14 of the DiPentima declaration, where he makes that point.

So, in our view, there is a credible threat of enforcement, which means there is Article III standing, which means that the Court has jurisdiction to reach the merits of the First Amendment and the preemption challenges.

THE COURT: What do I do with the argument that the number of intervening events that have to occur in this case before the threat is, in fact, credible are so many that somebody has to refuse to go, there has to be injury? I mean --

MR. KILLIAN: Yeah, I think it's a red herring, Your Honor. Because the law applies not just when employees actually skip, but when the employer makes the meeting mandatory *ex ante*. So, it covers both the post discipline and the *ex ante* threat of it.

So, when an employer like CBIA calls a mandatory meeting, it is telling its employees "You must come." It is that action that triggers -- that the law actually prohibits.

18

It also prohibits *ex ante*. You know, an employer, I guess in theory, could have a voluntary meeting and then fire a whole bunch of employees afterwards for not going. But the law covers both of its bases -- or both sort of the before and the after, and says that when there is a threat of discipline for a meeting about political matters, then that, also, the law prohibits.

So, there aren't really any intervening activities that we need to worry about here. CBIA wants to have the mandatory meeting -- it intends to have that meeting when Your Honor rules; and for that reason, it is currently presently injured.

CBIA is complying with the law and is asking for the Court -- for relief from that, so it can go back to calling these mandatory meetings.

THE COURT: And has it not -- there was some, I think, factual dispute as to whether or not they, in fact, did not refrain from calling mandatory meetings at which policy or politics was discussed, once the law passed but in advance of bringing this lawsuit.

MR. KILLIAN: I'm not aware of that, Your Honor. When the law went into effect, CBIA began to comply. In order to comply, the meeting -- you sort of have a suite of options; right? You could stop talking about politics. You can keep talking about politics, but make it voluntary. So,

just maybe -- but you could talk about politics at a mandatory meeting.  Or you could -- excuse me, I have that backwards.  You could talk about politics at a voluntary meeting, or you could stop talking about politics at a mandatory meeting.

THE COURT:  At a mandatory meeting.

MR. KILLIAN:  Yeah.  CBIA went with that other course.  It stopped talking about politics, but has kept the meetings mandatory.  It still needs to tell its employees a lot of other things and didn't want to make these meetings fully optional; and, so, the course that CBIA chose was to remove political topics from the meetings that it used to hold.

Again, what's important is that what it intends to do when the Court grants relief.  And what it intends to do is to tell all of its employees about its policy positions at these "all staff required" meetings.

Okay.  So, turning to the First Amendment, then.  As I noted at the outset, 31-51q is not a content-neutral law.  It does not ban all mandatory meetings.  It does not ban all employer discipline.  It does not let employees just opt-out of any meeting that the employee chooses.  But, rather, the law, by its own text, applies only to employers in meetings where the employer engages in political speech.  And, so, the law itself draws these content discriminatory lines on the

face of the law.

That's what makes our challenge a classic facial challenge, because one needs to read only the text of the law, 31-51q, to see that it is drawing content discriminatory lines.  In that way, our case is similar to the one that the Supreme Court decided in *RAV v. St. Paul*, where the law banned cross-burning with a racial message.  Or like the case, in *Reed v. Town of Gilbert*, where the law banned signs that had religious messages and drew other types of distinctions -- directional signs and the like.  But the law had a number of different content-based classifications on the face of the law.

So, it is the text of 31-51q that tells employers in the state that they cannot talk about political matters if they want to retain their right to discipline an employee or to threaten discipline to an employee.  And that's what makes this a classic facial challenge.

In turn, 31-51q draws these content discriminatory lines in every case to which the First Amendment applies.  It is for that reason, I think -- we think, an appropriate facial challenge.

Now, the state's, our view, main response to that is to point out that 31-51q also applies to the state as an employer; that it applies to all the private employers within Connecticut and also the state.

Respectfully, we think that's a red herring, for a couple of reasons. Number one, there is no precedent that the state has cited where a court found that a challenge was not a facial challenge or that all the applications were not unconstitutional simply because the state itself was subject to the same requirements.

And, in fact, the *Honeyfund* case, from the Eleventh Circuit, in Footnote 1, the Court noted that that Florida law -- that banned mandatory meetings on diversity, equity and inclusion -- that Florida law also applied to the state. It applied to public schools. And in Footnote 1, the Eleventh Circuit said, well, we're not looking that; we're looking at the law as it applies to private employers.

And we think the same analysis applies here, because the Government doesn't have First Amendment rights. And the fact that the law applies to the Government --

THE COURT: I think if I read the -- if I understood the defendants' argument correctly, it's that you essentially waived this argument during the course of discovery in the case when clarifying the plaintiffs' position. And I will confess, I haven't --

MR. KILLIAN: Yeah, I'll address it, Your Honor.

THE COURT: -- gone down the rabbit hole of all the cases that talk about that, but...

MR. KILLIAN: Yeah. We have not waived the

argument.  I'm very confident of that.  What we have said is we're not bringing an overbreadth challenge, which is what the Second Circuit defines as a case where the plaintiff is someone to whom the law may be constitutionally applied, but that person is seeking to enjoin the law because of unconstitutional applications to, quote, "hypothetical third parties.  That's the *Farrell v. Burke* case, from the Second Circuit, that we discuss in our brief.

So, in all classic overbreadth cases where a criminal defendant clearly violated a law on obscenity, but then says the law is, nonetheless, unconstitutional because this law, although constitutionally applied to me, proscribes the speech of far more than just obscenity and all these other people, these hypothetical third parties, their speech is being restricted by the law.

So, when we told the state that we weren't bringing an overbreadth challenge, that's what we're doing.  With CBIA, the law is unconstitutional as applied to it.  None of our plaintiffs contends that the law is constitutional as applied to that plaintiff, but is, nonetheless, unconstitutional because of its application to others.

So, we have not waived this kind of argument.  Moreover, this is the standard for facial challenges -- the ordinary standard for facial challenges, as the Supreme Court clarified in the *Moody* case earlier this year.

So, I think that's -- the state tries to say that because -- anyway, what -- I guess the last point I want to make is the Government doesn't have First Amendment rights; and, so, the fact that the Government subjects itself to a law does not suddenly transform it from one into which the law is unconstitutional in all of its applications or where a facial challenge is appropriate, as the Supreme Court -- again, I'll point the Court to *RAV v. St. Paul* and *Reed v. Town of Gilbert*, where the facial challenge is not based on discrete facts and circumstances, but can be determined simply from the face of the law -- that's why it called a facial challenge; right?  You don't need to read beyond the text to determine unconstitutionality -- then the Court can confidently determine that it's unconstitutional in all of its applications.

And even if the Court did consider the application of the law to the state, it would be unconstitutional in a substantial number of the applications, including those to our clients.

So, does that address Your Honor's question about the waiver issue?

THE COURT:  It did.

MR. KILLIAN:  Okay.  So, because the law draws these content-discriminatory lines, the law then moves to strict scrutiny.  The State has to demonstrate a compelling and

legitimate state interest and that this law is narrowly tailored to that interest.

But all of the interest that the state has proffered to support in Section 31-51q fail under the standard that the Supreme Court noted in the *NetChoice* case in July this area.

THE COURT:  I think you may have addressed this already, and I'm going to ask you to circle-back because maybe I'm being dense.

Isn't it intermediate scrutiny if -- even if content-based is neutral?

MR. KILLIAN:  I don't -- I guess I don't follow Your Honor's question about -- content-based wouldn't be neutral. At that point, if the content is --

THE COURT:  Well, you can't talk about politics, but --

MR. KILLIAN:  Viewpoint neutral?

THE COURT:  -- but -- yeah.

MR. KILLIAN:  Sure.

THE COURT:  I mean -- or you can't talk about religion.  But it doesn't say you can't talk -- it doesn't say what you can say one way or the other about politics.

MR. KILLIAN:  Understood.  So, if -- if the law drew on its face "viewpoint discriminatory" lines, it would be, per se, unconstitutional.  What you get -- when the law just draws content-based lines, that's what gets you to strict

scrutiny. And the strict scrutiny then requires the compelling interest and narrow tailoring.

So, the content-based lines that are drawn here are the lines around political matters, including elections, laws and unionization; and so, no, I wouldn't call that intermediate scrutiny, Your Honor. I'd call it strict scrutiny. But the point remains, there still needs to be a compelling interest and narrow tailoring.

So, I guess the label is, perhaps, secondary. What the state must come forth with is -- are a compelling interest and an explanation for why the law is narrowly tailored to that interest. This isn't a "time, place and manner" regulation, which is a truly content-neutral regulation of speech -- you know, no noise trucks after 11 p.m. -- that has nothing to do with the content, but applies to all speech. Because the law itself draws the lines around political matters, that's what triggers the heightened scrutiny of strict scrutiny.

So, the interest that the state has proffered here fail the standard that the Supreme Court identified in *Moody v. NetChoice*, where the Court said that an interest, to be legitimate, must be unrelated to the suppression of expression.

It has to be unrelated to the suppression of expression. But the interests that the state has articulated

here are directly related to the suppression of expression.

According to the state, certain opinions expressed by certain people in certain environments harm certain listeners. And, so, 31-51q is an attempt to suppress that expression. And, thus, under the *NetChoice* standard, that is not a legitimate interest.

Protecting listeners from hearing speech that they dislike is not, in and of itself, a legitimate interest. The Supreme Court reiterated that in the *RAV v. St. Paul* case, where -- undeniably dealing with speech that nobody would want to hear -- cross-burning in your front yard -- or *Snyder v. Phelps*, where the antiwar protestors were engaged in homophobic slurs at the funeral of the soldier.

In all of those cases, the listeners absolutely did not want to hear the speech, but that was not a sufficient reason for the state to prohibit that sort of conduct, particularly -- particularly -- in content discriminatory ways.

And I think that's where I want to take the Court back, with the Court's interests -- excuse me -- with the state's proffered interests. Because the interests that the state has put forth are not an attempt to explain the content discrimination in 31-51q.

As the Supreme Court noted, in *Snyder,* topics like politics are -- they get the greatest First Amendment

27

protection.  You know, this is not a sort of case where you are dealing with speech that is at the outer limits of what the First Amendment protects -- hateful speech.  This is core political speech that gets the greatest protection.  And yet, that is exactly that speech that the state has said is too sensitive to be discussed in the workplace.

Now, I think the state's primary response to this, and its primary effort to justify this, is through a line of cases that address something known as the "captive-audience rationale."  We believe the captive-audience rationale does not apply here for two fundamental reasons:

First, the captive-audience rationale does not allow content discrimination.  That's what the Supreme Court explained in the *RAV* case.  Again -- a lot of these issues came up in *RAV*, so it's not -- I'm probably going to cite it a couple more times.

But, in *RAV*, Justice Scalia discussed two precedents that dealt with picketing:  The *Frisby* case and the *Kerry* case.  In one of those cases, the law banned all residential picketing because of concerns about people having to hear that within their own homes -- and the Supreme Court upheld that law on the captive-audience rationale.

In the other case, the law banned residential picketing except for labor-related picketing.  It drew a content baseline.  And that law was held unconstitutional,

28

even though it was the same interest of people not having picketing within their homes.  But because the law drew content discriminatory lines, it failed the standard for captive-audience cases.

In other words, a captive-audience law, to be justified, really needs to be a time/place/manner restriction on -- that is content-neutral.  Again, as *RAV* says, time/place/manner restrictions must be content-neutral.

And even the case that the defendants cite most often, *Hill v. Colorado*, which involved a buffer zone around abortion clinics, was a time/place/manner content-neutral buffer zone on speech activities within the buffer.  It did not draw the same -- it did not draw any content discriminatory lines, let alone the same content discriminatory lines around political speech.

Now, we've also argued, and I won't go great into detail here, that we don't think the captive-audience rationale applies outside of a listener's home, although *Hill* sort of stands for the contrary.

But *Hill* is only case where the Court has ever countenanced captive-audience outside a listener's home.  And for us, I think the take-away is that no captive-audience case has ever been inside the speaker's home -- because that's what we're dealing with here.  Inside the speaker's own workplace is where the state are claiming that the other

people are a captive-audience. And whatever the captive-audience rationale is -- originally it was just homes -- homes and abortion clinics. It's never been extended that far. It's never been extended to a place where the listener does not have an intense privacy interest.

And so, we don't think the workplace is enough. But even so, the content discriminatory nature of 31-51q is enough to knock the legs out of the captive-audience rationale.

So, you add those up, and the state has not come forth with a compelling state interest to support the content discriminatory lines that 31-51q draws. They're related to the suppression of expression, and they don't apply to captive-audience rationale.

I'm happy to address why we also think it's over- and underinclusive, but I think we've argued that pretty well in the briefs. And if Your Honor has questions, I'd address those. Otherwise, I'll move to the preemption argument briefly and then wrap up.

THE COURT: The -- it would seem to me that the preemption argument is -- well, I'll just leave it to you. It wasn't as -- I mean, the First Amendment arguments are very nuanced. The preemption issues seem less so.

MR. KILLIAN: They are black-and-white. *Garmon* preemption standard is very clear. If the same conduct is --

30

that the state law regulates -- is arguably or actually protected or prohibited under federal labor law, it's preempted, full stop.

Now, we argued this case -- we briefed this case under a different regime, under the *Babcock* and *Wilcox* regime, which the Board overturned last week. But I'll just -- I'll highlight, I think, what we said in the letter that we sent to Your Honor to alert the Court that we were going to mention this new decision, the *Amazon* decision.

The *Amazon* case -- in that case, the Board does recognize what we've been arguing all along. These sorts of meetings were actually protected under the Act up until last Wednesday. And that --

THE COURT:  In *Wilcox*?

MR. KILLIAN:  In -- yes, *Babcock* and *Wilcox* is the name of the decision. They were actually -- that is why the Board overruled *Babcock* and *Wilcox*. It had held for 80 years that these were protected. Now they're prohibited.

So, you know, while my clients strongly disagree with last week's decision -- and we're not here to litigate that -- the point is, under *Garmon,* it doesn't really matter whether it's protected or prohibited, because, either way, a state law in that area -- regulating that conduct would be preempted. So, it is -- it is kind of black-and-white.

Now, as to machinists preemption, I'll just say,

briefly, you know, machinist is an even broader type of preemption to say that a whole area is supposed to be unregulated by state and federal law.  And, in our view, if the First Amendment applies, that inherently means that this is meant to be unregulated by state and federal law.

And I would just point out that the decision of the Board last week in the *Amazon.com* case, while the Board majority purported that its decision was not viewpoint discriminatory, in the last two paragraphs or so of its decision the Board did not engage in the sort of content-based discrimination analysis that I've been discussing with Your Honor today and that we've briefed.

According to the Board, because the National Labor Relations Act draws a line and only gives the Board power to regulate unionization, the Board said "It's not really up to us to decide whether that's a content discriminatory line."

So, in other words, we think the Board sort of kicked the First Amendment question for judicial review.

And it's pretty typical.  A lot of federal agencies don't consider whether their own decisions violate the Constitution.  Federal courts don't defer to agencies on those questions, and they're almost always brought up for the first time in judicial review.

And, so, I raise that simply to say that, even if the Board had addressed the First Amendment -- and they

clearly didn't -- at least -- that's overstating it.  They did not address the content discriminatory concerns that we raised with the Court here -- it would not be binding on Your Honor, and it wouldn't be preclusive of the First Amendment challenge that we've brought, to 31-51q.

Okay.  So, just to conclude.  Our position is that the state of Connecticut has overstepped it constitutional bounds here.  A couple years ago, not content with the 80-year rule under the National Labor Relations Act that captive-audience meetings relating to unionization were actually protected by federal law, the General Assembly decided to ban those meetings in the state of Connecticut; and yet, went even further, and banned not just those meetings, but also captive-audience meetings -- mandatory meetings in the workplace that relate to politics.

But it is not the power or the prerogative of the state of Connecticut to decide for all employers in the state and for all employees in the state that certain opinions from the employers are not appropriately discussed within the workplace.  When the state made that judgment, it went too far.

THE COURT:  They don't -- the statute doesn't ban the speech itself.  It bans disciplining an employee who chooses not to listen to the speech.  And I do think that's a distinction with a difference.

33

If I understood your argument, the idea of a mandatory meeting has baked into it the threat of discipline.

Is that fair?

MR. KILLIAN:  Absolutely.

THE COURT:  Okay.  So, if the threat of discipline arises with the mandate that there's going to be a mandatory meeting at which political matters are going to be discussed --

MR. KILLIAN:  Uh-huh.

THE COURT:  -- that's different than saying the statute precludes this --

MR. KILLIAN:  Topic.

THE COURT:  -- these statements and this speech.

Because I don't think that it can -- just in the language of the statute itself, I don't think you can say that this statute restricts speech on -- content-based.

What it may -- if there's a path to a constitutional infirmity, it's through the language in the statute that talks about the threat of discipline, as opposed to actual discipline.

Agree, disagree?

MR. KILLIAN:  I disagree with that, Your Honor.  Let me try a couple -- a couple ways.  I mean, we could look -- if you could -- with the text of the law, because it does refer specifically to speech; right?  It refers --

THE COURT:  Right.

MR. KILLIAN:  -- to meetings on political matters. It refers to communications on political matters.  And, so, the law clearly is addressing speech in some way.

What the Eleventh Circuit said when this issue came up in the *Honeyfund* case, is that this is a clever framing of an attempt by a state to regulate conduct, but to do so based on the message that the person engaging in that conduct wants to speak or has spoken -- right?  Because this meeting -- this law applies to both before and after the meeting -- is a sort of bootstrapping.  It's an attempt to use the state's power to regulate conduct, to actually regulate speech.

And, so, the law does not prohibit mandatory meetings.  I want to come back to that point because I think it's important.  The law does not tell employees, You may not threaten -- excuse me -- employers -- does not tell employers, You may not threaten your employees with discharge for skipping a mandatory meeting.  It says, You may not threaten your employees with discharge for skipping a mandatory meeting if you're going to talk about politics.

And it's that "if you're going to talk about politics" that is the attempt by the state to turn "potentially permissible conduct" regulation into a conduct-plus-speech regulation.  And as soon as that -- that tying together of conduct and speech is made, the law is

governed by the First Amendment.

And that is -- that is *RAV* v. St. Paul.  The law that was at issue there was a law against -- it wasn't just a law against cross-burning.  It was a law against -- which would be conduct -- or a law against flag-burning.  There are a lot of laws that ban burning someone's property.  But where the law says you can't burn a cross to express a racial message or you can't burn a flag to protest the Government, it's that second part that turns a permissible content regulation into -- excuse me -- a permissible conduct regulation into an impermissible content regulation.

There's another example I'd give Your Honor, too, but...

THE COURT:  Let me just ask, because there is conduct and then there's expressive conduct.

MR. KILLIAN:  Absolutely.  And we're not dealing with that here.  This is not a situation of --

THE COURT:  But isn't burning a cross expressive conduct?

MR. KILLIAN:  I don't think that's the way the Supreme Court looked at it in *RAV*.  Right?

THE COURT:  That was actually my next question, and I'll have to go back and re-read it.

MR. KILLIAN:  Yeah.

THE COURT:  Was it viewed as expressive conduct --

36

MR. KILLIAN:  The answer is --

THE COURT:  -- because that changes the analysis.

MR. KILLIAN:  I think the answer is sometimes. Right?  Flag-burning, I think, is a clearer example of this. Right?  Often, people will burn a flag because they believe that's the appropriate way to dispose of a flag.  However, some people burn a flag because they want to protest an action by a Government, and it's their way of expressing -- so the same conduct, but the motive of the actor is what transforms just an ordinary burning of your flag in the back yard because it's been ragged and destroyed by the weather -- nonexpressive conduct -- burning the flag on the street in front of the state House -- expressive conduct.

So, it's not that we're dealing -- this is not an expressive conduct case.  We're not saying that the conduct of calling a meeting is somehow expressive.  This is not a dancing case, where we're questioning -- or a "who's baking a cake" expressive conduct.  That's not this case.

This is a case about discipline, which is not expressive conduct, but discipline regulated only when you engage in expression -- not conduct -- expression that the state has determined to be unfit for the workplace.

And that's why I come back to *RAV* and *Reed v.* City -- excuse me -- *Town of Gilbert*, not City of Gilbert, where there was an action regulated, but only for people who were

engaged in expressive conduct.

Another example from *RAV*, Your Honor -- and if I'm -- at the risk of belaboring the point, because this --

THE COURT:  Well, I clearly have to re-read it.

MR. KILLIAN:  The Supreme Court addressed this in connection with threats against the President.  It's one of the examples that Justice Scalia gave in that decision, where a law can ban all threats of violence against the President. That's clearly protected and would be constitutional.

What the Federal Government can't do is ban threats against the President by people who disagree with him on policy matters or by people who have given speeches that are opposed to the President.  Because if you limit the law only to that, only this permissible regulation of conduct, but do so only when a person has engaged in expression somewhere else, that the Government thinks is unfavorable expression, that's what triggers the First Amendment.

It's a bootstrapping and attempt, a sort of "sneak door" attempt to get at the speech that the state doesn't like by leveraging its power over conduct.

So, we don't dispute that the state can regulate employer-employee relations at large.  But that's not what 31-51q is.  Because the text of the law says "politics" -- only when you talk about politics do you give up these rights.

38

THE COURT:  Okay.  Thank you.

MR. KILLIAN:  Thank you.

THE COURT:  Thank you.

Attorney Holzman.

MR. HOLZMAN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. HOLZMAN:  All right.  I will just start off with standing, if that's okay with the Court.

So, basically, Your Honor, this law was passed, became effective more than two years ago now -- 2022.  Pretty much 15 minutes after it became effective, there were what seemed like every single trade association under the sun all rushed into court in order to challenge it.

It's never been enforced, never threatened to be enforced.  It's not even really a statute that the state primarily does enforce.  What it really is, is a cause of action that individual employees can bring.

We can impose a $300 penalty.  That hasn't come about in the 40-some-year history of the entire statute itself, and we now have two years on the books where it hasn't come up with this provision, either.

In any event, we're not at the pleading stage anymore, like we were last year.  We now know the conduct that CBIA claims that it is chilled from engaging in.  And as it turns out, they -- all that they want to do is tell their

employees "These are the things that we are advocating for, These are the policy positions that we are taking."

There -- there just is not any possible reading of this law that would give you a reasonable basis for believing that that speech is unlawful. There just isn't. It clearly isn't.

First of all, it doesn't protect speech -- or, excuse me -- it doesn't prohibit or restrict speech at all. It only prohibits the separately identifiable acts of retaliating against people who refuse to listen, or threatening to do so.

CBIA doesn't claim that it is chilled or deterred from doing any of that, and it's actually never even had occasion to be chilled from doing any of that because, as it's said in its deposition, it's never had an employee refuse to show up at one of its meetings.

And, I mean, let's be -- I mean, it's never going to happen. Because if you take a job at CBIA that's involved in political advocacy, you're not going to not show up at a meeting about what it's advocating for. I mean, that would be very strange behavior, in our view.

So, CBIA is never going to have an occasion where it's going to have an employee that refuses to attend and it's going to say, well, you know, maybe we -- maybe we're deterred from -- you know, we want to discipline that

40

employee, but we're deterred by this law from doing that.

I mean, that's not an imminent injury, Your Honor. I mean, that is exactly what the Supreme Court has said in *Clapper*.  The decision from this -- just this year, in the FDA -- with respect to mifepristone -- that you can't just sensor yourself and injure yourself and then claim standing based on this events that are probably never going to happen in the future.  You need some concrete belief that that's going to happen imminently, in order to justify chilling yourself now.

And this is the exact opposite.  Because we have -- you know, it's this whole theory of, well, you know, maybe an employee will refuse to attend in the future.

It's never happened before.  It probably never will happen, based on this record.  So, that's exactly the kind of, you know, unfettered decision-making of third parties that cuts off any chain of events that makes any future injury imminent.

So, that's all that we have here.

THE COURT:  If I understood the argument correctly, it's not that they're being chilled from disciplining their employees for doing something they've never done and likely never will do, but they're being chilled from including in their meetings political speech.

MR. HOLZMAN:  Well, that's their claim.  But in

order for that to be a legitimate Article III injury, they have to show that that speech is actually, or at least arguably, prohibited by this law.  And you just cannot read this law as making that speech unlawful, for a number of reasons.

Number one, it doesn't prohibit speech at all.  It clearly doesn't.  It prohibits threats and discipline and discharge, but not the speech.

And you asked a couple questions about the threats, Your Honor, and the idea that, you know, maybe calling a meeting mandatory in some circumstances -- you know, next week's meeting is going to be mandatory -- maybe that could qualify as a threat.

We don't think that's the case, Your Honor.  We actually think CBIA is pretty good example of why that may not be the case in all circumstances, because they've had a couple employees who failed to show up in the past, but they said they basically just -- you know, they kind of had these verbal conversations with them and told them to come next time, or something to that effect.

I mean, none of that's discipline.  So, we don't think just calling a meeting mandatory is a threat of discipline.  But even if it were, even if you could make an argument that that would be the case, it's not even relevant to whether CBIA has standing here because they're not chilled

from doing that.  They're still doing it.

They say in their summary judgment affidavit, we call them mandatory in, you know, our employee onboarding orientation process.  You know, we've got this telecommunicating policy that mentions attendance in-person.  But they don't say they altered those policies or changed any.  They're still doing that.

So, the only thing that they've changed is what they're talking about at the meetings.  And they have no reason to do that.  None.

So, the speech that they're saying gives them an injury is not even arguably protected -- or, excuse me -- prohibited.

I have *Garmon* on my mind, so I'll get to that in a minute.

But even if they could get around the hurdle of, you know, "maybe our speech is arguably prohibited by the law," that's not enough for a standing.  You still have to show a credible threat of enforcement if you do engage in that conduct.

And, here, not only have they not shown anything that would create any such threat, there's zero threat -- zero -- because we have a sworn declaration from DOL saying, essentially, this law would never be enforced against CBIA for talking about what it wants to do or what it's doing as a

business, because that conduct is a thousand miles from anything that would be prohibited by this law.

First of all, again, it doesn't prohibit speeches. Second, CBIA fits pretty squarely within that exception of -- in subsection (c)(2) for businesses that are not -- you know, they're not -- they're engaged in the -- you know, the business of political advocacy. That's what they do. That is their business.

This isn't a situation where you have a business that is, you know, providing some good or service that wants to, you know, indoctrinate its employees with its political views that don't have anything to do with the business but are really just the employer's personal opinions.

That's what this law was about. But, clearly, this is not that. I mean, and DOL views that exception in (c)(2) as applying pretty straightforwardly to what CBIA says it's afraid to do in this case.

THE COURT: They draw a distinction between their employees, given the language in the statute itself. And I'll -- I don't know what graphic designers do and whether need to know what CBIA is advocating for or not -- and that -- the answer to that might be in these exhibits.

But say you have an employer who is a lobbying group, and they've got 25 employees, and one way -- one decision they make, as a cost-saving measure, is they're not

going to subcontract somebody to come clean their offices. They're going to just hire that person to come in every day to clean their offices.

They still have the exception, if they make the cleaning lady come to the meeting?

MR. HOLZMAN:  Well, a couple things, Your Honor. So, you started off by saying you don't know what the graphic designer does at CBIA.  We don't know either, because they didn't tell.  I mean, all that they said is the graphic designer isn't directly involved in political advocacy, but that doesn't mean there aren't some functions that would be impacted by hearing about what CBIA is doing as an organization.

I mean, are they involved with members?  Do they have other duties other than graphic design, or anything like that?

But in terms of your hypothetical, no, I don't think it would apply to that person either, because, again, as DOL has explained in its sworn declaration, they take a broad interpretation of that exception as covering businesses, generally, that are involved, as a business as -- their core mission in, you know, political advocacy -- like CBIA; like a political campaign, for example.

That type of thing is just clearly not what prompted the General Assembly to pass this law, and it's not what it's

concerned with, so it's never going to be enforced in that circumstance.

CBIA is an easier case here, because their speech -- again, it's not even arguably prohibited, and we don't know, you know, who this graphic designer is or whether they have other duties or anything like that.  It's their burden to establish standing at the summary judgment phase.  Not our burden to disprove it.

And they didn't say -- tell us really anything about their graphic designer that would establish, you know, that their duties wouldn't be in some way impacted.

But, in any case, there's no credible threat of enforcement.  There's zero threat of enforcement.  It's never going to be enforced against CBIA.  And the thing we mention in our briefs, that I want to emphasize again here, is this declaration from DOL you would think carriers particular weight with CBIA because they deal with DOL all the time.

I mean, if they have questions -- and this is all in the record.  If they have questions about how a law should be interpreted or how DOL enforces it, they just reach out and ask, and DOL gives an answer, and they're fine with that answer.

So, I don't understand the basis now, when you have, you know -- not even like an unsworn response, but an actual formal, sworn-under-oath declaration "This will never be

enforced against you," there's no basis for them to say, Oh well, maybe it still will be.

I mean, that, you know, -- so, it's their burden to show credible threat of enforcement.  If anything, we've proven quite the opposite.

And Attorney Killian mentioned some cases in a Vermont right-to-life case, and the *Picard* case, which were -there was some language, from the Second Circuit, about how, under the circumstances of those cases, the state's representations about how a law would be enforced, it didn't ultimately carry the day.

Those cases are nothing like this case.  Those cases involved, sort of, you know, informal argument from lawyers in the briefs.

We don't have informal lawyer -- you know, arguments from us.  This is a sworn statement from the agency itself, and it's under oath.  And we cite numerous cases that have relied upon, you know, sworn affidavits in finding no credible of threat of enforcement.

The *Greenberg* decision from the Third Circuit is a very recent one that has a pretty -- what we think is a pretty thorough discussion of that.

THE COURT:  Let me ask you:  If I agree with you at the end of the day that CBIA has not established credible threat and there's no standing.  There has been no -- well,

let me ask you:  What's the outcome if I make that determination?

MR. HOLZMAN:  The entire case is dismissed.

THE COURT:  Okay.

MR. HOLZMAN:  The other organizations have conceded that they don't have standing in associational capacities. They haven't put forward any evidence establishing any members that would individually have standing, so we think the whole case should be dismissed.

If I can -- if the Court has any more questions on standing, I could just go to the First Amendment.

THE COURT:  Let me check my notes.

(Pause.)

THE COURT:  No, I do not.

MR. HOLZMAN:  Okay.  So, with respect to the First Amendment, Your Honor, I want to start off by, I think -- so, we don't think that there's any application of this law that would even restrict speech at all or that would limit speech at all.  But there's a pretty straightforward basis for rejecting CBIA's facial First Amendment claim here, which is -- and you were mentioning this in Attorney Killian's argument -- the state employer application.

This is a facial challenge.  They made the decision, when we were arguing about discovery, to waive overbreadth. That decision has consequences.  Usually, in a facial

48

challenge in free speech cases, you could win either by showing that there are no circumstances in which it's constitutional -- the usual *Solerno* standard -- or, in free speech cases, that it's unconstitutional in a substantial number of applications.

They waived that.  They may have some buyer's remorse about that now that we're in the *Solerno* land and there's clearly a State employer application that, even under their theories, wouldn't be unconstitutional.  But that disposes of their whole facial challenge, in our view.

And Attorney Killian made this point well, that overbreadth really doesn't apply here because they weren't claiming that the statute was constitutional as to CBIA.

We think that's a red herring, Your Honor. Overbreadth, it's not really -- it's not really a claim, per se.  I mean, you can maybe refer to it as that colloquially. But what it really is, is a legal standard that applies to facial challenges, and it dictates what you need to show in order to prevail.

One situation where it would come in handy would be if it was constitutional as applied to you, but was unconstitutional as applied to other people.  You could still show, well, it's unconstitutional in a substantial number of applications, so the whole law should be struck down.

Another situation where it might come in handy would

be if you were claiming, well, even though it's unconstitutional as applied to me and unconstitutional as applied to others, there are some people out there where it would be constitutionally applied.

That would be an overbreadth issue, too. And that seems to be what CBIA is trying to invoke here: Well, we're claiming it's unconstitutional as to us and all private organizations, but -- you know, but not unconstitutional as to State employers.

They've waived that theory, because they waived overbreadth.

The only reason why you don't have to meet *Salerno* in the First Amendment context is because of the overbreadth doctrine, which is no longer part of this case because they made the decision to waive it. So, in our view, the state employer application is fully dispositive of the First Amendment issue.

Setting that aside. The First Amendment doesn't apply at all here because this is only a restriction on conduct. That's all that it restricts. And in the *Fair (phonetic)* decision, the Supreme Court was pretty clear that a law restricts conduct rather than speech if it regulates what you can do, as opposed to what you can or cannot say.

Employers can say whatever they want about politics or religion. They can have whatever meetings that they want.

50

The only thing they cannot engage in is the separate and distinct conduct of disciplining or discharging or threatening employees who refuse to show up.

So, it's not a limitation on the circumstances in which employers can speak about these things at all. It's a limitation on the circumstances in which employers can engage in that conduct.

THE COURT: So, let me ask you something.

MR. HOLZMAN: Yeah.

THE COURT: There wouldn't be -- there wouldn't be any need for the statute to talk about religion and politics at all unless impacting speech on religion and politics was part of the purpose of the statute.

MR. HOLZMAN: No, I don't think so, Your Honor. So, first of all, on the speech/conduct distinction, all that you look at is what the law actually does. I don't think any purpose even comes into it. It's just what is restricted, number one. But number --

THE COURT: But the Courts have said -- it's kind of like a "wolf in sheep's clothing" kind of argument; that on its face it's regulating conduct, but in its impact it's restricting speech. And that's the argument that's being advanced here, and it's sort of the area where the two of you have really briefed past each other, where the defense does not sort of explore those circumstances where conduct and

speech regulation appear to get a little "murky," I'll say.

MR. HOLZMAN:  So, a couple things on that.  And I do think that we addressed this in our main brief, Your Honor, particularly at the end where we talk about direct restrictions on speech versus incidental ones.

The Supreme Court has always been clear that the state can restrict conduct, even if that conduct may have some incidental unforeseen impact on whether people are going to speak about certain things.  I mean, that's not a restriction.

THE COURT:  I think that's always true.  I think that's always true.

MR. HOLZMAN:  Exactly.  That's the point.  Because then every restriction on conduct, you can make an argument, Well, since I can't do this, it's not as worth it for me to talk about this, so this is a "free speech" issue and we got to get into all the scrutiny and all that type of stuff.

They've always rejected that approach.  So, what you have to do is show an actual direct burden on what you can say.  And they can't make that showing here.  All of the cases that they cite involve situations where there was a direct restriction on the circumstances in which you could lawfully speak and what you could say.

None of that is true here.  I mean, restricting discipline and discharge for refusing to listen to speech is

52

not a restriction on the speech itself.  They don't have any authority that goes the other way on that.

And what the Supreme Court has said, and what other cases have said, including the *Honeyfund* decision, which they cite a lot -- the only reason it came out the other way was because that law actually did prohibit speech, but -- which is that the state can restrict conduct so long as it is "separately identifiable from the protected speech," to use the words in the Supreme Court decision in *Cohen.*

And that's exactly what this is.  So, you have a meeting.  You have an employer [*sic*] refuse to show up or attend, and then you make the decision to discipline or discharge that employee.  So, the protected speech is separated by an intervening event -- namely, an employee not showing up -- and then the restriction on what you can do to that employee is triggered.

And even if you look at the specific prohibition on threats.  So, we -- because you were talking about that with Attorney Killian.  So, first of all, that's one application of this law.  It would not justify the facial relief that CBIA is seeking here.

Number two, even if you have a threat of discipline for not attending next week's meeting -- for example, if you don't show up at next week's meeting, you're going to get fired -- that is not a restriction on the speech at that

meeting, because that violation is already complete as soon as that threat is made. Even if the meeting, for whatever reason, never even took place, you still would have violated that law as soon as you make the threat.

And we think on that point, the Second Circuit's decision in the *Gormley* case, which we cited in our main brief, is on point. And that involved a challenge to a law that prohibited making phone calls with the intent to harass.

And what the Second Circuit said there, and what other circuits have said, too, is that's a restriction on conduct -- the act of making the phone call with the intent to harass. And that violation is complete as soon as you do the conduct, even if you don't even have a subsequent conversation -- so, even if they don't pick up the phone, for example.

So, it's not a restriction on speech. It's a restriction on separately identifiable conduct, which is what this is.

And there are a couple of other good examples that we cite, Your Honor. I mean, the -- I'll probably butcher the name, but *Wollschlaeger* case from the Eleventh -- I think it's the Eleventh Circuit, and the *City of Philadelphia* case from the Third Circuit. Both involved -- I mean, if you look at *Wollschlaeger,* that was a couple provisions. One prohibited medical providers from asking patients about, you

know, whether they have firearms at home and they're kind of "Second Amendment-protected" activities.  That was a restriction on speech because it prohibited what they could say and what they could ask.

Another provision, which prohibited them from treating patients differently if they were gun owners, that was a restriction on conduct.  That was separate and distinct from whatever speech may have taken place.  So, it wasn't a First Amendment issue.

Same thing in *City of Philadelphia.*  You had a law that prohibited employers from asking job applicants what -- you know, what wages did you -- what did you used to make in your former job?  That was a restriction on speech because it prohibited what they could ask.

But another provision, which prohibited them from relying on that wage history during negotiations and when setting a salary, that was a restriction on conduct, the act of relying on the information that you get from the speech.  So, it was separate and distinct from any speech restriction.  Not a First Amendment problem.

So, that's the "conduct versus speech" issue, Your Honor.  I mean, I think before you even get to any level of scrutiny, there are a number of sort of threshold problems other than "conduct versus speech" that defeat the plaintiffs' claim here.  One is that this law prohibits what

the First Amendment just doesn't protect at all.  You have a right to speak your opinions about politics and religion and other things.  You have a right to persuade others to agree with those opinions.

You do not have a right to force those opinions on unwilling listeners against their will.  There is a clear distinction between those two categories.  Because when you start forcing speech on unwilling listeners against their will, that implicates those unwilling listeners' competing rights to be left alone, which the Supreme Court talks about in *Rowan*, in *Hill*, and a number of other cases.  It comes from the common law.  And that right to be left alone has to be put on the scales with the right of speakers to communicate.

And that's all that our law does.  I mean, all that it says is if an employee refuses to participate in these political and religious discussions at work -- which they already could do, I mean, there's no -- you know, there's nothing in the Constitution that requires people to engage with speech they don't want to engage in.  All that our law says is employers have to respect that decision by not disciplining or firing them.  That's all that it says.

That's not a First Amendment-protected activity.

Independent of that is this captive-audience rationale.  And Attorney Killian made the point that it's

limited to the home.  It isn't.  It's -- the *Erznozkik* decision makes very clear that it applies outside the home. It applies to speech that intrudes on the privacy of the home or under circumstances in which it would be impractical for the unwilling listener to get away from it -- in other words, when they're captive.

I mean, the second category applies pretty squarely here.  I mean, if you're an employee -- obviously, people are extraordinarily dependent on their jobs for all kinds of reasons -- if you are sat down and said "You have to listen to this speech unless you are -- otherwise, you're fired," I mean, that employee is captive.

There's no credible argument that it is, you know, practical for that employee to just say, "Oh, well, you know, I'd just rather risk bankruptcy and financial ruin, so not to listen to this speech."

That's not how it works.  That employee is captive, and so the state has a legitimate interest in stepping in and protecting those unwilling listeners from that conduct.  And, so, that's what we have here.

I want to talk about the *RAV* decision.  Attorney Killian talked about that a lot.  That was a case where -- first of all, it wasn't a restriction on conduct that became a restriction on speech because the state was out there making judgments about certain speech.

That -- it may have been -- I actually have to confess I don't recall the specific facts of the case. But my recollection is that that particular plaintiff -- what that plaintiff may have been up to was the cross-burning stuff, but the law that he was challenging directly prohibited communications that would probably all qualify as unprotected fighting words.

But the problem was that the state in that case just got in there and made judgments of its own about which types of fighting words it thought were most offensive, like those based on race, religion, et cetera. And that was a problem because there wasn't any objective basis for making that distinction, so that's why that law got struck down.

This case isn't anything like that for a couple reasons. Number one, we're not restricting speech at all. All we're saying is that employers have to respect employees' decisions not to listen to speech. So, the one that's getting out of the speech or not engaging with it is the employee. They're making that decision for themselves. The State isn't in there making value judgments. The employee is. All that the law says is you have to respect that decision.

*Rowan* is a much more comparable situation than *RAV* for that reason, because that was a law that the Supreme Court upheld that said that when homeowners object to future

mailings from certain mailers that in the past they had sent them stuff that they thought was, you know, lewd or inappropriate, they had the right to say "no more mailings to my house," and the mailers had to respect that.

The Supreme Court upheld that because, again, when you decide for yourself not to engage with certain speech, you have that right.  And the First Amendment doesn't give you -- doesn't give mailers or anybody else the right to stick their foot in the door and get the mail in there against your will.  And, so, that's -- that's a more comparable situation than Rav -- or *R-A-V*, I should say.

The other reason *RAV* is different is what I mentioned before, was the state in that case was basically making value judgments of its own:  "We think these types of fighting words are more offensive."  It wasn't connected with any objective criteria.

That was not the case in the *Virginia v. Black* decision.  That was a case that prohibited cross-burning because it was speech that had a tendency to intimidate.  But it didn't prohibit other kinds of speech that had a tendency to intimidate.  It was just that one subclass that was -- that triggered, you know, special prohibitions.

That was okay.  That was not a *RAV* problem because there were objective reasons for the state to believe that that particular type of speech was especially likely to cause

intimidation, given the history of cross-burning and all that type of stuff. And, so, that wasn't a *RAV* problem because it wasn't an example of the state just making its own value judgments about what's more offensive and what isn't. That was a case where there was objective criteria that gave the state a legitimate reason to do it.

Here, same thing. Like *Virginia v. Black*. Coercing somebody to listen to speech that -- you know, against their will. That may be harmful in a number of different circumstances, but it is especially harmful under circumstances in which they're being forced to participate in political and religious activities, because political and religious activities are connected with what I think everybody would agree with are protected constitutional rights of those employees to engage in political and religious activities of their own. So, that's an objective criteria right there, like in *Virginia v. Black*.

I mean, those things are protected by the Constitution. The plaintiffs argue in their briefs -- and they are obviously right about this -- that political speech is at the heart of what the First Amendment protects. Same with religious activities. So, this is much more like *Virginia v. Black* than the *RAV* decision.

In any event, it doesn't -- that doesn't -- that still doesn't deal with the threshold problem that I

mentioned before, that this only restricts speech and not -- excuse me -- that it only restricts conduct and not speech.

This is a situation -- this would involve a situation where the Court finds that it imposes some direct restriction on speech, but -- and then kind of has to get beyond that. But we don't even get to this "*RAV/Virginia v. Black*" discussion because we're not even in First Amendment world when we have a restriction on conduct.

Actually, if I could make one other point on that, Your Honor.

If the plaintiffs had wanted to, they could have argued that this restriction on conduct is subject to some lower level of First Amendment scrutiny under the *O'Brien* standard. And that standard says that when you have a law that prohibits conduct, you know, it's subject to an intermediate scrutiny only if that conduct is inherently expressive or it's intertwined with some expressive-related components to it.

They did not argue that here, so they have waived an "expressive conduct" claim. Their claim is the even more extreme one, which is that this is a restriction on pure speech. And I do not see any basis for coming to that conclusion.

In the *Slattery* decision, the Second Circuit rejected the argument that a prohibition on discipline and

61

discharge was even expressive conduct.  So, certainly, it can't be pure speech.

So -- and unless the Court has any questions, I can go on to preemption.  Actually, before I do that, I do just want to clarify one other point about strict scrutiny.

We are not arguing that the state has a compelling interest in protecting people from speech they don't like.  That's not our argument.  That's not what the harm is.  The harm is in coercing people to listen to that speech against their will.  That's the harm.

We saw what that can mean for a lot of people.  If you look at some of the legislative history, and the testimony that some of these workers who were on the receiving end of this type of conduct, what they described to the General Assembly, and it's not great.  I mean, that is harmful conduct, and it stems from the act of holding people captive, not what they're saying in the actual meetings and whether they like it or not.  That's not the issue.

The issue is, you don't want to have to deal with this political/religious stuff, it doesn't have to do with your job, but we're going to force you to do it anyway because you work for us and we can.  You know, We don't need you, but you need us, so we're going to do this.  We're going to do it tomorrow, too, and the next day after that, for hours if we want, or for every 45 minutes -- like the NLRB

was just discussing in the *Amazon* decision.

That's the harm.  It's not in that they don't like the speech at the meeting.  That's not the issue.

So, with respect to preemption, Your Honor, I'll start with *Garmon*.  So, there's two sides of it, as you were discussing with Attorney Killian.  There is argument that the act regulates conduct that's arguably protected by the NLRA, which was always their theory throughout this case, or that it regulates conduct that's arguably prohibited.

On the "arguably protected" side of it, we don't think that argument had any basis at all before or after the NLRB decision in *Amazon* because the provision that they rely on, Section 8(c), all that it protects is the right to engage in noncoercive union speech.

I won't belabor the point anymore, but that's not what our law prohibits.  It prohibits separate and distinct conduct, not the speech.  Now that we have the *Amazon* decision, that forecloses any argument that the NLRA -- or that Section 8(c) protects anything other than that speech.  If anything, it suggests that the speech is illegal, it's unlawful.  So any argument that there's an "arguably protected" preemption issue under *Garmon* is foreclosed by *Amazon*.

On to the "arguably prohibited" side of it.  We don't think that that issue is even before the Court.

Because the only time that the plaintiffs have ever mentioned the idea that this conduct is already arguably prohibited, they've argued the exact opposite.  I mean, they cited the NLRB counsel's memorandum, but then, in the next breath, say it was completely wrong for about five or six different reasons.

So, they can't be heard to seek injunctive relief on a theory of preemption that they've never adopted and, if anything, have disclaimed throughout this case.  So, number one.

Number two, is the conduct prohibited by this law arguably prohibited by the NLRA?  You can make an argument that some applications of this would involve conduct that overlap a little bit with what the *Amazon* case said was arguably prohibited.  But, in totality, it's not arguably prohibited.  It deals with stuff that have nothing -- you know, stuff that have nothing to do with unionization or what the NLRB was discussing.

I mean, firing people for not showing up to meetings about religious matters, I mean, that has nothing to do with NLRB preemption -- excuse me, NLRA preemption.

But even if it did, even if it were the case that all of the conduct prohibited by the Act were already arguably prohibited by the NLRB -- excuse me -- by the NLRA, it still wouldn't be a *Garmon* preemption issue because then

you have to get into the second requirement which asks, Would adjudicating the case in the state court under state law, would that interfere with the primary jurisdiction of the NLRB?

Here, it clearly would not.  The reason being, that the issues that the state court would have to decide are just different from what the NLRB decides.

In *Amazon*, in determining whether something is an unfair labor practice, the NLRB decided that, you know, some of that conduct, it was unlawful because it had a tendency to interfere with their ability to engage in rights protected by Section 7, like whether to seek unionization or whether to participate in these meetings and things like that.

Those issues, none of that would even be relevant for a proceeding in the state court.  The state court would just ask some pretty simple questions:  Did you discipline and discharge or threaten somebody for refusing to show up at a meeting and was -- did you do that for an unlawful purpose; namely, on account of their refusal to attend, as opposed to some other reason, like they were a bad employee, or whatever?

THE COURT:  Wouldn't you also have to ask the question:  And did you discuss politics or religion at the meeting for which the person was being disciplined?

MR. HOLZMAN:  So, that would go into the question of

whether they were fired or disciplined for an unlawful purpose.  The unlawful purpose is on account of refusal to attend a meeting or listen to a speech, the primary purpose of which is political or religious matters.

THE COURT:  Okay.

MR. HOLZMAN:  Because, again, it wouldn't be a *Garmon* preemption issue because the NLRB wouldn't be getting into any of that.  They would be asking different questions.

You may have cases where it comes out as a violation the same way, but for different reasons.  And, so, if a state court were to hear one of these cases, it would be deciding issues that are distinct from the issues that the NLRB would be having to decide.  So, it's not a *Garmon* preemption problem.

On machinists, we think the Second Circuit's decision in -- from earlier this year, in the *Restaurant Law Center* case, we think that forecloses the plaintiffs' argument here.  I mean, it says pretty clearly that -- that the NLRA was never intended to abrogate the broad authority that states have under their police powers to pass laws that establish minimum labor standards designed to protect workers from what legislators believe is harmful.

That was the law -- in *Restaurant Law Center*, that was a law that prohibited certain employers from firing workers without just cause or without a legitimate economic

reason.  That was done to protect those workers from the vulnerable state that they were in without those protections.  That was something that was a generally applicable law.  It applied to all employers, all employees, whether you unionized or not.

All of that is true of this law, as well.  It's a minimum labor standard.  It governs all aspects of the employer-employee relationship, whether you're unionized or not, what industry you're in or not -- all employers, the state included.  So, it's a clear example of a minimum labor standard law that's generally applicable, and that is well within the state's police powers, especially under circumstances like this one, when you consider the harmful harassing conduct, which is what motivated this law to be passed in the first place.

So, this was always about protecting workers' basic dignity and protecting them from harm, protecting them from having their own First Amendment political and religious activities and leadings interfered with by their employer.  And that's a pretty -- what we think is a pretty classic example of a minimum labor standards law, Your Honor.

And I think that's all I have, unless the Court has any questions.

THE COURT:  Give me one second.

(Pause.)

THE COURT: I don't think so. Thank you.

MR. HOLZMAN: Okay. Thank you, Your Honor.

THE COURT: Attorney Killian, do you wish to respond?

MR. KILLIAN: I do, Your Honor, thank you. I'll respond to some of Mr. Holzman's points.

First, Your Honor, I'll address standing remedy, which is a question you addressed with Mr. Holzman.

They're cross motions for summary judgment as to CBIA. And, so, we believe we've put forth evidence that demonstrates standing, and they haven't reputed it factually.

But you also asked a question about the other plaintiffs in this case. And through two of the orders that Your Honor entered in this case -- and we addressed these in Footnote 1 of our reply brief -- the associational issues have simply been parked. We have not taken discovery on associational issues, and that's why we didn't put them forth in the summary judgment motion.

In our view, if the Court believes that CBIA's standing is not sufficiently proven, then we are back at it on the question of whether the other plaintiffs have demonstrated associational standing. And that stems from some of the conversation we had a year-and-a-half ago regarding the cause of action for associational standing.

According --

THE COURT:  This will -- may be go a little bit far afield, and it is testing my memory.

At the "motion to dismiss" stage, one of the issues, if I remember correctly, was whether or not the plaintiffs were willing to identify a member, which the defense believed that they were required to do -- and I think that that's an issue on which the Second Circuit has since spoken; is it not?

MR. KILLIAN:  The issue is whether we needed to plead the identity of a member, not whether we were willing to identify the member.  Because it was just a judgment -- or a motion to dismiss on the pleadings.

And, so, but the bigger issue, Your Honor, was the *Ex Parte Young* question, and whether, because associations under Second Circuit precedent can't bring a claim under Section 1983, whether our associational plaintiffs could bring a cause of action under *Ex Parte Young.*  And that was the basis on which associational standing would need to be proved.

And, so, in Your Honor's ruling, you said you would park the *Ex Parte Young* issues to be revisited, if necessary.  And then in a subsequent discovery ruling, the Court said that -- this is Order 84 -- "Discovery as to the nonCBIA plaintiffs' associational standing may be permitted at a later time."

And, so, those issues have simply been saved for later.

So, I simply just say that if the Court thinks that CBIA's standing is not sufficiently proven, that does not require a judgment for the state; but, instead, puts us back to discovery and then another round of summary judgment briefing in the future on associational standing.

THE COURT:  Okay.

MR. KILLIAN:  Okay.  Now, as the Article III standing, I think the fundamental problem with Mr. Holzman's argument is that he misses the standard that applies under Article III.  The question -- the standard, from the Second Circuit in the *Vitagliano* case, is whether there is an arguable basis.  It's arguable for everything.

Is discipline, is a reprimand -- which is what we've done in the past -- is that discipline under the statute?  Is calling a mandatory meeting discipline under the statute?

The question is whether it's simply arguable.  The question, under the (c)(2) exemption for graphic designers, it's not "Are they exempt?"  It's "Are they 'arguably' covered by the law?"

Mr. Holzman has speculated today that graphic designers might need to know about CBIA's policy positions in order to do their job.  But Mr. DiPentima testified, under oath, that they do not.  And that is why, unfortunately --

well, not "unfortunately" -- fortunately for us, his speculative argument does not carry the day for Article III purposes.

Mr. Holzman also discussed the cases of *Picard* and *Vermont Right to Life*.

THE COURT:  Let me -- let me -- before you move on to that, I guess I'll ask you to just -- and I know that you covered this.  I didn't read the argument -- I didn't hear the argument as necessarily implicating the arguable strength of the plaintiffs' position as I did that, on this record, there is zero credible threat of enforcement against CBIA. And they're related, but they're not the same.

MR. KILLIAN:  They're highly related, in fact, though, because the "arguable" goes -- "arguably proscribed," right, goes to whether there's an injury.  The disavowal by Mr. Wydra is sort of a -- they use that as a mocking attempt to cut off that injury and say, Here's a nonprosecution promise.

Notwithstanding -- but, and I guess this is the way maybe I should take it, Your Honor, is to say that the cases -- and this is where I was going to go -- *Picard* and *Right to Life* -- *Vermont Right to Life* committee -- in those cases, the reason the Second Circuit rejected the disavowals by the state was not because, as Mr. Holzman told you, because it was an informal argument made by lawyers.  It was because

those disavowals were not consistent with the statutory texts.  They weren't even arguably consistent with the statutory text.

He mentioned a case from the Third Circuit that he thinks is particularly noteworthy.  That was a case about someone who wanted to provide a CLE, and the question was whether that CLE would have violated an ethics rule.  The Third Circuit said it wasn't even debatable that that CLE would violate the -- the ethics rule; and, therefore, the nonprosecution promise was consistent with the only plausible reading of the statute.

And, so, I do think the "credible threat of enforcement" point ultimately gets us back to what is arguable under the statute.  If the state flies in the face of the text of the law, and says "Well, we still won't prosecute you for that anyway," that's not the kind of credible threat, because it doesn't apply -- excuse me -- that doesn't eliminate the credible threat.

THE COURT:  But you're a political activist organization.

MR. KILLIAN:  Absolutely.  And for many of our employees, they do need to know everything that CBIA is talking about.  But not all of the employees.  And as we discussed, the exemption itself is targeted to the employee. It's not targeted to the organization.  It's whether such

employees need that information to do their job.

And we have facts to support that.  They only have speculation on the other side.

THE COURT:  Well, you have indicated that your graphic designers don't need to know what you're doing politically.  I guess I have no way to test that assertion.

MR. KILLIAN:  I think --

THE COURT:  Do I, at this stage, accept that assertion as sufficient --

MR. KILLIAN:  Yes.

THE COURT:  -- to challenge the state, basically taking the position that CBIA is not subject to this -- this is a very odd situation, Attorney Killian.

I mean, you're each arguing the position that I would ordinarily expect the other side to be arguing in the context of this statute.  And I get why you're making the argument you're making, because you want to get to the constitutionality of its --

MR. KILLIAN:  And that's why they're making the opposite argument; right?  So, that's why we're having opposite --

THE COURT:  So, this is not --

MR. KILLIAN:  -- in this case.

THE COURT:  -- lost on me.  But...

MR. KILLIAN:  But yes, Your Honor, we think it's a

question of fact, that really is a question of fact, and the ordinary summary judgment rules apply here.

We have come forward with under-oath, sworn testimony from the president of the organization that his graphic designers do not need to know this information to do their job for him -- or for the this organization.  And at summary judgment, when the -- when one side has competent evidence and the other side has just speculation, it's no contest at summary judgment.  We've carried our burden, and the Court can accept that.

THE COURT:  Okay.

MR. KILLIAN:  Okay.  As to the standard of review that applies here, Mr. Holzman went through the argument that -- that he claims we've waived the overbreadth challenge.  I will reiterate a point that I made previously, but with a direct quote from the Second Circuit, because I think it demonstrates exactly the error in Mr. Holzman's argument.

When he -- he asked us, "Did you bring an overbreadth challenge," and we said this was not an overbreadth case -- this is the Second Circuit's verbatim definition of an overbreadth claim:

"A party alleging overbreadth claims that, although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical

third parties if applied to them."

This is not a "gotcha."  We have been consistent from the very beginning of this case that the law violates the First Amendment rights of my clients.  We -- so, when he said "Did you bring an overbreadth claim," and we said, "No," it's because it wasn't an overbreadth claim.  Case -- case in point.  That's --

THE COURT:  But I think the point that the defense was making is, that if you're not making an overbreadth claim you're making a facial challenge, the standard for a facial challenge as opposed to -- that the standard for a facial challenge does ask the question of whether or not there are scenarios under which the laws not violate the First Amendment.  And they have said --

MR. KILLIAN:  Because the application to the state --

THE COURT:  Yes.

MR. KILLIAN:  -- as employers.  The one scenario that they've come up with on the other side.

THE COURT:  Right.

MR. KILLIAN:  And -- yeah, but Mr. Holzman's argument is you don't even have to get there, Your Honor, because we've waived that whole inquiry together.  And, so, I'm saying, no, we have absolutely not waived that inquiry.

We are at the question of whether this law has a

substantial number of unconstitutional applications or, in fact, all of its applications are unconstitutional. That is not waived. That's step one.

And then we get to the question: Have we demonstrated that either the law is unconstitutional in all of its applications or in a substantial number of those applications? And we believe, for the reasons I discussed before, that we have done that. When the only application -- the only application, that they claim where the law is not unconstitutional, is when it applies to the state itself.

*Honeyfund* dealt with that. The state doesn't have First Amendment rights. And on any kind of balancing, I think the Court would be very safe in saying that a substantial number of applications are unconstitutional, because the one application to the state is not substantial.

THE COURT: Okay.

MR. KILLIAN: Okay. A couple more points, Your Honor, and then I'll wrap up.

THE COURT: Sure.

MR. KILLIAN: Mr. Holzman, of course, spends a lot of time today talking about the speech/conduct distinction. And if his theory is correct that this is, in fact, purely a regulation of conduct and has no connection to speech, whatsoever, then 31-51q could be written differently. It could say an employer -- that a meeting about -- ah, I didn't

bring the text up with me.

That an employer cannot threaten to discipline or actually discipline an employee for refusing to attend a meeting where the employer is critical of the governor of Connecticut.  Because that would be just conduct; right?

And, so, the fact that the viewpoint expressed is clearly a viewpoint, on his view you don't even get over the hurdle because it's just conduct.

Well, 31-51q doesn't call out viewpoints specifically.  It calls out content.  But that -- that doesn't -- that's not a distinction with a real difference here.  Just because you're calling conduct, but then tying it, welding it, to some sort of speech activity, makes it a type of bootstrapping that the First Amendment prohibits.

The Eleventh Circuit dealt with this in the *Honeyfund* case, where this exact argument was raised at page 1279, the Court, addressing Florida's argument, says --

THE COURT:  Well, *Honeyfund* was much more like the hypothetical you just identified.

MR. KILLIAN:  It was viewpoint, absolutely.  But my point, Your Honor, is that if it doesn't regulate speech, then you don't -- you never -- Your Honor would never ask the question, Is it viewpoint or content, because it's just conduct, right, on their view?  What I'm trying to say is that it clearly regulates speech and conduct together.  It

regulates conduct only when certain speech is engaged in.

And the viewpoint example, I think, is just to highlight all the things the state could do, if, in fact, this only regulated conduct.  It could put any -- it could take the Florida code, put it in there and say "You're not allowed to threaten employees with discipline for skipping a meeting where you provide all these viewpoints."

The very things that the Eleventh Circuit said were unconstitutional.  And I'd also point out that the Eleventh Circuit, from the very first page of the decision, characterized the law at issue as dealing with required meetings and mandatory meetings.

Yes, the state was targeting viewpoints that it disliked, but it was targeting those viewpoints in connection with required meetings and mandatory meetings.  The law did not prohibit those voluntary meetings.  It didn't do so by using words "discharge" or "discipline" like 31-51q.  The way the Florida law operated is it made it -- it made it a violation of law to have these meetings be a condition of employment, which is another way of saying "a requirement for the employees."

So, written differently, there are an infinite number of ways to write these laws that target mandatory meetings on topics that a state doesn't like.  Florida and Connecticut wrote their laws a little bit differently, but

they are essentially the same thing, targeting a mandatory meeting on topics or viewpoints that the state views as its unfavored topics.

Mr. Holzman identified an argument he's raised before, that 31-51q would be violated merely upon making a threat; right? "You have to come to this meeting next week where we're going to talk about politics." Then he says, But if the meeting's canceled, you still violate the law.

True. But the only reason you did is because, when you made the threat, the meeting -- the threat was in connection with a future meeting, an intent to have a speech that was prohibited by the law.

So, whether you discipline afterwards, where the speech has already taken place, or whether you threaten to discipline *ex ante*, it's not that an employer is prohibited from threatening employees to come to mandatory meetings. You have to have that mandatory meeting be about politics. So, at the moment you make that threat, you are communicating to the employee "Here is what the meeting is going to be about," and that's the problem. That's the problem.

So, the law still focuses on the subject of the speech. At the *ex ante* phase, it focuses on the speech that the employer wants to give. At the *ex post* phase, it focuses on the speech that the employer has given. But, either way, it is the employer's speech that is welded to his ability to

discharge an employee.

On "captive-audience," Mr. Holzman talked about the workplace as an environment, as an area where people feel captive.  So, too, a funeral for your loved one who has died; and yet, in the *Snyder v. Phelps* case, the Supreme Court did not apply the rationale in that sphere.  But more importantly than that, Your Honor, is the fact that it's the content-discriminatory basis that renders their captive-audience reasoning ultimately unsuccessful.

The state has made a decision that political meetings, meetings about unionization, meetings about governors, meetings about new laws, are more offensive than other meetings.  And that is the essential First Amendment problem here.  The captive-audience rationale does not countenance content-based discrimination.

He talked about the *Rowan* case, R-o-w-a-n case, which was a mail case -- sorry, let me be more specific -- a case about delivery of mail to someone who wanted to opt-out. Content neutral.  It didn't apply only to certain subject matters that the United States Government thought was offensive.  An individual can say "I don't want mail from that recipient anymore."  It's content-neutral in the law itself.

Okay.  Lastly, turning to preemption.  Mr. Holzman tries to argue that our *Garmon* argument is waived.  Your

Honor, it is undisputable what the law was until last Wednesday, and we made our preemption argument under the law as it existed until last Wednesday. We never disclaimed that we were making a variation.

Let me be specific. The law was that these meetings were protected, and we argued as if the meetings were protected. However, with foresight, in Footnote 5 of our opening brief we did acknowledge, because the general counsel of the National Labor Relations Board had made her decision -- her opinion very clear on what she wanted the Board to do here, we did acknowledge that the same reasoning would apply if ultimately the Board accepted her view, as they did last Wednesday.

I don't know what else we could have done to predict a change in the law. We have not, certainly, waived an argument based on the fact that now captive-audience meetings are arguably prohibited, when a week ago they were arguably protected.

And I'd also point out that in the Second Circuit -- I could cite Your Honor a couple cases, because I only found these in response to the letter that Mr. Holzman sent on Friday. The Second Circuit does allow parties to raise arguments based on intervening changes in the law, and I'll cite two for the Court. I'm not going to be able to pronounce all these names correctly. One is *Kaputskiy v.*

*Keisler*, 251 F.App'x 65, at 67, Footnote 2.

And the language there, the Court says:  It could not have been expected to raise arguments regarding this change in the law before the change had occurred.

And then the other case I'll cite is *Pescatore v. PanAm*, 97 F.3d 1, at page 8.  And there the Second Circuit noted that "an intervening change in controlling law is a well-known basis for issuing -- granting a motion for reconsideration."

So, even if Your Honor had ruled before last Wednesday's decision, an intervening change in the law, such as the *Amazon* decision, would provide us a basis for seeking a motion for reconsideration.  We don't have to reach that point because Your Honor hasn't ruled yet.  The motion is briefed.  But our adaptation of our argument, in light of an intervening change in the law, is fully allowed under the rules, particularly when we did our best to predict it earlier in this case.

THE COURT:  I mean, the cases -- the prior cases -- the cases that were overruled and *Amazon*, they seem to me to be sort of two sides of the same coin when it comes to the *Garmon* issue.  Yes, no?

MR. KILLIAN:  I think that's right.  *Garmon* says states may not regulate what is protected or prohibited.  It used to be protected, now it's --

82

THE COURT:  Now it's prohibited.

MR. KILLIAN:  -- prohibited, so it's the same side.

Different pads that get you ultimately to the conclusion of *Garmon* preemption.

And I think I just want to conclude, Your Honor, with a couple final points on the decision last week and how it relates to Section 31-51q.

Mr. Holzman explained to you that, in a case under the National Labor Relations Act, the Board would not have to consider, necessarily, the same factors as a state court considering a case brought by the defendants to enforce Section 31-51q.  And his point was that 31-51q is boarder than just unionization.  It covers a whole range of political matters, not just unionization.

But *Garmon* preemption applies where the conduct covered is the same.  It doesn't have to be perfectly co-extensive.  The state, here, wrote the word the decision whether to join or support a labor union into the law itself.  So, it's clear that the law has that as at least one of the triggers.  And that one trigger, only that one trigger, is covered by the *Amazon* case from last week.

We would agree that if an employer in the state of Connecticut had a meeting about who to support for governor, that that doesn't trigger *Garmon* preemption.  *Garmon* preemption is only about the meetings as they relate to

unionization.

Where that takes us is, if, once the Court identifies, sees, that there is at least a preemption issue as to the unionization topic, that gets us to a final question about, Well, what's left of 31-51q, a severability analysis of sorts.  In other words, does the Court simply enjoin enforcement of 31-51q as to the unionization topic, which would minimally solve the -- or which would solve the preemption problem?  Or, applying the state of Connecticut's rules of severability, do you enjoin the entirety of the law?

And we didn't discuss that earlier.  We briefed it.  We've argued for the more expansive relief.  But even the narrower relief would be available to the Court in that situation.

And so, yes, there are parts of 31-51q that are not preempted -- clearly not preempted, but because -- the most important part of 31-51q is preempted.  And because, once you strip that from the law, based on the legislative history and based on everything that went into it, it's clear that the Assembly would not have enacted 31-51q but for the effort to go after unionization speech.  There's really no reason that the Court would save the rest of the law, and thus our conclusion that the entirety should be enjoined on preemption grounds.

But it's through that extra step that we hadn't

addressed today that we get there, not through some hocus-pocus.

And the last point I'll raise is that Mr. Holzman raises the -- what's known as the "local law exemption" for *Garmon* preemption.  That's not 31-51q.  And the Supreme Court has acknowledged that it's dealing with rules like property destruction laws and, you know, ordinary incidents of the state government that in some rare circumstances happen to overlap with an issue that is covered by the National Labor Relations Act.

31-51q was enacted two years ago, and it specifically texturally covers union-related speech.  This is not a historical local exemption subject to the state's police powers where *Garmon* preemption would not apply.

THE COURT:  Okay.

MR. KILLIAN:  That's all I have, Your Honor.

THE COURT:  All right.  Thank you.

Attorney Holzman, do you wish to respond to that?

MR. HOLZMAN:  Thank you.  Briefly, Your Honor.  Just a couple of things.

So, on standing, I don't really want to get bogged down in the graphic designer issue.  I don't think it really matters that much, because -- so there are two requirements they need to meet to show that their decision to chill their speech was objectively reasonable, which is what they have to

85

show.

One is that their speech is arguably prohibited. It's just, clearly, not. There's no reading of this statute that would prohibit that speech. That's dispositive. The second reason why it -- even if they were to fire somebody for not showing up, even if they were to actually do that -- and they've never done that and probably won't have occasion to do that -- that's when the second reason it's not arguably prohibited would come into play, which is this exception.

And they had to present evidence about that graphic designer's duties and functions and what distinguishes the political discussions at the meetings from anything that that person would need to perform their duties. They haven't done that, other than just say they're not involved in political advocacy. So, that's not enough.

Even if they can show -- even if we're wrong about all of that, even if they can show that their speech is arguably prohibited, they still wouldn't have standing because there's zero threat of enforcement. There's no credible threat of enforcement. That's an independent requirement.

That Third Circuit case, *Greenberg*, that we were both talking about, that relied on a sworn declaration, saying this would never be enforced against that conduct because we don't think it comes anywhere near violating the

statute. And that was enough to deprive them of any credible threat of enforcement -- so, no standing.

There was also the issue of whether the conduct was arguably prohibited, and the Court concluded that it was not. But the "credible-threat declaration disavowal" issue was an independent reason for finding no standing. So, the fact that we have DOL saying "Have your meetings, Have your speech," I mean, "It doesn't matter, You're not violating this law," that's a completely independent reason for finding that they don't have standing, apart from if you could somehow read the statute as making it unlawful to prohibit that speech.

So, on the "speech conduct" issue, the one thing I just wanted to respond to was Attorney Killian gave a hypothetical about, "Well, what if you substitute in, you know, a situation where the law says, you know, well, you can't fire somebody for not showing up to a meeting that's critical of the Governor," or something, I think was the hypothetical.

I mean, that's not this. I mean, that's a case where the state would be basically imposing its own viewpoint on employers. I mean, that's not what this is. This is a generally applicable law which says that if you're going to engage with political/religious activities in the workplace, you can do that, but you just can't fire people if they don't

87

want to participate and it's unrelated to their jobs.

And we have all kinds of laws on the books that generally regulate the circumstances in which employers can fire or discipline people, because it's harmful if they were able to do that and if they did do that.

This just adds one more thing to the bucket.  If you're going to engage with politics or religion in the workplace, have at it, but that's not a permissible basis for firing.  So, that's conduct and not speech.

And, again, if they wanted to argue a inherently expressive conduct claim, they could have at least argued it.  But they've waived it.  They haven't argued that.  They're arguing that it's purely speech.

So, that's the question that this Court has to answer, is:  Is a restriction on discipline and discharge for not showing up, is that pure speech?  And it just isn't.

There was a citation to the *Snyder v. Phelps* decision, which rejected application of the captive-audience doctrine to a case where they attempted to apply it to a funeral.  There were, you know, kind of protests taking place near the funeral.  That has nothing to do with the "home/outside-of-the-home" distinction.  That was not the reason the Supreme Court said it didn't apply.  They did not say "This does not apply because this is taking place at a funeral where other people are."  That's not what it said.

The reason the Court gave was simply because from where the people were located in the funeral they couldn't really see the speech.  They could see only the tops of picket signs and hats.  It wasn't a situation where they were captive.

So, it didn't have to do with the location of where it was taking place.  It was just a simple case where they weren't captive.  Here, employees clearly are captive when an employer sits them down and says, "If you don't participate in this, you're going to get fired."  They're clearly captive under that scenario.

So, on -- actually, I do want to make a point about there may be a Pullman issue in this case, Your Honor.  If we're arguing about what a state statute means and how it should be interpreted.  If this Court seriously believes that this law makes it unlawful to hold mandatory meetings, which is what the plaintiffs are essentially suggesting, that's a question that would have to be answered by the state court before this Court could proceed any further with addressing any constitutional issues that may arise from that.

We don't think Pullman abstention is necessary here, and actually think it would be inappropriate, because it's only appropriate when the statute is clear and unambig -- or, is ambiguous.  But, here, it's clear and unambiguous.  It does not say what the plaintiffs are suggesting.  It only

prohibits conduct.

But if there's any question in the Court's mind about the ambiguity of it or whether it reaches speech or something else, that's an abstention question that the state courts would have to answer.

With respect to *Garmon*.  Attorney Killian cited a couple cases -- I haven't reviewed those cases -- about preserving arguments when there's been an intervening change in the law.  I don't know what those cases say because I have not read them, but what I do want to emphasize is this is not a case where a plaintiff has simply failed to raise an argument and then a case comes out and they say "Oh, I guess this is an argument, maybe now we can raise it."

This is a case where they argued the exact opposite of what they are arguing now, which is that there was no -- which is that this is protected conduct and that any suggestion in that NLRB memo that it was prohibited is just clearly wrong, contrary to precedent.  That was always their position in this case, and we think they should be held to that.

THE COURT:  But isn't this a *Garmon* issue, not so much -- it didn't really depend on the answer as much as it contemplates being within the scope of the NLRA?  I mean, whether it's protected or prohibited, I understand that law has changed.  But for purposes of *Garmon* analysis, I'm not

sure it really moves the needle.  Does it?

MR. HOLZMAN:  So, it does move the needle here, but there are other circumstances where it wouldn't.  And what I mean by that is, if you look at the *Sears* decision from the Supreme Court, for example, that involved a case where a, you know, cause of action was brought in state court for trespass and they said "Well, it could be arguably prohibited and also arguably protected, so we've got to address both sides of it."

But that's only because the state court had a cause of action in front of it and it was figuring out whether it even had subject matter jurisdiction to hear the case.  Because when you're in a state court, preemption goes to whether the state court even has subject matter jurisdiction to hear it.  So, if they -- if an employee had brought a cause of action under the Act, to Connecticut Superior Court, and had claimed a violation of it, an employer there could raise this preemption issue and say "Superior Court, you don't have subject matter jurisdiction to even hear this case."

In fact, even if they didn't raise that question, the Superior Court would be obligated to raise it and consider both sides on its own because it goes to subject matter jurisdiction.

But this isn't that.  I mean, we have a -- this is a

lawsuit here, seeking injunctive relief to strike down a statute, that the plaintiffs brought themselves in federal court.  They're not responding to a lawsuit in state court.  So, this is totally different from that.

So, I think that would be a situation where the distinction between "arguably prohibited/protected" doesn't really matter when you're in state court and it goes to jurisdiction.  But it matters here because they decided to come into court and try to strike it down.  And if they're going to do that, they can't rely on a theory that they've disclaimed throughout the entire case.

So, that's our position on that.

And, so, on the *Garmon* analysis about whether it's arguably prohibited.  Even if it is the case that the conduct is arguably prohibited -- and it's not all arguably prohibited by the NLRA; some of it doesn't have anything to do with labor -- unionization stuff, so you still have to look at what the state court would have to decide in order to determine whether it violated the state law, and then ask the question:  Are those issues the same as what the NLRB would have to decide?

That's a separate and distinct requirement from whether or not the conduct is --

THE COURT:  Arguably prohibited.

MR. HOLZMAN:  -- arguably prohibited.  And that's

the *Sears* decision.  That was a case where you had a claim that, you know, in state court, that there was picketing, but it was trespass.

And they said "Well, it's already arguably prohibited by the NLRA," and the Supreme Court said "That's true, it is arguably prohibited, depending on the purpose of it, but it is not a *Garmon* preemption issue."  Because under the NLRA you look at what is the purpose of the picketing -- is it for labor unionization-related objectives or something else? -- whereas, in the state court you just look at the location -- Is it on my property, against my will?  If it is, it's trespass.

So, the identity of issues wasn't present in that situation.

And unless the Court has questions, I think I will conclude there.

THE COURT:  I do not.

MR. HOLZMAN:  Okay.  Thanks.

THE COURT:  Thank you.

MR. KILLIAN:  May I make one last point, Your Honor? One last point, Your Honor.

THE COURT:  You may, but the clock is ticking.

MR. KILLIAN:  I just want to address the last point Mr. Holzman raised about identity of issues with reference to the Board's decision last week.

I believe the issues would be identical in a proceeding before the Board and before the state of Connecticut. Paragraph 1 of the Board's decision, the Board says what violates -- according to the *Amazon* decision -- what violates the National Labor Relations Act:

"...compelling its employees, on pain of discipline or discharge, to attend a meeting during which it expresses its views concerning unionization."

I'll also point the Court to page 9, the slip opinion from the Board. The Board identifies what does not violate the Act:

"Thus, we specify straightforward steps that employers may take to avoid violating Section 8(a)(1) when they wish to hold such a meeting, including by informing employees, in advance, of the subject matter and the voluntary nature of the meeting."

In other words, the very issues, what triggers for national -- unfair labor practice under the National Labor Relations Act, are the exact issues that 31-51q puts at issue.

Thank you.

THE COURT: Thank you.

THE COURT: All right. Well, I obviously have my work cut out for me.

Thank you again, Counsel. The briefing was

94

excellent, the presentations were excellent -- as was the case last time -- and I will, hopefully, get something out to you in a reasonably expeditious fashion, recognizing that that is a very relative term.

All right.  We're in recess.

(Proceedings conclude, 12:09 p.m.)


C E R T I F I C A T E

RE: *Chamber of Commerce of the United States of America, et al. v. Bartolomeo, et al.*

Civil No. 3:22-cv-01373-KAD

Motion Hearing
November 18, 2024

I, Tracy L. Gow, RPR, Official Court Reporter for the United States District Court, District of Connecticut, do hereby certify that the foregoing pages, 1 through 94, are a true and accurate transcription of my shorthand notes taken in the aforementioned matter, to the best of my skill and ability.


                        /s/   TRACY L. GOW
                        Official Court Reporter
                        U.S. District Court
                        915 Lafayette Boulevard, Room 216
                        Bridgeport, Connecticut 06604
                        (203) 910-0323